## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., MICHAEL DZIURGOT, individually and as the representatives of a class of similarly-situated persons, | ) ) ) ) ) | Civil Action No.: 1:24cv20755 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) ) | |
| ALEBRIJE ENTERTAINMENT LLC, CRAIG COLE, MATTHEW COLE, GUSTAVO MONTAUDON, and John Does 1-10, | ) ) ) ) ) | |
| Defendant. | | |

## CLASS ACTION COMPLAINT

Plaintiffs, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., and MICHAEL DZIURGOT (collectively "Plaintiffs"), on behalf of a class of similarly situated individuals, by and through her undersigned attorneys, complains against Defendants, ALEBRIJE ENTERTAINMENT LLC, Craig Cole, Matthew Cole, Gustavo Montaudon, and John Does 1-10 (collectively "Defendants"), as follows:

## PRELIMINARY STATEMENT

1.     1inMM Capital, LLC ("1inMM") was a billion dollar Ponzi Scheme that only resulted in on criminal indictment despite the fact that that many individuals assisted in and profited from the scheme besides Zachary Horwitz ("Horwitz").

2.     Craig Cole was advertised as the right-hand man of convicted fraudster Horwitz and, when convenient to Craig Cole, he held himself out as the co-founder and owner of Horwitz's 1inMM.

3.     The manner 1inMM allegedly generated revenue included, but was not limited to,

the following: (i) receiving a percentage of the gross receipts that HBO generated from exploiting film rights; (ii) retaining a portion of the profit margin from Netflix-specific transactions; (iii) following the repayment of notes used to finance the acquisition of content rights and the expiration of initial 3-year sublicensing period with platforms such as HBO and Netflix, Horwitz would retain rights to the same content for an additional period of years, thereby enabling Horwitz to continue licensing the content to other parties for Horwitz's sole financial benefit.

4.     One of Craig Cole's roles with 1inMM was to promote 1inMM to potential investors.

5.     By far the most valuable of Craig Cole's potential investors turned out to be his friend Ryan Spiegel, and his father Jeffrey Spiegel, an accountant turned wannabe broker, who together formed SAC Advisory Group, LLC ("SAC") which raised $75,132,950 for 1inMM from innocent investors including Plaintiffs.

6.     The majority of 1inMM's investment came via JJMT Capital, LLC in Chicago, Illinois.

7.     The 1inMM Ponzi scheme wouldn't have been funded but for Craig Cole, Matthew Cole, Julio Hallivis ("Hallivis"), Gustavo Montaudon,  and ALEBRIJE ENTERTAINMENT LLC propping up 1inMM in order to create the network of investors in the scheme and create some air of legitimacy.

8.     Horwitz is serving twenty years in prison for operating the 1inMM Ponzi Scheme and his closest associates including Defendants must be held accountable in civil actions for the hundreds of millions in losses. (Horwitz Plea Attached hereto as Exhibit "A").

## **PARTIES**

9.     Plaintiff, AVR GROUP, LLC, is a Nevada limited liability company whose only member is a citizen of California and domiciled in California.

10.     Plaintiff, TRIDENT ASSET MANAGEMENT, INC., is a California Corporation with its principal place of business in California.

11.     Plaintiff, MICHAEL DZIURGOT, is an individual and citizen of Illinois and domiciled in Cook County Illinois.

12.     Defendant, ALEBRIJE ENTERTAINMENT LLC ("ALEBRIJE"), is incorporated in Miami-Dade County Florida and in good standing and owned by Gustavo Montaudon.

13.     Defendant, Gustavo Montaudon ("Montaudon" or "Gustavo"), is an individual and citizen of Florida and domiciled in Broward County Florida.

14.     Defendant, Craig Cole ("Craig"), is an individual and citizen of Bend, Oregon and domiciled in Oregon.

15.     Defendant, Matthew Cole ("Matthew"), is an individual and citizen of Idaho and domiciled in Ada County Idaho.

16.     Plaintiffs do not know the true names of JOHN DOES 1 through 10 and, therefore, is suing these Defendants by fictitious names. Plaintiffs will amend this Complaint to set forth the true names of the John Doe Defendants when Plaintiffs learn more about them.

## **JURISDICTION**

17.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d).

18.     This is a class action. Members of the proposed Class are citizens of states different from states Defendants are located in.

19.     Aggregate claims of individual Class Members exceed $50,000,000, exclusive of interest and costs.

20.     This Court has personal jurisdiction over Defendants because Defendants transacted business within this judicial district, made contacts within this judicial district, and/or

have committed tortious acts within this judicial district.

**VENUE**

21.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

22.     A substantial part of the events or omissions giving rise to these claims occurred in this district.

23.     All of Defendants' relevant business, including the formulation and execution of the unlawful practices alleged herein, occurred in or emanated from Florida, where ALEBRIJE and Montaudon, did business with the remaining Defendants and Horwitz prior to the 1inMM Ponzi Scheme imploding. Thus, Florida has significant contacts and/or a significant aggregation of contacts to the claims asserted by Plaintiffs and Class Members.

24.     Florida has a materially greater interest than any other State in enforcing the rights and remedies granted to consumers under the Florida laws invoked in this Complaint. These rights and remedies further strong fundamental public policies of the State of Florida.

**FACTS COMMON TO ALL COUNTS**

**A.     The Relationship between Craig and Horwitz**

25.     Craig and Horwitz are longtime business associates and close personal friends. Upon information and belief, the two corresponded extensively via text and email at all times relevant.

26.     In 2012, shortly after Horwitz relocated to California from Indiana, Craig and Horwitz formed a business together called Hyped Productions, LLC which operated from the same address as 1inMM.

27.     1inMM operated out of 3129 S. La Cienega Blvd, Los Angeles, California, 90016.

28.     Alebrije formed a partnership with 1inMM to create One Key Entertainment, LLC ("ONE KEY ENTERTAINMENT") which was incorporated on February 1, 2013 in Florida

4

though it operated at 3129 S. La Cienega Blvd, Los Angeles, California, 90016.[1] (Attached hereto as Exhibit _ is ONE KEY ENTERTAINMENT, LLC - Articles of Organization attached hereto as Exhibit "B").

