# EXHIBIT A

TRACY L. WILKISON
Acting United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
ALEXANDER B. SCHWAB (Cal. Bar No. 283421)
DAVID H. CHAO (Cal. Bar No. 273953)
Assistant United States Attorneys
Major Frauds Section
 1100 United States Courthouse
 312 North Spring Street
 Los Angeles, California 90012
 Telephone: (213) 894-1259/4586
 Facsimile: (213) 894-0141
 E-mail: alexander.schwab@usdoj.gov
     david.chao@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>   Plaintiff,<br><br>     v.<br><br>ZACHARY JOSEPH HORWITZ,<br><br>   Defendant. | No. CR 21-214-MCS<br><br>PLEA AGREEMENT FOR DEFENDANT<br>ZACHARY JOSEPH HORWITZ |

  1. This constitutes the plea agreement between ZACHARY JOSEPH HORWITZ ("defendant") and the United States Attorney's Office for the Central District of California (the "USAO") in the above-captioned case.  This agreement is limited to the USAO and cannot bind any other federal, state, local, or foreign prosecuting, enforcement, administrative, or regulatory authority.

DEFENDANT'S OBLIGATIONS

  2. Defendant agrees to:

    a. At the earliest opportunity requested by the USAO and provided by the Court, appear and plead guilty to count one of the

1  indictment in <u>United States v. Zachary Joseph Horwitz</u>, CR No. 21-214-

2  MCS, which charges defendant with securities fraud, in violation of

3  15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5.

4        b.  Not contest facts agreed to in this agreement.

5        c.  Abide by all agreements regarding sentencing contained

6  in this agreement.

7        d.  Appear for all court appearances, surrender as ordered

8  for service of sentence, obey all conditions of any bond, and obey

9  any other ongoing court order in this matter.

10       e.  Not commit any crime; however, offenses that would be

11 excluded for sentencing purposes under United States Sentencing

12 Guidelines ("USSG" or "Sentencing Guidelines") § 4A1.2(c) are not

13 within the scope of this agreement.

14       f.  Be truthful at all times with the United States

15 Probation and Pretrial Services Office and the Court.

16       g.  Pay the applicable special assessment at or before the

17 time of sentencing unless defendant has demonstrated a lack of

18 ability to pay such assessments.

19       h.  Defendant agrees that any and all criminal debt

20 ordered by the Court will be due in full and immediately.  The

21 government is not precluded from pursuing, in excess of any payment

22 schedule set by the Court, any and all available remedies by which to

23 satisfy defendant's payment of the full financial obligation,

24 including referral to the Treasury Offset Program.

25       i.  Complete the Financial Disclosure Statement on a form

26 provided by the USAO and, within 30 days of defendant's entry of a

27 guilty plea, deliver the signed and dated statement, along with all

28 of the documents requested therein, to the USAO by either email at

1   usacac.FinLit@usdoj.gov (preferred) or mail to the USAO Financial

2   Litigation Section at 300 North Los Angeles Street, Suite 7516, Los

3   Angeles, CA 90012.  Defendant agrees that defendant's ability to pay

4   criminal debt shall be assessed based on the completed Financial

5   Disclosure Statement and all required supporting documents, as well

6   as other relevant information relating to ability to pay.

7        j.   Authorize the USAO to obtain a credit report upon

8   returning a signed copy of this plea agreement.

9        k.   Consent to the USAO inspecting and copying all of

10  defendant's financial documents and financial information held by the

11  United States Probation and Pretrial Services Office.

12       l.   Agree that all court appearances, including his change

13  of plea hearing and sentencing hearing, may proceed by video-

14  teleconference ("VTC"), so long as such appearances are authorized by

15  Order of the Chief Judge 20-097 or another order, rule, or statute.

16  Defendant understands that, under the Constitution, the United States

17  Code, the Federal Rules of Criminal Procedure (including Rules 11,

18  32, and 43), he may have the right to be physically present at these

19  hearings.  Defendant understands that right and, after consulting

20  with counsel, voluntarily agrees to waive it and to proceed remotely.

21  Defense counsel also joins in this consent, agreement, and waiver.

22  Specifically, this agreement includes, but is not limited to, the

23  following:

24       i.   Defendant consents under Section 15002(b) of the

25  CARES Act to proceed with his change of plea hearing by VTC.

26       ii.  Defendant consents under Section 15002(b) of the

27  CARES Act to proceed with his sentencing hearing by VTC if personal

28  appearance is deemed by the Court to be unsafe due to COVID-19

3

1  concerns.  The parties agree to use best efforts to conduct the

2  sentencing hearing in person with the Court's approval.

3          iii. Defendant consents under 18 U.S.C. § 3148 and

4  Section 15002(b) of the CARES Act to proceed with any hearing

5  regarding alleged violations of the conditions of pretrial release by

6  VTC or telephone, if VTC is not reasonably available.

7  THE USAO'S OBLIGATIONS

8     3.  The USAO agrees to:

9        a.  Not contest facts agreed to in this agreement.

10       b.  Abide by all agreements regarding sentencing contained

11 in this agreement.

12       c.  At the time of sentencing, move to dismiss the

13 remaining counts of the indictment as against defendant.  Defendant

14 agrees, however, that at the time of sentencing the Court may

15 consider any dismissed charges in determining the applicable

16 Sentencing Guidelines range, the propriety and extent of any

17 departure from that range, and the sentence to be imposed.

18       d.  At the time of sentencing, provided that defendant

19 demonstrates an acceptance of responsibility for the offense up to

20 and including the time of sentencing, recommend a two-level reduction

21 in the applicable Sentencing Guidelines offense level, pursuant to

22 USSG § 3E1.1, and recommend and, if necessary, move for an additional

23 one-level reduction if available under that section.

24 NATURE OF THE OFFENSE

25    4.  Defendant understands that for defendant to be guilty of

26 the crime charged in count one, that is, securities fraud, in

27 violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5, the

28 following must be true:

4

(1) defendant willfully used a device or scheme to defraud someone, made an untrue statement of a material fact, failed to disclose a material fact that resulted in making the defendant's statements misleading, or engaged in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person;

(2) defendant's acts were undertaken, statement was made, or failure to disclose was done in connection with the purchase and sale of securities within the meaning of 15 U.S.C. § 78c(a)(10);

(3) defendant directly or indirectly used wire communications in connection with these acts, making this statement, or this failure to disclose; and

(4) defendant acted knowingly.

