# EXHIBIT H

# DISTRIBUTION AGREEMENT

This Distribution Agreement ("Agreement"), dated (07/02/19), confirms the terms and conditions pursuant to which HBO Latin America Holdings ("HBO"), shall acquire from 1inMM Capital LLC, with an address at 3129-A S. La Cienega Blvd, Los Angeles, California, 90016 ("1inMM"), certain distribution rights in the "Program" in the "Territory" (as such terms are defined below) subject to the terms contained herein, all as set forth below.

1.     Definitions. All capitalized terms set forth herein, unless elsewhere defined, shall have the following meanings:

a.     "Authorized Languages" means all languages, including all dubbed, voice-lectored and subtitled versions.

b.     "Availability Date" shall have the meaning set forth in Section 4.

c.     "Final Delivery" shall mean 1inMM's full, final and complete delivery of the Delivery Items for the Program (including any and all attempts to cure), of quality acceptable to HBO, as confirmed in writing by HBO.

d.     "Distribution Expenses" means all costs and expenses incurred in connection with the release, delivery, marketing, distribution and exploitation of the Program and the Rights (as defined in Section 5), including, without limitation, all expenses for advertising, marketing, promotion, merchandizing, and publicity of the Program; all expenses for the full and complete delivery of Delivery Items (as hereinafter defined) and translation thereof; shipping, mailing and insurance costs; storage; cleaning and inspection; mastering, submastering, and duplication costs, duplication of scripts and music cue sheets; residuals; renewal of music synchronization licenses and master use licenses (to the extent same are the responsibility of Licensee); all taxes (other than corporate income taxes), whether sales, gross receipts, value added, withholding, remittance, excise, property, use, transfer or similar taxes, levies, customs duties, import charges, penalties, fines or interest, however denominated, imposed and whether by a governmental authority or taxing authority (whether federal, local, territorial or state of the United States or any country in the Territory); foreign language dubbing and/or subtitling; any Third Party Payments (as defined at Section 10.a.) to the extent paid for by HBO, and all other usual distribution costs customarily incurred.

e.     "Gross Receipts" means the aggregate of all monies actually received by HBO from the exploitation of the Rights in the Territory, monies and royalties collected by a collecting society or governmental agency with respect to the exploitation of the Program on television from compulsory licenses, retransmission income, secondary broadcasts, tax rebates, less rebates, discounts, reasonable reserves for returns and bad debt (each of which will be liquidated within one (1) year from its establishment), credit adjustments, advertising agency commissions, security deposits, advances or other similar sums received until earned or forfeited or credited and any amounts received and thereafter refunded (except to the extent such sums are non-refundable) related to the Program. All Gross Receipts are the sole and exclusive property of HBO, subject only to 1inMM's contractual entitlements pursuant to Section 11 hereof.

f.     "Latin America" means Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St.

HBO-1inMM

FOIA Confidential Treatment Requested

Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.

       g.    "License Period" shall have the meaning set forth in Section 3.

       h.    "Program" means the live action feature length motion picture entitled "BLOOD QUANTUM" that was: (i) originally produced in English; (ii) directed by Jeff Barnaby starring Devery Jacobs, Michael Greyeyes and Forrest Goodluck and (iii) will be theatrically released in Mexico and/or Brazil on a minimum of 120 screens.

       i.    "Television Rights" means the right to exhibit, distribute market, display, transmit, broadcast, perform, transmit, reproduce, advertise, publicize, sell copies of, license, derive revenues from, rent, dispose of, communicate publicly or privately, turn to account and otherwise exploit the Program by any form of television media now known or hereafter devised or commercially exploited (including, but not limited to subscription pay television, basic television, free television, pay-per-view, on demand, video-on-demand, free-on-demand, free-video-on-demand, subscription-video-on-demand, advertising-supported on demand, near-video-on-demand, hotel/motel, non-theatrical, electronic rental, download to rent, digital rental, electronic sell-through, digital sell-through, download to own, download to burn and on demand retention licensing), regardless of whether or how paid for, programmed, or marketed to the viewer, and regardless of how delivered to or received by the viewer (whether by over-the-air, cable, satellite, wire, fiber, ADSL, DSL, MDS, Internet, mobile, wireless, closed circuit, or other means, method, process, or device or delivery system now known or hereafter devised, discovered, created, or developed) in all versions, resolutions, formats, and sizes, and shall, for the avoidance of doubt, include without limitation reception on television sets, personal computers, IP-enabled devices, mobile devices, and analogous devices.

       j.    "Territory" shall mean Africa and Latin America.

    2.    Conditions Precedent. All of HBO's obligations hereunder will be subject to and conditioned upon the satisfaction of all of the following:

       a.    Full execution and delivery to HBO of this Agreement; and

       b.    Final Delivery (including HBO's receipt and written approval of: (i) a complete typewritten statement of all third party screen and paid advertising credit, name and likeness, and other third party obligations, restrictions and approval rights (including all third party obligations, restrictions and approvals necessary for HBO's creation of Local Language Versions) as further set forth in Paragraph 5 of the Legal Delivery section of Exhibit B (collectively, the "Paid Ad Restrictions"); (ii) all chain of title documents for the Program and documents necessary to establish 1inMM's valid copyright in the Program, and (iii) all Delivery Items) occurring no later than 01/25/2020 (the "Final Delivery Date").

    3.    License Period. The "License Period" means the period commencing on the Program's Availability Date and expiring three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

HBO-1inMM

2

FOIA Confidential Treatment Requested    JJMT-SEC-0004869

4. <u>Availability Date</u>. The "<u>Availability Date</u>" means day and date with the Program's earliest video-on-demand availability date in the Mexico and/or Brazil, but in no event later than 02/25/2020.

5. Rights.

a. For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, 1inMM hereby grants to HBO, with respect to the Program, the exclusive rights throughout the Territory and during the Program's License Period to exploit, and to sublicense others the right to exploit the Television Rights in the Program (and all of its themes, materials and other elements), in all formats now known or hereafter devised (including, without limitation, high definition, standard definition and 3D), including the right to (and cause and license others to) market, advertise, publicize, derive revenues from and otherwise exploit the Program. Without limiting the generality of the foregoing, 1inMM hereby grants to HBO the sole, exclusive and irrevocable right to: (i) license the rights granted for the Program for exhibition on such terms as it deems appropriate, and HBO shall have complete discretion relating to the promotion and distribution of the Program; (ii) edit and to permit the editing of all prints of the Program to conform to time segment requirements or to the orders of any duly authorized public censorship authority and to insert commercial material at appropriate time intervals during the exhibition of the Program and to dub and subtitle and to permit the dubbing and subtitling of the Program in the Authorized Languages as it sees fit; (iii) translate the title of the Program into any language and, to the extent cultural differences necessitate that the title be changed, to change such title; (iv) manufacture and distribute, or cause to be manufactured and distributed, two-dimensional advertising, publicity and promotional materials of all types and kinds for use solely in connection with the exhibition and distribution of the Program based on the images and materials provided by 1inMM; and (v) include HBO's (or one or more of HBO's affiliates, HBO's or sub distributors) name, logo, trademark or emblem in such manner, position, form and substance as HBO may elect on the prints of the Program, and on all advertising and publicity material for the Program together with such words as HBO may elect indicating that the Program is being distributed by HBO or one of its sub distributors, licensees or any of its affiliates.

b. Without limiting the foregoing, 1inMM further grants to HBO the right to use and license the use of trailers, excerpts, clips supplied by 1inMM or made by HBO and stills supplied by 1inMM from the Program in connection with the promotion and exploitation of the Program, to collect all copyright royalties, retransmission, private copy or similar monies relating to the Program, and to use the approved names, voices and likenesses, which 1inMM shall provide to HBO in a timely manner, of all persons who appear in, or above-the-line persons who rendered services in connection with, the production of the Program for the purpose of advertising and promoting the Program.

c. 1inMM acknowledges that any inadvertent, unavoidable, incidental and de minimus overspill of an unencrypted satellite signal outside of the Territory shall not constitute a breach of this Agreement.

d. 1inMM shall include the following credit information in any version of the Program authorized by 1inMM for exhibition hereunder as well as in all advertising and promotional materials authorized for exhibition or dissemination in association therewith: "[1inMM TO PROVIDE COPYRIGHT NOTICE]."

e. The rights granted to HBO in this Section 5 shall be referred to herein as the "<u>Rights</u>".

HBO-1inMM.

3

FOIA Confidential Treatment Requested

Case 2:24-cv-07659-X CASD Document 1 Filed 04/05/24 Page 5 of 36
Case 2:21-cv-02927-CAS-GJS Document 1-3 Entered on FLSD Docket 02/27/2025 Page 5 of 36
#:1603

6. Reserved Rights. All rights and licenses in the Program not granted to HBO hereunder (i.e., theatrical, derivative, novelization, souvenir, music publishing and music soundtrack rights, merchandising, publication, commercial tie-in and/or co-promotion (unless approved in writing by 1inMM but in no event on an exclusive basis), product placement, games, videogames, ring tones, alerts, wallpapers, screensavers, messaging applications, digital greeting cards, theme park and location based entertainment, remake, sequel, tv series, live stage/stage play, clip license rights (which excludes, for the avoidance of doubt, the right to use clips for promotional purposes as set forth in Section 5.b.), and all rights to the underlying material to the Program) are reserved by 1inMM and may be exploited by 1inMM without limitation or restriction by HBO except as may be set forth herein.