29.    In 2015, Craig and Horwitz founded Doppler App LLC. (Doppler App LLC – Statement of Information attached hereto as Exhibit "C")

30.    Craig and Horwitz comingled funds from Doppler App LLC with funds with 1inMM.

31.    Craig was intimately familiar with Horwitz and his business acumen, or lack thereof, after at least one failed venture with him.

32.    Craig's father, Matthew, was 1inMM's first significant investor, providing 1inMM $100,000 on October 15, 2013.

33.    But for Matthew providing Craig's employer, 1inMM, this $100,000, 1inMM would never have been able to start the Ponzi Scheme.

34.    In 2014 Horwitz devised a new venture, this time an imaginary one, and invited his close associate Craig to help him run it.

35.    Craig used the email address craig@1inmmcapital.com when performing work on behalf of 1inMM.

36.    Horwitz needed Craig's help expanding the network of investors for his Ponzi Scheme beyond just his own wealthy college buddies.

37.    Horwitz offered Craig a percentage of any investments he brought which, as discussed below, ultimately yielded Craig and his father, Matthew, millions of dollars.

---

[1] https://variety.com/2013/film/markets-festivals/sxsw-1inmm-alebrije-team-to-form-one-key-entertainment-1200005507/ (accessed January 24, 2024).

38.     Craig dove into the 1inMM venture headfirst and earned commissions by securing investments for 1inMM.

39.     Even though Craig didn't own any part of 1inMM, Craig held himself out as a co-owner and co-founder of 1inMM until Horwitz's arrest.



(1inMM Disclosure attached hereto as Exhibit "D" at 7).

40.     Craig made these misrepresentations in order to reel in more investors.

41.     Craig was a prolific fundraiser for Horwitz and is personally accountable for over $85,000,000 in investment into the criminal scheme.

42.     Craig disseminated forged banking records for 1inMM, the company which he held himself out as a founder, to induce investments. (December 12, 2019 Email from Craig attached hereto as Exhibit "E")

43.    Craig and Horwitz would provide investors and aggregators with periodic updates regarding payouts for investors based on their respective investments into the Distribution Agreements.

44.    On September 30, 2019, Craig sent an email to investors providing information on active deals. (September 30, 2019 Email from Craig attached hereto as Exhibit "F").

45.    The deals described by Craig were all illusory as 1inMM had no investments.

46.    None of Craig's periodic updates were real.

47.    Craig did nothing to verify the information he was disseminating to 1inMM's victims.

48.    For example, on July 14, 2020, after 1inMM stopped paying back investors, Craig informed SAC that:

7/14/20, 6:48 PM

Long form is being reviewed by another attorney at our firm as our main guy is in the hospital on "paternity leave" this week. Smh hence the MIA. I am sure as soon as baby and mom are healthy - he will reach out and hop back in. - No red flag that we know of from a deal point perspective.... language changes, clauses that we don't want in there etc but nothing unexpected as of yet. Great so far.

Heard from HBO and they are having "COVID related issues" as it pertains to getting approval from everyone they need to have eyes on this - so still dealing with that but been approved by many.

According to Gustavo - it's an absolute shitshow in Miami so I'm sure people are sick etc.

But, train is moving

**B.    The Relationship between Horwitz, Craig, Montaudon and Hallivis**

49.    Hallivis worked directly and in-person with Horwitz.

50.    1inMM told investors Hallivis was a Principal with the following roles:

7

**JULIO HALLIVIS**
*PRINCIPAL*

Julio is responsible for bookkeeping, content acquisition, foreign sales agent relations and head of our Latin America distribution arm. Julio has an unprecedented knowledge of film production that allows him to have the ability of spotting projects at an early stage with the potential to become extremely profitable prior to being shopped at a film market. With these tools, Julio works closely with foreign sales agents to pinpoint projects for acquisition prior to them going on the market and eliminating the chance of a higher acquisition cost. Additionally, Julio has strong roots within the Latin American film landscape that allows 1inMM Capital to get inside access into an extremely difficult territory to capitalize. Julio is a credited commercial and film producer working with brands such as Porsche, Audi and Volkswagen prior to getting into film distribution.

(2015 1inMM Capital Annual Report attached hereto as Exhibit "G")

51.     Hallivis met with perspective 1inMM investors and gave information to them to induce investments into 1inMM.

52.     Hallivis and Horwitz co-founded (a) Curvature Travel, LLC, (b) Chroma Travel LLC, (c) Sunday to Sunday Travel, LLC, (d) Don't Look Back Travel LLC, and (e) This Is It Travel LLC.

53.     Montaudon is a relative of Hallivis.

54.     Montaudon owns ALEBRIJE.

55.     Montaudon has owned ALEBRIJE since prior to 2015.

56.     ALEBRIJE claims it has "nearly 20 years [experience] in the industry, Alebrije []
stands as one of the leading and most promising independent distributors of Latin America."[2]

57.     Craig, Hallivis and Montaudon represented themselves as Principals of 1inMM.
(Exhibits "F" and "G").

58.     ALEBRIJE represents itself as a Leading Latin America Distribution Company and
Strategic Partner of 1inMM. *Id.*

59.     In addition to its office in Florida, ALEBRIJE claims to have an office located on
the fourth floor of 8560 W Sunset Blvd, Los Angeles, CA 90069.[3]

60.     Prior to the Ponzi Scheme imploding, 1inMM also claimed to have an office located
on the fourth floor of 8560 W Sunset Blvd, Los Angeles, CA 90069.

61.     Craig described Gustavo Montaudon as "the OG LatAm connect" to investors[4]:

62.     On March 9, 2020, Craig forwarded an email to investors stating in part:

---

[2] https://www.alebrije.tv/about-us/ - accessed on February 27, 2024.
[3] https://www.alebrije.tv/contact/ - accessed on February 27, 2024.
[4] "OG" is shorthand for "original gangster" and "LatAm" is shorthand for Latin America.