"Willfully" means intentionally undertaking an act, making an untrue statement, or failing to disclose for the wrongful purpose of defrauding or deceiving someone. Acting willfully does not require that the defendant know that the conduct was unlawful.

A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making the decision to purchase securities.

It is not necessary that an untrue statement passed through or over the wire communications so long as the wire communications were used as a part of the transaction.

It is not necessary that defendant made a profit or that anyone actually suffered a loss.

<u>PENALTIES AND RESTITUTION</u>

5.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of 15 U.S.C. §§ 78j(b),

78ff and 17 C.F.R. § 240.10b-5 is: twenty years of imprisonment; a three-year period of supervised release; a fine of $5 million or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

6. Defendant understands that defendant will be required to pay full restitution to the victims of the offense to which defendant is pleading guilty and agrees to make such restitution. Defendant understands and agrees that although a violation of 18 U.S.C. § 1343 does not constitute the count of conviction in this plea agreement, this plea agreement relates to such a charge, which is an offense against property, within the meaning of 18 U.S.C. § 3663A(c)(2), thereby bringing this offense within the ambit of 18 U.S.C. § 3663A. Defendant agrees that, in return for the USAO's compliance with its obligations under this agreement, the Court may order restitution to persons other than the victims of the offense to which defendant is pleading guilty, and in amounts greater than those alleged in the count to which defendant is pleading guilty, so long as such persons qualify as "victims," within the meaning of 18 U.S.C. § 3663A(a)(2), of defendant's offense and/or relevant conduct. In particular, defendant agrees that the Court may order restitution to any victim of any of the following for any losses suffered by that victim as a result: (a) any relevant conduct, as defined in USSG § 1B1.3, in connection with the offense to which defendant is pleading guilty; and (b) any counts dismissed pursuant to this agreement as well as all relevant conduct, as defined in USSG § 1B1.3, in connection with those counts. Defendant understands that the Court may impose, and the USAO reserves the right to seek, restitution on any basis permitted by law.

7. Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

8. Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition. Defendant understands that the conviction in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty plea.

9. Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the conviction in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported from the United States. Defendant may also be denied United States citizenship and admission to the United States in the future.

1  Defendant understands that while there may be arguments that

2  defendant can raise in immigration proceedings to avoid or delay

3  removal, removal is presumptively mandatory and a virtual certainty

4  in this case. Defendant further understands that removal and

5  immigration consequences are the subject of a separate proceeding and

6  that no one, including his attorney or the Court, can predict to an

7  absolute certainty the effect of his conviction on his immigration

8  status. Defendant nevertheless affirms that he wants to plead guilty

9  regardless of any immigration consequences that his plea may entail,

10  even if the consequence is automatic removal from the United States.

11  <u>FACTUAL BASIS</u>

12  10. Defendant admits that defendant is, in fact, guilty of the

13  offense to which defendant is agreeing to plead guilty. Defendant

14  and the USAO agree to the statement of facts provided below and agree

15  that this statement of facts is sufficient to support a plea of

16  guilty to the charge described in this agreement and to establish the

17  Sentencing Guidelines factors set forth in paragraph 12 below but is

18  not meant to be a complete recitation of all facts relevant to the

19  underlying criminal conduct or all facts known to either party that

20  relate to that conduct.

21  In or about 2013, defendant founded 1inMM Capital, LLC ("1inMM

22  Capital"), which defendant promoted as a film distribution company.

23  1inMM Capital's principal place of business was in Los Angeles,

24  California.

25  Beginning no later than in or about March 2014, and continuing

26  through at least on or about April 6, 2021, in Los Angeles County,

27  within the Central District of California, and elsewhere, defendant

28  knowingly and willfully, by the use of the means and

8

1   instrumentalities of interstate commerce, in connection with the
2   purchase and sale of securities, used and employed manipulative and
3   deceptive devices and contrivances, in violation of Title 15, United
4   States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal
5   Regulations, Section 240.10b-5, by: (1) employing a scheme to
6   defraud; (2) making untrue statements of material facts and omitting
7   to state material facts necessary in order to make the statements
8   made, in light of the circumstances under which they were made, not
9   misleading; and (3) engaging in acts, practices, and courses of
10  business which operated and would operate as a fraud and deceit upon
11  purchasers of securities (the "investors").  Defendant did so by
12  making and causing to be made materially false and fraudulent
13  statements and material omissions to the investors about defendant
14  and 1inMM Capital's use of their investments.

15      In execution of the fraudulent scheme, defendant made offers to
16  investors to purchase promissory notes issued by 1inMM Capital, which
17  notes constituted "securities" within the meaning of the Securities
18  Exchange Act of 1934, by making a series of false and misleading
19  statements and by using various deceptive contrivances.  Each of
20  these statements and contrivances was material to investors.
21  Specifically, defendant falsely represented to investors that 1inMM
22  Capital would purchase distribution rights to certain films, which
23  defendant falsely claimed 1inMM Capital would then profitably license
24  to online streaming platforms such as HBO and Netflix for further
25  distribution in regions outside the United States.  To raise funds
26  for 1inMM Capital's purported business activities, defendant
27  solicited investments from the investors by offering to sell them
28  promissory notes issued by 1inMM Capital and signed by defendant.

9

The promissory notes guaranteed a specified payment on a specified maturity date, typically six or twelve months in the future. Each note listed the principal amount of money borrowed, which typically ranged from approximately $35,000 to $1.5 million, as well as the specified amount to be paid at maturity, a calculated return that ranged from 25 to 45 percent.

In connection with the sale of these promissory notes, defendant falsely represented that 1inMM Capital would use the principal amount of money invested pursuant to each note to purchase distribution rights for the film(s) specified as collateral for the note. Defendant also falsely represented that 1inMM Capital would satisfy its obligations under each note through the profits that 1inMM Capital would obtain by acquiring and licensing the distribution rights to the film(s) specified in each note. Each note contained an assignment of rights provision that listed the specific film(s) that would serve as collateral for the note. The assignment of rights provision in each note contained express representations and warranties that 1inMM Capital was the sole and exclusive owner of the rights to the listed film(s). However, as defendant then knew, his representations concerning 1inMM Capital's business activities and the promissory notes themselves were false and deceptive because 1inMM Capital generally did not and would not acquire or possess the film distribution rights for the films specified as collateral in the promissory notes, and 1inMM Capital did not and would not enter into any distribution agreements with the online streaming platforms for these specified films.