7. Delivery. No later than thirty **(30) days after the execution of this Agreement,** 1inMM shall, at its sole cost and expense, deliver to HBO all elements, materials, documents and advertising and promotional materials set forth Exhibit B (which is attached hereto and incorporated herein by this reference), with respect to the Program (the "Delivery Items"). All Delivery Items shall be of first class technical quality suitable for the manufacture of first class broadcast quality exhibition materials of the Programs, as determined in HBO's sole discretion. HBO shall provide notice to 1inMM specifying any technical defect within thirty (30) days of receipt of the Delivery Items from 1inMM. Upon such notice to 1inMM, 1inMM shall either (i) correct the defect and redeliver the corrected Delivery Item or (ii) deliver a replacement Delivery Item within thirty (30) days of receipt of HBO's notice. Approval by HBO of less than all Delivery Items or any exploitation of the Program will not be deemed a waiver by HBO of 1inMM's obligation of complete delivery of the Program hereunder. In the event that 1inMM, or any distributor or licensee of 1inMM, has prepared or subsequently prepares a version of the Program dubbed and/or subtitled in any Authorized Language ("Local Language Version"), 1inMM shall provide and HBO shall have unrestricted access to such Local Language Version at no cost, including any dubbed or subtitled tracks of the Program. In no event shall Final Delivery (including any and all attempts to cure) occur later than the Final Delivery Date.

8. Distribution Fee. In connection with HBO's exploitation of Rights in the Territory, HBO shall retain a Distribution Fee as set forth in the table below:

| Gross Receipts | Distribution Fee |
|---|---|
| Gross Receipts equaling or less than US$400,000.00 | 25% |
| Gross Receipts over US$400,000.00 | 40% |

9. Advance. Subject to the terms and conditions of this Agreement and provided all of the Conditions Precedent have been satisfied (including full and Final Delivery having occurred by the Final Delivery Date), and 1inMM is not in breach of this Agreement or, for the avoidance of doubt, any other agreement, HBO shall pay in connection with the Program, a fully recoupable and cross-collateralized advance (the "Advance") in an amount equal to Nine Hundred Ninety-Eight Thousand Eight Hundred Sixty-Five U.S. Dollars ($998,865.00), as further set forth in Section 12. Upon the satisfaction of all of the terms set forth herein, the Advance shall be due and payable in one lump sum payment six (6) months after HBO's receipt of a valid invoice from 1inMM.

HBO-1inMM

4

Exhibit 2c Page 43

**FOIA Confidential Treatment Requested**

JJMT-SEC-0004871

10. Certain Expenses.

    a. Third Party Payments. As between 1inMM and HBO, 1inMM shall be responsible for, and shall pay, all third party payments (other than performance fees for the public performance of any music contained in the Program) that may become payable as a result of HBO's exploitation of its rights hereunder ("Third Party Payments") including, without limitation, any and all mechanical reproduction fees, download fees, payments and/or tariffs with respect to exploitation, advertising and promotion of the Program and residuals, reuse fees, and participations in the proceeds (net or gross) of the Program. If 1inMM fails to make such payments, HBO shall have the right (but not the obligation) to make such Third Party Payments and may: (i) deduct from amounts payable to 1inMM hereunder any such amounts paid to third parties; and/or (ii) invoice 1inMM for any such amounts paid to third parties.

    b. Payment of Distribution Expenses. As between 1inMM and HBO, HBO shall be responsible for and shall pay all Distribution Expenses. Distribution Expense(s) incurred by HBO shall be deducted as provided in Section 11 below.

11. Allocation of Gross Receipts. In full consideration of the Rights and the representations, warranties and covenants made by 1inMM hereunder, HBO shall pay to 1inMM, for the Program, an amount ("1inMM's Share") equal to one hundred percent (100%) of the Net Receipts (as defined below) derived from the distribution and exploitation of the Program by HBO. As used herein, the term "Net Receipts" shall mean all Gross Receipts less the following deductions in the following order of priority: (a) HBO's Distribution Fee as set forth in Section 8 on account of the exploitation of the Programs by HBO; (b) all Third Party Payments to the extent paid for by HBO; (c) all Distribution Expenses in connection with the exploitation of the Program by HBO; provided, however, that expenses for advertising, marketing, promotion and publicity of the Programs shall not exceed Five Percent (5%) of Gross Receipts without 1inMM's prior written consent, and (d) the Advance.

12. Payments and Accounting Statements.

    a. HBO shall have the right to cross-collateralize the Gross Receipts (after HBO deducts its Distribution Fee) earned for exploitation of the Rights in the Program throughout the Territory and the Term for purposes of recouping the Distribution Expenses, Third Party Payments, and the Advance, and calculating 1inMM's Share.

    b. Subject to Section 11 hereof, HBO shall credit 1inMM's Share to the Program to 1inMM as follows: ninety (90) days after each quarter for the three (3) years

    c. All payments due hereunder shall be payable in U.S. Dollars. 1inMM hereby directs HBO to make any and all payments due under this Agreement to 1inMM as set forth below:

        **Bank Name:** City National Bank
        **Bank Address:** 8641 Wilshire Blvd. Beverly Hills, CA 90211
        **ABA Number:** 122016066
        **Account Number:** 127412944
        **Account Name:** 1INMM CAPITAL LLC

    d. HBO shall account to 1inMM and provide customary participations statements for the following periods in which related Gross Receipts are received: ninety (90) days after each quarter for the three (3) years. Such customary participations statements shall be in a form HBO customarily details such calculations for other licensors. If in any period the

HBO-1inMM

5

FOIA Confidential Treatment Requested

JJMT-SEC-0004872

deductions allowed pursuant to this Agreement for the Programs exceed Gross Receipts reported for the Programs, such excess shall be deducted from Gross Receipts in each succeeding period, as applicable, until such excess has been totally recouped. Accounting Reports shall be sent to the parties as set forth in Section 20.

e. HBO shall not be liable for any default or delay in payments from any licensee of HBO with respect to the Programs, provided that HBO shall take commercially reasonable steps to cause such licensee to pay any monies owed by such licensee in connection with its license of the Programs.

13. 1inMM's Representations and Warranties. 1inMM hereby covenants, warrants and represents to HBO each and all of the following.

a. The Program is protected by all the applicable copyright laws throughout the Territory and that such copyrights are and shall be valid and subsisting throughout the Territory during the Program's License Period.

b. The Program, when delivered to HBO and thereafter, will be free and clear of any lien, claim, charge, encumbrance, security interest, restriction, agreement, commitment or arrangement with any third party which would, in any way, interfere with, impair or adversely affect any of the Rights granted to HBO hereunder, and (other than as specifically provided in this Agreement) there are and will be no payments of any kind required to be made by HBO in respect of, or as result of, any use by HBO of such Program hereunder.

c. 1inMM will not exploit and will not authorize any third party to exploit Television Rights in the Program prior to (and, for the avoidance of doubt, during) the License Period hereunder.

d. The Program shall not contain any product placement or product integration, except as set forth in a letter to HBO no later than the Final Delivery Date, signed by 1inMM, setting forth all product placement arrangements entered into in connection with the Program and the consideration provided by both the supplier (e.g., payment, free or discounted product) and the production (e.g., visible display of labels, verbal mention of brand, etc.). For any non-monetary consideration received from suppliers, 1inMM shall provide HBO an estimate of the value of such consideration (in U.S. Dollars). 1inMM's letter shall be accompanied by available substantiating documentation (e.g., written agreements, confirmation letters) as well as a listing of the footage notations determined on the same basis as the "Combined Continuity, Dialogue and Spotting List" at which all such product placements are seen or heard.

e. 1inMM has obtained all of the rights, permissions and licenses (including all music synchronization licenses) required to enable HBO to fully exploit the Program pursuant to the terms of this Agreement including, without limitation, the right to use any performers' names, voices, likenesses and biographies to advertise and promote such Program.

f. No part of the Program (including the music contained therein) nor HBO's exercise of any rights granted hereunder will infringe upon the trademark, trade name, copyright, right of privacy, property right or any other right of any person or entity, and no part of the Program shall contain anything defamatory, tortious or which would violate the common law, statutes or regulations of any jurisdiction.

g. To the extent the Program or any underlying property is based upon or related to, events in the life of real persons, living or dead, or portrays real persons, 1inMM has obtained all personal releases and other rights necessary to permit HBO to exploit the Program in

HBO-1inMM

6

FOIA Confidential Treatment Requested

Exhibit 2c Page 45

JJMT-SEC-0004873

the manner provided herein without violating any third party rights or incurring any obligation to any third party.

    h.    1inMM has full power and authority to make this Agreement and has not done and will not do, or permit any person or entity to do, anything which would interfere with the full performance of 1inMM's obligations or HBO's rights hereunder; this Agreement is the legally valid and binding obligation of 1inMM enforceable against 1inMM in accordance with its terms; and 1inMM is a corporation duly formed and validly existing in good standing under the laws of Florida.

    i.    The non-dramatic performing rights to all music contained in the Program are (a) controlled by BMI, ASCAP, SOCAN, SESAC or a performing rights society having jurisdiction in the Territory; (b) in the public domain; or (c) controlled by 1inMM (in which event such rights are hereby licensed to HBO to the extent necessary for the exercise of HBO's rights hereunder). 1inMM does not represent or warrant that HBO may exercise the performing rights in the music without the payment of a performing rights royalty or license fee for music falling within category (a). As between HBO and 1inMM, HBO shall be responsible for the payment of any required performing rights royalty or license fee.

    j.    1inMM is familiar with and shall abide by the requirements of the Foreign Corrupt Practices Act and meets all the eligibility requirements for the safe harbor certification set forth in 18 U.S.C. section 2257A(h)(1) and 28 C.F.R. section 75.9(a)(1)-(3).

    k.    All Delivery Items delivered by 1inMM as part of delivery hereunder are complete and accurate, and HBO will incur no liability to any third party from its reliance thereon and/or compliance therewith.

    14.    HBO's Representations and Warranties. HBO hereby covenants, warrants and represents to 1inMM it has the full power and authority to make this Agreement; this Agreement is the legally valid and binding obligation of HBO enforceable against HBO in accordance with its terms; HBO is a corporation duly formed and validly existing in good standing under the laws of the state of California.