-------- Original Message --------
Subject: HBOLA Update
From: <lvacanti@hbo.com> <lvacanti@hbo.com>
Date: Mon, March 09, 2020 3:40 pm
To: "Zach Horwitz" <zach@1inmm.com>
Cc: "gustavom@alebrije.tv<gustavom@alebrije.tv>,
<lperaza@hbo.com> <lperaza@hbo.com>,
<cristina.marquez@hbo.com> <cristina.marquez@hbo.com>,
<rhernandez@hbo.com><rhernandez@hbo.com>,
<rrios@hbo.com><rrios@hbo.com>,
"vanessa.cruz@hbo.com" <vanessa.cruz@hbo.com>

Good Afternoon -

Hope this email finds you well. As promised, please find the
initial outline of proposed terms for all past, current and
future licensed content. As we continue to assimilate the next
chapter of our enterprise, it is essential that our processes fall
in line across the board. We understand that some of these
modifications to our previous relationship may require
discussion and we will do our best to work side by side until
both parties feel comfortable and confident moving forward.

Please review the below modifications and we will be following
up with a condensed (content specific) proposal for
films/shows/etc that have been licensed in CY 2019 and
currently in the market. This proposal will outline advance
payments, profit participation payments and profit
participation accounting statements for 2020/2021.

We look forward to our future.

Respectfully,

HBO Latin America

63.     Craig did nothing to verify that the statements he was sending to investors were accurate regarding their investments nor that this email is even real.

64.     On January 5, 2021, Craig identified Emilio Rubio ("Rubio"), a Miami-based HBO Executive, to investors as involved in the deal as well:

https://todotvnews.com/en/emilio-rubio-to-step-down-as-ceo-of-hbo-latin-america/

Wow

Have u guys been in talks with him?  That might be reason for slow response?



Approved the deal

Not in talks but was final seal of approval

From old email

Remaining process of getting the deal/doc approved, signed and payment remitted?
- The real players involved that will need to approve: Emilio Rubio (HBOLatAm) / David Torkington (HBOLatAm) - Doesn't give a shit about the deal but just need to say yes for payment to be cleared / Whit Richardson (Warner Media) / Gerhard Zeiler (Warner Media)

Well even if he is leaving, shouldn't impact them remitting payments from a previously approved deal

Nope

Well keep me posted tomorrow

Will do man

65.    Craig informed investors about Luis Vacanti ("Vacanti"), a Miami-based HBO Executive, numerous times including recounting an alleged conversation between Vacanti and Horwitz:

1/12/21, 5:23 PM

Alrighty just spoke to Zach. Lawyer had call w Luis - tried to pull the "internal delays" card and Our guy told him that if he doesn't have the authority to release the money because someone "internally" isn't allowing him to do so than he's wasting his time and He will simply go around him.

Apparently Luis got all "huffy" and they went at it a bit.

End of the day - Lawyer gave Luis until Thurs EOB to confirm release of first 50% minimum or he would be contacting the legal department of Warner Media, HBO and their outside counsel. Then 1inMM would be pursuing the reimbursement of legal fees for the runaround.

The Thursday deadline was a straight threat rather than a "you have till Thursday... okay?" - so seems like Luis just had to take it.

66.     Through their employment with HBO in Miami, Robert Rios ("Rios"), Rubio, and Vacanti, had access to materials that Horwitz and Defendants needed to keep tricking the investors into believing the 1inMM Ponzi Scheme was real.

67.     In one of Craig's texts to investors, he stated that "Rios [is] extremely involved in our deal."



68.     ALEBRIJE and Montaudon, provided necessary material support to 1inMM which prevented the Ponzi Scheme from collapsing for as long as it did.

69.     ALEBRIJE and MONTUDON were identified on multiple distribution agreements with 1inMM that were provided to investors.

70.     These documents were a reason that investors were willing to invest large sums of money into 1inMM.

**C.     Horwitz's Ponzi scheme was a monumental crime**

71.     By the time it imploded, Horwitz, a Los Angeles based actor and Indiana University alum, and his company 1inMM raised over $690 million from investors through aggregators in multiple states.

72.     On April 6, 2021, Horwitz was arrested for being the head of the 1inMM Ponzi Scheme.

73.     On September 1, 2021, Horwitz agreed to plead guilty to Securities Fraud for running the 1inMM Ponzi Scheme, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5. (Exhibit "A" at 4).

74.     His plea agreement specified:

In execution of the fraudulent scheme, defendant made offers to investors to purchase **promissory notes** issued by 1inMM Capital, which notes constituted "securities" within the meaning of the Securities Exchange Act of 1934, by making a series of false and misleading statements and by using various deceptive contrivances.  Each of these statements and contrivances was material to investors. Specifically, defendant falsely represented to investors that 1inMM Capital would purchase distribution rights to certain films, which defendant falsely claimed 1inMM Capital would then profitably license to online streaming platforms such as HBO and Netflix for further distribution in regions outside the United States.  To raise funds for 1inMM Capital's purported business activities, defendant solicited investments from the investors by offering to sell them promissory notes issued by 1inMM Capital and signed by defendant.

In furtherance of the scheme, defendant also provided investors with fraudulent copies of purported license agreements between 1inMM Capital and the sales agents for the production companies of the films identified in the promissory notes. In fact, as defendant then knew, these license agreements were fake because 1inMM Capital had not acquired the film distribution rights that constituted the purported collateral for the promissory notes and had not entered into the asserted license agreements with the identified sales agents.

(*Id.* at 9-11) (emphasis added).

75.     The promissory notes guaranteed a specified payment on a specified maturity date, typically six or twelve months in the future.  Each note listed the principal amount of money borrowed, which typically ranged from approximately $35,000 to $1.5 million, as well as the specified amount to be paid at maturity, a calculated return that ranged from 25 to 45 percent.

76.     The promissory notes issued by 1inMM to aggregators and investors had maturities ranging from three months to twenty-four months, with the vast majority of those notes coming due in either six months or twelve months. Each note provided for a specific amount to be paid at maturity, which typically equated to a profit of between 35 and 45 percent over the life of the note.

77.     Horwitz and Craig told investors that they would profit from these transactions by selling the movie rights to HBO or Netflix at a profit in excess of the profits paid to investors, and that 1inMM would retain this excess.

78.     1inMM would not have raised such a staggering amount of money without the use of the Distribution Agreements from one of the largest distribution companies in the world and the emails with prominent third-party companies.

79.     Horwitz, Craig, Hallivis and Montaudon represented that the purpose of the offering was to finance 1inMM's acquisition and licensing of distribution rights in specific movies, primarily from Latin America, to major media companies, mostly Netflix or Home Box Office ("HBO").