In furtherance of the scheme, defendant also provided investors with fraudulent copies of purported license agreements between 1inMM

1  Capital and the sales agents for the production companies of the

2  films identified in the promissory notes.  In fact, as defendant then

3  knew, these license agreements were fake because 1inMM Capital had

4  not acquired the film distribution rights that constituted the

5  purported collateral for the promissory notes and had not entered

6  into the asserted license agreements with the identified sales

7  agents.

8      In furtherance of the scheme, defendant also falsely represented

9  to investors that online streaming platforms had already entered or

10 committed to enter into distribution agreements with 1inMM Capital.

11 Defendant provided investors with copies of these purported

12 distribution agreements when, in fact, as defendant knew, 1inMM

13 Capital had not entered into the asserted distribution agreements

14 with the online streaming platforms and the purported copies of the

15 distribution agreements were fake.

16      In furtherance of the scheme and to lull the investors into

17 believing their funds were safely invested as he had promised,

18 defendant falsely reassured investors that any missed payments on

19 promissory notes were caused by the actions of the online streaming

20 platforms, and that payment on the notes would resume.  To support

21 these false claims, defendant sent the investors emails and text

22 messages regarding progress addressing the actions purportedly

23 causing the missed payments and the resumption of payments, which

24 defendant claimed had been sent to him by representatives of the

25 online streaming platforms.  In fact, as defendant then knew, he had

26 not been in communication with the online streaming platforms, and

27 the correspondence he was supposedly forwarding was fake.

28

Through the fraudulent scheme, defendant sold hundreds of promissory notes issued by 1inMM Capital and thereby fraudulently obtained at least $650 million from at least five major groups of private investors. Defendant understood that these investor groups derived their investments, in part, from various sub-investors who did not have direct contractual agreements with 1inMM Capital, and in fact there were more than 250 such sub-investors (subject to the reservation of rights in paragraph 12 below). Defendant did not use the invested money as promised but instead used the money to make payments to prior investors, maintain 1inMM Capital's facade of legitimate operations, make disbursements to himself and entities he controlled, and otherwise finance his own lavish lifestyle. Beginning in or about December 2019, 1inMM Capital began defaulting on all of its outstanding promissory notes. Thus, to date, defendant, through 1inMM Capital, is in default to investors on a total outstanding principal amount of approximately $230.36 million, and defendant's scheme has caused substantial financial hardship to at least five investors.

For the purpose of executing the above-described scheme to defraud, and in furtherance of the manipulative and deceptive devices described above, defendant directly and indirectly caused the use of instrumentalities of interstate commerce in connection with the purchase and sale of securities. For example, on or about December 14, 2018, defendant caused the interstate wire transfer of approximately $1,425,500 from Investor 1, located in Illinois, to the 1inMM Capital Account, located in California, to purchase a promissory note secured by the assignment of rights to the film "Active Measures."

1    <u>SENTENCING FACTORS</u>

2        11.  Defendant understands that in determining defendant's

3    sentence the Court is required to calculate the applicable Sentencing

4    Guidelines range and to consider that range, possible departures

5    under the Sentencing Guidelines, and the other sentencing factors set

6    forth in 18 U.S.C. § 3553(a).  Defendant understands that the

7    Sentencing Guidelines are advisory only, that defendant cannot have

8    any expectation of receiving a sentence within the calculated

9    Sentencing Guidelines range, and that after considering the

10   Sentencing Guidelines and the other § 3553(a) factors, the Court will

11   be free to exercise its discretion to impose any sentence it finds

12   appropriate up to the maximum set by statute for the crime of

13   conviction.

14       12.  Defendant and the USAO agree to the following applicable

15   Sentencing Guidelines factors:

16   | Base Offense Level | 7 | USSG § 2B1.1(a)(1) |
17   | Loss of more than $150 million but not more than $250 million | +26 | USSG § 2B1.1(b)(1)(N) |
19   | Substantial Financial Hardship to 5 or more victims | +4 | USSG § 2B1.1(b)(2)(B) |
20   | Sophisticated Means | +2 | USSG § 2B1.1(b)(2)(10)(C) |

22   Defendant and the USAO reserve the right to argue that additional

23   specific offense characteristics, adjustments, and departures under

24   the Sentencing Guidelines are appropriate.  By way of example, but

25   not limitation, the government reserves the right to argue that

26   defendant's offense and relevant conduct resulted in substantial

27   financial hardship to 25 or more victims, and defendant reserves the

28

1  right to contest the number of sub-investors of the victim investor

2  groups as referenced above at page 12.

3      13.  Defendant understands that there is no agreement as to

4  defendant's criminal history or criminal history category.

5      14.  Defendant and the USAO reserve the right to argue for a

6  sentence outside the sentencing range established by the Sentencing

7  Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1),

8  (a)(2), (a)(3), (a)(6), and (a)(7).

9                    <u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

10     15.  Defendant understands that by pleading guilty, defendant

11  gives up the following rights:

12          a.   The right to persist in a plea of not guilty.

13          b.   The right to a speedy and public trial by jury.

14          c.   The right to be represented by counsel –- and if

15  necessary have the Court appoint counsel -- at trial.  Defendant

16  understands, however, that, defendant retains the right to be

17  represented by counsel –- and if necessary have the Court appoint

18  counsel -- at every other stage of the proceeding.

19          d.   The right to be presumed innocent and to have the

20  burden of proof placed on the government to prove defendant guilty

21  beyond a reasonable doubt.

22          e.   The right to confront and cross-examine witnesses

23  against defendant.

24          f.   The right to testify and to present evidence in

25  opposition to the charges, including the right to compel the

26  attendance of witnesses to testify.

27

28

1    g.    The right not to be compelled to testify, and, if

2 defendant chose not to testify or present evidence, to have that

3 choice not be used against defendant.

4    h.    Any and all rights to pursue any affirmative defenses,

5 Fourth Amendment or Fifth Amendment claims, and other pretrial

6 motions that have been filed or could be filed.

7                    <u>WAIVER OF APPEAL OF CONVICTION</u>

8    16.  Defendant understands that, with the exception of an appeal

9 based on a claim that defendant's guilty plea was involuntary, by

10 pleading guilty defendant is waiving and giving up any right to

11 appeal defendant's conviction on the offense to which defendant is

12 pleading guilty.  Defendant understands that this waiver includes,

13 but is not limited to, arguments that the statute to which defendant

14 is pleading guilty is unconstitutional, and any and all claims that

15 the statement of facts provided herein is insufficient to support

16 defendant's plea of guilty.