    15.    Indemnification. Each party hereto (the "Indemnifying Party") shall indemnify, defend and hold harmless the other party, and its successors, licensees, assigns, and employees, officers and directors (collectively, for the purposes of this Section, referred to as "Indemnified Party") from and against any and all liability, loss, damage, cost and expense, including, without limitation, reasonable attorneys fees (but excluding lost profits or consequential damages) arising out of any breach or alleged breach (including, in the case of 1inMM as Indemnifying Party, a breach of 1inMM's delivery requirements hereunder), or claim by a third party with respect to any warranty, representation or agreement made by the Indemnifying Party herein. The Indemnified Party shall give prompt written notice to the Indemnifying Party of any claim to which the foregoing indemnification applies and the Indemnifying Party shall undertake, at its own cost and expense, the defense thereof, provided that the failure to provide such notice shall excuse the Indemnifying Party's obligations only to the extent such failure prejudices the Indemnifying Party. The Indemnified Party may, at its option and expense, engage its own counsel. If the Indemnified Party settles or compromises any such suit, claim or proceeding, the amount thereof shall be charged to the Indemnifying Party, provided that the Indemnifying Party's approval, to be reasonably exercised, has been secured. Neither party may settle any claim or action without the prior written consent of the other party if such settlement would in any manner materially impair or inhibit the quiet enjoyment of such other party's rights hereunder or would result in any manner of injunctive or injunctive-like relief.

HBO-1inMM

7

Exhibit 2c Page 46

FOIA Confidential Treatment Requested    JJMT-SEC-0004874

16.     Default. 1inMM shall be in default of this Agreement upon the occurrence of any of the following (collectively, the "1inMM Events of Default"): (i) 1inMM fails or refuses to perform its material obligations hereunder or breaches any material provision hereof, or (ii) 1inMM goes into receivership or liquidation, or becomes insolvent, or a petition under any bankruptcy act shall be filed by or against 1inMM (which petition, if filed against 1inMM, shall not have been dismissed within thirty days thereafter), or 1inMM executes an assignment for the benefit of creditors, or 1inMM takes advantage of any applicable insolvency, bankruptcy or reorganization or any other like or analogous statute, or experiences the occurrence of any event analogous to the foregoing. If 1inMM fails to cure a 1inMM Event of Default specified in (i) above that is curable within thirty (30) days from receipt of written notice from HBO of such default or immediately upon a 1inMM Event of Default under (ii) above that is not curable under (ii) above, HBO shall have the right to immediately terminate this Agreement. 1inMM acknowledges that the intellectual property rights and licenses in and to the Program granted to HBO herein would be governed by 11 USC Section 365(n) in the event of the commencement of a bankruptcy case by or of 1inMM. 1inMM acknowledges and agrees that, notwithstanding any rejection of this Agreement in any bankruptcy case, HBO may elect to continue to enjoy all exclusive rights and licenses granted in the Program for the entire License Period as provided herein.

17.     Copyright. 1inMM hereby acknowledges and agrees that the Program shall contain a copyright notice in the name of the copyright proprietor conforming to and complying with the requirements of the applicable copyright laws of the Territory, and HBO shall not remove or delete such copyright notice. Subject to 1inMM's prior written approval, not to be unreasonably withheld, conditioned or delayed, HBO may, in consultation with 1inMM, in its own name or in the name of the copyright proprietor, take such steps as HBO may deem necessary or appropriate by action at law or otherwise, to prevent any unauthorized reproductions, exhibition or distribution of the Program, any infringement of the copyright of the Program or any impairment of or encumbrance on the rights granted to HBO hereunder, provided that should HBO commence any action in the name of 1inMM, HBO shall indemnify 1inMM against any out-of pocket costs, damages, and reasonable attorney fees. 1inMM agrees that it shall promptly execute and deliver to HBO the Assignment of Distribution Rights Under Copyright which is attached hereto as Exhibit A and incorporated herein by this reference and that upon the request of HBO it shall promptly execute and deliver to HBO such additional documents as HBO may need in connection with the foregoing. 1inMM hereby irrevocably appoints and designates HBO as its attorney-in-fact to exercise and file all such documents requested by HBO pursuant to this Section. This power-of-attorney is coupled with an interest.

18.     Distribution. All decisions concerning the advertising, marketing, distribution and exploitation of the Program and the rights herein granted shall be under HBO's sole and exclusive control, it being expressly understood that HBO shall not be required to continuously distribute the Program. The Program will be marketed appropriately as determined in HBO's good faith judgment, but in no event shall HBO be required to incur marketing costs. HBO makes no representation, warranty, guarantee or agreement as to the amount of receipts which may be derived from the distribution, exhibition or other exploitation of the Program and the Rights, nor does HBO guarantee the performance of any contract for the exhibition of the Program. Notwithstanding anything to the contrary contained herein, HBO shall have the right, in HBO's sole discretion, to withhold distribution of the Program or to withdraw the Program from distribution anywhere in the Territory at any time during the License Period.

HBO-1inMM

8

FOIA Confidential Treatment Requested                                    JJMT-SEC-0004875

19.    Insurance. 1inMM shall secure and maintain standard commercial general liability and errors and omissions liability insurance in the minimum amounts of $5,000,000 per occurrence/$5,000,000 aggregate with a deductible not larger than $25,000 until four (4) years after the initial exhibition of the Program, which policy(ies) shall be endorsed to name HBO Latin America Holdings, its parents, subsidiaries, licensees, successors, and related and affiliated companies, and their officers, directors, employees, agents, representatives, assigns and its subdistributors (collectively "Beneficiaries") as additional insureds as their interests may appear and shall contain an endorsement negating the "other insurance clause" therein, together with an endorsement that such policies are primary and that any insurance carried by the Beneficiaries is neither primary nor contributory. 1inMM shall deliver to HBO a certificate and endorsements evidencing such insurance concurrently with the execution of this Agreement. A prior thirty (30) days notice of cancellation or non-renewal will be provided to HBO and will be shown on the certificate.

20.    Notices. All notices, claims, certificates, requests, demands and other communications under this Agreement shall be made in writing and shall be delivered by hand or sent by facsimile, or sent, postage prepaid, by express mail, or reputable overnight courier service, and shall be deemed given when so delivered by hand; if faxed, on the business day of receipt as evidenced by a fax confirmation sheet, or two business days after deposit with an express mail or overnight courier to the parties at the following addresses (or at such other address for a party as shall be specified by like notice):

If to 1inMM:   1inMM Capital LLC
               3129-A S. La Cienega
               Los Angeles, Ca 90016
               Attn: Zachary Horwitz

If to HBO:     HBO Latin America Holdings
               c/o Home Box Office International
               2500 Broadway #4
               Santa Monica, California 90404
               Attn: Senior Vice President, Sales Planning
               Facsimile: 1-310-382-3000

With a copy to:

               Home Box Office
               2500 Broadway #4
               Santa Monica, California 90404
               Attn: General Counsel
               Facsimile: 1-310-244-0510

HBO-1inMM

9

Exhibit 2c Page 48

FOIA Confidential Treatment Requested                    JJMT-SEC-0004876

Case 1:24-cv-05927-VM-OTW Document 18-1 Filed 05/21/24 Page 11 of 36
Case 1:21-cv-05927-VA Document 1-3 Filed 07/07/21 Page 11 of 36
#:1609

21. <u>Governing Law/Disputes</u>.

a. The internal laws of the State of California (as opposed to the choice of law rules) and the United States of America shall govern the validity, construction and interpretation of this Agreement, the performance by the parties of their respective obligations and all other causes of action (whether sounding in contract, in tort or arising under statute) arising out of or relating to this Agreement or to the Program.

b. All actions, proceedings, controversies and claims based upon, arising out of or resulting from this Agreement, the breach thereof or its enforcement, arbitrability (including the scope of this arbitration provision) or interpretation shall be submitted to JAMS ("<u>JAMS</u>") for binding arbitration under its Comprehensive Arbitration Rules and Procedures if the matter in dispute is over $250,000 or under its Streamlined Arbitration Rules and Procedures if the matter in dispute is $250,000 or less (the "<u>Rules</u>"). Such Arbitration shall be held solely in Los Angeles, California, in the English language. Each arbitration shall be conducted by an arbitral tribunal (the "<u>Arbitral Board</u>") consisting of a single arbitrator who shall be mutually agreed upon by the parties. If the parties are unable to agree on an arbitrator, the arbitrator shall be appointed by JAMS. The arbitrator shall be a retired judge with at least ten (10) years experience in commercial matters. Except with respect to requests for interim relief, neither party shall be entitled or permitted to commence or maintain any action in a court of law with respect to any matter in dispute until such matter shall have been submitted to arbitration as herein provided and then only for the enforcement of the Arbitral Board's award. Neither party shall challenge or resist any enforcement action taken by the arbitrator against the losing party. In addition, the prevailing party in any arbitration or legal proceeding relating to this Agreement shall be entitled to all reasonable expenses including, without limitation, reasonable attorney's fees. Each party shall be permitted to engage in formal discovery with respect to any dispute arising out of, in connection with or related to this Agreement, the provisions of Section 1283.05 of the California Code of Civil Procedure being incorporated herein by this reference.

c. 1inMM hereby acknowledges that the Program and the exploitation rights granted to HBO hereunder are of a special, unique, extraordinary and intellectual character which gives them a peculiar value, for the loss of which HBO cannot be reasonably or adequately compensated in damages in any action at law and that a breach of this Agreement by 1inMM will cause HBO irreparable injury and damage. 1inMM therefore expressly agrees that in the event of a breach or threatened breach of this Agreement by 1inMM, HBO shall be entitled to seek injunctive and other equitable relief against 1inMM in HBO's discretion to end or prevent such breach and to secure enforcement of this Agreement. Resort to such equitable relief, however, shall not be construed as a waiver of any other rights or remedies which HBO may have for damages or otherwise. Notwithstanding any other provision of this Agreement, 1inMM's sole remedy for any breach by HBO of this Agreement shall be an action at law for damages and 1inMM acknowledges that such damages are fully adequate to compensate 1inMM in the case of any breach by HBO hereunder. In no event shall 1inMM have any right to terminate this Agreement or seek or be entitled to rescission, injunctive or other equitable relief.