80.     To persuade investors to purchase the promissory notes, Horwitz and Craig made materially false and misleading statements, including that 1inMM had experience acquiring and licensing distribution rights in movies to HBO and Netflix, and that they had, in the past, used the profits from those transactions to repay investors in 1inMM's promissory notes.

81.     Defendants also claimed that HBO, Netflix, and other media corporations were 1inMM's "Strategic Partners[]." (Exhibit "G")

82.     Horwitz, Craig, and Hallivis showed investors numerous documents to substantiate purported deals with HBO and Netflix, including numerous "Distribution Agreements" that looked real. (July 2, 2019 Distribution Agreement attached hereto as Exhibit "H").

83.     ALEBRIJE and Montaudon provided the Distribution Agreements to 1inMM to use to lure investors such as Plaintiffs and the Class.

84.     One of ALEBRIJE's email addresses, alebrije@alebrije.tv, is disclosed on Distribution Agreements shared with JJMT investors that induced them to invest with 1inMM. (March 4, 2019Distribution Agreement attached hereto as Exhibit "I" at JJMT-SEC-0003916)

85.     JJMT investors were told the following about Montaudon's involvement as one of the Principals of 1inMM:

**GUSTAVO MONTAUDON**
*PRINCIPAL*

Gustavo is responsible for output deal relations with Netflix, Sony and HBO. Gustavo is a veteran in the business of distribution and acquisitions for Latin America. With over three decades of experience, his knowledge of the industry is unsurpassable. Gustavo founded Alebrije Entertainment, a leading programming distribution company for high quality products for television. This venture allowed him to negotiate multiple successful output deals with prominent companies such as Netflix, Sony Worldwide and HBO in Latin America, in addition to distributing Mexican films in the United States Hispanic video market. Prior to forming Alebrije Entertainment, Gustavo was Vice President of TV Distribution in Latin America for 20th Century Fox for 28 years, where he oversaw all sales of TV and Theatrical product in Latin America, including Video On Demand, Pay-Per-View, Free TV, Basic Cable, Internet and Syndication. Gustavo was credited for creating synergies between Fox divisions in Mexico and Latin America to launch Theatrical movies and DVD releases of movies, sequels, TV series and the licensing of products.

(Exhibit "G" at JJMT-SEC-0004845).

86.     As just one example, JJMT investors were shown the distribution agreement for the movie "Brooklyn Guns"[5] identifying ALEBRIJE as the distributor and Montaudon email address on the agreement that Montaudon signed. (IFTA International Multiple Rights Distribution Agreement attached hereto at Exhibit "J" at TC-SETTLMT-0001563).

87.     JJMT investors were shown documentation allegedly transferring the alleged ownership interest in "Brooklyn Guns" from Alebrije to ONE KEY ENTERTAINMENT to 1inMM. (*Id.* at TC-SETTLMT-0001604-05).

---

[5] "Brooklyn Guns" was also known as "First We Take Brooklyn."
https://en.wikipedia.org/wiki/First_We_Take_Brooklyn (Accessed February 26, 2024).

15

88.     Montaudon provided the "Brooklyn Guns" documents and many others like it to 1inMM so 1inMM could lure investors.

89.     Collectively JJMT investors and SAC investors made up the vast majority of the investments in 1inMM.

90.     Craig told investors that Horwitz had experience acquiring and licensing distribution rights in movies to HBO and Netflix.

91.     Craig told investors that 1inMM had experience and relationships in the media content distribution industry, that he and 1inMM had existing business relationships with HBO and Netflix, and that he could use his experience and connections to acquire and sell distribution rights in movies to Netflix and HBO for a profit.

92.     Craig knew Horwitz had no direct relationship with either HBO or Netflix regarding any of the promissory notes and nonetheless held himself out as the co-founder of 1inMM's marvelous money-making machine.

93.     Promissory notes alleging distribution on HBO were between 1inMM and "HBO Holdings, Inc." (June 1, 2019 Distribution Agreement  attached hereto as Exhibit "K").

94.     In addition to knowledge from Craig's day-to-day involvement at 1inMM, Craig was directly confronted with the fact that the promissory notes between 1inMM and HBO were fraudulent on November 18, 2019 when he and Horwitz received the following email:

> 1. One investor asked me about HBO Holdings, Inc. She said she didn't see it when she did a business search and asked for an explanation on how it is tied to Home Box Office, Inc. (Which I am assuming is HBO's main entity). Can you give me some more information on this so I can clear it up for her? Who signs on behalf of HBO Holdings, Inc?

95.     Rather than (a) coming clean and admitting to running a massive Ponzi Scheme or (b) walking away, Craig and Horwitz doubled down responding as follows on November 18, 2019:

- HBO Holdings in the Latin America/European subsidiary of Home Box Office / Time Warner (who owns HBO). The corporations are filed under "HBO LATIN AMERICA HOLDINGS LLC and HBO LATIN AMERICA ACQUISITIONS LLC) - I assume the HBO Holdings, INC would be the parent company of these subsidiaries in the same vein as HBO's holding companies in most major territories such as Europe aka HBO Europe Holdings, INC.

96.     Craig generated over $85,000,000 for the Ponzi Scheme.

97.     Craig has enjoyed his millions of dollars in finders' fees and put on a lavish wedding in August 2021 in Palm Springs shortly before Horwitz was sentenced.[6]

98.     Unlike Plaintiffs and the Class, Craig, Matthew and Montaudon did not lose money in the Ponzi Scheme.

99.     Horwitz sold himself as bringing "a wealth of knowledge, reputation, and experience[.]" (Exhibit "G" at JJMT-SEC-0004844).

100.    In 2019, Craig provided falsified bank records to falsely claim that 1inMM was engaged in legitimate business. (Exhibit "E").