17              <u>LIMITED MUTUAL WAIVER OF APPEAL OF SENTENCE</u>

18    17.  Defendant agrees that, provided the Court imposes a total

19 term of imprisonment within the statutory maximum, defendant gives up

20 the right to appeal all of the following: (a) the procedures and

21 calculations used to determine and impose any portion of the

22 sentence; (b) the term of imprisonment imposed by the Court; (c) the

23 fine imposed by the Court, provided it is within the statutory

24 maximum; (d) to the extent permitted by law, the constitutionality or

25 legality of defendant's sentence, provided it is within the statutory

26 maximum; (e) the amount and terms of any restitution order, so long

27 as it is less than $235 million; (f) the term of probation or

28 supervised release imposed by the Court, provided it is within the

1   statutory maximum; and (g) any of the following conditions of

2   probation or supervised release imposed by the Court: the conditions

3   set forth in Second Amended General Order 20-04 of this Court; the

4   drug testing conditions mandated by 18 U.S.C. §§ 3563(a)(5) and

5   3583(d); and the alcohol and drug use conditions authorized by 18

6   U.S.C. § 3563(b)(7).

7       18.  The USAO agrees that, provided (a) all portions of the

8   sentence are at or below the statutory maximum specified above and

9   (b) the Court imposes a term of imprisonment of no less than 235

10  months' imprisonment, the USAO gives up its right to appeal any

11  portion of the sentence, with the exception that the USAO reserves

12  the right to appeal the amount of restitution ordered.

13                  <u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

14      19.  Defendant agrees that if, after entering a guilty plea

15  pursuant to this agreement, defendant seeks to withdraw and succeeds

16  in withdrawing defendant's guilty plea on any basis other than a

17  claim and finding that entry into this plea agreement was

18  involuntary, then (a) the USAO will be relieved of all of its

19  obligations under this agreement; and (b) should the USAO choose to

20  pursue any charge that was either dismissed or not filed as a result

21  of this agreement, then (i) any applicable statute of limitations

22  will be tolled between the date of defendant's signing of this

23  agreement and the filing commencing any such action; and

24  (ii) defendant waives and gives up all defenses based on the statute

25  of limitations, any claim of pre-indictment delay, or any speedy

26  trial claim with respect to any such action, except to the extent

27  that such defenses existed as of the date of defendant's signing this

28  agreement.

                                    16

1        RESULT OF VACATUR, REVERSAL, OR SET-ASIDE

2        20.  Defendant agrees that if the count of conviction is

3   vacated, reversed, or set aside, both the USAO and defendant will be

4   released from all their obligations under this agreement.

5        EFFECTIVE DATE OF AGREEMENT

6        21.  This agreement is effective upon signature and execution of

7   all required certifications by defendant, defendant's counsel, and an

8   Assistant United States Attorney.

9        BREACH OF AGREEMENT

10       22.  Defendant agrees that if defendant, at any time after the

11  effective date of the agreement, knowingly violates or fails to

12  perform any of defendant's obligations under this agreement ("a

13  breach"), the USAO may declare this agreement breached.  All of

14  defendant's obligations are material, a single breach of this

15  agreement is sufficient for the USAO to declare a breach, and

16  defendant shall not be deemed to have cured a breach without the

17  express agreement of the USAO in writing.  If the USAO declares this

18  agreement breached, and the Court finds such a breach to have

19  occurred, then: (a) if defendant has previously entered a guilty plea

20  pursuant to this agreement, defendant will not be able to withdraw

21  the guilty plea, and (b) the USAO will be relieved of all its

22  obligations under this agreement.

23       23.  Following the Court's finding of a knowing breach of this

24  agreement by defendant, should the USAO choose to pursue any charge

25  that was either dismissed or not filed as a result of this agreement,

26  then:

27

28

1    a.   Defendant agrees that any applicable statute of

2    limitations is tolled between the date of defendant's signing of this

3    agreement and the filing commencing any such action.

4    b.   Defendant waives and gives up all defenses based on

5    the statute of limitations, any claim of pre-indictment delay, or any

6    speedy trial claim with respect to any such action, except to the

7    extent that such defenses existed as of the date of defendant's

8    signing this agreement.

9    c.   Defendant agrees that: (i) any statements made by

10   defendant, under oath, at the guilty plea hearing (if such a hearing

11   occurred prior to the breach); (ii) the agreed to factual basis

12   statement in this agreement; and (iii) any evidence derived from such

13   statements, shall be admissible against defendant in any such action

14   against defendant, and defendant waives and gives up any claim under

15   the United States Constitution, any statute, Rule 410 of the Federal

16   Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal

17   Procedure, or any other federal rule, that the statements or any

18   evidence derived from the statements should be suppressed or are

19   inadmissible.

20   <u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>

21   <u>OFFICE NOT PARTIES</u>

22   24.  Defendant understands that the Court and the United States

23   Probation and Pretrial Services Office are not parties to this

24   agreement and need not accept any of the USAO's sentencing

25   recommendations or the parties' agreements to facts or sentencing

26   factors.

27   25.  Defendant understands that both defendant and the USAO are

28   free to: (a) supplement the facts by supplying relevant information

18

1  to the United States Probation and Pretrial Services Office and the

2  Court, (b) correct any and all factual misstatements relating to the

3  Court's Sentencing Guidelines calculations and determination of

4  sentence, and (c) argue on appeal and collateral review that the

5  Court's Sentencing Guidelines calculations and the sentence it

6  chooses to impose are not error, although each party agrees to

7  maintain its view that the calculations in paragraph 12 are

8  consistent with the facts of this case.  While this paragraph permits

9  both the USAO and defendant to submit full and complete factual

10  information to the United States Probation and Pretrial Services

11  Office and the Court, even if that factual information may be viewed

12  as inconsistent with the facts agreed to in this agreement, this

13  paragraph does not affect defendant's and the USAO's obligations not

14  to contest the facts agreed to in this agreement.

15      26.  Defendant understands that even if the Court ignores any

16  sentencing recommendation, finds facts or reaches conclusions

17  different from those agreed to, and/or imposes any sentence up to the

18  maximum established by statute, defendant cannot, for that reason,

19  withdraw defendant's guilty plea, and defendant will remain bound to

20  fulfill all defendant's obligations under this agreement.  Defendant

21  understands that no one -- not the prosecutor, defendant's attorney,

22  or the Court -- can make a binding prediction or promise regarding

23  the sentence defendant will receive, except that it will be within

24  the statutory maximum.