22. <u>Miscellaneous Terms</u>.

a. This Agreement constitutes the entire agreement of the parties and supersedes all prior oral or written agreements between them concerning the same subject. This Agreement may only be amended or modified by a written instrument executed by the parties to this Agreement. No failure or delay on the part of either party in exercising any of its respective rights hereunder upon any failure by the other party to perform or observe any condition,

HBO-1inMM

10

FOIA Confidential Treatment Requested

Exhibit 2c Page 49

covenant or provision herein contained shall operate as a waiver thereof, nor shall any single or partial exercise of any such rights preclude any other or further exercise thereof or the exercise of any other or further exercise thereof or the exercise of any other right hereunder. Without limiting the foregoing, no payment by HBO shall constitute a waiver of any term or condition of this Agreement.

      b.    This Agreement may not be assigned without the prior written consent of the other party except that HBO may assign this Agreement, or any part thereof.

      c.    Each of the parties shall execute and deliver any further documents or instruments the other may reasonably request to carry out the intent of this Agreement.

      d.    Nothing contained in this Agreement shall constitute a partnership between, or joint venture by, the parties hereto or constitute either party the agent of the other. Neither party shall hold itself out contrary to the terms of this Agreement and neither party shall become liable by reason of any representation, act or omission of the other contrary to the provisions hereof.

      e.    Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person or entity, other than the parties to this Agreement, or their permitted successors and assigns, any legal or equitable right, remedy or claim under or in respect thereof or any provision contained herein, it being the intention of the parties that this Agreement is for the sole and exclusive benefit of such parties, and any permitted successors and assigns of this Agreement and for the benefit of no other person or entity.

      f.    The section headings contained in this Agreement are for reference purposes only and shall not in any way affect the meaning or interpretation of this Agreement.

      g.    This Agreement and all of its terms shall be confidential, and each party agrees that, except as may be required by law, it shall not make any disclosures with regard thereto without the prior written approval of the non-disclosing party.

      h.    If any provision of this Agreement, or any covenant, obligation or agreement contained herein is determined by a court of competent jurisdiction to be invalid or unenforceable, such determination shall not affect any other provision, covenant, obligation or agreement, each of which shall be construed and enforced as if such invalid or unenforceable provision were not contained herein. Such invalidity or unenforceability shall not affect any valid and enforceable application thereof, and each such provision, covenant, obligation or agreement, shall be deemed to be effective, operative, made, entered into or taken in the matter and to the full extent permitted by law.

      i.    In the event of the occurrence of an event of force majeure which materially interferes with the production or delivery of the Program or with the rendition of 1inMM's material obligations hereunder, HBO shall have the right to suspend this Agreement and shall have the right, but not the obligation, to extend this Agreement by the length of any such suspension.

HBO-1inMM

11

FOIA Confidential Treatment Requested

Exhibit 2c Page 50

JJMT-SEC-0004878

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be executed by a duly authorized representative as of the date first set forth above.

**HBO LATIN AMERICA HOLDINGS**             **1INMM CAPITAL LLC**

By: _____             By: _____

Its: _President of Operations_             Its: _M.P._____

HBO-1inMM                                                          12

Exhibit 2c Page 51

**FOIA Confidential Treatment Requested**                    **JJMT-SEC-0004879**

# EXHIBIT A
## ASSIGNMENT OF DISTRIBUTION RIGHTS
## UNDER COPYRIGHT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, 1inMM Capital LLC ("1inMM"), hereby licenses, grants, transfers and assigns to

### HBO Latin America Holdings

*aka* "HBO" (a California corporation) and its successors and assigns ("Distributor"), the sole and exclusive right, under copyright, to exhibit, distribute, market, advertise, license or otherwise exploit the following feature length motion picture ("Program") throughout the Territory for the License Period as defined below, by means of television, howsoever delivered:

> **Title of Program**: BLOOD QUANTUM
>
> **Territory**: Africa and Anguilla, Antigua, Argentina, Aruba, Bahamas, Barbados, Barbuda, Belize, Bermuda, Bolivia, Bonaire, Brazil, Cayman Islands, Chile, Colombia, Costa Rica, Cuba, Curacao, Dominica, Dominican Republic, Ecuador, El Salvador, French Guiana, Grenada, Guadeloupe, Guatemala, Guyana, Haiti, Honduras, Jamaica, Martinique, Mexico, Montserrat, Nicaragua, Panama, Paraguay, Peru, Saba, St. Barthelemy, St. Eustatius, St. Kitts & Nevis, St. Lucia, St. Maarten, St. Martin, St. Vincent & Grenadines, Suriname, Trinidad & Tobago, Turks & Caicos, Uruguay, Venezuela, and British Virgin Islands.
>
> **License Period**: Commences on the Program's Availability Date and expires three (3) years thereafter; provided, however, that the License Period shall include an additional exclusive play-off period of six (6) months for all licenses in existence as of the last day of the License Period during which HBO may continue to exercise the Rights.

1inMM hereby irrevocably appoints Distributor as its attorney-in-fact, with full power and authority to do all such acts and things, and to execute, acknowledge, deliver, file, register and record the Program and all documents pertinent thereto, in the Copyright Office of the United States of America and in any other office or offices in any other jurisdictions in the name, stead and on behalf of the 1inMM, as Distributor may deem necessary or proper to accomplish the same, this being a power coupled with an interest.

Distributor is hereby empowered by 1inMM to bring, prosecute, defend and appear in suits, actions and proceedings of any nature, concerning any copyright in and to the Program or any infringement of such copyright or violation of any of the rights licensed to Distributor herein, but at the cost and expense of Distributor, and, at its option, Distributor may join the 1inMM as a party plaintiff or defendant in any such suit, action or proceeding. Any recovery of damages, penalties, costs or other amounts arising by reason of the infringement of any such copyright(s) or violation of the rights licensed to Distributor herein has been assigned, and shall be paid, to Distributor.

HBO-1inMM

13

**FOIA Confidential Treatment Requested**

**JJMT-SEC-0004880**

This Assignment is dated as of, and is subject to all of the terms, conditions and provisions of the Agreement between 1inMM and Distributor dated as of 07/30/2019.

1INMM CAPITAL, LLC

Signed: _____

By: _____

Its: _____ /Authorized Signatory

Exhibit 2c Page 53

FOIA Confidential Treatment Requested                                                JJMT-SEC-0004881

# EXHIBIT I

LICENSE AGREEMENT

This License Agreement ("Agreement") is entered into as of March 4th, 2019 (the "Effective Date") by and between 1inMM Capital LLC, with its principal place of business at ████████████████████ ("Licensor") and NETFLIX, INC., a California Corporation, with its principal place of business at ████████████ ████████████████████ ("Netflix").

**Recitals**

Licensor is a Distributor and owner of all rights hereby granted for "Yuli" (the "Title"), directed by Iciar Bollain and "Lucia's Grace" (the "title"), directed by Gianni Zanasi.

Netflix is a digital platform.

Licensor and Netflix desire to enter into a relationship whereby Licensor will grant Netflix, among other things, a license to distribute the Title to subscribers within the Territory, as defined below, all in accordance with the terms and conditions set forth below.

**Agreement**

In consideration of the mutual promises contained herein and such other good and valuable consideration, the parties agree as follows:

1. **Definitions.**

    1.1. "Affiliate" shall mean any business entity which Licensor and Netflix directly or indirectly controls, is controlled by, or is under common control with, where "control" is defined as the ownership of at least fifty percent (50%) of the equity or beneficial interest of such entity or the right to vote for or appoint a majority of the board of directors or other governing body of such entity or otherwise possesses the power to direct the affairs of the entity.

    1.2. "Basic TV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product by means of cable, satellite or any other electronic or non-tangible means (whether analog or digital, or via the Internet or any other electronic or non-tangible medium now known or hereafter devised) where the consumer is charged a recurring fee and/or periodic access charge for the first or lowest tier(s) of service (including a tier that is required to be purchased or accessed before access to other programming services is permitted), regardless of whether such exhibition is on a regularly scheduled basis or made available to the viewer on an on demand basis at the consumer's discretion.

    1.3. "Electronic Sell-Through" or "EST" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product, solely on a non-ad supported basis, where the timing and/or selection of same is not pre-determined, but rather is at the consumer's discretion, and for which, and the right to permanently download, retain and/or have access to same, the consumer is charged a transactional fee.

    1.4. "Free TV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product by means of over the air signals (including the retransmission of such signals by cable, satellite or any other electronic or non-tangible means) whether analog or digital, or via the Internet solely on one (1) website owned and operated by one (1) free-to-air broadcaster and branded as such broadcaster's website, where the consumer (i) is not charged a fee (except for the license fee, if any, payable for the right to use a television set in certain territories) and (ii) is required to view or is otherwise exposed to commercial interruptions (display or interstitial).

    1.5. "High Definition" shall mean a resolution of greater than or equal to 720p.

Exhibit 6 Page 32

JJMT-SEC-0003898

1.6.    "Home Video" shall mean the commercial release of a motion picture, television show or other entertainment product for purchase and/or rent on optical media, such as DVD and/or Blu-ray disc.

1.7.    "Internet Transmission" shall mean the transmission of data via Internet Protocol, including without limitation through use of client software contained on a Blu-ray disc or other optical media.

1.8.    "License Fees" shall mean, collectively, as set forth in more detail in Section 4.1.

1.9.    "Licensed Languages" shall mean, for each Title hereunder, (i) its original language, (ii) neutral or Mexican Spanish (in subtitled form (and, if available, dubbed form) if the original language is other than Spanish), and (iii) Brazilian Portuguese (in subtitled form, if available (and, if available, dubbed form) if the original language is other than Brazilian Portuguese).

1.10.   "Netflix-Enabled Device" or "NED" shall mean any device capable of receiving data via Internet Transmission, subject to the security and copy protection specifications set forth in Section 2.5 or otherwise agreed to by the parties, including without limitation (i) a desktop or laptop computer; (ii) a television set; (iii) a set top box, including a box that offers an integrated personal digital video recorder (DVR); (iv) a DVD and/or Blu-ray player; (v) a game console; (vi) a portable device, including without limitation a mobile phone or tablet; or (vii) a device with a web browser interface or other like capability.