101.    The bank account number identified by Craig was real. *Id.*

102.    22 of the entries purporting to show incoming payments from HBO were forged by Craig. *Id.*

103.    The last 4 of the 22 entries were marked by Craig:

```
)-30  Incoming Wire - Dom  FR HOMEBOXOFFICETM125 3977         997,162.00  191030000008123
)-30  Incoming Wire - Dom  FR HOMEBOXOFFICETM125 3971       1,003,101.00  191030000008001
)-30  Incoming Wire - Dom  FR HOMEBOXOFFICETM125 3973         998,860.00  191030000005829
)-30  Incoming Wire - Dom  FR HOMEBOXOFFICETM125 3972         995,498.00  191030000005832
```

*Id.*

104.    Craig said the following to one of the investors regarding these bank records:

---

[6] Craig Wedding Reality Show Style Video, https://www.youtube.com/watch?v=t9WAIJgW-6o (Accessed February 26, 2024).

Hey Ryan,

See attached bank statement of incoming wires from HBO. It goes without saying this is beyond confidential. We've never shared this before as everything with HBO, Netflix, etc. we hold extremely close to the chest, for good reason.

Assuming this should suffice, as you can see, a lot of deposits. There are 4 marked at the end of the doc, 3 of those are for Warning Shot, Heart Beats Loud, and Lexi. The other is one I bought personally from that set to complete it.

Then you literally have to sign the wire docs for outgoing to FSA, that should be good.

Fluffy set of available films coming next!

Cheers.

C + Z

*Id.*

105.    Craig sent this email to lull numerous investors into believing that their investments in 1inMM were real.

106.    Craig provided updates about alleged events taking place in Miami regarding Montaudon to lead investors to believe that 1inMM was not a Ponzi Scheme:

107.    Montaudon said anything to earn his finder's fee.

108.    Prior to Horwitz's arrest, Montaudon had been working with Horwitz for approximately a decade.

109.    Montaudon had publicly touted the partnership between 1inMM and Alebrije by saying "We've seen the stuff that Zach [Horwitz] and Julio [Hallivis] have done and we are pretty impressed, especially considering how new to this industry they are,…We're thrilled to enter this partnership with such a charismatic pair of creative individuals."

https://variety.com/2013/film/markets-festivals/sxsw-1inmm-alebrije-team-to-form-one-key-entertainment-1200005507/ (Accessed February 20, 2024).

110.    Montaudon's Executive Profile for 1inMM claimed he is a "[v]eteran in the business of distribution and acquisitions for Latin America. With over three decades of experience, his knowledge of the industry is unsurpassable." (Exhibit "D" at 8).

111.    Investors were also told that:

› The company was founded in early 2013 by Zach Horwitz and his partners Julio Hallivis, Gustavo Montaudon, and Javier Salgado with significant committed capital from Howard Schultz (Starbucks Chairman and CEO)

› In its current geographies, 1inMM is a top three distribution company

› Within its distribution business segment, 1inMM Productions' business model consists of purchasing the film distribution rights from Producers and selling those rights to Platforms including HBO, SONY, Netflix, Showtime, basic cable, etc.

› 1inMM's revenue model consists of earning a royalty on the revenue stream of every film it "flips" to Platforms

› For every film 1inMM distributes, it earns royalties for 15 years

› In addition to Howard Schultz, JJMT Capital is one of the sources of capital for 1inMM – thereby providing 1inMM the financial flexibility to purchase film rights from Producers

(JJMT August 2015 Pitch Overview attached hereto at Exhibit "L" at 3).

112.    Prospective investors of 1inMM were told that Montaudon's Alebrije and Horwitz's 1inMM co-founded an entity called ONE KEY ENTERTAINMENT. (Exhibit "D" at 6).

113.    The following representations were made to investors about ONE KEY ENTERTAINMENT:

a. "Co-Founded by 1inMM Productions and Alebrije Entertainment in order to capitalize and fulfill the current output deal that Alebrije Entertainment has in place with Netflix, Sony and HBO. " (*Id.* at 6).

b. "One Key Entertainment is the legal entity in which 1inMM Capital will be funding the acquisition and distribution of feature length motion pictures through Netflix, Sony and HBO." (*Id.* at 6).

c. "One Key Entertainment coassigns the rights of each film purchased from 1 inMM Capital, proceeds to 1inMM Capital, for the length of the licensing period (10-15 years)." (*Id.* at 6).

114.    Contrary to all of these representations, there were no current deals nor future deals with Netflix, Sony nor HBO involving the investors.

115.    1inMM obtained funds from aggregators and investors via promissory notes. The aggregators utilized all sorts of investment vehicles to gather funds to pay 1inMM in exchange for promissory notes.

116.    1inMM relied on the aggregators to function as its brokers, investment bankers, or underwriters to raise funds based on their reputation as trustworthy financial professionals.

117.    The aggregators were gatekeepers for Horwitz, Craig, Montaudon, and Alebrije and parroted their lies from their position as trustworthy professionals.

118.    1inMM's scheme was carefully orchestrated to put layers of confidence between Defendants and the end investors.

119.    Craig promised SAC that 1inMM would use the proceeds from each promissory note placed with investors to purchase the rights to a specific movie, to license those rights to either HBO or Netflix, and to use the profits to repay the note.

120.    The manner Craig claimed 1inMM supposedly generated revenue for itself included, but was not limited to, the following: (i) receiving a percentage of the gross receipts that HBO generated from exploiting film rights; (ii) retaining a portion of the profit margin from Netflix-specific transactions; (iii) following the repayment of notes used to finance the acquisition

of content rights and the expiration of initial 3-year sublicensing period with platforms such as HBO and Netflix, 1inMM would retain rights to the same content for an additional period of years, thereby enabling 1inMM to continue licensing the content to other parties for 1inMM's sole financial benefit.

121.    Horwitz and Craig justified the relatively short maturities for the notes by representing that the standard payment timeline – and thus the time needed to repay investors on the notes – was twelve months for Netflix and six months for HBO.

122.    1inMM did not acquire the movie rights funded by the Promissory Notes and did not sell those rights to Netflix or HBO.

123.    Horwitz raised money with five principal firms who acted as placement agents selling securities, most of whom raised funds from friends, family, and other downstream investors via investing in promissory notes used to fund individual projects offered by 1inMM (hereinafter "1inMM Offering").