25                     NO ADDITIONAL AGREEMENTS

26      27.  Defendant understands that, except as set forth herein,

27  there are no promises, understandings, or agreements between the USAO

28  and defendant or defendant's attorney, and that no additional

19

promise, understanding, or agreement may be entered into unless in a writing signed by all parties or on the record in court.

### PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

28.  The parties agree that this agreement will be considered part of the record of defendant's guilty plea hearing as if the entire agreement had been read into the record of the proceeding.

AGREED AND ACCEPTED

UNITED STATES ATTORNEY'S OFFICE
FOR THE CENTRAL DISTRICT OF
CALIFORNIA

TRACY L. WILKISON
Acting United States Attorney

_____        9/1/2021
ALEXANDER B. SCHWAB                       Date
DAVID H. CHAO
Assistant United States Attorneys

_____        09/01/2021
ZACHARY JOSEPH HORWITZ                     Date
Defendant

_____        9.1.2021
ANTHONY PACHECO                           Date
RYAN S. HEDGES
Attorneys for Defendant
ZACHARY JOSEPH HORWITZ

## CERTIFICATION OF DEFENDANT

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charge and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____          09/01/2021
ZACHARY JOSEPH HORWITZ                     Date
Defendant

21

1    <u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

2        I am one of ZACHARY JOSEPH HORWITZ's attorneys.  I have

3    carefully and thoroughly discussed every part of this agreement with

4    my client.  Further, I have fully advised my client of his rights, of

5    possible pretrial motions that might be filed, of possible defenses

6    that might be asserted either prior to or at trial, of the sentencing

7    factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing

8    Guidelines provisions, and of the consequences of entering into this

9    agreement.  To my knowledge: no promises, inducements, or

10   representations of any kind have been made to my client other than

11   those contained in this agreement; no one has threatened or forced my

12   client in any way to enter into this agreement; my client's decision

13   to enter into this agreement is informed and voluntary; and the

14   factual basis set forth in this agreement is sufficient to support my

15   client's entry of a guilty plea pursuant to this agreement.

16   _____          9·1·2021

17   ANTHONY PACHECO                          Date
     RYAN S. HEDGES
18   Attorneys for Defendant
     ZACHARY JOSEPH HORWITZ

19

20

21

22

23

24

25

26

27

28

22

# EXHIBIT B

# Electronic Articles of Organization For
# Florida Limited Liability Company

L13000017115
FILED 8:00 AM
February 01, 2013
Sec. Of State
alunt

## Article I

The name of the Limited Liability Company is:

ONE KEY ENTERTAINMENT, LLC

## Article II

The street address of the principal office of the Limited Liability Company is:

1421 SW 107 AVE
#261
MIAMI, FL. US  33174

The mailing address of the Limited Liability Company is:

1421 SW 107 AVE
#261
MIAMI, FL. US  33174

## Article III

The purpose for which this Limited Liability Company is organized is:

ANY AND ALL LAWFUL BUSINESS.

## Article IV

The name and Florida street address of the registered agent is:

GUSTAVO  MONTAUDON
1421 SW 107 AVE
#261
MIAMI, FL.   33174

Having been named as registered agent and to accept service of process for the above stated limited
liability company at the place designated in this certificate, I hereby accept the appointment as registered
agent and agree to act in this capacity.  I further agree to comply with the provisions of all statutes
relating to the proper and complete performance of my duties, and I am familiar with and accept the
obligations of my position as registered agent.

Registered Agent Signature:   GUSTAVO MONTAUDON

## Article V

The name and address of managing members/managers are:

Title:  MGRM
1INMM PRODUCTIONS, LLC
5600 WILSHIRE BLVD., SUITE #358
LOS ANGELES, CA.  90036  US

Title:  MGRM
ALEBRIJE ENTERTAINMENT, LLC
1421 SW 107 AVE., #261
MIAMI, FL.  33174  US

**L13000017115**
**FILED 8:00 AM**
**February 01, 2013**
**Sec. Of State**
alunt

## Article VI

The effective date for this Limited Liability Company shall be:

02/01/2013

Signature of member or an authorized representative of a member

Electronic Signature: JON D. CANTOR

I am the member or authorized representative submitting these Articles of Organization and affirm that the facts stated herein are true.  I am aware that false information submitted in a document to the Department of State constitutes a third degree felony as provided for in s.817.155, F.S. I understand the requirement to file an annual report between January 1st and May 1st in the calendar year following formation of the LLC and every year thereafter to maintain "active" status.

# EXHIBIT C



# State of California
## Secretary of State

**91**

### STATEMENT OF INFORMATION
(Limited Liability Company)
Filing Fee $20.00. If this is an amendment, see instructions.
**IMPORTANT — READ INSTRUCTIONS BEFORE COMPLETING THIS FORM**

**FILED**
Secretary of State
State of California

**OCT 0 1 2015**

2V20/PC
This Space For Filing Use Only

**L**

1. LIMITED LIABILITY COMPANY NAME

Doppler App LLC

| File Number and State or Place of Organization | |
|---|---|
| 2. SECRETARY OF STATE FILE NUMBER  201526410205 | 3. STATE OR PLACE OF ORGANIZATION (If formed outside of California)  CA |

**No Change Statement**

4. If there have been any changes to the information contained in the last Statement of Information filed with the California Secretary of State, or no Statement of Information has been previously filed, this form must be completed in its entirety.

☐ If there has been no change in any of the information contained in the last Statement of Information filed with the California Secretary of State, check the box and proceed to Item 15.