1.11.   "Netflix Service" shall mean a global subscription service that provides subscribers with on-demand access to movies and television content, and delivers such content through Internet Transmission to NEDs (including User Interfaces on same) and/or, currently in the United States only, in optical disc format (e.g., DVD, Blu-ray).

1.12.   "Pay Per View" or "PPV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product, where the timing and/or selection of same is pre-determined, and not at the consumer's discretion, where the consumer is required to view the content over a limited period of time, and for which the consumer is charged a transactional fee.

1.13.   "Pay TV" shall mean the delivery and/or exhibition of a motion picture, television show or other entertainment product by means of cable, satellite or any other electronic or non-tangible means (whether analog or digital, or via the Internet or any other electronic or non-tangible medium now known or hereafter devised) where the consumer is charged a recurring fee and/or periodic access charge in addition to or in a greater amount than any fee payable in order to receive Basic TV, regardless of whether such exhibition is on a regularly scheduled basis or made available to the viewer on an on demand basis at the consumer's discretion.

1.14.   "Source Material" shall mean the source files for the Titles and associated trailers, artwork, promotional materials and metadata (including without limitation audio and closed captioning files), the delivery specifications for which are detailed in Schedule B attached hereto.

1.15.   "Start Date" shall mean, for each Title, the date such Title may first be made available for exhibition on and distribution, as detailed on Schedule A attached hereto or, on the notifications Licensor shall provide to Netflix pursuant to Section 3.1.3.

1.16.   "Subscription Video-on-Demand" or "SVOD" shall mean the delivery and/or exhibition of motion pictures, television and/or other entertainment products on a commercially uninterrupted basis where the consumer is charged a recurring fee and/or periodic access charge for the service.

1.17.   "Taxes" shall mean all federal, state, local, foreign and other net income, gross income, gross receipts, sales, use, value added, goods and services, consumption, ad valorem, transfer, franchise, profits, withholding, payroll, excise, stamp, real or personal property, customs, duties or other taxes, fees, assessments or charges of any

Exhibit 6 Page 33

JJMT-SEC-0003899

kind whatsoever, including any related penalties and interest, imposed by any federal, territorial, state, local, or foreign government or any agency or political subdivision of any such government.

1.18. "Term" shall mean the period commencing on the Effective Date and ending on the expiration date of the last to expire Title License Period.

1.19. "Territory" shall mean the following countries and each of their respective territories, possessions, commonwealths, and trusteeships:

Mexico;

Central America, including Belize, Costa Rica, Guatemala, El Salvador, Honduras, Nicaragua and Panamá;

South America, including Argentina, Bolivia, Brazil, Chile, Colombia, Ecuador, Paraguay, Peru, Uruguay and Venezuela; and

The Caribbean Basin Islands, including Anguilla, Antigua, Barbuda, Aruba, Barbados, British Virgin Islands, Dominica, Dominican Republic, Grenada, Guadeloupe, Haiti, Jamaica, Martinique, Montserrat, the Netherland Antilles, St. Kitts and Nevis, St. Lucia, St. Vincent and the Grenadines, Trinidad, Tobago, and the Turk and Caicos Islands.

1.20. "Theatrical" shall mean the exhibition of a motion picture, television show or other entertainment product or program (regardless of the means of delivery) in conventional, drive-in or special format (e.g., iMax) theaters that are open to the general public and for which an admission fee is charged.

1.21. "User Interfaces" shall mean web applications built using Application Programming Interfaces (commonly known as APIs) released by Netflix, which applications enable subscribers and potential subscribers to link to or otherwise use the Netflix Service on NEDs.

1.22. "Video-on-Demand" or "VOD" shall mean the delivery and exhibition of a motion picture, television show or other entertainment product, where the timing and/or selection of same is not scheduled, but rather is at the consumer's discretion, where the consumer can view the content over a limited period of time, and for which the consumer is charged a transactional fee.

1.23. "Years" shall mean three (3) successive periods of twelve (12) calendar months during the Term, the first of which shall begin on as detailed on Schedule A.


2. **Grant of Licenses.**

2.1. Title License.

2.1.1. Licensor grants to Netflix during the Term the exclusive right and license to exhibit and distribute the Title (and associated Source Material) in any or all of the Licensed Languages within the Territory solely by way of Internet Transmission via SVOD and AVOD, the Netflix Service to NEDs (including User Interfaces on same).

2.1.2. Licensor also grants to Netflix during the Term a limited, non-exclusive right and license to copy, install, compress, uncompress, encode, encrypt, decode, decrypt, display, use, cache, store and transmit the Titles (and associated Source Material) for purposes of such approved exhibition and distribution.

2.2. Marketing and Promotion.

2.2.1. Trademark License. Licensor grants to Netflix during the Term a limited, non-exclusive right and license to copy, install, display, use, cache, store, transmit, exhibit and distribute Licensor's trademark(s) and logo(s) identified on Schedule

Exhibit 6 Page 34

JJMT-SEC-0003900

C (collectively, "Licensor Marks") for purposes of exercising its rights under this Section 2.

2.2.2. Marketing; Pre-promotion. Subject to Section 5.4, Netflix may, commencing sixty (60) calendar days prior to each Title's Start Date, market and promote the availability of such Title through the any Service here granted.

2.2.3. Introductory Segments; Promotion To Non-Subscribers. Licensor grants to Netflix during the Term a limited, non-exclusive right and license to cut each Title to create short promotional clips, each of which shall consist of no more than three (3) consecutive minutes in length of a Title, an "Introductory Segment". Licensor further grants to Netflix during the Term a limited, non-exclusive right and license to (a) exhibit and distribute, solely by way of Internet Transmission, Source Material (excluding Titles) and Introductory Segments to subscribers and potential subscribers for purposes of marketing and promoting the availability of the Titles through the Netflix Service and (b) copy, install, compress, uncompress, encode, decode, encrypt, decrypt, display, use, cache, store and transmit such materials for purposes of such approved exhibition and distribution. For the avoidance of doubt, Netflix need not encrypt Introductory Segments or trailers.

2.3. Encryption; Copy Protection. Netflix shall, at all times during the Term, implement security and copy protection technologies with respect to each Title, including geo-filtering and encryption technologies, that are at least as protective as the then-current industry standard in the Territory and which shall be no less protective than those provided by Netflix to other platforms in the Territory. Once terminated this Agreement by any cause, Netflix shall destroy, eliminate and/or return to Licensee any and all protection copy.

2.4. Geo-filtering. Netflix shall, at all times during the Term, implement geo-filtering technology to restrict access to Titles, via the Netflix Service, to subscribers within the Territory that is at least as protective as the then-current industry standard in the Territory and which shall be no less protective than those provided by Netflix to other platforms in the Territory. Notwithstanding the foregoing, Licensor acknowledges that Netflix cannot guarantee that current geo-filtering technology shall be effective in every instance.

2.5. For the avoidance of doubt, Netflix may offer the Netflix Service, including the Titles licensed hereunder, on NEDs where a subscriber is required to use a third party service (including without limitation a User Interface) and/or make payment to such third party to use the Netflix Service (whether such payment is for an additional charge in order to access the Netflix Service and/or for the relevant subscription fee for the Netflix Service itself). Such third parties may also offer interactive features, such as on-screen chat functionality or simultaneous or coordinated viewing. By way of example only, the Netflix Service may be offered through a game console such as the Microsoft Xbox, wherein use of the Netflix Service by subscribers through such NED requires the payment of a recurring, material fee to Microsoft Corporation and/or payment of the relevant Netflix Service subscription fee to Microsoft Corporation.

2.6. Notwithstanding anything to the contrary in this Agreement, but without in any way limiting Netflix's security and related obligations pursuant to Sections 2.5 and 2.6 or Netflix's indemnification obligations pursuant to Section 6.3, Netflix shall not be responsible or liable for any acts or omissions of, or resulting from a consumer's use of, a third party NED and/or any third party software (including any User Interface).

2.7. Exclusivity; Holdbacks. Netflix shall be the exclusive SVOD and AVOD licensee in the Territory during such Title's Title License Period. Further, during the period commencing on the first day of the Term and continuing through the expiration of the Title License Period, as applicable, Licensor (and its Affiliates) shall not, and shall not license or permit any third party to, license, exhibit, distribute or otherwise

Exhibit 6 Page 35

JJMT-SEC-0003901

exploit such Title in the Territory other than on a Theatrical, Home Video, VOD, or purely EST, (e.g., no Basic TV exploitation, no Pay TV exploitation, no SVOD exploitation, no AVOD). Holdback against Free TV and Basic Cable only during the first 18 months. Licensor acknowledges that this provision and Licensor's performance of its obligations under this Section is essential to Netflix and its willingness to enter into this Agreement.

## 3. License Fees.

3.1. License Fees. Netflix shall pay Licensor the License Net Fee of $4,200,000.00 (Four Million Two Hundred Thousand US Dollars and 00/100), including Taxes and withholdings, agreeing both parties that any and all discounts, withholdings, taxes or similar will be absorbed by the Netflix.

3.2. Payment Details. License Fee shall be due and payable as follows: the amount of $4,200,000.00 (100%) for two (2) Titles due 365 days after the delivery of the required materials as established in this Agreement and as defined on Schedule A.

3.3. Taxes. Each party shall, as set forth in more detail in Section 5, indemnify the other for failure to pay any Taxes payable by such party pursuant to this Section and/or applicable law.

## 4. Delivery.

4.1. Source Material. Licensor shall create and deliver, at its sole expense, Source Material for each Title set forth on Schedule A as of the Effective Date to Netflix no later than ninety (90) calendar days prior to the applicable Start Date or such other date agreed to in writing by the parties. Source Material shall be loaned to Netflix for the purpose of encoding and shall be, at Licensor's option, either destroyed or, with written notice, returned to Licensor within ninety (90) calendar days of accepted delivery. Licensor shall also provide, at Netflix's request, accurate music cue sheets for each Title.