124.    Hallivis, Craig, and Montaudon represented that they worked with 1inMM to SAC in one or more presentations to prospective investors. (Exhibit "D" at 7-8)

125.    SAC published an information statement to Plaintiff and other Class Members which stated, "[Ryan Spiegel] has known Craig Cole, Co-Founder of 1INMM, for over 10 years and has built a working relationship with his company.  With an opportunity to make a strong investment, [Ryan Spiegel] jumped on the opportunity to start SAC Movie Fund One, LLC and provide investors a very sizeable ROI." (March 10, 2017 SAC Confidential Information Statement attached hereto as Exhibit "M" at 6)

126.    The information statement issued by SAC went on to state: "1INMM is a California limited liability company that was formed in September, 2013.  Company was founded and is managed by Zachary Horwitz and Craig Cole. They are a foreign distributor of movie rights

focusing on the Latin America territory." (December 17, 2017 SAC Confidential Information Statement attached hereto as Exhibit "N" at 7).

127.    Craig knowingly made misrepresentations regarding 1inMM to the SAC founders regarding his and Horwitz's experience and relationships in the media content distribution industry, as well as the investment dynamics, deal structure, potential returns, and associated risks pertaining to the opportunity.

128.    Plaintiffs and Class Members relied only on representations that originated from Craig when investing.

129.    Horwitz would not have been able to tap into the wealthy Bay Area investors absent Craig's lies.

130.    SAC proceeded to tell anyone they could about the incredible investment opportunity that Craig brought to them.

131.    Craig made representations regarding 1inMM's experience and relationships in the media content distribution industry, as well as the investment dynamics, deal structure, potential returns, and associated risks pertaining to the opportunity.

132.    Between April 4, 2018 and February 2, 2019, Craig was paid $606,000 in commissions for luring SAC clients to invest with 1inMM.

133.    Between February 12, 2019 and December 31, 2019, proceeds paid to Craig were paid to an entity he set up in California called FATHOM FEATURES LLC. (Fathom Features LLC – Statement of Information attached hereto as Exhibit "O").

134.    Proceeds sent to Craig via FATHOM FEATURES LLC included Memos such as "SAC 2018 / JAN 19", "SAC DISTROS", "SAC BACKEND FILM PAYMENTS", "BACKEND - SAC – FILMS", "BACKEND -SAC-DEPOSIT -FILMS."

135.    Matthew sent 1inMM $745,500 on December 27, 2019.

136.    On that same day, 1inMM returned that investment with $997,401.

137.    Matthew made over 33% return on an investment in 1inMM in less than 24 hours.

138.    SAC proceeded to sell Plaintiffs and the Class promissory notes for the 1inMM Offering by regurgitating the lies told by Horwitz, Craig and Montaudon.

139.    Part of the strategy of Horwitz, Craig and Montaudon was to play the aggregators, such as JJMT Capital, LLC ("JJMT") and SAC, like a competition to see who could invest the most into the 1inMM Ponzi Scheme.

140.    At present, the proposed class is owed approximately $300,000,000 for amounts loaned in or about 2018 and 2019 pursuant to the 1inMM Offerings.

### D.    1INMM DEFAULTS

141.    As with every Ponzi Scheme, the well eventually dried up and payments stopped coming in late 2019. Everyone who had direct contact with Horwitz saw this coming. Especially Craig and his family who knew Horwitz and was working with him from the start. In December 2019, the coverup shifted to high gear.

142.    Shortly after the payments stopped, Horwitz engaged two sophisticated law firms to add a layer of credibility to 1inMM's communications and Defendants, in turn, engaged well regarded counsel to help lull investors who were owed money.

143.    Montaudon, Craig and Hallivis all helped maintain the façade that business was still running at 1inMM.

144.    Craig made claims to investors about having audited the books of 1inMM in order to lull investors.

145.    Throughout 2020, Montaudon was on emails with 1inMM's Counsel and continued 1inMM's façade in efforts to secure letters that could be provided to concerned investors to keep the Ponzi Scheme operating despite no investment returns being paid back to investors.

146.    Throughout 2020 and into 2021 Craig communicated directly with investors and aggregators to avoid civil and criminal repercussions.

147.    Throughout 2020 aggregators relayed 1inMM's elaborate lies about delays in payment to lull investors into not pursuing action against 1inMM or Defendants.

148.    The Ponzi Scheme could not have survived 2020 without the hard work and dedication of Defendants.

149.    On November 4, 2020, SAC's counsel, who Craig was included in correspondence with, sent a letter to many Class Members that provided in pertinent part:

> As you know, 1inMM Capital ( our distribution partner) and HBO (the licensor of our films), have been in negotiations over the past many months to restructure their agreement. That amended agreement was finally executed on October 13, 2020. I was provided a severely redacted copy of this agreement in order to verify that it had been signed and what the terms were regarding the catch up payment owed on film investments. I received the redacted version on October 20, 2020. **While the agreement is highly confidential, I am able to tell you that I was able to verify its execution and was further able to verify the terms of payment of past due amounts to 1inMM**. SAC has also been in communication with 1inMM Capital regarding how 1inMM will satisfy its obligations to SAC and its entities. The following information has been provided:
> • 1inMM has confirmed that it agrees with the total amount due and owing as asserted by
> SAC and its entities.
> • 1inMM has agreed to notify SAC of payments made by HBO over the coming months. What I can tell you is that the redacted agreement provides that **HBO will be making full payment by the end of the year, unless it exercises options to extend, which would require making substantial interim payments**.
> • 1inMM has committed that it will make pro rata or proportionate payments to SAC for its share of the total advances. These payments will be made within 14 days of 1inMM receiving any payment from HBO.
> • 1inMM has told SAC that March 1, 2021 is the latest date by which full payment will be made.
> • SAC will remit payments to its investors in a timely manner as soon as received from 1inMM. These payments will be remitted on a first in first out basis based on the original maturity date of each film.

150.     Defendants already knew HBO had no outstanding debt to 1inMM prior to November 4, 2020.

151.     On April 5, 2021, the Securities and Exchange Commission filed a securities fraud Complaint against Horwitz detailing the obvious fraud that was easily unraveled with minimal investigation. (*Securities and Exchange Commission v. Zachary J. Horwitz*, 2:21-cv-02927, C.D. California).

152.     Plaintiffs and the Class relied on Craig, Montaudon and Alebrije to investigate the investment it was promoting and confirm facts presented in the offering materials.

153.     Plaintiffs and the Class justifiably relied on Defendants' statements about the investment and that Defendants had a reasonable basis for recommending the investment.