**Complete Addresses for the Following** (Do not abbreviate the name of the city. Items 5 and 7 cannot be P.O. Boxes.)

| | | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 5. STREET ADDRESS OF PRINCIPAL OFFICE  8157 Laurel View Dr. | | Los Angeles | CA | 90069 |
| 6. MAILING ADDRESS OF LLC, IF DIFFERENT THAN ITEM 5 | | CITY | STATE | ZIP CODE |
| 7. STREET ADDRESS OF CALIFORNIA OFFICE  8157 Laurel View Dr. | | CITY  Los Angeles | STATE  CA | ZIP CODE  90069 |

**Name and Complete Address of the Chief Executive Officer, If Any**

| 8. NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| | | | | |

**Name and Complete Address of Any Manager or Managers, or if None Have Been Appointed or Elected, Provide the Name and Address of Each Member** (Attach additional pages, if necessary.)

| NAME | ADDRESS | CITY | STATE | ZIP CODE |
|---|---|---|---|---|
| 9. Zachary Horwitz | 8157 Laurel View Dr. | Los Angeles | CA | 90069 |
| 10. Craig Cole | 8157 Laurel View Dr. | Los Angeles | CA | 90069 |
| 11. | | CITY | STATE | ZIP CODE |

**Agent for Service of Process** If the agent is an individual, the agent must reside in California and Item 13 must be completed with a California address, a P.O. Box is not acceptable. If the agent is a corporation, the agent must have on file with the California Secretary of State a certificate pursuant to California Corporations Code section 1505 and Item 13 must be left blank.

| 12. NAME OF AGENT FOR SERVICE OF PROCESS  Legalzoom.com, Inc.  C2967349 | | | | |
|---|---|---|---|---|
| 13. STREET ADDRESS OF AGENT FOR SERVICE OF PROCESS IN CALIFORNIA, IF AN INDIVIDUAL | CITY | | STATE  CA | ZIP CODE |

**Type of Business**

14. DESCRIBE THE TYPE OF BUSINESS OF THE LIMITED LIABILITY COMPANY

Technology

15. THE INFORMATION CONTAINED HEREIN, INCLUDING ANY ATTACHMENTS, IS TRUE AND CORRECT.

| 09/24/2015 | Cheyenne Moseley | Auth. Rep. | CM |
|---|---|---|---|
| DATE | TYPE OR PRINT NAME OF PERSON COMPLETING THE FORM | TITLE | SIGNATURE |

| LLC-12 (REV 01/2014) | APPROVED BY SECRETARY OF STATE |
|---|---|

# EXHIBIT D



1inMM Capital    |    5550 Wilshire Blvd. Suite 523    |    Los Angeles, CA 90036    |    info@1inMM.com

# 1inMMcapital

THESE FILES ARE INTENDED SOLELY FOR THE USE OF THE INDIVIDUAL OR ENTITY TO WHOM THEY ARE ADDRESSED. IF THE READER OF THIS DOCUMENT IS NOT THE INTENDED RECIPIENT OR THE EMPLOYEE OR AGENT RESPONSIBLE FOR DELIVERING THE FILE TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT ANY USE, DISSEMINATION, FORWARDING, PRINTING OR COPYING OF THIS FILE, ANY ASSOCIATED E-MAILS OR FILES HERE TO IS STRICTLY PROHIBITED.

THIS DOCUMENT AND ANY OTHER FILES OR ASSOCIATED E-MAIL MESSAGES CONTAIN CONFIDENTIAL  INFORMATION THAT IS LEGALLY PRIVILEGED.

# DISCLOSURE

# 1inMMcapital

**is a private equity fund that focuses solely on the acquisition and distribution of feature length motion pictures through executed output deals with:**

  SONY make.believe

## OUR STRATEGIC PARTNERSHIPS

1inMM Productions          Alebrije Entertainment          One Key Entertainment

# INTRODUCTION

# 1inMMcapital

- Strategic focus on specific investments in acquisitions and distribution of feature length motion pictures.

- Financially capitalize on bridging the gap between domestic and Latin American markets.

- Strategic partnership with Netflix, Sony, HBO and Alebrije Entertainment in order to profit from the evolving Latin American market.

- Target commercially viable, elevated feature films to be distributed in Latin America.
  - Genres to include action, horror, thriller and sci-fi.

## PARTNERSHIP: 1inMM Productions

# 1inMMcapital

- Leading programming distributor of high quality product for television.

- Specializes in worldwide content to be distributed in Latin American and U.S Hispanic Markets.

- Founded in 1999, Alebrije Entertainment has built a vast library of TV products including movies, formats, animations, documentary films, series and soap operas.

- With almost 15 years in the market, Alebrije prides themselves on being one of the most important and promissory independent distributors in this industry.

- Executive agreements with important producers such as 1inMM Productions, Archstone Distribution LLC, Acort International, Arrow Entertainment Inc., Cinema Management Group, NuVision Films and Imagination LLC.

## PARTNERSHIP: Alebrije Entertainment

# 1inMMcapital

Co-Founded by 1inMM Productions and Alebrije Entertainment in order to capitalize and fulfill the current output deal that Alebrije Entertainment has in place with Netflix, Sony and HBO.

- One Key Entertainment is the legal entity in which 1inMM Capital will be funding the acquisition and distribution of feature length motion pictures through Netflix, Sony and HBO.

- One Key Entertainment co-assigns the rights of each film purchased from 1inMM Capital, proceeds to 1inMM Capital, for the length of the licensing period (10-15 years)

# PARTNERSHIP: One Key Entertainment

# 1inMMcapital

## Zach Horwitz

- Independent thinker with a creative vision.

- Graduated from Indiana University and began his Doctoral Degree in Industrial/Organizational Business Psychology at The University of Chicago.

- Founded the fitness driven lifestyle brand FÜL. He took FÜL from inception to a multi-million dollar, multi-pronged fitness brand in less than 24 months. What started as a fast-casual restaurant with a healthy twist soon turned into seven locations throughout the Chicago area (including Protein Bar locations); FÜL fitness apparel sold in Target, Dick's Sporting Goods and Sports Authority; fitness supplements sold at GNC; and an urban FÜL Bag line.  Horwitz sold a majority share to venture capitalists.

- Horwitz began working in the film industry with distribution and acquisitions after co-founding 1inMM Productions LLC with key principles within the venture capital landscape. Through these relationships Horwitz has worked to developed strategic partnerships, both domestically and Internationally, in which he has created a revolutionary acquisition and distribution output model.

## Craig Cole

- Driven, passionate negotiator.

- While attending Bellevue College, earning his business degree, he came in on the ground floor to help establish Washington State's premiere wholesale and off-market property firm, Invest Now LLC.

- High performing sales veteran who worked for prestigious companies including Wyndham Vacation Ownership.

- Successfully negotiated and closed a deal with the studio Legendary Pictures for the rights to their blockbuster script, 'The Lost Patrol.' Currently the film is being packaged and hopes to hit theatres Fall of 2015.

- Cole partnered with Horwitz in May of 2012, where together they have successfully established 1inMM Productions as a leader in the industry.