4.2. Specifications. All Source Material shall be provided to Netflix in accordance with the specifications set forth in, and accompanied by all information required by, Schedule B. For the avoidance of doubt, in the event that Source Material is provided in encrypted format, including for example on DVD, Netflix shall be permitted to decrypt such media as necessary prior to encoding and/or encode directly from such media. Notwithstanding anything to the contrary in this Agreement, no advertising elements (pre-roll, bugs, bumpers, placards, etc.) or overlay branding (either Licensor's or any other third party's) shall be included before, after or within any Source Material for a Title delivered hereunder. Source Material shall be delivered in the highest quality and resolution available to Licensor (e.g., if not available in 1080p, then delivered in 1080i, or if not available in 1080i, then delivered in 720p), including without limitation High Definition

4.3. Acceptance. Upon Netflix's receipt of the Source Material for a Title, Netflix shall have thirty (30) calendar days in which to send Licensor written notice of its acceptance ("Notice of Acceptance") or rejection ("Notice of Rejection") of the Source Material for that Title, such acceptance or rejection to be determined by Netflix based solely upon whether such material complies with Schedule B.

4.4. Rejection. Upon Licensor's receipt of a Notice of Rejection, if any, Licensor shall, without delay and at its sole expense, replace the defective Source Material. In the event that Licensor is unable to provide an acceptable Source Material replacement, Netflix shall not be obligated to pay any License Fee with respect to the relevant Title.

Exhibit 6 Page 36

JJMT-SEC-0003902

5. **Representations and Warranties; Indemnification; Limitation on Liability.**

5.1. Netflix. Netflix represents, warrants and covenants that (i) it has the full right, power, legal capacity and authority to enter into and fully perform its obligations under this Agreement; (ii) there are not now any liens, claims, encumbrances, legal proceedings, agreements or understandings which might conflict or interfere with, limit, derogate from, be inconsistent with any of Netflix's representations, warranties or covenants contained in this Section 6.1. (iii) it has satisfied and shall satisfy during the Term all third party obligations of any kind with respect to the obligations acquired by this Agreement and with any third party, including the viewers of Netflix; (iv) Netflix's distribution and other exploitation of the Titles (and associated Source Material and Introductory Segments) granted by this Agreement to Netflix shall not violate or infringe any rights of any third party, including without limitation any third party intellectual property rights, contract rights, moral rights, rights of publicity, and rights of privacy, or defame or constitute unfair competition against such third party; and (v) Netflix's distribution and other exploitation of same in accordance with this Agreement shall not violate any applicable law, rule or regulation.

5.2. Licensor. Licensor represents, warrants and covenants that (i) it has the full right, power, legal capacity and authority to enter into and fully perform its obligations under this Agreement, and neither it nor an Affiliate has entered into an agreement with another party which is inconsistent with the terms of this Agreement or would otherwise prevent Licensor from fulfilling its obligations as to the Titles or under this Agreement; (ii) it has and shall maintain during the Term all necessary rights, titles, authorizations, consents and interests, including without limitation from all third party rights holders for each Title, necessary to grant Netflix the licenses granted in this Agreement, including without limitation the right to license to Netflix, on an exclusive basis in accordance with Section 3.2, the Titles designated and delivered by Licensor hereunder; (iii) it has satisfied and shall satisfy during the Term all third party obligations of any kind with respect to the Titles (and associated Source Material and Introductory Segments) and their distribution and exploitation in accordance with this Agreement, including without limitation all guild residuals and participations, and Netflix shall have no obligation for any such past, current or future charges or similar payments; (iv) Netflix's distribution and other exploitation of the Titles (and associated Source Material and Introductory Segments) and Licensor Marks in accordance with this Agreement shall not violate or infringe any rights of any third party, including without limitation any third party intellectual property rights, contract rights, moral rights, rights of publicity, and rights of privacy, or defame or constitute unfair competition against such third party; and (v) the Titles (and associated Source Material and Introductory Segments) and Netflix's distribution and other exploitation of same in accordance with this Agreement shall not violate any applicable law, rule or regulation.

5.3. Indemnification.

5.3.1. Licensor will defend, indemnify and hold harmless Netflix, its directors, officers and employees from any and all loss, damage, claim, liability or expense (including legal fees and costs) actually incurred as a result of a third party claim ("Claim") to the extent arising out of a breach or alleged breach of the representations and warranties made in Section 6.1 or (ii) any failure by Licensor to pay any Taxes required to be paid to any governmental entity on monies earned by Licensor hereunder or as a result of Licensor's performance of its obligations hereunder.

5.3.2. Netflix will defend, indemnify and hold harmless Licensor, its directors, officers, employees from any and all Claim to the extent arising out of a breach or alleged breach of (i) the representations and warranties made in Section 6.2 and/or (ii) any failure by Netflix to pay any Taxes required to

Exhibit 6 Page 37

JJMT-SEC-0003903

be paid by Netflix to any governmental entity on monies earned by Netflix hereunder or as a result of Netflix's performance of its obligations hereunder.

## 6. Confidentiality.

6.1 Confidential Information. Each party acknowledges and agrees that all business and technical information provided to it by the other party pursuant to this Agreement constitutes confidential and/or proprietary information of the other party ("Confidential Information"). Confidential Information shall includes all oral, written or recorded confidential and/or proprietary information about or related to the disclosing party or its business, including without limitation the terms and conditions of this Agreement. Notwithstanding the foregoing, Confidential Information does not include information that (i) is or becomes publicly available without breach of this Agreement; (ii) can be shown by documentation to have been known to the receiving party prior to its receipt from the disclosing party; (iii) is rightfully received from a third party who did not acquire or disclose such information by a wrongful or tortious act; (iv) can be shown by documentation to have been developed by the receiving party without reference to any Confidential Information; or (v) that the receiving party becomes legally obligated to disclose to a governmental entity with jurisdiction over it.

6.2 Use of Confidential Information. Neither party shall use the other's Confidential Information for its own use or for any purpose other than as necessary to perform or enforce its rights and/or obligations under this Agreement or as required by law, or disclose such information to any third party (except for attorneys, accountants, and/or the third party contractors identified in Section 9.3, provided such parties have reason to know such information and are bound to a confidentiality agreement at least as protective as this Section 7). Each party shall take all reasonable measures to protect the secrecy of and avoid disclosure of Confidential Information, which measures shall be no less than reasonable care and shall include all of those measures that the receiving party uses to protect its own Confidential Information. This Section 7 shall survive expiration or earlier termination of this Agreement.

## 7. Termination.

7.1.   Either party may terminate this Agreement:

7.1.1.   in the event of a material uncured breach or default by the other party of any of its obligations under this Agreement, provided that (i) notice is provided to the other party in writing and (ii) such breach or default is not cured within thirty (30) calendar days following the date such notice is deemed given, unless such breach or default is by nature uncurable in which case this Agreement shall be terminable on the date of notice; or

7.1.2.   in the event that the other party (i) institutes or otherwise becomes a party, voluntarily or involuntarily, to a proceeding alleging or pertaining to the insolvency or bankruptcy of that party; (ii) is dissolved or liquidated; (iii) makes an assignment of its material assets for the benefit of creditors; and/or (iv) initiates or is subject to reorganization proceedings. This Agreement shall be terminable on the date written notice is deemed given to such party.

7.2.   No Waiver. Waiver by either party of a single breach or default or a succession of breaches or defaults shall not deprive such party of the right to terminate this Agreement by reason of any subsequent breach or default.

Exhibit 6 Page 38

JJMT-SEC-0003904

7.3.  Effect of Termination or Expiration.  Upon termination or expiration of this Agreement, the licenses granted hereunder shall immediately terminate.  Nothing herein shall be construed to release either party from any obligation that matured prior to the effective date of such termination or expiration (or which may continue beyond such termination or expiration) or to relieve the defaulting party from any and all liabilities at law or in equity to the other for breach of this Agreement.  Further, in the event that this Agreement is terminated due to a material breach or default of Licensor, Licensor shall refund or credit to Netflix, at Netflix's option and within thirty (30) calendar days of the effective date of such termination, a prorated amount of the aggregate License Fees paid to Licensor, calculated as of the effective date of such termination and based upon the amount of time remaining in the relevant Title License Periods.

7.4.  Survival.  Those rights and obligations, which by their very nature are intended to survive termination or expiration of this Agreement, shall survive, including without limitation Sections 1, 2.8, 4.3, 6.3, 6.4, 7, and 8.

**8.  General Provisions.**

8.1.  Governing Law; Dispute Resolution.  This Agreement was fully negotiated and entered into in, and shall be governed by and construed and enforced in accordance with the federal laws of United States of Mexico without regard to its rules on conflict of laws or any other rules that would result in the application of a different body of law.  The parties consent to the exclusive jurisdiction and venue of the Federal and State Courts located in Mexico, Federal District for purposes of any proceeding arising out of or relating to this Agreement.

8.2.  Third Party Contractors.  Netflix may use third party contractors (e.g., backend fulfillment providers that encode, encrypt, store and/or host content) to exercise its rights and fulfill its obligations pursuant to Section 2; provided, however, that Netflix shall be fully responsible for any act or omission, or failure of any right or obligation of this Agreement by such a contractor in the event that such an act, failure or omission, if performed by Netflix instead of such contractor, would constitute a breach by Netflix of this Agreement.

8.3.  Notice.  Notices and other communications required or permitted to be given hereunder shall be given in writing and delivered in person, sent via certified mail or email, or delivered by nationally-recognized courier service, properly addressed and stamped with the required postage, if applicable, to the applicable individuals and addresses specified in the signature block below.  Notice shall be deemed effective upon receipt.

8.4.  Assignment.  Neither this Agreement nor any rights, licenses or obligations hereunder may be assigned by either party without the prior written approval of the non-assigning party, which shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, either party may assign this Agreement to any parent of such party, wholly-owned subsidiary of such party, or any acquirer of all or of substantially all of such party's equity securities or assets, provided that such party provides the non-assigning party with prompt written notice.  Any purported assignment not in accordance with this section shall be void.  Subject to the foregoing, this Agreement will benefit and bind the parties' successors and assigns.