**E.  Plaintiff's Investment in 1inMM**

154.     Plaintiff, AVR Group, LLC, first invested in the Ponzi Scheme via SAC on or about June 2019 and entered its final investment agreement on or about January 2020 and paid $2,359,515 to participate in profit sharing agreements.

155.     Plaintiff, Trident Asset Management, Inc., first invested in the Ponzi Scheme via SAC on or about June 2019 and entered its final investment agreement on or about January 2020 and paid $663,125 to participate in profit sharing agreements.

156.     Plaintiff, Michael Dziurgot, first invested in the Ponzi Scheme via JJMT on or about October 2019 and entered its final investment agreement on or about November 2020 and paid $261,000 for investment in promissory notes to fund 1inMM that were not repaid.

157.     Plaintiffs' investments in the Ponzi Scheme were a total loss.

**F.  CLASS ALLEGATIONS**

158.     In accordance with Fed. R. Civ. P. 23(b)(3), Plaintiff brings this class action on behalf of the following class of persons:

All persons who invested in 1INMM CAPITAL, LLC, directly or indirectly through aggregators, from January 1, 2018 to December 31, 2020, and have not yet received a refund of their initial investment.

Excluded from the proposed Class are Defendants, their officers, directors, employees, agents, independent contractors, and members of the Judiciary. Plaintiff reserves the right to amend the class definition upon completion of class certification discovery.

159.    Plaintiff is a member of the Class.

160.    Excluded from the Class are judicial personnel involved in considering the claims herein, all persons and entities with claims for personal injury, the defendants, any entities in which the defendants have a controlling interest, and all of their legal representatives, heirs and successors.

161.    <u>Class Size (Fed. R. Civ. P. 23(a)(1))</u>: Plaintiff is informed and believes, and upon such information and belief avers, that the number of persons and entities of the Plaintiff Class is numerous and joinder of all members is impracticable. Plaintiff is informed and believes, and upon such information and belief avers, that the number of class members is at least forty.

162.    <u>Commonality (Fed. R. Civ. P. 23(a)(2))</u>:  Common questions of law and fact apply to the claims of all class members. Common material questions of fact and law include, but are not limited to, the following:

(a)    Whether each Defendant aided and abetted Horwitz in committing fraud;

(d)    Whether Defendants were unjustly enriched.

163.    <u>Typicality (Fed. R. Civ. P. 23(a)(3))</u>:  Plaintiff's claims are typical of the claims of all class members. Plaintiff is making the same claims and seeking the same relief for itself and all class members based upon the same federal statute and State cause of action. Defendants acted in the same or in a similar manner with respect to Plaintiff and all class members.

164.    <u>Fair and Adequate Representation (Fed. R. Civ. P. 23(a)(4))</u>:  Plaintiff will fairly and adequately represent and protect the interests of the class. Plaintiff is interested in this matter, has no conflicts, and has retained experienced class counsel to represent the class.

165.    <u>Predominance and Superiority (Fed. R. Civ. P. 23(b)(3))</u>:  Common questions of law and fact predominate over any questions affecting only individual members, and a class action is superior to other methods for the fair and efficient adjudication of the controversy because:

(a)    Proof of the claims of Plaintiff will also prove the claims of the class without the need for separate or individualized proceedings;

(b)    Evidence regarding defenses or any exceptions to liability that Defendants may assert and attempt to prove will come from Defendants' records and will not require individualized or separate inquiries or proceedings;

(c)    Defendants have acted pursuant to common policies or practices in the same or similar manner with respect to all class members;

(d)    The amount likely to be recovered by individual class members does not support individual litigation. A class action will permit a large number of claims involving virtually identical facts and legal issues to be resolved efficiently in one proceeding based upon common proofs; and

(e)    This case is inherently manageable as a class action in that:

(i)    Liability and damages can be established for Plaintiff and the class with the same common proofs;

(ii)    A class action will result in an orderly and expeditious administration of claims and it will foster economies of time, effort, and expense; and

(iii)    A class action will contribute to uniformity of decisions concerning Defendant's practices.

166.    The claims asserted by Plaintiff are typical of the claims of the members of the Class.

167.    This class action satisfies the criteria set forth in Fed. R. Civ. P. 23(a) and 23(b)(3) in that Plaintiffs are members of the Class; Plaintiff will fairly and adequately protect the interests of the members of the Class; Plaintiff's interests are coincident with and not antagonistic to those of the Class; Plaintiffs have retained attorneys experienced in class and complex litigation; and Plaintiff have, through their counsel, access to adequate financial resources to assure that the interests of the Class are adequately protected.

168.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

a.    It is economically impractical for most members of the Class to prosecute separate, individual actions;

b.    After the liability of Defendants has been adjudicated, the individual and aggregate claims of all members of the class can be determined readily by the Court; and

c.    Litigation of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members that would substantially impair or impede the ability of other Class members to protect their interests.

169.    Class certification is also appropriate because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory and/or injunctive relief with respect to the claims of Plaintiff and the Class Members.

## CLAIMS

### FIRST CLAIM FOR RELIEF
**AIDING AND ABETTING FRAUD (Craig, Montaudon, and Alebrije)**

170.    Plaintiff on behalf the Class, restates and realleges paragraphs 1 through 169 as though fully set forth herein.

171.    Aiding and abetting fraud has three elements:

    a.  the existence of an underlying fraud;

    b.  that [t]he defendant had knowledge of the fraud; and

    c.  that [t]he defendant provided substantial assistance to advance the commission of the fraud.

172.    Craig had actual knowledge of the existence of the underlying fraud and provided substantial assistance to advance the Ponzi Scheme.

173.    Craig assisted the Ponzi Scheme by knowingly disseminating falsified bank records to falsely claim that 1inMM was engaged in legitimate business. (Exhibit "E").

174.    Craig assisted the Ponzi Scheme in providing false information to cover up the fact that Class Members were investing in forged promissory notes.