# THE TEAM: Executive Profiles

# 1inMMcapital

## Gustavo Montaudon

- Veteran in the business of distribution and acquisitions for Latin America.  With over three decades of experience, his knowledge of the industry is unsurpassable.

- Founded Alebrije Entertainment, a leading programming distribution company for high quality products for television.  This venture allowed him to negotiate multiple successful output deals with prominent companies such as Netflix, Sony Worldwide and HBO in Latin America, in addition to distributing Mexican films in the United States Hispanic video market.

- Former Vice President of TV Distribution in Latin America for 20th Century Fox for 28 years, where he oversaw all sales of TV and Theatrical product in Latin America, including Video On Demand, Pay-Per-View, Free TV, Basic Cable, Internet and Syndication.

- Credited for creating synergies between Fox divisions in Mexico and Latin America to launch Theatrical movies and DVD releases of movies, sequels, TV series and the licensing of products.

## Julio Hallivis

- Innovative Producer with a fresh approach.

- Degrees in Business Administration and Film & Digital Studies

- Unit Production Manager for the film *G.E.D* and produced commercials for international brands that include Diesel, King of Shaves, Royal Caribbean, Volkswagen, Porsche, Audi, Wendy's and Pepsi.

- Worked the film festival circuit, acquiring American content for Latin America and creating great relationships with distribution companies world-wide.

- Raised money and produced his first film, *Game Time*, which is currently being distributed by Lionsgate.

- Attends major film markets as a sales agent to acquire products to distribute worldwide.

- In 2012, Hallivis partnered up with Zach Horwitz, Cole and 1inMM Productions with the goal to distribute American films to Latin America.

# THE TEAM: Executive Profiles

# 1inMMcapital

Film distribution is the process of taking a completed feature length motion picture and placing it in and/or on platforms that allow the general public to view the finished production.



MULTIPLE WINDOWS OF DISTRIBUTION

**THEATRICAL**
- View the film in a movie theatre

**DVD**
- Buy a disc and watch it at home

**VOD**
- Video on Demand, Pay to "rent" it through your cable box, iTunes, Netflix, Hulu, Roku or any other transaction driven device or platform

**BASIC CABLE**
- Wait for it to be "premiered" on a network such as ABC or TBS

- Once a feature length motion picture is finished, the producer and/or financier/s of that film own the worldwide rights BUT they must sell these rights in order to recoup their investment of the film.
- Producers and/or financiers work with foreign sale agents to sell the rights of their film to each territory in the world in order to begin to recoup their investment.
- The foreign sales company then work with distributors, both foreign and domestic, in order to sell the right to distribute this film in each distributors given territory.
- Once these rights are sold to each distributor, that distributor then is able to release the film through the output deals that each distributor has in place in some or all windows of distribution.
- Thus, allowing the general public to view the same film, usually dubbed into different languages, all across the globe.

# FEATURE FILM DISTRIBUTION: The Basics

# 1inMMcapital

- Representatives from 1inMM Capital travel to each major film market throughout the year in search of feature length films that meet the criteria for each output deal (Netflix, Sony, HBO).

- The title is then immediately sold to the selected output deal for the pre-negotiated licensing fee.

SEARCH

TITLE IS SOLD TO OUTPUT DEAL

STRATEGIC CONNECTIONS

- Through strategic connections within the industry, specifically foreign sales agents, meetings are set up at each market to discuss a plethora of films that meet the criteria of the output deals.

- If the profit margin meets 1inMM Capital's standards, a deal is closed with the Foreign Sales representative and the rights to distribute the given title is transferred to 1inMM Capital for the licensing period negotiated (10-15 years).

OBTAIN RIGHTS TO DISTRIBUTE

OUTREACH TO PLATFORMS

- Once the films are narrowed down, 1inMM Capital representatives reach out to Netflix, Sony and HBO to obtain a letter of intent from each platform verifying that they will accept the titles in question and get the exact price that each platform will pay for the licensing of the title.

NEGOTIATIONS

- Once 1inMM Capital representatives have the letter of intent and licensing fee that will be paid per title/per output deal, the negotiations with the foreign sales agents begin

# WHAT WE DO: The Process

# EXHIBIT E

**From:** Craig Cole
**To:** Ryan Spiegel
**Cc:** Zach Avery
**Subject:** Fwd: 1inMM Cap - Oct Incoming Statement
**Date:** Thursday, December 12, 2019 10:11:38 PM
**Attachments:** 1INMM CAP - OCT INCOMING STATEMENT.pdf

Hey Ryan,

See attached bank statement of incoming wires from HBO. It goes without saying this is beyond confidential. We've never shared this before as everything with HBO, Netflix, etc. we hold extremely close to the chest, for good reason.

Assuming this should suffice, as you can see, a lot of deposits. There are 4 marked at the end of the doc, 3 of those are for Warning Shot, Heart Beats Loud, and Lexi. The other is one I bought personally from that set to complete it.

Then you literally have to sign the wire docs for outgoing to FSA, that should be good.

Fluffy set of available films coming next!

Cheers.

C + Z

RES0558

XH1309DPCSTM        10311900123820290

Page 1      (0)

Account #: 123820290

This statement: October 31, 2019          Contact us:
Last statement: September 30, 2019        800 773-7100

City National Bank
400 N Roxbury Drive
001                              0830N    Beverly Hills CA  90210
1INMM CAPITAL, LLC
9615 BOLTON RD                            cnb.com
LOS ANGELES CA 90034

REASURY SERVICES FEE ADJUSTMENTS EFFECTIVE NOVEMBER 1, 2019 -
REASURY NET BASIC- MONTHLY FEE- $35 TOTAL (UP TO 5 ACCOUNTS/MONTH) -
SI LINK CONNECTOR- MONTHLY FEE- $300 PLEASE CONSULT WITH YOUR BRANCH
PRESENTATIVE IF YOU HAVE ANY QUESTIONS

alyzed Business Checking

| Account Summary | | Account Activity | | |
|---|---|---|---|---|
| Account number | 123820290 | Beginning bal | (9/30/2019) | $1,180,902.49 |
| Minimum balance | $50,899.49 | Deposits | (0) | + 0.00 |
| Average balance | $1,592,162.14 | Electronic cr | (46) | + 39,924,900.00 |
| Avg. collect bal | $1,592,162.00 | Other credits | (19) | + 9,864,045.00 |
| | | Total credits | | +$49,788,945.00 |
| | | Checks paid | (0) | - 0.00 |
| | | Electronic db | (33) | - 37,789,461.00 |
| | | Other debits | (6) | - 1,894,000.00 |
| | | Total debits | | - $39,683,461.00 |
| | | Ending balance | (10/31/2019) | $11,286,386.49 |