8.5.  Severability.  If any provision of this Agreement, other than a provision going to the essence of the Agreement, is held to be unenforceable pursuant to

Exhibit 6 Page 39

JJMT-SEC-0003905

Section 9.1, such decision shall not affect the validity or enforceability of any other provision of this Agreement. Any provision of this Agreement held invalid or unenforceable shall, to the extent practicable, be substituted with a valid and enforceable provision that achieves the results contemplated by the parties in the original provision.

8.6. Headings. The headings of Sections and subsections in this Agreement are provided for convenience only and shall not affect its construction or interpretation.

8.7. Counterparts. This Agreement may be executed in two counterparts, each of which will be deemed to be an original copy of this Agreement and all of which together shall constitute one and the same Agreement.

8.8. Entire Agreement. This Agreement supersedes all prior or contemporaneous negotiations and agreements (whether oral or written) between the parties with respect to the subject matter thereof and constitutes, along with its Exhibits, a complete and exclusive statement of the terms and conditions of the Agreement between the parties with respect to such subject matter. This Agreement may not be amended or modified except by the written agreement of both parties. The language of this Agreement is English, and any translations shall have no effect and shall not be binding.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first written above.

1INMM CAPITAL LLC                          NETFLIX INC.

By: _____          By: _____
                                                           855B796CF11C4A6...
Name: Zachary Horwitz                    Name: Funa Maduka
Title: MANAGING PARTNER____          Title: VP, Content Acquisition

Exhibit 6 Page 40

JJMT-SEC-0003906

**Schedule A-1**
**Titles**

| TITLE: | YULI |
|---|---|
| YEAR: | 2019 |
| START DATE: | MARCH 04TH, 2019 |
| LICENSE PERIOD: | 36 MONTHS **EXCLUSIVE** for AVOD and SVOD; 18 months for any other licensed right according to the terms conditions of the Agreement. |
| LICENSE PLATFORM: | SVOD, PAY TV, BASIC TV, AVOD |
| LICENSE NET FEE: | $2,100,000.00 |
| FORMAT: | HD |
| TERRYTORY: | ALL LATIN AMERICA INCLUDING BRAZIL |

| TITLE: | LUCIA'S GRACE |
|---|---|
| YEAR: | 2019 |
| START DATE: | MARCH 04TH, 2019 |
| LICENSE PERIOD: | 36 MONTHS **EXCLUSIVE** for AVOD and SVOD; 18 months for any other licensed right according to the terms conditions of the Agreement. |
| LICENSE PLATFORM: | SVOD, PAY TV, BASIC TV, AVOD |
| LICENSE NET FEE: | $2,100,000.00 |
| FORMAT: | HD |
| TERRYTORY: | ALL LATIN AMERICA INCLUDING BRAZIL |

Exhibit 6 Page 41
JJMT-SEC-0003907

**Schedule B**
**Source Material Requirements and Specifications**

NETFLIX, INC ("NTFLX") will determine the appropriate source for it's encoding. Examples of sources are listed below. If Content Provider does not have the source NTFLX requests, then NTFLX and Content Provider will mutually agree upon the source.

Per the agreement, it is the Content Provider's obligation to deliver Source Material compliant with the specifications below to NTFLX.

*Requirements*

**Primary Digital Assets**

| File Type (in order of preference) |
| --- |
| 1. High Definition – MPEG-2 (80 Mbps) |
| 2. Standard Definition – MPEG-2 (50 Mbps) |

We accept .mpg for MPEG-2 files. For a given title, only one contiguous file can be delivered. Titles cannot be delivered as multi-part files, i.e., if a title is 90 minutes in duration, a single file with 90-minute duration must be delivered. Two (2) files with 45-minute durations will not be accepted. Below in section *3 Primary Digital Asset Specifications* are the technical details for the acceptable formats.

**Please ensure that all files do not contain bars and tones, advertisements, slates, ratings cards, FBI warning cards, placards, overlay branding or website link callouts before, during and/or after the program. Also, no commercial blacks can be contained in the program. There are no exceptions to these requirements. All files must consist of the feature program with one (1) second of black at the head and tail of the program.**

Exhibit 6 Page 42

11

FOIA Confidential Treatment Requested

## Digital Video Prerequisites

We require 16x9 (1:1 PAR for HD, 32:27 PAR for SD) versions if available. The following information and table specify the priority order in which NTFLX will accept content.

1. **16x9 (1:1 PAR for HD, 32:27 PAR for SD)**
2. **We will only accept 4x3 content if 16x9 (1:1 PAR for HD, 32:27 for SD) sources do not exist.**
3. HD sources must be in 23.976p format. 60i or 50i sources will only be accepted if feature was originally shot in 60i or 50i.
4. Please refer to the table below for quick reference.

| Preference Priority | Format | DAR | PAR | Frame Rate | Scan Type |
|---|---|---|---|---|---|
| 1 | HD 1920x1080 | 16x9 | 1:1 | 23.976 | Progressive |
| 2 | HD 1920x1080 | 16x9 | 1:1 | 25 or 29.97 or 59.94 | Interlaced or Progressive |
| 3 | HD 1280x720 | 16x9 | 1:1 | 23.976 | Progressive |
| 4 | HD 1280x720 | 16x9 | 1:1 | 25 or 29.97 or 59.94 | Progressive |
| 5 | SD 720x480 | 16x9 | 32:27 | 23.976 | Progressive |
| 6 | SD 720x480 | 16x9 | 32:27 | 25 or 29.97 | Interlaced or Progressive |
| 7 | SD 720x480 | 4x3 | 8:9 | 23.976 | Progressive |
| 8 | SD 720x480 | 4x3 | 8:9 | 25 or 29.97 | Interlaced or Progressive |

## Digital Audio Prerequisites

Titles with surround sound require 5.1 audio. When 5.1 audio is supplied an additional 2-channel Left Total + Right Total mix (2-channel stereo mix) must be supplied on the same audio track as well. We require a single audio track that contains all 8 channels (6 channels for the 5.1 and 2 channels for the LT/RT mix). We do not accept multi-track audio files.

If a conformed 5.1 audio source is not available, stereo audio (or mono audio if the program is an old black-and-white movie, documentary, etc., as long as the original source was mono) will be accepted.

We use standard channel assignments as shown below:

1. **5.1 audio + 2.0 audio channel assignments**
   a. Channel 1 – Left
   b. Channel 2 – Right
   c. Channel 3 – Center
   d. Channel 4 – LFE
   e. Channel 5 – Left Surround
   f. Channel 6 – Right Surround
   g. Channel 7 – Left Total
   h. Channel 8 – Right Total

Exhibit 6 Page 43

2. **Stereo Comp audio only**
    a. Channel 1 – Left Total
    b. Channel 2 – Right Total

3. **Mono Comp audio** (usually old black-and-white movies, etc.)
    a. Channel 1 – Mono Comp
    b. Channel 2 – Mono Comp

Primary Digital Asset Specifications

**MPEG-2 Specifications**

## High Definition – MPEG-2 (80 Mbps)

1. **Video Codec:** MPEG-2
2. **Profile ID:** High Profile
3. **Level ID:** High Level
4. **Video Bitrate:** 80 megabits
5. **Resolution:**
    a. 1920x1080
    b. 1280x720
6. **Audio Codec:**
    a. **Multi-Channel Assignment** (if available)
        i. Acceptable audio codecs
            1. Multi-channel PCM – 16bit, 48 kHz (Little Endian)
            2. Multi-channel AES3 LPCM (302m) – 16 bit, 48 kHz
        ii. Channel Mapping
            1. Channel 1 – Left
            2. Channel 2 – Right
            3. Channel  3 – Center
            4. Channel  4 – LFE
            5. Channel  5 – Left Surround
            6. Channel  6 – Right Surround
            7. Channel  7 – Left Total
            8. Channel  8 – Right Total
    b. **Stereo Assignment** (if multi-channel does not exist)
        i. Acceptable stereo audio codecs
            1. PCM – 16 bit, 48 kHz (Little Endian)
            2. Stereo AES3 LPCM (302m) – 16 bit, 48 kHz
            3. DVD LPCM – 16 bit, 48 kHz
            4. MPEG Layer 1 – 48 kHz, 448 kbps
        ii. Channel Mapping
            1. Channel  1 – Left Total
            2. Channel  2 – Right Total
7. **Frame rate:** *(frame rate should match source)*
    a. 23.976 progressive
    b. 25.00 progressive
    c. 25.00 interlaced
    d. 29.97 progressive
    e. 29.97 interlaced
    f. 59.94 progressive

Exhibit 6 Page 44

JJMT-SEC-0003910

8. **Aspect Ratio:**
   a. 1:1 square pixels
9. **Intra DC Precision:** 10-bit
10. **Chroma Format:** 4:2:2
11. **GOP Structure:** I-frame ONLY
12. **Closed Captioning:** As defined in section *3.3 Closed Captioning* below
13. **Stream Type:** Transport Stream

## Standard Definition – MPEG-2 (50 Mbps)

1. **Video Codec:** MPEG-2
2. **Profile ID:** High Profile
3. **Level ID:** High Level
4. **Video Bitrate:** 50 megabits
5. **Resolution:**
   a. NTSC or Film: 720x480
   b. PAL: 720x576
6. **Audio Codec:**
   a. PCM – 48 kHz or 44.1 kHz, 16-bit, stereo (Little Endian)
   b. DVD LPCM – 48 kHz, 16-bit, stereo
   c. MPEG Layer 1 – 48 kHz or 44.1 kHz, 16-bit, stereo with minimum data rate of 128 kbps
7. **Frame rate:** *(please ensure all files are de-interlaced, or have had Inverse-Telecine applied, to make sure the content is **progressive** and **not interlaced**)*
   a. 23.976 progressive
   b. 25.00 progressive
   c. 25.00 interlaced
   d. 29.97 progressive
   e. 29.97 interlaced
8. **Aspect Ratio:**
   a. 4x3 if standard
   b. 16x9 if anamorphic
9. **Intra DC Precision:** 10-bit
10. **Chroma Format:** 4:2:2
11. **GOP Structure:** I-frame ONLY
12. **Closed Captioning:** As defined in section *3.3 Closed Captioning* below
13. **Stream Type:** Transport Stream

### Subtitle as a Separate File

The preferred formats for subtitles are text-based WC3 Timed Text Markup Language (.dfxp) or SubRip (.srt) formats; otherwise they must be one of the acceptable formats listed below. The subtitle file must have time code that is conformed (synced) to the digital video file asset. Raster image-based subtitles will not be accepted.