175.    On September 30, 2020, Craig assisted the Ponzi Scheme by knowingly disseminating false information regarding receipt of "the final agreement [] from HBO" which was memorialized in an email to Craig and Horwitz:

Subject: Request
From: Ryan Spiegel <<u>Ryan@spiegelcorp.com</u>>
Date: Wed, September 30, 2020 8:34 pm
To: 'Zach Horwitz' <<u>zach@1inmm.com</u>>, "craig@hockeystick.media"
<craig@hockeystick.media>
Cc: Jeff Spiegel <<u>jeff@spiegelcorp.com</u>>, 'Richard Bowles'
<<u>rbowles@bowlesverna.com</u>>

Good Evening,
Hope you are doing well. Craig informed us that you received the final agreement
today from HBO.
Our legal counsel (CC'd) sent over a request letter via email on September 21 to the
both of you and didn't receive a response. I have attached the letter to this email and
would appreciate if you could confirm the receipt and get us a response to our
requests by Friday 10/2.
We are now into October and still don't have anything concrete as to when payments
will be made. We are getting extreme pressure from our investors and need to
provide them with documentation as soon as possible. We cannot allow this to

176.    On October 9, 2020, Craig assisted the Ponzi Scheme by knowingly disseminating

a portion of an email he alleged came from HBO:



177.    When SAC asked for information on who sent this email, Craig said he could not.

178.    On October 13, 2020, despite 1inMM having no relationship with HBO, Craig stated "YAHTZEE" and that the contract was "Signed":



179.    On October 19, 2020, despite 1inMM having no relationship with HBO, Craig stated:



180.    On November 23, 2020, spite 1inMM having no relationship with HBO, Craig represented that as a result of the imaginary HBO contract allegedly signed on October 13, 2020:



181.   Craig knew all of his statements were false and were made to lull SAC, Plaintiffs and the Class into believing that there was in fact a contract with HBO which was resulting in a return on the investments made.

182.   Montaudon had actual knowledge of the existence of the underlying fraud and provided substantial assistance to advance the Ponzi Scheme.

183.   ALEBRIJE and Montaudon provided the template Distribution Agreements to 1inMM to assist the Ponzi Scheme in looking legitimate. (Exhibit "I")

184.   One of ALEBRIJE's email addresses, alebrije@alebrije.tv, is disclosed on Distribution Agreements shared with investors that induced them to invest with 1inMM.

185.   Montaudon is a relative of one of the two employees of 1inMM, Hallivis.

186.   Montaudon was identified to prospective 1inMM investors as an Executive. (Exhibit "D" at 8).

187.   Montaudon and Horwitz co-founded ONE KEY ENTERTAINMENT which was used to further the Ponzi Scheme. (*Id.* at 6).

188.   Specifically, prospective investors of 1inMM were told that ONE KEY ENTERTAINMENT was meant to "to capitalize and fulfill the current output deal that Alebrije Entertainment has in place with Netflix, Sony and HBO. " (*Id.* at 6).

189.   At the time the statement was made to prospective investors, Montaudon knew this was false.

190.   As the direct and proximate result of Craig, Montaudon, and Alebrije aiding and abetting the fraud committed by Horwitz, the 1inMM Ponzi Scheme ensnared Plaintiff and Class Members causing them to be damaged in amounts to be proven at trial. The conduct of Horwitz was intentional, willful, malicious, and oppressive, by virtue of which Plaintiffs pray for an award of exemplary and punitive damages.

## SECOND CLAIM FOR RELIEF
### Unjust Enrichment (All Defendants)

191.    Plaintiff on behalf the Class, restates and realleges paragraphs 1 through 169 as though fully set forth herein.

192.    Defendants have received and retained a benefit from Plaintiff and the Class totaling in excess of $2,000,000 and inequity has resulted.

193.    Plaintiff and the Class conferred a benefit on each of the Defendants by paying excessive interest on fraudulent investments.

194.    Plaintiff and the Class were not aware of the true facts about the investment, and did not benefit from Defendants' conduct.

195.    Defendants knowingly accepted the benefits of their unjust conduct.

196.    Craig benefitted from mispresenting the nature and value of the Plaintiff's investment in the 1inMM Ponzi Scheme.

197.    In total Craig benefitted by making over $2,000,000 from 1inMM Ponzi Scheme.

198.    Matthew benefitted from Craig mispresenting the nature and value of the Plaintiffs investment in the 1inMM Ponzi Scheme.

199.    In total Matthew benefitted by making over $2,000,000 from 1inMM Ponzi Scheme.

200.    Montaudon benefitted from providing documents to assist in mispresenting the nature and value of the Plaintiff's investment in the 1inMM Ponzi Scheme.

201.    ALEBRIJE benefitted from providing documents to assist in mispresenting the nature and value of the Plaintiff's investment in the 1inMM Ponzi Scheme.

202.    It is inequitable for Defendants to retain these benefits, including finders' fees, paid by 1inMM.

203.    As a result of Defendants' conduct, the amount of their unjust enrichment should be disgorged in an amount according to proof.

WHEREFORE, Plaintiff, individually and on behalf of the Class as defined herein, respectfully request that this Court enter a judgment against Defendants and in favor of Plaintiff and the Class, and grant the following relief:

A. Determine that this action may be maintained and certified as a class action on a nationwide, statewide, and/or multistate basis under Rule 23(b)(1), 23(b)(2) and/or 23(b)(3); or alternatively, certify all questions, issues and claims that are appropriately certified under 23(c)(4); and that it designate and appoint Plaintiffs as Class Representatives, and appoint Class Counsel under Rule 23(g).

B. Award Plaintiff and Class members their actual, compensatory and/or statutory damages, according to proof;

C. Award Plaintiff and Class members their reasonable attorneys' fees, costs, and pre-judgment and post-judgment interest;

D. Award Plaintiff and Class members such other, further and different relief as the case may require; or as determined to be just, equitable, and proper by this Court.

Dated:  February 27, 2024                    Respectfully submitted,


                                             AVR GROUP, LLC, TRIDENT ASSET
                                             MANAGEMENT, INC., and  MICHAEL
                                             DZIURGOT, individually, and as the
                                             representatives of a class of similarly-situated
                                             persons

                                     By:     /s/ Ross M. Good
                                              Ross M. Good – FL Bar No.: 116405

                                             Ross Good, Esq.
                                             LOFTUS & EISENBERG, LTD.
                                             161 N. Clark, Suite 1600
                                             Chicago, Illinois 60601
                                             Telephone:  (312) 772-5396
                                             Direct: (786) 539-3952
                                             ross@loftusandeisenberg.com