ELECTRONIC CREDITS

| ate | Description | | | | Credits | Control Number |
|---|---|---|---|---|---|---|
| )-1 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3923 | | 575,000.00 | 191001000014886 |
| )-3 | Incoming Wire - Dom | FR ACC 00123705270 | 3924 | | 738,500.00 | 191003000003921 |
| )-3 | Incoming Wire - Dom | FR ACC 00800069120 | 3925 | | 743,500.00 | 191003000003925 |
| )-3 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 744,800.00 | 191003000003922 |
| )-7 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3923 | | 200,000.00 | 191007000004121 |
| )-7 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3923 | | 500,000.00 | 191007000001018 |
| )-7 | Incoming Wire - Dom | FR ACC 00800069120 | 3927 | | 739,750.00 | 191007000007400 |
| )-7 | Incoming Wire - Dom | FR ACC 00800069120 | 3928 | | 742,500.00 | 191007000007402 |
| )-9 | Incoming Wire - Dom | FR ACC 00800069120 | 3929 | | 739,800.00 | 191009000000802 |
| )-9 | Incoming Wire - Dom | FR ACC 00800069120 | 3930 | | 740,500.00 | 191009000000801 |

:XH1309DPCSTM          10311900123820290


1INMM CAPITAL, LLC                    Page 2
October 31, 2019                      Account #: 123820290


ECTRONIC CREDITS (Continued)

| ate | Description | | | | Credits | Control Number |
|-----|-------------|---|---|---|--------:|----------------|
| )-9 | Incoming Wire - Dom | FR ACC 00800069120 | 3931 | | 741,500.00 | 191009000006193 |
| )-9 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3939 | | 1,407,500.00 | 191009000007931 |
| )-9 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3939 | | 1,409,500.00 | 191009000007929 |
| )-9 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3939 | | 1,413,750.00 | 191009000007930 |
| )-11 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 739,200.00 | 191011000011835 |
| )-11 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 742,500.00 | 191011000011834 |
| )-11 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 742,800.00 | 191011000011848 |
| )-15 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 738,500.00 | 191015000003412 |
| )-15 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 740,750.00 | 191015000003410 |
| )-16 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3939 | | 940,200.00 | 191016000002713 |
| )-16 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3922 | | 977,650.00 | 191016000002711 |
| )-16 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3942 | | 980,200.00 | 191016000002712 |
| )-17 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3931 | | 221,850.00 | 191017000006574 |
| )-17 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 739,000.00 | 191017000006646 |
| )-17 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 739,850.00 | 191017000009201 |
| )-17 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3953 | | 1,996,650.00 | 191017000010204 |
| )-18 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3921 | | 959,500.00 | 191018000000558 |
| )-18 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3927 | | 965,000.00 | 191018000000559 |
| )-21 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 743,000.00 | 191021000000714 |
| )-21 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 743,500.00 | 191021000000715 |
| )-21 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 744,700.00 | 191021000000716 |
| )-21 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3981 | | 973,500.00 | 191021000000717 |
| )-22 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3986 | | 1,414,500.00 | 191022000008178 |
| )-23 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3914 | | 1,411,250.00 | 191023000003497 |
| )-24 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3900 | | 1,410,800.00 | 191024000005837 |
| )-24 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3967 | | 1,414,500.00 | 191024000005838 |
| )-25 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 740,500.00 | 191025000006042 |
| )-25 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 744,000.00 | 191025000006043 |
| )-25 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 744,250.00 | 191025000006041 |
| )-28 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 739,800.00 | 191028000005094 |
| )-28 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 740,000.00 | 191028000005096 |
| )-28 | Incoming Wire - Dom | FR ACC 00800069120 | 3926 | | 742,500.00 | 191028000005095 |
| )-30 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3977 | | 997,162.00 | 191030000008123 |
| )-30 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3971 | | 1,003,101.00 | 191030000008001 |
| )-30 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3973 | | 998,860.00 | 191030000005829 |
| )-30 | Incoming Wire - Dom | FR HOMEBOXOFFICETM125 | 3972 | | 995,498.00 | 191030000005832 |

# EXHIBIT F

| | |
|---|---|
| **From:** | Craig Cole |
| **To:** | Ryan Spiegel |
| **Cc:** | Zach Avery |
| **Subject:** | OCT DEAL FLOW |
| **Date:** | Monday, September 30, 2019 2:00:49 PM |
| **Attachments:** | SAC - OCT - Deal Flow.pdf |

Hey Ryan,

See attached deal flow. Funding 10/3.

Cheers!

-CC

**BOTTOM OF THE 9TH**

(2019) – ENGLISH – Drama

Cast – Sofia Vergara / Joe Manganiello / Denis O'Hare

Director – Raymond De Felitta

Writer – Robert Bruzio

Logline: After serving 17 years in prison for a violent mistake he made in his youth, a once-aspiring baseball player returns to his Bronx neighborhood.

Price: $738,500.00 --- HBO 6 MONTHS --- $900,970.00

Funding Date: 10/03/19

**CRUEL PETER**

(2019) – ENGLISH– Horror

Cast – Rosie Fellner / Genry Douthwaite / Angelica Alleruzzo

Director – Christian Bisceglia

Writer – Christian Bisceglia

Logline: It is Christmas 1908 in Messina, one of the richest merchant cities of the Mediterranean. Peter, the 13 year-old son of a rich English family is notorious for his cruelty to children, animals and servants. One night he is ambushed and wakes up in a coffin underground in the city's Gothic cemetery, buried in retaliation for his callousness by a servant boy from his mother's estate.

Price: $741,500.00 --- HBO 6 MONTHS --- $904,630.00

Funding Date: 10/03/19

**IRON SKY: THE COMING RACE**

(2019) – ENGLISH – Action / Adventure

Cast – Udo Kier / Tom Green / Julio Dietze

Director – Timo Vuorensola

Writer – Dalan Musson

Logline: A follow-up to the film Iron Sky in which Nazis plan to take over the world after lying dormant in a secret military base on the moon.

Price: $744,800.00 --- HBO 6 MONTHS --- $908,656.00

Funding Date: 10/03/19