Acceptable Text-Based Subtitle Files:
- DFXP
- SRT
- SAMI
- DailyScripts
- DVD Nav

Exhibit 6 Page 45

JJMT-SEC-0003911

- Softitler

Please ensure all subtitle files do not contain advertisements, placards, overlay branding or website link callouts.

If your text-based subtitle format is not listed above please contact NTFLX to discuss other options.

Please follow the file-naming convention specified in section *5 File-Naming Conventions*

**Closed Captioning**

## Closed Captions as Ancillary Data

This is the preferred method of delivery. The primary closed caption data must be carried within the video stream as Line21 data. For MPEG-2 video, the Line21 captions must be carried in the picture user data, as defined in "ATSC Standard: Digital Television Standard (A/53), Revision D, section 5.2."

Please ensure all caption files do not contain advertisements, placards, overlay branding or website link callouts.

## Closed Captioning as Separate File

If closed captioning must be delivered as a separate file, it must be submitted in one of the acceptable formats listed below. The closed caption file must have time code that is conformed (synced) to the digital video file asset. Raster image-based closed captioning will not be accepted.

Acceptable Closed Caption Files:
- SCC
- DFXP
- DailyScripts
- SDI Media
- Softitler
- DVD Nav

Please ensure all caption files do not contain advertisements, placards, overlay branding or website link callouts.

If your closed caption format is not listed above please contact NTFLX to discuss other options.

Please follow the file-naming convention specified in section *5 File Naming Conventions*

*Secondary Digital Assets Specifications*

**Alternate Language Audio as a Separate File**

If alternate language audio tracks are available, then they should be conformed to the primary digital audio/video asset delivered. Acceptable formats for alternate language audio tracks are stereo or multichannel AAC (in an MP4 wrapper) or AES3 LPCM audio

Exhibit 6 Page 46

JJMT-SEC-0003912

(in a MPEG-2 Transport Stream, .mpg). Either format should be encoded at the highest possible bitrate to maintain fidelity. Please follow the file-naming convention described below.

**Acceptable Alternate Language Audio Formats**

1. **Audio Codec and Container:**
    a. AAC (Low Complexity) in an MP4 container (.mp4)
2. **Bitrate:** Highest bitrate possible
3. **Sample rate:** 44.1 kHz or 48 kHz
4. **5.1 Audio Channel Mapping:**
    a. Channel 1 – Left
    b. Channel 2 – Right
    c. Channel 3 – Center
    d. Channel 4 – LFE
    e. Channel 5 – Left Surround
    f. Channel 6 – Right Surround
5. **2.0 Audio Channel Mapping:**
    a. Channel 1 – Left Total
    b. Channel 2 – Right Total

*File-Naming Conventions*

**Primary Video Asset File-Naming**

The file-naming convention for the MPEG-2 file is as follows:
**[movieID]_[framerate]_[aspectratio]_[bitrate]_[countrycode].mpg**

The country code is used to specify for which country the asset has rights. If the asset has rights for a specific country, then the 2-letter country code should be used as defined by the ISO 3166-1-alpha-2 code specifications (http://www.iso.org/iso/english_country_names_and_code_elements). If the asset has global rights, then the word "global" should be used in place of the 2-letter country code.

**Example for High-Definition Files**

60011152_24_178_80_us.mpg
60028202_60i_185_80_ca.mpg
60028204_60p_178_80_global.mpg

**Example for Standard-Definition Files**

60028202_24_235_50_fr.mpg

**Alternate Language Audio File-Naming**

The audio filename should follow the same file-naming convention as the primary asset file name, with the addition of channel mapping with the file name:

**[movieID]_[framerate]_[aspectratio]_[channel1]_[channel2]_..._[channelX]_[2letterLanguageCode].[ext]**

Exhibit 6 Page 47
JJMT-SEC-0003913

Please use the 2-letter language codes as defined in the ISO 639-1 specifications (http://www.loc.gov/standards/iso639-2/php/code_list.php).

The filename should match the channel mapping of the audio file.

Examples:
70106666_24_178_80_L_R_C_Lfe_Ls_Rs_ca.mp4
70106666_24_178_80_LT_RT_fr.mpg
70106667_30_178_80_L_R_C_Lfe_Ls_Rs_es.mp4

**Subtitle File-Naming**
The file-naming convention of closed caption file is as follows:

**[movieID]_[framerate]_[aspectratio]_[2letterLanguageCode].scc**
or named exactly the same as the video asset except with "_2letterLanguageCode" post-fixed to the filename of the secondary Closed Caption (CC) file.

Please use the 2-letter language codes as defined in the ISO 639-1 specifications (http://www.loc.gov/standards/iso639-2/php/code_list.php).

Example:
60028202_24_235_es.scc
60028202_24_235_en.srt
72343234_30_133_fr.smi
72342123_24_178_pt.smi

**Closed Caption File-Naming**
The file-naming convention of the secondary closed caption file is as follows:

**[movieID]_[framerate]_[aspectratio]_[2letterLanguageCode].scc**

Or named exactly the same as the video asset except with "_2letterLanguageCode" post-fixed to the filename of the secondary Closed Caption (CC) file.

Please use the 2-letter language codes as defined in the ISO 639-1 specifications (http://www.loc.gov/standards/iso639-2/php/code_list.php).

Example:
60028202_24_235_es.scc
60028202_24_235_en.scc
60028202_24_235_fr.scc
60028202_24_235_pt.scc

Exhibit 6 Page 48
JJMT-SEC-0003914

*Metadata*

**Movie Content Metadata**

Movie metadata is required for all content and is to be submitted via the approved NTFLX Metadata Template to NTFLX@NTFLX.TV

All dubbed and/or subtitled content is to be accompanied with the relevant metadata in the original <u>and</u> alternate language to support the source delivered.

Sample metadata files via XMLs may also be submitted and require NTFLX approval prior to acceptance.

**Primary and Secondary Assets Metadata**

If metadata for the primary and secondary assets is available via vendor API or file (XML,TXT, etc.), NTFLX will require access to the API or sample file for approval prior to acceptance.

*Delivery*

**Network Delivery via Aspera**

Currently, NTFLX uses Aspera exclusively for network delivery. The Content Supplier must push content to NTFLX via Aspera. NTFLX will not pull content.

Please be prepared to provide the following information in order to set up an Aspera account.

- Public outbound IP address(es) for which your host(s) will use for transferring files to us via Aspera.
- Technical contact (name, e-mail and phone number) of the person responsible for setting up the Aspera connection on your end.

**Directory Structure and File Organization**

*The following folder structure must be followed to organize each group of conformed assets. A group of conformed assets must consist of one audio/video muxed primary digital asset and any of its other conformed digital assets.*

*Folder Structure of external hard drive:*

*E:.*
*+---[NFLXMovieID] – (directory)*
*        [DigitalAsset1a] – (file)*
*        [DigitalAsset1b] – (file)*
*        [DigitalAsset1c] – (file)*

*Example:*
*E:.*
*+---61234123*
*|   61234123_24_178_80_us.mpg*
*|   61234123_24_178_80_en.scc*
*|*

Exhibit 6 Page 49

JJMT-SEC-0003915

```
+---62345234
|   62345234_24_235_80_us.mpg
|
+---7712332
|   7712332_60i_133_80_en.scc
|   7712332_60i_133_80_es.srt
|   7712332_60i_133_80_us.mpg
|
+---79661231
    79661231_30_178_50_ca.mpg
    79661231_30_178_50_en.scc
    79661231_30_178_50_fr.srt
    79661231_30_178_50_LT_RT_es.mp4
    79661231_30_178_50_L_R_C_Lfe_Ls_Rs_fr.mp4
```

*Artwork*

High-resolution images are required for every title and must be submitted a minimum of 30 days in advance of licensing start date to NTFLX via any of these options:

    a. Vendor-provided website
    b. FTP (must request access from NTFLX)
    c. Email: alebrije@alebrije.tv

Artwork is accepted in original and bilingual language formats for all content.

File-naming convention:
[NTFLXMovieID].png (or .tiff or .jpg)

If NTFLX movie ID not known, use movie title:
[MovieTitle].png (or .tiff or .jpg)

Examples:
60028202.jpg
Terminator2.jpg

Below are the requirements for submitting artwork to NTFLX. We seek the highest quality possible to ensure optimal display for the website and NTFLX-ready devices.

| Artwork Attribute | Description |
| --- | --- |
| Image Aspect Ratio | Box art: 1:1.40 (w:h) aspect ratio. Aspect ratio tolerance: 1:35 through 1:1.45. |
| Image Height (h) | Box art: 800 pixels minimum. Higher is better. |
| Image Width (w) | Box art: Depends on image height. For example, 570 (w) x 800 (h) when art is 1:1.40. |
| Image Resolution | 150 dpi |
| Pixel Aspect Ratio | Square (1.0) |
| Color Mode | RGB Color (8-bits/channel). Conversions from CMYK are undesirable. |
| File Format | Uncompressed (.png, .tiff, etc.). JPEGs acceptable with "maximum |

Exhibit 6 Page 50

JJMT-SEC-0003916

| | quality" compression. |
|---|---|
| Black Point | RGB 0 - 0 - 0 |
| White Point | RGB 255 - 255 - 255 |
| Color Profile | No color profiles assigned (a 2.1/2.2 gamma setting on calibrated monitors is assumed). |
| Image Area | Artwork should be two-dimensional and extend over entire image area. No extraneous graphics (borders, frames, drop shadows). |
| Graphical Elements | Art should not have graphical elements (such as Now on DVD, Widescreen, Coming Soon, Available on Blu-ray, etc.). |

Exhibit 6 Page 51

JJMT-SEC-0003917