# EXHIBIT J

---

## IFTA® INTERNATIONAL
## MULTIPLE RIGHTS DISTRIBUTION AGREEMENT

---

This International Multiple Rights Distribution Agreement ("Agreement") is made as of June 06, 2017, ("Effective Date") between the following Licensor and Distributor:

**Licensor:**  Gussi Films [MX], Acting on behalf of Gussi Cinema
   Address: Montes Urales No. 715 Col. Lomas de Chapultepec [MX]
Tel:+01 55 52-77-89-99        Fax:+01 37 33-19-11-02      E-Mail: gsflm@gussifilm.tv

**Distributor:**  Alebrije Entertainment, LLC
   Address: 1421 SW 107 Ave #261 Miami, FL 33174
Tel: 954-442-6777          Fax: 954-442-2411            E-Mail: Gustavom@alebrije.tv

Subject to timely payment of the Guarantee, Licensor licenses to Distributor, and Distributor accepts from Licensor, the Licensed Rights in the Picture throughout the Territory for the Term in the Authorized Languages on the terms and conditions of this Agreement.

This Agreement has been prepared using the International Multiple Rights Distribution Agreement, Version V: 2010 Form, promulgated by the Independent Film & Television Alliance® (IFTA®). This Agreement may also include additional IFTA® Forms and in which case the IFTA® Forms are those current as of the Effective Date of this Agreement. The Parties acknowledge that IFTA® has only authorized use of the IFTA® trademark in this Agreement where no change has been made to the applicable IFTA® Form except to insert information in the Deal Terms or where mutually agreed by the Parties and reasonably identified as such.

This Agreement consists of the following parts: this Cover Page; IFTA® International Deal Terms; IFTA® International Standard Terms; IFTA® International Schedule of Definitions. Any IFTA® Form referenced in the Deal Terms or the Standard Terms which is not attached to this Agreement is incorporated by reference. Current versions of the IFTA® International Standard Terms and IFTA® International Schedule of Definitions are accessible at www.ifta-online.org. All parts of this Agreement should be interpreted together to form one Agreement, but, in case of conflict of terms, those terms inserted in the Deal Terms to complete the Agreement and specific terms mutually agreed by the Parties will prevail over pre-existing terms in any IFTA® Form.

*In Witness Whereof,* Licensor and Distributor through their authorized signatories have executed this Agreement as of the Effective Date above to be a binding contract between them.

**LICENSOR:**

Gussi Films (On behalf of Gussi Cinema)

By: _____

Its: _____

**DISTRIBUTOR:**

Alebrije Entertainment, LLC

By: _____

Its: _____

By: _____

Its: _____

# TABLE OF CONTENTS

*Section*                                                                                                    *Paragraph*

**Deal Terms**
Basic License Terms ....................................................................................................... I.
Licensed Rights Terms .................................................................................................. II.
Financial Terms ............................................................................................................. III.
Delivery Terms ............................................................................................................... IV.
Additional Terms .......................................................................................................... V.


**Standard Terms**                                                                                              *Page*

1.  Definitions and Usage ............................................................................................ 1
2.  Picture and Version ................................................................................................. 1
3.  Licensed Rights and Reserved Rights ................................................................. 1
4.  Allied Rights ............................................................................................................. 2
5.  Territory .................................................................................................................... 3
6.  Term, License Period and Holdbacks ................................................................ 3
7.  Use Provisions ........................................................................................................ 4
8.  Gross Receipts ........................................................................................................ 6
9.  Recoupable Costs ................................................................................................... 8
10. Payment Requirements .......................................................................................... 9
11. Accountings ............................................................................................................. 10
12. Delivery, Acceptance and Return ....................................................................... 11
13. Exploitation Obligations ....................................................................................... 14
14. Music ........................................................................................................................ 16
15. Suspension and Withdrawal ................................................................................. 17
16. Termination, Cancellation and Default .............................................................. 18
17. Intellectual Property Protection Provisions ...................................................... 20
18. Licensor's Representations and Warranties ...................................................... 20
19. Distributor's Representations and Warranties .................................................. 21
20. Indemnities .............................................................................................................. 22
21. Assignment and Sublicensing .............................................................................. 22
22. E-Commerce Provisions ........................................................................................ 22
23. Miscellaneous Provisions ...................................................................................... 23


**Schedule of Definitions**

Cinematic Rights ........................................................................................................... A.
PayPerView Rights ........................................................................................................ 8.
Ancillary Rights ............................................................................................................. C.
Video Rights ................................................................................................................... D.
Pay TV Rights ................................................................................................................ E.
Free TV Rights ............................................................................................................... F.
Internet Rights ............................................................................................................... G.
ClosedNet Rights .......................................................................................................... H.
Additional Definitions .................................................................................................. I.

Contract No: _ _

# IFTA_ INTERNATIONAL DEAL TERMS

*All Licensed Rights are defined in the IFTA _ International Schedule of Definitions. A Right not specifically licensed to Distributor in the Licensed Rights Terms is reserved by Licensor.*

## I.
## BASIC LICENSE TERMS

**A. Picture:**

<u>Current Title:</u>   BROOKLYN GUNS

**B. Territory:**   LATIN AMERICA, SOUTH AFRICA

As further defined in the IFTA® International Schedule of Territories.

**C. Term and License Period:**

**Term:** The Term of this Agreement starts on the Effective Date indicated on the Cover Page and continues until the end of the License Period for all Licensed Rights.

**License Period:** The License Period for all Licensed Rights begins on Notice of Delivery and continues until ten (10) years from Notice of Delivery subject to Paragraph 6 of the Standard Terms and any Exceptions in Paragraph II.B of these Deal Terms.

**D. Language:**

Authorized Language(s): Spanish, Portuguese, local
Authorized Language Use(s): Dubbed, Subtitled

**E. Release Requirements:**

First Release Medium: *N/*A
Outside Release Date: Six (6) months from Notice of Initial Delivery

CONFIDENTIAL

TC-SETTLMT-0001565

Contract No:___

## II.
## LICENSED RIGHTS TERMS

**A. Licensed Rights:**

Licensor grants to Distributor the following Licensed Rights in the Picture throughout the Territory for the Term subject to any Exceptions in Paragraph B, Uses in Paragraph C, Holdbacks in Paragraph D, and Options in Paragraph E.

**Cinematic** (NonTheatrical only)

**Ancillary** (Hotel only)

Exclusive **PayPerView** (Residential, NonResidential, Demand View)

Exclusive **Pay TV** (Pay TV Terrestrial, Pay TV Cable, Pay TV Satellite)

Exclusive **Free TV** (Free TV Terrestrial, Free TV Cable, Free TV Satellite)

Exclusive **Internet** (Internet Downloading, Internet Streaming)
   *[Excluding* Internet Downloading and Internet Streaming for Home Video]

Exclusive **ClosedNet** (ClosedNet Downloading, ClosedNet Streaming)
   *[Excluding* Internet Downloading and Internet Streaming for Home Video]

**B. Exceptions:**

The following are exceptions to the grant of the Licensed Right(s) in the Picture:  *N/A*

**C. Uses:**

In exploiting any Licensed Right, Distributor will conform to the following Use requirements in accordance with Paragraph 7 of the Standard Terms.

   In exploiting any Pay TV Licensed Rights, Distributor may only undertake or authorize a total of UNLIMITED Authorized Play dates of the Picture

**D. Holdbacks:**

1. Distributor Holdbacks:  *N/A*
2. Licensor Holdbacks:  *N/A*

**E. Options:** Licensor shall allow Distributor the First Option to renew the rights to the Picture at 50% of the original License Fee.



CONFIDENTIAL                                                    TC-SETTLMT-0001566

Contract No:_ _

## III.
## FINANCIAL TERMS

A. **Guarantee:** United States Dollars $530,500.00 Net.
The Guarantee is a minimum net sum and no deductions of any kind may be made from it. The Base Currency is the currency in which the Guarantee is denominated and applies to all payments and recoupments under this Agreement.

B. **Payments:** Distributor will pay to Licensor the Guarantee in the following installments:
1. 100% ($530,500.00) on execution of this Agreement

C. **Payment Methods:**
1. **WT - Wire Transfer:** Distributor will pay the Guarantee to Licensor by wire transfer of unencumbered funds, free of any transmission charges, to the following account(s):

### TO BE INDICATED ON GUARANTEE INVOICE

D. **Additional Guarantee: N/A**

E. **Recoupment Provisions: N/A**

F. **Disposition of Gross Receipts:** *N/A*

CONFIDENTIAL                                                            TC-SETTLMT-0001567

Contract No: _ _

# IV.
# DELIVERY TERMS

**A. Delivery Materials:**

The Delivery Materials consist of the following Initial Materials and Additional Materials:

1. Initial Materials: To be advised by Distributor's delivery department
2. Additional Materials: To be advised by Distributor's delivery department

**B. Delivery Dates:**

1. Initial Delivery Date:
   Licensor will endeavor to give Distributor a Notice of Initial Delivery indicating that Licensor is prepared to make Initial Delivery promptly after execution of this Agreement
2. Outside Delivery Date: June 10, 2017
   Licensor must give Distributor a Notice of Initial Delivery by no later than the Outside Delivery Date above. This Outside Delivery Date may not be extended for any reason without prior Notice of Distributor's approval, even for Force Majeure.
3. Acceptance of Delivery:
   Distributor will accept Delivery per Paragraph 12.5 of the Standard Terms as follows:
   - By the Evaluation Process per Paragraph 12.5.4 of the Standard Terms for all Delivery Materials.

**C. Materials Payment Instructions:**

Distributor will pay Licensor for all Delivery Materials:
- As specified in Licensor's applicable Notice of Delivery.

**D. Materials Shipping Instructions:**

Licensor will ship all Delivery Materials to Distributor:
- By Physical Delivery as indicated by Distributor.

CONFIDENTIAL                                    TC-SETTLMT-0001568

Contract No: _ _

# V.
# ADDITIONAL TERMS

**A. Governing Law:** Mexico
This Agreement will be governed by and interpreted under the Governing Law set forth above.

**B. Dispute Resolution:**
Any dispute arising under this Agreement, including with respect to any right or obligation that survives termination or cancellation of this Agreement, will be administered and resolved by binding arbitration under the IFTA® Rules for International Arbitration ("IFTA- Rules") in effect as of the Effective Date and in accordance with Paragraph 16.12 of the IFTA-International Standard Terms. The IFTA® Rules are available at www.ifta-online.org.

**C. Forum:** Distrito Federal
The exclusive location for resolving disputes under this Agreement is the Forum set forth above.

**D. Attorneys' Fees:**
The prevailing party in any dispute under this Agreement will be entitled to collect all costs of suit, including reasonable attorneys' fees.

**E. Additional Deal Terms:**

Notwithstanding anything to the contrary contained in the Agreement, each Party hereby agrees that it shall not be entitled to terminate or rescind this Agreement or enjoin or restrain or otherwise interfere with the other Party's rights in the Picture *(i.e.,* in connection with either the Licensed Rights granted to Distributor hereunder or the Reserved Rights held by Licensor).



CONFIDENTIAL                                                                TC-SETTLMT-0001569

Contract No:_____

## IFTA® INTERNATIONAL STANDARD TERMS

### 1. DEFINITIONS AND USAGE

1.1.    **Definitions**: Words and phrases with initial letters capitalized are Defined Terms. If not defined where they first appear, Defined Terms are defined in the IFTA® International Schedule of Definitions or otherwise by industry custom and practice.

1.2.    **References**: Reference to any Right in these Standard Terms that is not specifically licensed in the Deal Terms is for convenience only and does not grant Distributor any such Right.

1.3.    **Multiple Pictures**: If more than one Picture is licensed in the Deal Terms, then all provisions of this Agreement apply to each Picture individually unless otherwise provided.

### 2. PICTURE AND VERSION

2.1.    **Picture**: The Picture is the Motion Picture identified by its current title in the Deal Terms. Licensor may change the title of the Picture in its discretion.

2.2.    **Key Element**: A Key Element is a Person who is committed to render services or materials on the Picture as indicated in the Deal Terms. A Person will be deemed to have done so if the Person receives credit for so doing in the main or end titles of the Picture. For a director, this requirement will be satisfied if the director renders directing services through the end of Principal Photography.

2.3.    **Key Replacement**: If Licensor elects to replace a Key Element, Licensor will give Distributor prompt Notice to such effect. If the Deal Terms permit Key Replacement, Licensor's Notice will also indicate the replacement for the Key Element who has been accepted by the Person indicated in the Deal Terms, in which case Distributor may not refuse to accept Delivery of the Picture or reduce the Guarantee or Other Payments because of such replacement. If the Deal Terms indicate replacement is subject to Distributor's approval, then Licensor's Notice will also indicate any available replacements and provide a reasonable time for Distributor to respond, which time may be reduced to not less than five (5) days from receipt of Licensor's Notice due to exigencies of production. If Distributor does not give Licensor a Notice disapproving a proposed replacement within the time provided, the replacement will be deemed approved and Distributor may not refuse to accept Delivery of the Picture or reduce the Guarantee or Other Payments due to such replacement. If Distributor does give timely Notice of permitted disapproval of a proposed replacement, but Licensor nonetheless commits to use the proposed replacement in the Picture, then Distributor may also elect to terminate this Agreement under Paragraph 16.1.

2.4.    **Version**: The Picture is only licensed for viewing from beginning to end in substantially linear form and in authorized dubbed, subtitled, parallel-tracked or edited versions. Distributor may also create and exploit, in conjunction with the applicable Licensed Right, enhanced Versions of the Picture which include commentaries, EPKs, "making of" footage outtakes, the director's cut and the like, provided that applicable Delivery Materials to do so are delivered and subject to Licensor's Requirements in Paragraph 4.2. However, this does not authorize any use of the Picture in or as the basis for any interactive or video game. Except as provided in this Agreement, the Picture and its trailers must be exhibited at all times substantially in their original continuity, without alteration, interpolation, cut or elimination.

### 3. LICENSED RIGHTS AND RESERVED RIGHTS

3.1.    **License Grant**: Subject to the terms of this Agreement, Licensor licenses to Distributor, exclusively, except as set forth in the Deal Terms, the Licensed Rights in the Picture throughout the Territory for the Term in the Authorized Languages subject to the Exceptions, Uses and Holdbacks as set forth in the Deal Terms.

CONFIDENTIAL                                                                                    TC-SETTLMT-0001570

Contract No:_____

3.2.   **Reservation**: All Rights not expressly licensed to Distributor are Reserved Rights which Licensor may exploit without restriction except as provided in this Agreement.

3.3.   **Reversion**: All Licensed Rights will immediately revert to Licensor free of any claim by Distributor or other Person on the end of the applicable License Period for the Licensed Rights, but in any case no later than the end of the Term as provided in Paragraph 6.1.

3.4.   **Exclusive Grant**: If any Licensed Right is granted exclusively to Distributor, then Licensor may not exploit or authorize exploitation of such Licensed Right in the Authorized Language(s) in the Territory during any License Period when Distributor may exploit the exclusive Licensed Right.

3.5 **Non-Exclusive Grant**: If any Licensed Right is granted non-exclusively to Distributor then Licensor may exploit and authorize exploitation of such Licensed Right in any languages including the Authorized Language(s) in the Territory at any time but subject to any Licensor Holdbacks or Use requirements.

4.   **ALLIED RIGHTS**

4.1.   **License**: Subject to the terms of this Agreement and Licensor's Requirements, Licensor also grants to Distributor the non-exclusive license to use the following Allied Rights in the Picture within the Territory during the Term:

4.1.1.   To advertise, publicize and promote exploitation of the Licensed Rights in the Picture in the Territory, and in so doing to use the title of the Picture, the advertising and promotional materials supplied by Licensor or created by Distributor under this Agreement, and the name, voice and likeness of any Person rendering materials or services on the Picture but not as an endorsement for any product or service other than the Picture;

4.1.2.   To include before the beginning or after the end of the Picture the credit or logo of Distributor;

4.1.3.   To change the title of the Picture after first obtaining Notice of Licensor's approval;

4.1.4.   To dub, subtitle, or parallel track the Picture in accordance with the Authorized Language Uses in the Deal Terms but only in the Authorized Language(s);

4.1.5.   To edit the Picture to meet exhibition requirements after first obtaining Notice of Licensor's approval;

4.1.6.   To allow insertion of commercial announcements before the start or after the end of the Picture and during the continuity of the Picture as commercially reasonable;

4.1.7.   To use the name, logo, banner and other identified trademarks of Licensor solely in connection with exploitation the Picture and in compliance with Paragraph 4.5; and

4.1.8.   To use clips from the Picture for allowed advertising, marketing and promotion either as supplied by the Licensor, or as otherwise approved by Licensor, to the extent that they are no more than three (3) minutes individually or five (5) minutes total.

4.2.   **Licensor's Requirements**: Licensor's Requirements mean the following requirements and conditions for exploiting any Allied Rights: credit obligations including for use on-screen and on packaging; dubbing, subtitling, and parallel tracking requirements; editing restrictions; paid advertising, publicity and promotional requirements; provisions for use of any name, voice or likeness; limitations on use of commercial announcements; requirements for use of any trademark or logo; obligations for use of meta-data, DRM, RMI, and digital identifiers, including ISAN.

4.3.   **Compliance with Licensor's Requirements**: Licensor will give Distributor timely Notice of Licensor's Requirements promptly to the extent reasonably available for each Requirement. Distributor will abide by all of Licensor's Requirements after receipt of such Notice in exercising any applicable Allied Rights. Upon Licensor's reasonable request, Distributor will promptly submit to Licensor any materials created or used by Distributor in exploiting any Allied Rights so that Licensor can determine whether Licensor's Requirements are satisfied.

CONFIDENTIAL                                                                              TC-SETTLMT-0001571

Contract No:_____

4.4.  **Limitations**: In exercising any Allied Rights, Distributor may not: (i) alter or delete any credit, logo, copyright notice, trademark notice or RMI on the Picture; (ii) include any advertisements or other materials before, during or after the Picture other than the credit or logo of  Distributor, an approved anti-piracy warning, or commercials as authorized in this Agreement; or (iii) alter, substitute, dub or delete any music or lyrics without prior Notice of Licensor's approval.

4.5.  **Use of Licensor's Marks**: In using the title of the Picture or Licensor's name, logo,  banner or other identified trademark on the Picture ("Marks"), Distributor will at all times follow good trademark practices subject to Licensor's Requirements. Distributor will not at any time adopt any symbol confusingly similar to any of the Marks or attempt to register any of the Marks or claim any goodwill deriving from them. All good will arising from use of the Marks will inure to the benefit of Licensor. Upon reasonable request, Distributor will give Licensor representative samples of each use of all Marks for quality assurance purposes. If Licensor determines Distributor is using any of its Marks improperly, Licensor may give Notice to Distributor of the improper use. If Distributor fails to timely remedy the improper use, Licensor may immediately terminate Distributor's right to use such Marks.

4.6.  **Inadvertent Failure**: No inadvertent failure by Distributor to comply with  any  of Licensor's Requirements will be a material breach of this Agreement provided Distributor takes reasonable efforts to cure prospectively such failure after Notice of such failure from Licensor.

5.  **TERRITORY**

5.1.  **Territory**: The Territory means the countries or territories listed in the Deal Terms as their political borders exist on the Effective Date or as they may be further defined in the IFTA® International Schedule of Territories current as of the Effective Date. In case of any inconsistency between the Territory definitions in the Deal Terms and IFTA® International Schedule of Territories, the Deal Terms prevail.

5.2.  **Non-Contiguous Areas**: "Non-Contiguous Areas" mean embassies, military a n d government installations, oil rigs and marine drilling sites, airlines-in-flight and ships-at-sea flying the flag of a country but not located within its contiguous geographic borders. The Territory does not include the Non-Contiguous Areas of foreign countries located within the Territory. However, for exploiting any Non-Theatrical, Commercial Video, Airline or Ship Licensed Rights, the Territory includes Non-Contiguous Areas of each country in the Territory as necessary for exploiting such Rights.

5.3.  **Changes in Borders**: If during the Term an area separates from a country in the Territory, then the Territory will still include the entire area which formed one political entity as of the Effective Date. If during the Term an area is annexed to a country in the Territory, then Licensor grants Distributor a First Negotiation Right to acquire the Licensed Rights in the Picture until the end of the Term in the newly annexed area to the extent those Licensed Rights are then or later available.

5.4.  **Regionalization**: The Picture is only licensed for exploitation using the technological methods in customary commercial use in the Territory during the Term. For example, if PAL is the customary format in the Territory, then in exercising any Video Licensed Rights Distributor may only exploit Videograms in the PAL format. If the Video Licensed Rights include Disc as an Authorized Format, then Distributor may exploit solely in the regional format for the Territory.

6.  **TERM, LICENSE PERIOD AND HOLDBACKS**

6.1.  **Term**: The Term of this Agreement starts and ends on the dates set forth in the Deal  Terms *except* in case of Term extension per Paragraph 15.2 or early termination per Paragraph 16.1 or cancellation per Paragraph 16.3.

6.2.  **Vesting**: The Licensed Rights will only vest in Distributor for each Licensed Right when and subject to the conditions specified in the Deal Terms or, if not there specified, if and when Distributor accepts Initial Delivery of the Picture and Distributor pays Licensor the entire Guarantee, if

CONFIDENTIAL

TC-SETTLMT-0001572

Contract No:_____

any. Prior to vesting, Distributor may not exploit any Licensed Rights, although Distributor may enter into agreements with approved subdistributors or agents in accordance with Paragraph 21.1 to exploit any Licensed Rights after vesting. Between the Effective Date and the Vesting Date, Licensor will not exploit or authorize exploitation of any Licensed Rights in the Picture within the Territory in any Authorized Language.

6.3.     **License Period**: The License Period is the maximum time period indicated in the Deal Terms during which Distributor may exploit or authorize exploitation of each Licensed Right. If the Deal Terms only authorize a limited number of Authorized Telecasts for the PayPerView, Pay TV or Free TV Licensed Rights, then the applicable License Period for such Licensed Rights ends on the *earlier* of the end of the applicable License Period or the conclusion of the last Authorized Telecast. Failure to use all Authorized Telecasts will not extend the License Period. In no case may Distributor exploit or authorize exploitation of any Licensed Right after the end of the Term of this Agreement.

6.4.     **Distributor Holdbacks**: A Distributor Holdback means a contractual restriction on the period during which Distributor may exploit a Licensed Right. Distributor may not exploit or authorize exploitation of any Licensed Right until the end of its Distributor Holdback. However, Distributor may enter into agreements with approved subdistributors or agents in accordance with Paragraph 21.1 at any time during the Term to exploit a Licensed Right commencing after the end of its Distributor Holdback.

6.5.     **Additional Distributor Holdbacks**: In addition to any Distributor Holdbacks in the Deal Terms, Distributor agrees that to the full extent allowed by Law during the Term, Distributor will not undertake or authorize: (i) any overspill telecast of the Picture from within the Territory intended for primary reception outside the Territory; (ii) any export or sale of Videograms of the Picture from the Territory intended for primary consumer sale or rental outside the Territory; (iii) making the Picture available on the Internet or any Closed Network without commercially reasonably technological protection measures which restrict access at reasonably identifiable locations outside the Territory. However, a Simultaneous Retransmission outside the Territory of an Authorized Telecast that originated inside the Territory will not be deemed a breach of these provisions.

6.6.     **Licensor Holdbacks**: A Licensor Holdback means a contractual restriction on the period during which Licensor may exploit any Reserved Right in the Authorized Languages in the Territory. Licensor may not exploit or authorize exploitation in the Authorized Languages in the Territory of any Reserved Right until the end of its Licensor Holdback. However, Licensor may enter into agreements at any time to exploit a Reserved Right starting after the end of its Licensor Holdback.

6.7.     **Additional Licensor Holdbacks**: In addition to any Licensor Holdbacks in the Deal Terms, Licensor agrees that to the full extent allowed by Law during the Term, Licensor will not undertake or authorize: (i) any overspill telecast of the Picture in an Authorized Language from outside the Territory intended for primary reception within the Territory; (ii) any export or sale of Videograms of the Picture in any Authorized Language from outside Territory intended for primary consumer sale or rental within the Territory; (iii) making the Picture available on the Internet or any Closed Network in any Authorized Language without commercially reasonable technological measures which restrict access at reasonably identifiable locations within the Territory. For these purposes: (i) a Simultaneous Retransmission within the Territory of a broadcast that originated outside the Territory will not be deemed a breach of these provisions; and (ii) the Original Language Version of the Picture without subtitles or parallel tracks will not be deemed an Authorized Language version of the Picture subject to these provisions.

7.   **USE PROVISIONS**

7.1.     **Authorized Uses**: A Use authorized in the Deal Terms is an Authorized Use of the specific type, *e.g.* an Authorized Format or Authorized Telecasts. Distributor may only exploit each Licensed Right in accordance with the Authorized Uses for the Licensed Right and the provisions of this Agreement.

CONFIDENTIAL                                                                TC-SETTLMT-0001573

Contract No:_____

7.2.    **Authorized Formats**: If Disc is an Authorized Use, then Distributor may not, to the extent permitted by Law, sell or authorize sale of Discs incorporating the Original Language Version of the Picture Parallel Tracked with any other Authorized Language Version until after Original Language Disc Versions are made available for sale to the public in any country with the same Disc region code as that primarily utilized in the Territory.

7.3.    **Authorized Telecast(s)**: Distributor may not telecast or authorize telecast of the Picture for more than the Authorized Telecast(s) in the Deal Terms or, if none, a commercially reasonable number. Authorized Telecast(s) may only be used in Authorized Runs or Authorized Playdates as indicated in the Deal Terms. Distributor may allocate multiple Authorized Runs or Authorized Playdates among applicable Licensed Rights in a commercially reasonable manner unless otherwise indicated in the Deal Terms. Distributor may not telecast or authorize telecast of the Picture by any form of Pay TV other than an encrypted form and may not undertake or authorize any sale, rental or export of encryption decoders outside the Territory.

7.4.    **Authorized Channel & Satellite**: If the Deal Terms only authorize telecast of the Picture on a specific channel or satellite, then Distributor may only broadcast or authorize broadcast over the originating transmitting facilities of such Authorized Channel(s) or Authorized Satellite(s) as they exist on the Effective Date. Otherwise, Distributor may authorize broadcast over any existing channel in the Territory, but may only authorize satellite broadcast that is primarily intended for downlink reception in the Territory. If a physical change in telecasting facilities materially affects the number or kind of television receivers capable of receiving any telecast (*e.g.* signal boost, new transponder, orbital drift), then Distributor will promptly give Licensor Notice of such change. Licensor then grants Distributor a First Negotiation Right to exploit any affected Licensed Rights over the changed facilities, taking into account rights previously granted to other Persons. If no agreement is reached in the First Negotiation period and the change materially affects the exploitation of the Licensed Rights, then either Party may terminate this Agreement under Paragraph 16.1.

7.5.    **Authorized IPTV Use**: If the Deal Terms authorize IPTV Use and grants the PayPerView or Pay TV Licensed Rights and ClosedNet Rights, then Distributor may permit an Authorized Telecaster for to exploit the Picture in the Authorized Language(s) by IPTV Use on a Closed Network available to Authorized Subscribers of the service designated in the Deal Terms, or if not designated, by one used in conjunction with the services authorized to exploit Pay TV or PayPerView Licensed Rights. IPTV Use may only utilize the number of Authorized Telecasts specified in the Deal Terms, or if not specified, a commercially reasonable number. IPTV Use may only occur during the period specified in the Deal Terms, or if not specified, the License Period for the applicable PayPerView or Pay TV Licensed Rights. Authorizing IPTV Use does not authorize Distributor to exploit any other Internet Rights or ClosedNet Rights. All IPTV Use by Distributor is subject to the exploitation obligations in Paragraph 13.5. During the period when IPTV Use by Distributor is authorized, Licensor will not undertake or authorize IPTV Use of the Picture in the Territory in the Authorized Language(s) by any other party in conjunction with any PayPerView or Pay TV broadcast, but this will not prevent Licensor from exploiting any other Internet or Closed Net Rights in the Picture to the extent they are not otherwise granted to Distributor.

7.6.    **Authorized Simulcasting**: If the Deal Terms authorize Simulcasting Use, or if Simulcasting Use is required by Law in the Territory, then Distributor may permit an authorized telecaster to exploit the Picture in the Authorized Language(s) by Simulcasting in conjunction with authorized exploitation of the Licensed Free TV Rights, but doing so does not authorize exploitation of any other Internet Rights or ClosedNet Rights. All Simulcasting Use is subject to the obligations in Paragraph 13.5. During the period when Simulcasting by Distributor is authorized, Licensor will not undertake or authorize Simulcasting of the Picture in the Territory in the Authorized Language(s) by any other party

CONFIDENTIAL                                                                    TC-SETTLMT-0001574

Contract No:_____

in conjunction with any Free TV broadcast, but this will not prevent Licensor from exploiting any other Internet or ClosedNet Rights in the Picture to the extent they are not otherwise granted to Distributor.

7.7.    **Authorized Catch-Up TV**: If the Deal Terms authorize Catch-Up TV Use and grants the applicable PayPerView, Pay TV, or Free TV Licensed Rights and Internet or ClosedNet Streaming, then Distributor may permit an authorized telecaster for to exploit the Picture in the Authorized Language(s) by Catch-Up TV Use in conjunction with authorized exploitation of such Licensed Rights. Each Catch-Up TV Use must occur within the period after each Authorized Telecast specified in the Deal Terms, or if not specified within thirty (30) days of such Authorized Telecast. Catch-Up TV Use may only occur during the period specified in the Deal Terms, or if not specified only during the License Period for the applicable PayPerView, Pay TV, or Free TV Licensed Rights. Authorizing Catch-Up TV Use does not authorize exploitation of any other Internet Rights or ClosedNet Rights. All Catch-Up TV Use is subject to the exploitation obligations in Paragraph 13.5. During the period when Catch-Up TV Use by Distributor is authorized, Licensor will not undertake or authorize Catch-Up TV Use of the Picture in the Territory in the Authorized Language(s) by any other party in conjunction with any other PayPerView, Pay TV, or Free TV broadcast as applicable, but this will not prevent Licensor from exploiting any other Internet or Closed Net Rights in the Picture to the extent they are not otherwise granted to Distributor.

8.    **GROSS RECEIPTS**

8.1.    **Gross Receipts**: Gross Receipts means the sum on a continuous basis of the following amounts received by, used by or credited to Distributor, any Distributor Affiliate or any approved subdistributor or agent with respect to each and every Licensed Right calculated as provided in Paragraph 8.2:

8.1.1.    All monies or other consideration of any kind including all advances, guarantees, security deposits, awards, subsidies (other than those described in Paragraph 8.4) and other allowances from the license, sale, lease, rental, lending, barter, distribution, diffusion, exhibition, performance, exploitation, making available or other exploitation of each Licensed Right in the Picture, all without any deductions; and

8.1.2.    All recoveries of any kind actually received by Distributor, any Distributor Affiliate, or any approved subdistributor or agent for the infringement of any Licensed Right after first deducting all costs of suit including attorneys' fees paid to Licensor; and

8.1.3.    All monies or other consideration of any kind from any authorized dealing in trailers, posters, copies, stills, excerpts, advertising accessories or other materials used in connection with the exploitation of any Licensed Right; and

8.1.4.    All monies or other consideration of any kind from exploitation of the Picture or any of its elements on any Website or Closed Network from: (i) payments by any means from consumers, users or Authorized Subscribers from any accessing, streaming or downloading of the Picture from such Website or Closed Network, less only chargebacks, credits and refunds actually paid; (ii) payments from users or Authorized Subscribers for the privilege of accessing the Website or Closed Network as duly allocated to the Picture on a non-discriminatory basis consistently applied; (iii) advertising, access or related income derived from banners, links, or other symbols or identifying information for other motion pictures on the same web page as the Picture as duly allocated to the Picture on a non-discriminatory basis consistently applied; (iv) payments from affiliates or other third parties derived from accessing, streaming or downloading the Picture due to banner, links or other symbols or identifying information of the Picture included on web pages in an authorized affiliate or networking program.

8.2.    **Gross Receipts Calculated At Source**: For the purpose of determining Licensor's share of Gross Receipts, all Gross Receipts must be calculated at "source" determined as follows:

CONFIDENTIAL

8.2.1.    For any Theatrical Licensed Right, "source" means the levels at which payments are remitted directly by cinema theaters making the Picture available to the viewing public.

8.2.2.    For any NonTheatrical, Airline, Ship or Hotel Licensed Right, "source" means the level at which payments are remitted directly by airlines, shipping companies, hotels or other entities that exhibit or make the Picture available directly to their patrons or customers.

8.2.3.    For any Home Video Licensed Right, "source" means the level at which (i) payments are remitted by wholesalers shipping Videos directly to retailers for ultimate sale or rental to the paying public, including intermediate distribution levels such as rack jobbers if performed by a Distributor Affiliate or if Distributor participates in income from such intermediate distribution to the extent of such participation and (ii) payments are made for making Videos available directly to the paying public by Distributor or a Distributor Affiliate through mail order, video clubs, or video kiosks.

8.2.4.    For any Commercial Video or Public Video Licensed Right, "source" means at the level at which payments are remitted by exhibitors of the Picture.

8.2.5.    For any Pay-Per-View, Pay TV or Free TV Licensed Right, "source" means the level at which payments are remitted by broadcast stations, cable systems, satellite telecasters, or like entities that broadcast, cablecast, transmit or otherwise make available the Picture to the viewing public.

8.2.6.    For any Internet or ClosedNet Licensed Right, "source" means the level at which payments are remitted directly by parties operating any internet Website or Closed Network from which content is directly made available to the general public or Authorized Subscribers or from which content of multiple sites or services are aggregated for access by the general public or Authorized Subscribers.

8.2.7.    For any Licensed Right, if Distributor or any Distributor Affiliate owns or operates the "source" from which payments are made, then any payment attributable to the source must be no less than comparable payments remitted from that source to unaffiliated third parties in arm's length transactions.

8.3.    **Royalty Income**: All amounts collected by any collecting society, authors' rights organization, performing rights society or governmental agency, arising from all royalties, levies and remuneration imposed by law or designated to be collectively managed including, but not limited to: royalties for secondary or simultaneous retransmission by means of any cable, satellite, microwave, Internet, Closed Network or other system, any Authorized Simulcasting or Authorized Catch-Up TV, music performance royalties, tax rebates, exhibition surcharges, levies on blank Videograms or hardware, rental or lending levies or remuneration derived from other collectively managed rights, will as between Licensor and Distributor be the sole property of Licensor and not included in   Gross Receipts. Licensor has the sole right to apply for and collect all these amounts. If Distributor receives any such amounts, Distributor will immediately remit them to Licensor with an appropriate statement identifying their source.

8.4.    **Rebates And Subsidies**: The following amounts, if received by, used by, or credited to Distributor, any Distributor Affiliate or any approved subdistributor or agent will first be used to reduce Recoupable Costs to the extent not repayable by Distributor to any third party: (i) print, publicity and similar subsidies for the cost of releasing, advertising or publicizing the Picture; (ii) income from publicity tie-ins; (iii) freight, print, trailer, advertising and other cost recoveries, rebates, refunds or discounts, whether obtained from regional or national institutions, exhibitors, approved  subdistributors or other Persons; and (iv) income from any use of any clips for advertising, marketing or promoting the Picture. All such amounts in excess of Recoupable Costs will be included in Gross Receipts.

CONFIDENTIAL

Contract No:_____

## 9. RECOUPABLE COSTS

9.1.   **Recoupable Costs**: Recoupable Costs means all direct, verifiable, out-of-pocket, reasonable and necessary costs and expenses, exclusive of salaries and overhead, less any discounts, credits, rebates or similar allowances, actually paid by Distributor for exploiting each Licensed Right in arms-length transactions with third parties for:

9.1.1.   Customs duties, import taxes and permit charges necessary to secure entry of the Picture into the Territory;

9.1.2.   Notarization, translation, and similar costs relating to obtaining or securing registration, importation, exploitation or protection of the Picture in the Territory, but only to the extent reasonably pre-approved by Notice from Licensor, and, if Licensor advances any such fees or costs, Distributor will promptly reimburse Licensor for them upon demand;

9.1.3.   Sales, use, VAT, admission and turnover taxes and related charges assessable against any Gross Receipts realized from the exploitation of any Licensed Right, but not including any corporate income, franchise or windfall profits taxes, nor any remittance or withholding taxes assessable against amounts payable to Licensor;

9.1.4.   Remittance and withholding taxes on amounts payable to Licensor, but only as allowed in Paragraph 10.4;

9.1.5.   Shipping and insurance charges for Delivery of the Materials to Distributor including any amounts for shipping within the Territory, but not for returning the Materials to Licensor;

9.1.6.   Manufacture of pre-print materials, positive prints, masters, tapes, trailers and other copies of the Picture in an amount reasonably pre-approved by Notice from Licensor;

9.1.7.   Costs of allowed subtitling, dubbing or parallel tracking in the Authorized Language(s) in an amount reasonably pre-approved by Notice from Licensor;

9.1.8.   Costs of allowed advertising, promotion and publicity in an amount reasonably pre-approved by Notice from Licensor;

9.1.9.   Reasonable checking costs for verifying the accuracy of box office results reported by exhibitors, but not exceeding one percent (1%) of the reported box office receipts from each such exhibitor unless reasonably pre-approved by Notice from Licensor;

9.1.10.   Legal costs and fees paid to obtain recoveries for infringement by a third party of the Licensed Right and the cost of any infringement monitoring service for the Picture, in an amount reasonably pre-approved by Notice from Licensor;

9.1.11.   Actual and normal expenses, including reasonable legal costs and fees, incurred in recovering debts from defaulting licensees and exhibitors;

9.1.12.   Costs of packaging for Videograms embodying the Picture in an amount reasonably pre-approved by Notice from Licensor;

9.1.13.   Censorship fees and costs of editing to meet censorship requirements as allowed pursuant to a Censorship Rider, if incorporated in this Agreement;

9.1.14.   Additional customary and reasonable costs actually paid by Distributor in exploiting the Picture in the amount reasonably pre-approved by Notice from Licensor.

9.2.   **Limitations**: No Recoupable Cost may be deducted from Gross Receipts for any Licensed Right except as authorized in the Deal Terms. Recoupable Costs must be calculated separately for each Licensed Right and may not be recouped from Gross Receipts for any other Licensed Right *except* as authorized in the Deal Terms. Any cost that does not qualify as a Recoupable Distribution Cost will be Distributor's sole responsibility *unless* Licensor gives Notice approving its recoupment. No item qualifying as a Recoupable Distribution Cost may be deducted more than once.

9.3.   **Third Party Costs**: If a Distributor Affiliate or approved subdistributor or agent pays a cost that would be a Recoupable Cost if paid by Distributor, then such cost may be recouped by Distributor

CONFIDENTIAL

TC-SETTLMT-0001577

Contract No:_____

as a Recoupable Cost but may not be recouped or paid more than once. Otherwise no costs of any third party may be recouped from monies due to Licensor.

## 10. PAYMENT REQUIREMENTS

10.1.   **Timely Payment:** Distributor will make payments to Licensor and retain recoupments from Gross Receipts only in the manner and sequence specified in the Deal Terms. Timely payment is of the essence of this Agreement. Payment will only be considered made when Licensor has immediate and unencumbered use of funds in the required currency in the full amount due. Distributor will use diligent efforts to obtain promptly all permits necessary to make all payments to Licensor.

10.2.   **Guarantee:** The Guarantee including any Additional Guarantee (also referred to as the Minimum Guarantee or MG) is the amount payable to Licensor recoupable from Licensor's share of Gross Receipts for applicable Licensed Rights as indicated in the Deal Terms. The Guarantee is non-returnable, but fully recoupable in conformity with this Agreement. The Parties agree the Guarantee is a reasonable estimate at the time of contracting of the minimum share of Gross Receipts that Licensor would receive from Distributor's full performance under this Agreement.

10.3.   **Guarantee Installments:** Distributor will pay each installment of the Guarantee to Licensor in the time and manner specified in the Deal Terms. Where an installment is payable on events within Licensor's control, *e.g.,* the start of Principal Photography, Licensor will give Distributor timely Notice of such event. Where an installment is payable on events within Distributor's control, *e.g.,* First Release, Distributor will give Licensor timely Notice of such event.

10.4.   **Remittance Taxes:** The Guarantee is a minimum net sum and no taxes or charges of any sort may be deducted from it, regardless of any remittance or withholding taxes that may be due. However, Distributor may recoup all remittance or withholding taxes on the Guarantee and any other payments due Licensor as a Recoupable Cost after providing Licensor with all documentation demonstrating Distributor's payment of the required amount on Licensor's behalf.

10.5.   **Limits on Deductions:** There will be no deductions from any payments due Licensor because of any bank charges, conversion costs, sales use or VAT taxes, "contingents," quotas or any other taxes, levies or charges unless separately agreed in a Notice from Licensor.

10.6.   **Letter Of Credit:** If the Deal Terms indicate a payment is secured by a Letter of Credit, then Distributor will open the Letter of Credit at a corresponding bank of Licensor's designated bank. While open, the Letter of Credit will remain valid, negotiable, transferable, confirmed and irrevocable; it will be automatically renewable for any period stated in the Deal Terms if Licensor has not negotiated the Letter of Credit by its first end date. All costs for a Letter of Credit will be borne solely by Distributor.

10.7.   **Blocked Funds:** Distributor will give Licensor prompt Notice of any Law that prohibits remittance from the Territory of any sums due Licensor. Distributor will then deposit such sums in Licensor's name in a suitable depository designated by Licensor without any deductions for so doing.

10.8.   **Finance Charge:** Any payment not made when due will, in addition to any other right or remedy of Licensor, incur a finance charge at the lesser of three base points over the 3-month London Inter Bank Offered Rate ("LIBOR+3") on the date payment was due or the highest applicable legal contract rate. This finance charge will accrue from the date the payment was due until it is paid in full.

10.9.   **Exchange Rate:** Distributor will recoup the Guarantee and all Recoupable Costs in the currency of each country in the Territory. Distributor will convert any sums due Licensor to the Base Currency at the prevailing exchange rate on the date due at a bank timely designated by Licensor. For a late payment, Licensor will be entitled to the most favorable exchange rate between the due date and the payment date. The risk of devaluation of the Base Currency designated by Licensor is Licensor's sole risk; the risk of the devaluation of the currency of the Territory is Distributor's sole risk. Unless specified otherwise in the Deal Terms, the Base Currency means the currency in which the Guarantee is

CONFIDENTIAL

Contract No:_____

payable as designated in the Deal Terms, or, if not so designated, the national currency in the country where Licensor is headquartered.

10.10. **Documentation**: If any Law requires Distributor to obtain a permit or clearance to exploit any Licensed Right, then Distributor will do so at its expense promptly after payment of the Guarantee. These may include any dubbing certificate, quota permit, censorship clearance, author's certificate, certificate of origin, music cue sheet or remittance tax form. Distributor will provide Licensor on request with copies of documents indicating compliance with such Law. If this Agreement is terminated or cancelled, then upon request Distributor will take all necessary actions to ensure that any such documents are withdrawn or cancelled, failing which Distributor authorizes Licensor to do so.

## 11. ACCOUNTINGS

11.1. **Cross Collateralization**: Unless otherwise provided in the Deal Terms, no payment for the Picture may be cross collateralized or set-off against any amounts for any other Motion Picture, and amounts due for the Picture may not be used to recoup amounts for any other Motion Picture, or *vice versa.* Gross Receipts and Recoupable Costs for the Motion Picture may only be cross collateralized among the Licensed Rights to the extent, if any, authorized in the Deal Terms, but they may be cross collateralized among any countries in the Territory except as otherwise provided in the Deal Terms.

11.2. **Allocations**: If the Picture is exploited with other Motion Pictures, then Distributor will only allocate receipts and expenses among the Picture and the other Motion Pictures in the m a n n e r reasonably approved by Notice from Licensor.

11.3. **Financial Records**: Distributor will maintain true and accurate records in local currency of all financial transactions regarding the Picture using generally accepted accounting principles on a consistent, uniform and non-discriminatory basis until three (3) years after the Term and during any period while a dispute about payments remains unresolved. The records will include all Gross Receipts derived, all Recoupable Costs paid, all allowed adjustments or rebates made, all cash collected or credits received, and all other information necessary to render any statement due. Unless Licensor gives Notice approving otherwise, all records will be maintained on a cash basis. If Distributor permits any off-set, refund or rebate of sums due Distributor, then such sums will nonetheless be included in Gross Receipts. Distributor will also maintain full and accurate copies of every statement, contract, electronic record, audit report, correspondence and other records for the Picture and make available such records for inspection and copying at the Distributor's principal place of business.

11.4. **Statements - General Contents**: Starting after Initial Delivery, Distributor will furnish Licensor with a statement in English for the Picture that identifies from the time of the immediately prior statement, if any, all Gross Receipts derived, all Recoupable Costs paid (identifying to whom they are paid), and all exchange rates used. If the Territory contains more than one country, the information will be reported separately for each country and consolidated for the entire Territory. The information will be provided in reasonable detail on a current and cumulative basis.

11.5. **Statements - Video**: If the Licensed Rights include any Video Licensed Rights, each statement must also include: (i) all Videograms manufactured, sold, rented, leased, returned, erased, recycled or destroyed; (ii) their wholesale and retail selling prices; and (iii) all deductions taken. Distributor may not withhold any Gross Receipts as a reserve against returned or defective Videos for more than two (2) consecutive accounting periods after which the reserve must be liquidated. The reserve may not exceed ten percent (10%) of Video Gross Receipts derived for two (2) accounting periods for which the reserve is retained.

11.6. **Statements – Internet and ClosedNet**: If the Licensed Rights include Internet Rights or ClosedNet Rights, each statement must also include for each Website on which the Picture is made available to the extent reasonably available to Distributor for each month: (i) the total number of access attempts ("raw hits") to the site; (ii) the total number of subscribers to the site for the month and the

CONFIDENTIAL                                                                            TC-SETTLMT-0001579

Contract No:_____

daily average number; (iii) the total number of times the Picture was accessed or downloaded during the month; (iv) the total amount billed and collected, identifying by total number of transactions and total amounts all charges, chargebacks, credits, returns and refunds; (v) the average length of time elapsed or number of bytes when the Picture was accessed; (vi) all subscriber fees identifying the method of allocating such fees to the Picture; (vii) all revenue from advertising, indicating the source and any method of allocating such revenue to the Picture; and (viii) all other reasonable and available financial information necessary or appropriate for calculating Internet or ClosedNet Gross Receipts. Distributor may provide such information by making it available for access by Licensor on a secure portion of the applicable Website.

   11.7.   **Statement Periods**: Distributor will render statements for the following periods: (i) monthly for the first twelve (12) months after the First Release; then (ii) quarterly through the end of the Term and as long thereafter as Gross Receipts are derived by Distributor. Each statement must be delivered to Licensor within one (1) month after the end of the period for which it is rendered. However, no statement need be rendered for any period in which there are no Gross Receipts, but if Licensor has not received a statement for six (6) months, Distributor will provide a current statement within one (1) month of Licensor's request.

   11.8.   **Audit Rights**: Until three (3) years after the Term, Licensor may on fifteen (15) days prior Notice (extendable to thirty (30) days on Distributor's request if given during a major film market) examine and copy, on its own or through its auditors, Distributor's financial records regarding the Picture. The examination will be at Licensor's expense unless it uncovers an underpayment, uncontested or later determined due, of more than ten percent (10%) of the amount shown due Licensor on the statements audited, in which case Distributor will pay upon demand the costs of the examination.

## 12. DELIVERY, ACCEPTANCE AND RETURN

   12.1.   **Terminology**: Delivery of a Picture means delivery to Distributor of the Delivery Materials by the Delivery Methods as provided in the Deal Terms and this Paragraph. Delivery occurs in two stages: Initial Delivery and Additional Delivery. Initial Delivery means delivery of the Initial Materials. Additional Delivery means delivery of the Additional Materials. The Delivery Materials means the Initial Materials and the Additional Materials as applicable. A Notice of Delivery means a Notice of Initial Delivery or Notice of Additional Delivery as applicable.

   12.2.   **Initial Delivery**: Licensor will make Initial Delivery as follows:

      12.2.1.   Notice of Initial Delivery: Licensor will commence Delivery by giving Distributor a Notice of Initial Delivery stating the date on which Licensor is prepared to make Initial Delivery. Licensor will use commercially reasonable efforts to give Distributor a Notice of Initial Delivery by no later than the Delivery Date in the Deal Terms, subject to extension due to Force Majeure, but in any case Licensor must give Distributor a Notice of Initial Delivery by no later than any Outside Delivery Date in the Deal Terms.

      12.2.2.   Identified Initial Materials: If the Initial Materials are identified in the Deal Terms, then the Notice of Initial Delivery should also specify: (i) any Material Charges for the Initial Materials; (ii) the Delivery Method for each of the Initial Materials; (iii) the carrier making delivery; (iv) any other delivery cost; and (v) the method of payment. Distributor will immediately pay all amounts required. Upon receipt of payment, Licensor will immediately make Delivery to Distributor of all identified Initial Materials by their designated Delivery Method.

      12.2.3.   Non-Identified Initial Materials: If the Initial Materials are not identified in the Deal Terms, then Licensor's Notice of Initial Delivery will identify that Initial Materials are available, and if appropriate, specify the Initial Materials. Within ten (10) days of receipt of Licensor's Notice, Distributor will give Licensor Notice of the Initial Materials which Distributor reasonably requires. Licensor will then promptly give Distributor Notice of: (i) any Material Charges for the Initial

CONFIDENTIAL                                                                         TC-SETTLMT-0001580

Contract No:_____

Materials; (ii) the Delivery Method for each of the Initial Materials; (iii) the carrier making delivery; (iv) any other delivery cost; and (v) the method of payment. Distributor will promptly pay all required Materials Charges and delivery costs. Upon receipt of payment, Licensor will immediately make Delivery to Distributor of all Initial Materials required by Distributor by the designated Delivery Method.

12.2.4.  Distributor Response: Distributor must respond promptly to Licensor's Notice of Initial Delivery by making any required specification or payment, in any case no later than one (1) month after receipt of Licensor's Notice of Initial Delivery.

12.3.  **Additional Delivery**: Licensor will make Additional Delivery as follows:

12.3.1.  Notice of Additional Delivery: Promptly after completion of Initial Delivery, Licensor will give Distributor a Notice of Additional Delivery that Licensor is prepared to deliver all remaining Additional Materials.

12.3.2.  Identified Additional Materials: If the Additional Materials are identified in the Deal Terms, then the Notice of Additional Delivery should also specify: (i) any Material Charges for the Additional Materials; (ii) the Delivery Method for each of the Additional Materials; (iii) the carrier making delivery; (iv) any other delivery cost; and (v) the method of payment. Distributor will promptly pay all required Materials Charges and delivery costs. Upon receipt of payment, Licensor will immediately make Delivery to Distributor of all identified Additional Materials by their designated Delivery Method.

12.3.3.  Non-Identified Additional Materials: If the Additional Materials are not identified in the Deal Terms, then Licensor's Notice of Additional Delivery will identify that   Additional Materials are available, and if appropriate, specify the Additional Materials. Promptly after  receipt of Licensor's Notice Distributor will give Licensor Notice to the Additional Materials Distributor reasonably requires. Licensor will then give Distributor Notice of: (i) any Material Charges for  the Additional Materials; (ii) the Delivery Method for each of them; (iii) the carrier making delivery; (iv) any other delivery cost; and (v) the method of payment. Distributor will immediately pay all amounts required. Upon receipt of payment, Licensor will immediately make Delivery    to Distributor of all Additional Materials required by Distributor by the designated Delivery Method.

12.4.  **Delivery Methods**: Licensor will make Delivery of Delivery Materials by one of  the following methods specified in the Deal Terms or Licensor's Delivery Notice or as is otherwise customary for the applicable Delivery Material:

12.4.1.  Physical Delivery: Where *Physical Delivery* is specified, Licensor will deliver  the applicable Delivery Materials to Distributor at the applicable delivery location. Delivery will be made by air transport unless otherwise specified in the Deal Terms or Delivery Notice.

12.4.2.  Laboratory Access: Where *Laboratory Access* is specified, Licensor will provide Distributor with access to the applicable Delivery Materials at a recognized laboratory or facility mutually acceptable to the parties. Access will be on the terms of the  IFTA® International Laboratory Access Letter or, if indicated in the Deal Terms, another mutually approved access letter.

12.4.3.  Loan of Materials: Where *Loan of Materials* is specified, Licensor will deliver the applicable Delivery Materials on loan to Distributor at the applicable delivery location.   Delivery will be made by air transport unless otherwise specified in the Deal Terms or Delivery Notice. These loaned Delivery Materials may only be used to make new pre-print materials, at Distributor's sole expense, from which necessary exploitation materials can be made. The loaned Delivery Materials will always be held in a laboratory or facility subject to Licensor's reasonable approval and will be returned to Licensor within a reasonable time designated by Licensor.

12.4.4.  Satellite Delivery: Where *Satellite Delivery* is specified, Licensor will deliver  the applicable Delivery Materials to Distributor by satellite transmission consistent with available materials and Distributor's equipment. Licensor will be responsible for all up-linking costs;

CONFIDENTIAL

Contract No:_____

Distributor will be responsible for arranging for reception and all down-linking costs. If Distributor experiences a technical failure of transmission or reception, Licensor upon receipt of timely Notice will assist Distributor to receive a new transmission. Distributor will pay for each missed satellite feed a charge equal to Licensor's actual cost of the up-linking transmission.

12.4.5. Electronic Delivery: Where *Electronic Delivery* is specified, Licensor will deliver the applicable Delivery Materials to Distributor by electronic transmission over the Internet or comparable service consistent with available materials and Distributor's equipment. In so doing, Licensor may require Distributor to obtain and use reasonable and commercially available digital rights management software and intellectual property protection before making any electronic delivery.

12.5. **Acceptance of Delivery**: Distributor will evaluate all Delivery Materials for technical acceptance promptly after their receipt. Acceptance of Delivery means Distributor's actual or deemed acknowledgement that the applicable Delivery Materials are technically acceptable for exploitation of the Licensed Rights. Acceptance of Delivery is based on objective technical standards without regard to questions of commercial or artistic merit. Distributor will give Acceptance of Delivery for the applicable Delivery Materials in one of the following manners:

12.5.1. Guarantor Certificate: If provided in the Deal Terms or otherwise agreed by the Parties, Licensor may give Distributor a Guarantor Certificate for the applicable Delivery Materials. In such case, Distributor agrees that receipt of the Guarantor Certificate constitutes Acceptance of Delivery for the identified Delivery Materials for the purpose of making any payment due Licensor, but does not waive any right Distributor may have against Licensor or the Guarantor to require Delivery of substitute Delivery Materials in any case of technical insufficiency.

12.5.2. Laboratory Certificate: If provided in the Deal Terms or otherwise agreed by the Parties, Licensor may give Distributor a Laboratory Certificate for the applicable Delivery Materials. In such case Distributor agrees that receipt of the Laboratory Certificate constitutes Acceptance of Delivery for the identified Delivery Materials for the purpose of making any payment due Licensor but does not waive any right Distributor may have against Licensor or the Laboratory to require Delivery of substitute Delivery Materials in any case of technical insufficiency.

12.5.3. Quality Control Report: If provided in the Deal Terms or otherwise agreed by the Parties, Licensor may give Distributor a Quality Control Report for the applicable Delivery Materials. In such case, Distributor agrees that receipt of the Quality Control Report constitutes Acceptance of Delivery for the identified Delivery Materials.

12.5.4. Evaluation Process: If not otherwise covered by the above for any Delivery Materials, the following Evaluation Process will apply. Licensor will make Delivery to Distributor of the applicable Delivery Materials by the applicable Delivery Method. Distributor must evaluate all Delivery Materials for technical acceptance promptly after receipt, which may include submitting the Delivery Materials to a laboratory specified in the Deal Terms, or if not specified, as selected by Distributor, for a Quality Control Report. Any technical defect not specified in reasonable detail by Notice to Licensor within thirty (30) days of Delivery will be deemed waived. If Distributor does give such a Notice, then Licensor will at its expense either: (i) redeliver Delivery Materials correcting the specified technical defect; (ii) submit the Delivery Materials to another mutually agreed laboratory for a new Quality Control Report; or (iii) initiate arbitration under Paragraph 16.12 to determine whether the Delivery Materials were technically defective. This procedure will continue for any corrected Delivery Materials until Delivery is deemed completed. However, if Licensor is unable to Deliver satisfactory Delivery Materials within the earlier of one-hundred twenty (120) days after first Delivery of the Delivery Materials or three (3) attempts, then Licensor may exercise its rights of suspension or withdrawal under Paragraph 15.3 or Distributor may declare Licensor in default for failing to make timely Delivery. If Distributor has undertaken a First Release

CONFIDENTIAL

Contract No:_____

of the Picture then any alleged defect in any Delivery Material used in the First Release will be deemed waived by Distributor. Distributor will have the right in its discretion to waive any defect in any Delivery Material for purposes of making any payment to Licensor but such waiver will not waive Distributor's right to require delivery of technically satisfactory Delivery Materials at a later time.

12.6.   **Ownership**: Legal ownership of all Delivery Materials will remain with Licensor subject to Distributor's right to use such Delivery Materials under this Agreement. Distributor will exercise due care in safeguarding all Delivery Materials and will assume all risks for their theft or damage while they are in Distributor's possession.

12.7.   **Payment for Delivery Materials**: Distributor will pay for all Delivery Materials as indicated in the Deal Terms or otherwise in Licensor's Delivery Notice. All costs of Delivery and return of the Delivery Materials (including shipping charges, insurance, import fees, duties, brokerage fees, storage charges and related charges) will be Distributor's sole responsibility unless otherwise specified in the Deal Terms.

12.8.   **Distributor Created Materials**: Distributor will provide Licensor and its designees with immediate unrestricted free access to all alternate language tracks, subtitled, dubbed and parallel track versions, masters, advertising and promotional materials, artwork and other materials created or authorized by Distributor to exploit the Picture ("Distributor Created Materials"). Distributor will promptly give to Licensor a Notice of each Person who prepared any Distributor Created Materials and each laboratory or facility where they are located. Licensor will pay Distributor promptly on request for the actual cost of duplication and shipping to Licensor of any Distributor Created Materials and, if applicable, any reuse fees applicable to their use. Distributor assigns to Licensor, and Licensor will immediately become the owner of, the worldwide copyright in all Distributor Created Materials, subject to a non-exclusive free license in favor of Distributor and its licensees to use them during the Term solely for exploitation of the Licensed Rights. If such ownership is not allowed under a Law in the Territory, then Distributor grants Licensor a non-exclusive free license to use all Distributor Created Materials worldwide in perpetuity without restriction.

12.9.   **Return of Materials**: At the end of the Term, Distributor at its expense, will at Licensor's election, either: (i) return all Delivery Materials and Distributor Created Materials to Licensor; or (ii) destroy all Delivery Materials and Distributor Created Materials and provide to Licensor a customary certificate of their destruction.

13.   **EXPLOITATION OBLIGATIONS**

13.1.   **General Obligations**: Distributor will release the Picture in conformity with any Release Requirements in the Deal Terms, including releasing the Picture in any First Release Medium by no later than any Outside Release Date. Throughout the Term, Distributor will use diligent efforts and skill in the distribution and exploitation of the Licensed Rights to maximize Gross Receipts and minimize Recoupable Costs consistent with the quality standards of first-class distributors in the Territory. Distributor will not discriminate against the Picture or use the Picture to secure more advantageous terms for any other motion picture, product or service. Distributor will maintain the Picture in continuous release throughout the Territory for a period consistent with its reasonable business judgment.

13.2.   **Theatrical Exploitation Obligations**: In exploiting any Theatrical Licensed Rights:

13.2.1.   Licensor Consultation: Distributor will accord Licensor prior reasonable consultation on an on-going basis of all significant aspects of the plan for the first run theatrical release of the Picture in the Territory, including the initial campaign, print order, advertising budget, marketing campaign, and short subject allocations. Distributor will comply in all material respects with any release plan approved by Licensor. Distributor will give Licensor reasonable advance Notice of all

CONFIDENTIAL                                                                                  TC-SETTLMT-0001583

Contract No:_____

premieres of the Picture in the Territory. Distributor will not screen the Picture in any festival, charitable screening or the like where there is no paying audience without prior Notice of Licensor's approval.

13.2.2. <u>Release Information</u>: Distributor will give Licensor weekly Notice setting forth all information available to Distributor on a weekly and cumulative basis regarding the first run theatrical release of the Picture, including exhibition terms, box office receipts and expenses.

13.2.3. <u>Exhibition Obligations</u>: All exhibition agreements for the Picture must be separate from exhibition agreements for any other Motion Picture, product or service. If the Picture is exhibited with any other Motion Picture during its first run, any allocation of box office receipts must be reasonably approved by Notice from Licensor. No more than one percent (1%) of net box office receipts per theater may be allocated to a short subject. Distributor will not license the Picture to any theater in which Distributor or a Distributor Affiliate has any interest *except* on terms consistent with arm's-length transactions for like motion pictures. Distributor will use all reasonable efforts to maximize collections from exhibitors as quickly as possible.

13.3.   **Video Exploitation Obligations**: In exploiting any Video Licensed Rights:

13.3.1. <u>Licensor Approval</u>: Distributor will accord Licensor prior reasonable approval of all advertising, packaging, artwork, and marketing campaigns for exploiting the Video Licensed Rights. Distributor at its cost will also provide Licensor for its reasonable approval one (1) prototype copy of each authorized type of Video and its packaging promptly after its manufacture and before its sale or disposition. Licensor's approval will be deemed given if Licensor does not give Distributor Notice of an objection within fifteen (15) days of receipt of these items.

13.3.2. <u>Efforts and Quality</u>: Distributor will use all diligent efforts and skill in the manufacture, distribution, and exploitation of Videograms of the Picture. The Videograms manufactured by Distributor will meet quality standards at least comparable to other Videograms commercially available through legitimate outlets in the Territory. From the end of any Video Holdback until the end of the Term, Distributor will make Videograms of the Picture in the Authorized Language(s) and Authorized Formats available in the Territory through its catalogue and will not allow them to leave normal channels of distribution for a commercially unreasonable period of time.

13.3.3. <u>Included Material</u>: Distributor will not make or distribute any Videograms in which the Picture is included with another feature length Motion Picture for a single price without prior Notice of Licensor's approval. Distributor may include trailers and advertising material for other Motion Pictures on any Videogram of the Picture in a commercially reasonable manner provided that they do not interrupt the running time of the Picture and that Distributor also customarily includes trailers and advertising material for the Picture on Videograms of other motion pictures.

13.3.4. <u>Pricing</u>: If a Minimum Wholesale Price or a Minimum Retail Price is contained in the Deal Terms, Distributor, if not prohibited by Law, will not exploit or authorize exploitation of Videograms for less than such minimums. In any case, for calculating Gross Receipts all Videograms will be deemed sold for not less than such minimums. Distributor will not dispose of more than the number of Videograms set forth in the Deal Terms as promotional, discount, or free samples ("Free Goods") without prior Notice of Licensor's approval. Any Videograms disposed of beyond such amount will be deemed sold at the Minimum Wholesale Price for purposes of computing Gross Receipts.

13.4.   **Television Exploitation Obligations**: In exploiting any Licensed PayPerView, Pay TV or Free Rights:

13.4.1. <u>Limitations</u>: Distributor will not telecast or authorize telecast of the Picture by any form of Pay TV other than an encrypted form and Distributor will not undertake or authorize any sale, rental or export of decoders for such encryption outside the Territory.

CONFIDENTIAL

Contract No:_____

13.4.2. <u>Usage Reports</u>: Upon Licensor's request, Distributor will promptly provide Licensor with the following information to the extent reasonably available to Distributor: (i) the title of the Picture in each Authorized Language used for each telecast of the Picture; (ii) each Person responsible for preparing a dubbed, subtitled or parallel tracked version of the Picture; and (iii) the time and place of each telecast of the Picture since the last Usage Report to Licensor.

13.4.3. <u>Secondary Transmissions</u>: If, during the Term, Secondary Transmissions are subject to compulsory administration or designated to be collectively managed in a country in the Territory, then Licensor reserves the right to collect for its sole account all royalties for Simultaneous Retransmissions of the Picture in such country regardless of where the primary broadcast originated.

13.5.   **Internet and ClosedNet Exploitation Obligations**: In exploiting any Internet or ClosedNet Licensed Rights:

13.5.1. <u>Asset Protection</u>: Distributor may only make the Picture available on the Internet or a Closed Network where: (i) access to the Internet Website or Closed Network is subject to an enforceable access contract (e.g. Terms of Use) that only permits accessing the Picture by authorized and authenticated users, that prohibits to the full extent allowed by Law circumvention of technological measures protecting the Picture from unauthorized access or copying; (ii) the Internet Website or Closed Network uses current, commercially reasonable technological safeguards to ensure that accessing, streaming or downloading of the Picture is limited solely to reasonably identifiable locations within the Territory; (iii) the Internet Website or Closed Network uses current, commercially reasonable technological measures which continually restricts unauthorized copying, accessing, streaming or downloading from the site and circumvention of any DRM security features or technological measures to prevent unauthorized copying, access, streaming or downloading of the Picture; and (iv) the Internet Website or Closed Network uses current, commercially reasonable technological measures and attribution procedures which ensure that only qualified, verified users access the Picture on the Internet Website or Closed Network.

13.5.2. <u>Protection Verification</u>: Upon reasonable request from Licensor, Distributor will promptly provide Licensor with documentation demonstrating compliance of all the requirements in Paragraph 13.5.1. If Distributor is unable to do so, then Licensor may give Distributor Notice to cease exploiting any Internet Licensed Rights or ClosedNet Licensed Rights. In such case Distributor may not exploit such rights until Distributor provides Licensor with documentation demonstrating compliance with all requirements in Paragraph 13.5.1 and Distributor receives a return Notice from Licensor approving such compliance. Licensor's good faith decision not to approve any technological measure used by Distributor to demonstrate compliance will not be a breach of this Agreement.

## 14. MUSIC

14.1.   **Cue Sheets**: To the extent required and available, Licensor will supply Distributor promptly after Initial Delivery with music cue sheets listing the composer, lyricist and publisher of all music embodied in the Picture. Distributor will, as needed, promptly file with the appropriate government agency or music rights society in the Territory the music cue sheets as supplied by Licensor.

14.2.   **Synchronization**: Licensor represents and warrants to Distributor that Licensor controls all rights necessary to synchronize the music contained in the Picture on all Copies exploited by Distributor throughout the Territory for the Term. Licensor authorizes Distributor to exploit such synchronization rights without charge in exploiting the Licensed Rights in the Picture. Licensor will be solely responsible for paying all royalties or charges necessary to obtain and control such synchronization rights for the Term and will hold Distributor harmless from any payments in this regard.

14.3.   **Mechanical**: Licensor represents and warrants to Distributor that Licensor controls all rights necessary to make mechanical reproductions of the music contained in the Picture on all Copies

CONFIDENTIAL                                                    TC-SETTLMT-0001585

Contract No:_____

exploited by Distributor throughout the Territory for the Term. Licensor authorizes Distributor to exploit such mechanical rights without charge in exploiting the Licensed Rights in the Picture. Licensor will be solely responsible for paying all royalties or charges necessary to obtain and control such mechanical rights for the Term and will hold Distributor harmless from any payments in this regard, *provided* if a mechanical or authors' rights society in the Territory refuses to honor the authorization obtained by Licensor in the Picture's country of origin, then Distributor will be solely responsible for such royalties or charges.

14.4.   **Performance**: Licensor represents and warrants to Distributor that the non-dramatic ("small") performing rights in each musical composition embodied in the Picture are either: (i) in the public domain in the Territory; or (ii) controlled by Licensor sufficient to allow Distributor to exploit the Licensed Rights without additional payment for such rights; or (iii) available by license from a performing rights society in the Territory affiliated with the International Confederation of Authors and Composers Societies (CISAC). For music in category (iii), Distributor will be solely responsible for obtaining a license to exploit such performance rights from the local performing rights society.

14.5.   **Publishing**: As between Licensor and Distributor, Licensor (or its affiliated publishing company) will be solely entitled to collect and retain the publisher's share of any music royalties arising from Distributor's exploitation of any Licensed Rights in the Picture.

## 15.   SUSPENSION AND WITHDRAWAL

15.1.   **Licensor's Right**: Licensor may suspend Delivery or withdraw the Picture by Notice to Distributor: (i) if Licensor determines in good faith that its exploitation might infringe the rights of others or violate any Law; (ii) if Licensor determines in good faith that its Materials are unsuitable for the manufacture of first class commercial quality exploitation materials; or (iii) due to Force Majeure.

15.2.   **Suspension**: The Term will be extended for the length of each suspension. Suspension will not be a material breach of this Agreement and Distributor will only be entitled to incidental damages, but not direct or consequential damages (such as "lost profits"), for any suspension. If any suspension extends Initial Delivery of the Picture beyond the Outside Delivery Date, if any, then the Picture will be treated as immediately withdrawn on the Outside Delivery Date without the necessity of any Notice. Otherwise, if any suspension lasts more than three (3) consecutive months, then either Party may terminate this Agreement on ten (10) days Notice and treat the Picture as withdrawn.

15.3.   **Withdrawal**: If the Picture is withdrawn, then Licensor must promptly offer to substitute a Motion Picture of like quality mutually satisfactory to Licensor and Distributor without additional charge. If the Parties cannot agree on such a substitute within thirty (30) days of Licensor's Notice of withdrawal, then either party may terminate this Agreement in accordance with Paragraph 16.1. Distributor's sole remedy for any withdrawal will be as provided in Paragraph 16.2. In no case may Distributor collect any consequential damages (including "lost profits") for any withdrawal. If, within three (3) years after the Picture is withdrawn, Licensor elects to again release the Picture in the Territory, Distributor will have a First Negotiation Right to acquire any of the Licensed Rights in the Picture.

15.4.   **Force Majeure**: Force Majeure means any fire, flood, earthquake, or public disaster; strike, labor dispute or unrest; unavoidable accident; breakdown of electrical or sound equipment; failure to perform or delay by any laboratory or supplier; delay or lack of transportation; embargo, riot, war, insurrection or civil unrest; any Act of God including severe inclement weather; any act of legally constituted authority; inability to obtain sufficient material, labor, transportation, power or other essential commodity or service required for the conduct of either Party's business or any other cause beyond the reasonable control of either Party.

CONFIDENTIAL                                                         TC-SETTLMT-0001586

Contract No:_____

## 16. TERMINATION, CANCELLATION AND DEFAULT

16.1.  **Termination**: A "termination" means ending of rights or obligations without breach as allowed in this Agreement. This Agreement automatically terminates at the end of the Term. A termination during the Term may apply to the entire Agreement or only to specific rights or obligations. A Party effects a termination before the end of the Term by giving Notice of so doing to the other Party. A termination is effective upon receipt of the Notice or a later date specified in the Notice. Termination may be effected as provided in Paragraph 2.3 (Failure of Key Element), Paragraph 3.3 (Reversion), Paragraph 4.5 (Use of Marks), Paragraph 12.5.4 (Evaluation Process), or Paragraph 15.3 (Withdrawal).

16.2.  **Effect of Termination**: Upon termination all applicable unperformed obligations of both parties are discharged, but each Party retains all its remedies and remains liable for any breach of any obligation or failure of any representation or warranty that occurred before termination. If termination occurs before First Release, Licensor will promptly refund to Distributor all unrecouped amounts of the Guarantee and Recoupable Costs actually incurred, and Distributor will promptly return to Licensor all Delivery Materials received by Distributor. If termination occurs after First Release, but prior to the end of the License Period, Licensor will promptly refund to Distributor an equitable proportion of the unrecouped Guarantee and Recoupable Costs actually incurred as agreed by the parties in good faith in light of any exploitation that has occurred, and Distributor will promptly return to Licensor all Delivery Materials received by Distributor. Upon termination, Licensor will be free, and if necessary Distributor grants to Licensor the right, to exploit or authorize exploitation throughout the Territory of any Licensed Rights subject to the termination without further obligation to Distributor.

16.3.  **Cancellation**: A "cancellation" means ending of rights or obligations for an uncured material breach. A cancellation may apply to the entire Agreement or only to specific rights or obligations. A Party effects a cancellation by giving Notice of so doing to the other Party. A cancellation is effective upon receipt of the Notice or a later date specified in the Notice.

16.4.  **Effect of Cancellation**: Upon cancellation all applicable unperformed obligations of both Parties are discharged, but each Party retains all its remedies and remains liable for any breach of any obligation or failure of any representation or warranty that occurred before cancellation. Upon cancellation, Licensor will be free, and if necessary Distributor grants to Licensor the right to exploit or authorize exploitation throughout the Territory any Licensed Rights subject to the cancellation. Licensor has no obligation to exploit any cancelled Licensed Rights, but if Licensor does so Licensor will apply a reasonable portion of what would have been Distributor's net share of any Gross Receipts from so doing in mitigation of Licensor's damages for the breach.

16.5.  **Effect on Sublicenses**: Upon termination or cancellation Distributor will provide Licensor with all documents regarding any sublicenses (including agency agreements) entered into by Distributor. Upon the effective date of termination or cancellation, all such sublicenses will also terminate except as provided in this Paragraph. If allowed in the sublicense and Licensor and Distributor mutually agree in their sole discretion, or if Licensor, Distributor and the applicable sublicensee otherwise mutually agree in their sole discretion, Distributor may continue to service the sublicense including making collections and recoupments from Gross Receipts, but may not conclude any new sublicenses. Otherwise, if Licensor and the sublicensee mutually agree in their sole discretion, Licensor may assume the sublicense and retain all Gross Receipts itself, but will hold Distributor harmless from any claim by the sublicensee for any failure of performance by Licensor.

16.6.  **Distributor's Default**: Distributor will be in default under this Agreement if: (i) Distributor fails to pay any installment of the Guarantee including any Additional Guarantee or any Other Payments when due; (ii) Distributor becomes insolvent, fails to pay its debts when due, makes an assignment for the benefit of creditors, seeks relief under any bankruptcy or insolvency Law, or allows a receiver or insolvency representative to be appointed who is not removed within thirty (30) days; (iii) Distributor or any Distributor Affiliate breaches any term, covenant or condition of this Agreement or any other

CONFIDENTIAL

Contract No:_____

agreement with Licensor executed within eighteen (18) months before or after the Effective Date of this Agreement; (iv) this Agreement applies to more than one Picture and Distributor breaches any term, covenant or condition of this Agreement with respect to any Picture or all Pictures; or (v) Distributor attempts to make any assignment, transfer, sublicense or appointment of an agent without first obtaining Licensor's approval under Paragraph 21.1.

16.7.   **Distributor's Cure and Breach**: Licensor will give Distributor Notice of any claimed default. If the default is capable of cure, then Distributor will have fourteen (14) days after receipt of Licensor's Notice to cure a monetary default, and twenty-one (21) days after receipt of Licensor's Notice to cure a non-monetary default. If the default is incapable of cure, or if Distributor fails to cure within the time provided, then Distributor will be in breach of this Agreement. Licensor may then proceed against Distributor for all available relief, including canceling this Agreement retroactive to the date of default for a material breach, suspending Delivery of the affected Picture or all Pictures, and declaring all unpaid amounts due Licensor under this Agreement immediately due and payable.

16.8.   **Licensor's Default**: Licensor will be in default under this Agreement if: (i) Licensor fails to give Distributor a Notice of Initial Delivery before the Outside Delivery Date, if any, or otherwise fails to complete Delivery in a timely manner as required; (ii) Licensor becomes insolvent, fails to pay its debts when due, makes an assignment for the benefit of creditors, seeks relief under any bankruptcy or insolvency Law, or allows a receiver or insolvency representative to be appointed who is not removed within thirty (30) days; or (iii) Licensor breaches any term, covenant, or condition of this Agreement. Any default by Licensor is limited to the particular Picture affected, and no default by Licensor as to any one Picture or agreement with Distributor will be a default as to any other Picture or agreement with Distributor.

16.9.   **Licensor's Cure and Breach**: Distributor will give Licensor Notice of any claimed default. Licensor will have fourteen (14) days after receipt of Distributor's Notice to cure a monetary default, and twenty-one (21) days after receipt to cure a non-monetary default. If Licensor fails to cure within the times provided, then Licensor will be in breach of this Agreement. Distributor may then proceed against Licensor for all available relief, including canceling this Agreement for the affected Picture retroactive to the date of default for a material breach.

16.10.   **Recoverable Damages**: Each Party may only seek to recover incidental or direct damages occasioned by any breach. Each Party waives any right to seek special, consequential or punitive damages, including "lost profits" from any breach. This waiver is an independent covenant that survives the failure of essential purpose of any other remedy, even if limited. Nothing in this Agreement limits Licensor's remedies for infringement claims for any exploitation of Rights in the Picture by other than the Licensed Rights, outside the Territory, or before or after the Term.

16.11.   **Security**: To secure Licensor's right to receive payment of the Guarantee (including any Additional Guarantee), Other Payments and Licensor's Share of Gross Receipts when due, Distributor grants to and creates for the benefit of Licensor a continuing security right in the Licensed Rights in the Picture throughout the Territory for the Term, all Delivery Materials and Distributor Created Materials, and all their proceeds including receivables and Licensor's Share of Gross Receipts. This security right will be treated as and entitled to the same priority as an acquisition financing right. Licensor may enforce this security right if Distributor, any secured creditor, assignee of receivables or insolvency representative claims that it is entitled to retain any Gross Receipts without paying Licensor when due the Guarantee (including any Additional Guarantee), Other Payments or Licensor's Share of Gross Receipts or has priority over Licensor's claim to such payments. Distributor authorizes Licensor to file such notices as may be necessary or desirable to make Licensor's security right effective against third parties or to give it priority over competing claimants.

16.12.   **Arbitration**: Any dispute arising under this Agreement, including with respect to any right or obligation that survives termination or cancellation of this Agreement will be administered and resolved

CONFIDENTIAL                                                                                     TC-SETTLMT-0001588

Contract No:_____

by final and binding arbitration under the IFTA® Rules for International Arbitration in effect as of the Effective Date of this Agreement ("IFTA® Rules"). Each Party waives any right to adjudicate any dispute in any other court or forum, *except* that a Party may seek interim relief before the start of arbitration as allowed by the IFTA® Rules. The arbitration will be held in the Forum and under the Governing Law designated in the Deal Terms or, if none, as determined by the IFTA® Rules. The arbitration will be decided in accordance with the Governing Law. Otherwise, the Parties will abide by any decision in the arbitration and any court having jurisdiction may enforce it. The Parties submit to the jurisdiction of the courts in the Forum for interim relief, to compel arbitration and to confirm an arbitration award. The Parties agree to accept service of process in accordance with the IFTA® Rules and agree that such service satisfies all requirements to establish personal jurisdiction over the Parties. Both Parties waive application of the Hague Convention for Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters. Both Parties acknowledge that for an unsatisfied arbitration award that is confirmed by a court of competent jurisdiction, the Prevailing Party may request that the other Party be barred from attendance at the American Film Market™ solely in accordance with the barring provisions of the current AFM™ Guidelines.

## 17. INTELLECTUAL PROPERTY PROTECTION PROVISIONS

17.1.   **Notice Requirements**: Distributor will include on each Copy of the Picture distributed under its authority any copyright notice, trademark designation, anti-piracy warning and rights management information included on any Delivery Materials or otherwise supplied by Licensor.

17.2.   **Enforcement**: Distributor will take all reasonable steps to prevent infringement or unauthorized use of the Picture in the Territory, including monitoring for infringement. Licensor at its election may independently retain its own intellectual property protection monitoring service. Licensor may participate in any copyright infringement litigation initiated by Distributor using counsel of Licensor's choice, in which case Licensor's expenses will be first reimbursed from any recovery. If Distributor declines to undertake any copyright infringement litigation, Licensor may do so at its own expense, in Licensor's or Distributor's name, with Licensor recovering all of its costs of suit, including reasonable attorney's fees, from first recoveries in such litigation, and the balance remaining being treated as Gross Receipts.

17.3.   **New Technology**: If during the Term new technology in general commercial use in the Territory inhibits the unauthorized duplication, reception, access, downloading or exploitation of the Picture or its Copies, then Distributor will use such technology in a reasonable manner in exploiting the Licensed Rights in the Picture. Distributor may deduct the reasonable cost of so doing as a Recoupable Cost after obtaining prior Notice of Licensor's approval.

17.4.   **No Warranty Against Infringement**: The Parties acknowledge that it is in their mutual interest to prevent infringement and unauthorized distribution of the Picture in the Territory. Distributor has also taken all necessary steps to inform itself of any infringement of the Picture in the Territory before executing this Agreement. No infringement or unauthorized distribution of the Picture, whether before or after the Effective Date, will allow Distributor to terminate this Agreement, reduce any amounts due to Licensor or alter the terms of exploitation including any Holdbacks. Licensor will cooperate with Distributor to prevent or remedy any such act of infringement or unauthorized distribution of the Picture.

## 18. LICENSOR'S REPRESENTATIONS AND WARRANTIES

18.1.   **As Principal**: If the Cover Page indicates Licensor is a principal, then Licensor represents and warrants to Distributor that the following are true and correct as of the Effective Date:

18.1.1. Licensor has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

CONFIDENTIAL                     TC-SETTLMT-0001589

Contract No:_____

18.1.2. There are no existing or threatened claims, arbitration or litigation which would adversely affect or impair any of the Licensed Rights in the Territory during the Term;

18.1.3. Licensor has not licensed, encumbered or assigned any Licensed Right to any other Person in the Territory in a manner that would interfere with Distributor's exclusive exploitation of any Licensed Right granted exclusively, and will not do so during the Term;

18.1.4. Licensor will not exploit or authorize exploitation of any Reserved Right in the Territory before the end of the applicable Licensor Holdback period;

18.1.5. The Picture was produced by authors who are nationals of or have their habitual residence in, or was first published or simultaneously first published in, a country which at the time of such production or publication was a signatory to the Berne Convention for the Protection of Literary and Artistic Works and Licensor has not done any act or omitted to do any act which would impair the copyright in the Picture within the Territory during the Term;

18.1.6. Neither the Picture nor the exploitation of any Licensed Rights does or will during the Term: (i) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any Person; or (ii) infringe any copyright, trademark, trade secret, right of ideas, or similar property right of any Person. To the best of Licensor's knowledge, as of the Effective Date, no use of any of the Delivery Materials does or will infringe any patent rights of any Person; and

18.1.7. Licensor has undertaken reasonable efforts to ensure that its suppliers of essential special effects and other digital information embodied in the Delivery Materials have not included any electronic self-help instructions that will cause such digital information to cease operation of its own accord in such a manner as to materially impair Distributor's use of such Delivery Materials.

18.2.   **As Agent**: If the Cover Page indicates Licensor is acting as an agent, Licensor represents and warrants to Distributor that the following are true and correct throughout the Term:

18.2.1. Licensor has full authority from its principal designated on the Cover Page to enter into this Agreement on behalf of its principal and Licensor's principal will be bound by this Agreement; and

18.2.2. Licensor's principal has made to Licensor representations and warranties substantially comparable to those in Paragraph 18.1 and has authorized Licensor to make those representations and warranties directly from the principal to Distributor on the principal's behalf, and to the best of Licensor's knowledge they are all true and correct. In case of a breach of any representation or warranty in Paragraph 18.1, Distributor agrees to look directly to the principal and not to Licensor for any remedies Distributor might have.

## 19. DISTRIBUTOR'S REPRESENTATIONS AND WARRANTIES

19.1.   **As Principal**: Distributor represents and warrants to Licensor that the following are true and correct throughout the Agreement Term:

19.1.1. Distributor has full authority and capacity to execute this Agreement and full legal and financial ability to perform all of its obligations under this Agreement;

19.1.2. There are no existing or threatened claims, arbitration or litigation which would adversely affect or impair Distributor's ability to perform under this Agreement;

19.1.3. Distributor will honor all restrictions on the exploitation of the Licensed Rights and the Allied Rights under this Agreement and will not exploit any Licensed Right outside the Territory, before the end of its Holdback, or after the Term;

19.1.4. No authorized exploitation of any Allied Rights by Distributor does or will: (i) defame, or hold in a false light, or infringe any privacy or publicity or other personal right of any Person; or (ii) infringe any copyright, trademark, trade secret, right of ideas, or similar property right of any Person; or (iii) to the best of Distributor's knowledge at the time of its creation, infringe any patent rights of any Person.

CONFIDENTIAL                                                                 TC-SETTLMT-0001590

Contract No:_____

19.2.   **As Assignor**: In case of any authorized transfer of this Agreement under Paragraph 21.1, Distributor makes the following additional representations and warranties to Licensor:

19.2.1.  The assignee can and will make all of the representations and warranties set forth above in Paragraph 19.1 directly to Licensor; and

19.2.2.  If the assignee breaches any of those representations and warranties, then Licensor, in addition to any other right or remedy, may proceed directly against Distributor for such breach without first proceeding against the assignee or exhausting any right or remedy against the assignee.

## 20. INDEMNITIES

20.1.   **By Licensor**: Licensor will indemnify and hold harmless Distributor, its officers, directors, partners, owners, shareholders, employees, attorneys and agents, from all claims, loss, liability, damages or expenses, including, reasonable outside attorneys' fees and legal costs, but not including lost profits, due to any breach of any of Licensor's representations or warranties. Licensor will honor this indemnity despite any assignment of this Agreement. If Licensor is acting as an agent, these indemnities are also made directly by Licensor's principal to Distributor, but Distributor will look only to Licensor's principal to honor them.

20.2.   **By Distributor**: Distributor will indemnify and hold harmless Licensor, its officers, directors, partners, owners, shareholders, employees, attorneys and agents, from all claims, loss, liability, damages or expenses, including reasonable outside attorneys' fees and legal costs, but not including lost profits, due to any breach of any of Distributor's representations or warranties. Distributor will honor this indemnity despite any assignment, transfer, sublicense or appointment of an agent.

## 21. ASSIGNMENT AND SUBLICENSING

21.1.   **Distributor's Limitations**: INTENTIONALLY DELETED

21.2.   **Licensor's Rights**: Licensor may freely assign or transfer this Agreement or any of its rights under this Agreement, but no such assignment or transfer will relieve Licensor of its obligations under this Agreement, unless it is to a company which acquires all or substantially all of Licensor's assets and fully assumes all of the obligations hereunder.

21.3.   **Licensor's Assignment For Financing Purposes**: If Licensor pledges this Agreement, or assigns its right to receive any payment, to a lender, completion guarantor or other Person in connection with any loan or other obligation, then Distributor will promptly on request negotiate in good faith and execute a customary and mutually agreed Notice of Assignment that does not diminish the rights set forth in this Agreement. Distributor agrees to abide by consistent written instructions from Licensor and such Person in making any payments otherwise due Licensor directly to such Person. Distributor agrees not to assert any offset rights to delay, diminish or excuse the payment of any sums pledged or assigned to such Person. Instead, Distributor will treat such offsets or other rights as a separate and unrelated matter solely between Licensor and Distributor.

## 22. E-COMMERCE PROVISIONS

22.1.   **Electronics**: No record relating to this Agreement, including this Agreement itself or any Notice, may be denied legal effect, validity, or enforceability solely because an electronic signature or electronic record was used in its formation or transmission.

22.2.   **Notice**: A Notice means any communication required or allowed under this Agreement. All Notices must be in a record authenticated by the sender. Notice sent by personal delivery or mail will be effective when received. Notice sent by fax or e-mail will be effective when the sender receives an acknowledgement showing receipt by the recipient. A Notice of Termination or of Cancellation sent by fax or e-mail must be accompanied by Notice sent by non-electronic means to be effective.

CONFIDENTIAL                                                                     TC-SETTLMT-0001591

22.3.   **Place to Send Notice**: All Notices must be sent to a Party at its address on the Cover Page, except a Party may change its place for notice by Notice duly given. If a Party is no longer located at its place for Notice, the sender may give Notice by sending Notice to the receiving Party's last known address and providing a copy to a public official, if any, in the jurisdiction where such address is located designated to receive notice for absent parties, such as a Secretary of State, Company Commissioner or other appropriate authority.

22.4.   **Notice Time Periods**: All time periods in this Agreement based on Notice run from the date the recipient receives, or is deemed to have received, such Notice.

### 23. MISCELLANEOUS PROVISIONS

23.1.   **Approvals**: Where either Party may exercise any approval, it will do so promptly and in good faith, but in so doing, a Party need not place the other Party's interests ahead of its own.

23.2.   **No Waiver**: No waiver of any breach will waive any other breach. No waiver is effective unless it is contained in a Notice by the Party making the waiver. The exercise of any right or remedy will not waive any other right or remedy.

23.3.   **Remedies Cumulative**: All remedies are cumulative; resorting to one remedy will not preclude resorting to any other remedy at any time.

23.4.   **Entire Agreement**: This Agreement contains the entire understanding of the Parties regarding its subject matter. It supersedes all previous written or oral negotiations, deal memos, understandings or representations between the Parties, if any. Each Party expressly waives any right to rely on such negotiations, understandings or representations, if any.

23.5.   **Modification**: No modification of this Agreement is effective unless contained in a record authenticated by both Parties.

23.6.   **Counterparts**: This Agreement may be executed in Counterparts, each of which will be an original but all of which together will form one instrument.

23.7.   **Terminology**: In this Agreement "and" means all possibilities, "or" means any or all possibilities in any combination, and "either...or" means only one possibility. "Including" means "including without limitation"; "must" or "will" means a Party is obligated to act or refrain from acting; "may" means a Party has the right but is not obligated to act or refrain from acting.

23.8.   **Additional Documents**: Upon reasonable request, each Party will execute and deliver such additional documents or instruments as are necessary to evidence, effectuate or confirm this Agreement.

CONFIDENTIAL

Contract No:_____

# IFTA® INTERNATIONAL
## SCHEDULE OF DEFINITIONS

**A. Cinematic Rights Definitions**:

*Cinematic* means *Theatrical*, *NonTheatrical* and *Public Video* exploitation of a Motion Picture.

*Theatrical* means exploitation of a Motion Picture Copy only for direct exhibition in conventional or drive-in theaters, licensed as such in the place where the exhibition occurs, that are open to the general public on a regularly scheduled basis and that charge an admission fee to view the Motion Picture.

*NonTheatrical* means exploitation of a Motion Picture Copy only for direct exhibition before an audience by and at the facilities of either organizations not primarily engaged in the business of exhibiting Motion Pictures, such as in educational organizations, churches, restaurants, bars, clubs, trains, libraries, Red Cross facilities, oil rigs and oil fields, or governmental bodies such as in embassies, military bases, military vessels and other governmental facilities flying the flag of the licensed territory. NonTheatrical does not include Commercial Video, Public Video, Airline, Ship or Hotel exploitation.

*Public Video* means exploitation of a Motion Picture Copy embodied in a Videogram only for direct exhibition before an audience in a "mini-theater", an "MTV theater" or like establishment that charges an admission to use the viewing facility or to view the Videogram, and that is not licensed as a traditional motion picture theater in the place where the viewing occurs.

**B. PayPerView Rights Definitions:**

*PayPerView* means *NonResidential PayPerView*, *Residential PayPerView* and *Demand View* exploitation of a Motion Picture but does not include any form of *Pay TV, Free TV, Internet* or *ClosedNet* exploitation of a Motion Picture.

*Residential PayPerView* means the broadcast of a Motion Picture Copy by means of an encoded signal for television reception in homes or similar permanent living places where a charge is made to the viewer for the right to use a decoding device to view the broadcast of the Motion Picture at a time designated by the broadcaster for each viewing.

*NonResidential PayPerView* means the broadcast of a Motion Picture Copy by means of an encoded signal for television reception in hotels or similar temporary living places where a charge is made to the viewer for the right to use a decoding device to view the broadcast of the Motion Picture at a time designated by the broadcaster for each viewing.

*Demand View* means the transmission of a Motion Picture Copy by means of an encoded signal for television reception in homes and similar permanent living places where a charge is made to the viewer for the right to use a decoding device to view the Motion Picture at a time selected by the viewer for each viewing.

**C. Ancillary Rights Definitions**:

*Ancillary* means *Airline*, *Ship* and *Hotel* exploitation of a Motion Picture.

*Airline* means exploitation of a Motion Picture Copy only for direct exhibition in airplanes that are operated by an airline flying the flag of any country in the Territory for which Airline exploitation is granted, but excluding airlines that are customarily licensed from a location outside the Territory or that are only serviced in but do not fly the flag of a country in the Territory.

*Ship* means exploitation of a Motion Picture Copy only for direct exhibition in sea or ocean going vessels that are operated by a shipping line flying the flag of any country in the Territory for which Ship

CONFIDENTIAL                                                          TC-SETTLMT-0001593

Contract No:_____

exploitation is granted, but excluding shipping lines that are customarily licensed from a location outside the Territory or that are only serviced in but do not fly the flag of a country in the Territory.

*Hotel* means exploitation of a Motion Picture Copy only for direct exhibition in temporary or permanent living places, such as hotels, motels, apartment complexes, co-operatives or condominium projects, by means of closed-circuit television systems where the telecast originates within or in the immediate vicinity of such living places.

### D. Video Rights Definitions:

*Video* means *Video Rental, Video SellThru* and *Commercial Video* exploitation of a Motion Picture but does not include any form of *Internet* or *ClosedNet* exploitation of a Motion Picture.

*Video Rental* means exploitation of a Videogram embodying a Motion Picture that is rented to the viewer only for non-public viewing of the embodied Motion Picture in a linear form within a private living place where no admission fee is charged for such viewing.

*Video SellThru* means exploitation of a Videogram embodying a Motion Picture that is sold to the viewer only for non-public viewing of the embodied Motion Picture in a linear form within a private living place where no admission fee is charged for such viewing.

*Commercial Video* means direct linear exhibition before an audience of a Videogram embodying a Motion Picture at the facilities of either organizations not primarily engaged in the business of exhibiting Motion Pictures, such as in educational organizations, churches, restaurants, bars, clubs, trains, libraries, Red Cross facilities, oil rigs and oil fields, or governmental bodies such as in embassies, military bases, military vessels and other governmental facilities flying the flag of the licensed territory, but only to the extent that such exploitation is not otherwise utilized in the licensed Territory as a form of NonTheatrical exploitation. Commercial Video does not include NonTheatrical, Public Video, Airline, Ship or Hotel exploitation, nor any form of making the Picture available over the Internet or a Closed Network.

### E. Pay TV Rights Definitions:

*Pay TV* means *Terrestrial Pay TV, Cable Pay TV* and *Satellite Pay TV* exploitation of a Motion Picture but does not include any form of *PayPerView, Free TV, Internet* or *ClosedNet* exploitation of a Motion Picture.

*Terrestrial Pay TV* means over-the-air broadcast of a Motion Picture Copy by means of encoded Hertzian waves for television reception where a charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that broadcasts the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

*Cable Pay TV* means an originating transmission of a Motion Picture Copy by means of an encoded signal over cable for television reception where a charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that transmits the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

*Satellite Pay TV* means the uplink broadcast of a Motion Picture Copy by means of an encoded signal to a satellite and its downlink broadcast to terrestrial satellite reception dishes for television

CONFIDENTIAL                                                                                    TC-SETTLMT-0001594

viewing located in the immediate vicinity of the reception dishes where a charge is made: (i) to viewers in private living places for use of a decoding device to view a channel that broadcasts the Motion Picture along with other programming; or (ii) to the operator of a hotel or similar temporary living place located distant from where the broadcast signal originated for use of a decoding device to receive a channel that broadcasts the Motion Picture and other programming and retransmit it throughout the temporary living place for viewing in private rooms.

## F. Free TV Rights Definitions:

*Free TV* means *Terrestrial Free TV*, *Cable Free TV*, and *Satellite Free TV* exploitation of a Motion Picture but does not include any form of *PayPerView*, *Pay TV*, *Internet* or *ClosedNet* form of exploitation of a Motion Picture.

*Terrestrial Free TV* means over-the-air broadcast by Hertzian waves of a Motion Picture Copy for television reception in private living places without a charge to the viewer for the privilege of viewing the Motion Picture, *provided that* for this purpose government television assessments or taxes (but not a charge for PayPerView or Pay TV) will not be deemed a charge to the viewer.

*Cable Free TV* means the originating transmission by coaxial or fiber-optic cable of a Motion Picture Copy for television reception in private living places without a charge to the viewer for the privilege of viewing the embodied Motion Picture, *provided that* for this purpose neither government television assessments or taxes nor the regular periodic service charges (but not a charge for PayPerView or Pay TV) paid by a subscriber to a cable television system will be deemed a charge to the viewer.

*Satellite Free TV* means the uplink broadcast to a satellite and its downlink broadcast to terrestrial satellite reception dishes of a Motion Picture Copy for television viewing in private living places located in the immediate vicinity of a viewer's reception dish without a charge to the viewer for the privilege of viewing the embodied Motion Picture, *provided that* for this purpose government satellite dish or television assessments or taxes (but not a charge for PayPerView or Pay TV) will not be deemed a charge to the viewer.

## G. Internet Rights Definitions:

*Internet* means the interconnected facilities of a publicly available communications network which uses Internet Protocol for data transmission to Computers (including Mobile Devices) connected to that network.

*Internet Rights* means *Internet Downloading* and *Internet Streaming* exploitation of a Motion Picture but does not include any form of *PayPerView*, *Video*, *Pay TV*, *Free TV* or *ClosedNet* exploitation of a Motion Picture.

*Internet Downloading* means making available publicly a digital Motion Picture Copy on the World Wide Web portion of the Internet in a manner that allows its transmission to an authorized Computer (including a Mobile Device) for making another exact digital Copy of the embodied Motion Picture and retaining that Copy for personal use for more than a transient period of time after completion of transmission. *Internet Downloading* does not include any form of *Internet Streaming*.

*Internet Streaming* means making available publicly a digital Motion Picture Copy on the World Wide Web portion of the Internet in a manner that allows continuous viewing of the Copy of the embodied Motion Picture on an authorized Computer (including a Mobile Device) in a substantially linear form substantially simultaneously with the transmission of such Copy over the Internet but which does not allow making another digital Copy except for a transient period of time necessary to facilitate such viewing. *Internet Streaming* does not include any form of *Internet Downloading*.

CONFIDENTIAL

Contract No:_____

*Internet Streaming/Downloading* means making available publicly a digital Motion Picture Copy on the World Wide Web portion of the Internet for both *Internet Downloading* and *Internet Streaming* at substantially the same time.

## H. ClosedNet Rights Definitions:

*Closed Network* means the interconnected facilities of a closed, private communications network which uses Internet Protocol or other secure data transmission protocol for communication among Authorized Computers (including Mobile Devices) of Authorized Subscribers connected to that Closed Network.

*ClosedNet Rights* means *ClosedNet Downloading* and *ClosedNet Streaming* exploitation of a Motion Picture but not including any form of *PayPerView, Video, Pay TV, Free TV* or *Internet* exploitation of a Motion Picture.

*ClosedNet Downloading* means making available a digital Motion Picture Copy on a Closed Network in a manner that allows transmission to an authorized Computer (including a Mobile Device or reception device) by Authorized Subscribers connected to that Closed Network for making another exact digital Copy and retaining the Copy for personal use for more than a transient period of time after completion of transmission. *ClosedNet Downloading* does not include any form of *ClosedNet Streaming*.

*ClosedNet Streaming* means making available a digital Motion Picture Copy on a Closed Network in a manner that allows continuous viewing of the Copy on an authorized Computer (including a Mobile Device or reception device) by Authorized Subscribers connected to the Closed Network in a substantially linear form substantially simultaneously with the transmission of such Copy over the Closed Network but which does not allow making another digital copy except for a transient period of time necessary to facilitate such viewing. *ClosedNet Streaming* does not include any form of *ClosedNet Downloading*.

*ClosedNet Streaming/Downloading* means making available a digital Motion Picture Copy on a Closed Network for both *ClosedNet Downloading* and *ClosedNet Streaming* at substantially the same time.

## I. Additional Definitions:

*Access (access, accessing)* means to make available a digital Motion Picture Copy on the Internet or a Closed Network in a manner that allows a user to copy, view, stream, download or use, or to obtain data or information about or related to, the Motion Picture Copy or its embodied Motion Picture.

*Advertiser Supported* means making available a digital Motion Picture Copy on the Internet or a Closed Network for accessing, downloading or streaming, by either: (i) including trailers, commercials or other advertising before, after, or within the continuity of the Motion Picture Copy; or (ii) including banners, logos, icons, text, hyper-text, meta-tags, symbols or other identifying information of a product or service or a supplier of such product or service provider on the same Website as the Motion Picture Copy or any of its elements or identifying information.

*Affiliate* means any Person, including any officer, director, employee or partner of a Person controlled by, controlling or under common control with a Party.

*Authenticate (authenticated, authentication)* when used for a record means: (i) to sign the record using a signature or electronic signature; or (ii) to utilize an electronic sound, symbol, or process, attached to or logically associated with the record, with the intent to sign or otherwise adopt the record.

*Authentication procedure* when used in connection with an Internet Website or a Closed Network means the same as an attribution procedure.

CONFIDENTIAL                                                                    TC-SETTLMT-0001596

Contract No:_____

*Attribution procedure* means a procedure to verify that an authentication, display, message, record or performance is that of a particular Person as an Authorized Subscriber, or to detect changes or errors in information.

*Authorized Channel* means a specific television channel identified as authorized to broadcast a Motion Picture.

*Authorized Format* means a physical format in which Videograms embodying a Motion Picture are authorized to be exploited.

*Authorized Language* means a language in which a Motion Picture is authorized to be exploited by means of an Authorized Language Use.

*Authorized Language Use* means dubbing, subtitling or parallel tracking in an Authorized Language in which a Motion Picture is authorized to be exploited.

*Authorized Subscriber* means a Person who has been verified by an attribution procedure as someone who is legally entitled to access and utilize a service.

*Authorized Telecast* means either a Run or Playdate in which a Motion Picture is authorized to be exploited.

*Availability Date* means the first day after the end of the Holdback Period for a Licensed Right. If the Availability Date refers to a category of Licensed Rights, it refers to the first date on which Distributor may exploit any Licensed Right in the category. For example, the Pay TV Availability Date is the first date on which Distributor may exploit the Pay TV Terrestrial, Pay TV Cable or Pay TV Satellite Right.

*Broadcast* (*broadcast*) means the communication to the public of a Motion Picture Copy by means of Hertzian waves, wire, cable casting, wireless diffusion, radio waves or satellite in a manner that allows the Motion Picture Copy to be viewed on a television, but without use of an Internet Protocol. *Broadcast* (*broadcast*) means *telecast*.

*Broadcaster* (*broadcaster*) means *telecaster*.

*Cassette* means the same as VideoCassette.

*Catch-Up TV* means: (i) with respect to PayPerVew or Pay TV, making a digital Motion Picture Copy available for streaming on a Closed Network operated by a telecaster duly authorized to exploit such rights, but only by Authorized Subscribers accessing the Closed Network; and (ii) with respect to Free TV, making a digital Motion Picture Copy available for streaming on a Website operated by a telecaster duly authorized to exploit such rights but only by Authorized Subscribers of such Website.

*Closed Network* means the interconnected facilities of a closed, private communications network which uses Internet Protocol or other secure data transmission protocol for communication among Authorized Computers (including Mobile Devices) of Authorized Subscribers connected to that Closed Network.

*Compact Disc* means a combined optical and electronic analog storage device designed to be used in conjunction with an electronic device that causes a Motion Picture to be visible on the screen of a computer monitor or television for private viewing in a substantially linear manner. A Compact Disc does not include any type of VideoDisc or DVD.

*Compulsory Administration* means any Law under which: (i) Simultaneous Retransmissions are subject to compulsory license; (ii) systems or other Persons may simultaneously retransmit such Simultaneous Retransmissions without first obtaining direct authorization from rightsholders or Persons making originating broadcasts; or (iii) rightsholders may only grant or withhold authorization for Simultaneous Retransmissions remunerated through collective management societies, collective contractual agreements or local Law.

CONFIDENTIAL                                                                 TC-SETTLMT-0001597

Contract No:_____

*Computer* means an electronic device that accepts and manipulates digital information or data in response to a sequence of instructions in order to view a Motion Picture Copy where the type and order of the instructions can be defined, selected and entered by the user of the Computer.

*Copy* means the embodiment of a Motion Picture in any form, including film, tape, cassette, disc or digital file, *provided that* where exploitation of a Licensed Right is limited to an Authorized Format then Copy with respect to such Licensed Right is limited to such Authorized Format.

*Digital Rights Management (DRM)* means a sequence of software or hardware instructions embodied in, related to or activated by a Motion Picture Copy that controls or manages copying, viewing, altering, or accessing the Motion Picture, its content or elements or associated Rights Management Information.

*Disc* means an electronic storage device designed to be used in conjunction with an electronic device or a Computer that causes a Motion Picture Copy to be visible on the screen of a television or computer monitor for private viewing in a substantially linear manner. A Disc includes a VideoDisc, Compact Disc, DVD or Blu-ray Disc, but not a VideoCassette.

*Download (download)* means to make available a digital Motion Picture Copy on the Internet or a Closed Network in a manner that allows its transmission to a Computer or Mobile Device for making another exact digital Copy on such Computer or Mobile Device and retaining such copy for use for more than a transient period of time on such Computer or Mobile Device after completion of the initial continuous period of transmission. *Download* includes *downloading*.

*Dubbed* means a Version of the Motion Picture in which the voices of performers on the original soundtrack are replaced with the voices of other performers speaking dialogue in an Authorized Language.

*DVD* means a digitally encoded electronic storage device that conforms to one of the DVD Specifications for Read-Only Disc or Blu-ray Disc and that is designed for use in conjunction with an electronic device in a way that causes a Motion Picture Copy to be visible for private viewing on the screen of a monitor or television.

*Electronic record* means a contract or other record created, generated, sent, communicated, received, or stored by electronic means.

*Electronic signature* means an electronic sound, symbol, or process attached to or logically associated with a contract or other record and executed or adopted by a person with the intent to sign the record.

*Exhibition* means the same as public performance.

*First Release* means the earliest of: (i) the date on which the Motion Picture must be released as designated in the Deal Terms; or (ii) the date on which the Picture is first made generally available to the paying public in the Territory, either through exhibition in cinemas, sale of Videograms, or telecast; or (iii) six (6) months after Notice of Initial Delivery.

*First Theatrical Release* means the date on which the Motion Picture is first made generally available to the paying public in cinemas in the Territory, excluding festival and awards screenings.

*First Video Release* means the date on which Videograms embodying the Motion Picture is first made generally available for sale to or rental by the paying public in the Territory.

*First Negotiation* means, *provided that* Distributor is then actively engaged in the distribution business on a financially secure basis, Licensor will negotiate exclusively with Distributor in good faith for a period of ten (10) days after receipt of Notice by Licensor regarding the matter for which Distributor has a First Negotiation right before entering into negotiations regarding the matter with any other Person. If no agreement is reached within this time period, then Licensor will be free to stop

CONFIDENTIAL                                                         TC-SETTLMT-0001598

Contract No:_____

negotiations with Distributor and then to negotiate and conclude an agreement regarding the proposed matter with any other Person on any terms.

*Guarantor Certificate* means a certified statement in a record by a professional completion guarantor who has guaranteed completion and delivery of a Motion Picture that specific physical materials for the Motion Picture: (i) are of technical quality sufficient for customary commercial exploitation of applicable Licensed Rights; and (ii) have been placed in the hands of an acknowledged shipper or air carrier for delivery F.O.B. to the required delivery location for such materials.

*Internet* means the interconnected facilities of a publicly available communications network which uses Internet Protocol for data transmission to Computers (including Mobile Devices) connected to that network.

*Internet Protocol Television* or *IPTV* means ClosedNet Streaming of a digital Motion Picture Copy over a Closed Network to Authorized Subscribers of a service offered by a telecaster also authorized to exploit PayPerView or Pay TV Rights in the embodied Motion Picture.

*Internet Protocol* means the Transmission Control Protocol (TCP) and Internet Protocol (IP) or successors or substantially similar substitute protocols.

*International Standard Audiovisual Number* (*ISAN*) means an international standard audio-visual number assigned to a Motion Picture, or any of its Versions, that uniquely identifies the Motion Picture or the Version and is assigned by a duly authorized ISAN authority.

*Kiosk,* as related to Use, means obtaining ownership or possession of a Videogram through an automated dispenser or so-called "kiosk."

*Laboratory Certificate* means a certified statement in a record by a professional motion picture or sound laboratory which holds physical materials for a Motion Picture confirming that such materials: (i) are of technical quality sufficient for customary commercial exploitation of applicable Licensed Rights; and (ii) are available for access by at the laboratory or facility under its customary terms and conditions.

*Laser Disc* is a type of VideoDisc.

*Law* means any statute or ordinance, whether municipal, state, national or territorial, any executive, administrative or judicial regulation, order, judgment or decree, any treaty or international convention, or any rule, custom or practice with force of law.

*Limited Use* means authorizing accessing, streaming or downloading, as applicable, of a Motion Picture Copy that is made available on the Internet or Closed Network by a user who is required to pay a separate fee to obtain a limited right to use a new digital copy of a Motion Picture Copy that may be accessed and viewed, but not further copied, subject to express limitations as to either the number of accesses or viewings, the period of access or viewing, or both (*e.g.* unlimited viewing for *x* days, or *x* viewings maximum, or *x* viewings within *y* days).

*Live Performance* means performance of a Motion Picture or its Underlying Material by live players, whether by reading, performance, musico-dramatic rendition or pantomime, where the performance occurs directly before a live audience or is broadcast live and without prerecorded material directly to the public, but excluding performances less than fifteen (15) minutes in length done for the purpose of advertising or publicizing the Motion Picture.

*Local Language(s)* mean the primary language(s) spoken in each country of the Territory.

*Mail Order* means Video SellThru exploitation in which the sale occurs by placing an order for and receiving delivery of the Videogram through use of the postal service or other shipping service and not at a retail establishment, but not including ordering a Videogram over the telephone or through the Internet or a Closed Network.

CONFIDENTIAL                                                                          TC-SETTLMT-0001599

Contract No:_____

*Merchandising* means distribution and sale of tangible goods, other than Copies of a Motion Picture or any of its Versions, that are based on or utilize the title of the Picture, the names, likenesses or characteristics of artists in their roles in a Motion Picture, or physical materials appearing in or used for a Motion Picture and that are made for sale to the general public, but not including Interactive Multimedia, Interactive Networked Multimedia, Internet, ClosedNet or Publishing.

*Mobile Device* means a portable Computer, a substantial purpose of which is facilitating telephonic communication, but which also incorporates functionality that allows viewing of a Motion Picture Copy.

*Motion Picture* means the licensed audiovisual work consisting of a series of related images that, when shown in succession; impart an impression of motion, with accompanying sounds, if any.

*Near-Demand View* means multiple regularly scheduled transmissions in a short time period of a Motion Picture Copy by means of an encoded signal for television reception in homes and similar permanent living places where a charge is made to the viewer for the right to use a decoding device to view the Motion Picture at one of the scheduled transmission times selected by the viewer for each viewing.

*Original Language* means the primary language spoken in the dialogue of a Motion Picture in its original version.

*Outside Release Date* means the date on which Distributor must release the Picture in the First Release Medium, if so specified in the Deal Terms.

*Parallel Tracked* means embodying a Copy of the Original Language Version of the Picture in a Compact Disc or DVD that also contains a Dubbed or Subtitled Version of the Picture in the Authorized Language Uses.

*Party* means either Licensor or Distributor.

*Parties* mean each Party to the Agreement.

*Pay-Cable TV* means the same as Cable Pay TV.

*Permanent Use* means authorizing downloading of a Motion Picture Copy that is made available on the Internet or a Closed Network by a user who is required to pay a separate fee to obtain ownership of a new digital copy of the Motion Picture Copy which new copy may be viewed (but not further copied) without express limitations as to the number of such viewings by the user.

*Person* means any natural person or legal entity.

*Playdate* means one or more telecasts of the Picture during a twenty-four (24) hour period over the non-overlapping telecast facilities of an authorized telecaster such that the Picture is only capable of reception on televisions within the reception zone of such telecaster during such period.

*Principal Photography* means the actual photographing of a Motion Picture, excluding second-unit photography or special effects photography, requiring the participation of the director and the on-camera participation of a featured member of the principal cast.

*Private Internet* means the same as *Closed Network*.

*Public Internet* means the same as *Internet*.

*Publishing* means exploitation of hard cover or soft cover printed publications of a novelization of a Motion Picture or artwork, logos or photographic stills created for use in the Motion Picture that are included in such novelization.

*Quality Control Report* means a statement in a record from a professional motion picture or sound laboratory which confirms that physical materials for a Motion Picture identified in the report are of technical quality sufficient for customary commercial exploitation of applicable Licensed Rights.

CONFIDENTIAL                                                          TC-SETTLMT-0001600

Contract No:_____

*Record* means information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form.

*Remake* means a new Motion Picture derived from an existing Motion Picture or its Underlying Material in which substantially the same characters and events as shown in the existing Motion Picture are depicted.

*Rights* means rights, licenses and privileges under copyright, trademark, neighboring rights or other intellectual property rights with regard to any type of exploitation of a Motion Picture or its Underlying Material, including the rights to duplicate, adapt, distribute, perform, display and make available in accordance with the customary requirements of each specific licensed media.

*Rights Management Information (RMI)* means any information embodied, attached, related or appearing in or on a Motion Picture Copy that may include a copyright notice or other identifier, that identifies the copyright owner, producer, author, writer, director, performers or other Persons who have contributed to the making of the Motion Picture, or that describes any authorized terms and conditions for licensing or use of the Motion Picture or the Motion Picture Copy.

*Run* means one (1) telecast of the Motion Picture during a twenty-four (24) hour period over the non-overlapping telecast facilities of an authorized telecaster such that the Picture is only capable of television reception within the reception zone of such telecaster once during such period. A simultaneous telecast over several interconnected local stations (*i.e.* on a network) constitutes one (1) telecast; a telecast over non-interconnected local stations whose signal reception areas do not overlap constitutes a telecast in each station's local broadcast area.

*Sequel* means a new Motion Picture derived from an existing Motion Picture or its Underlying Material in which a character, event or locale depicted in the existing Motion Picture or its Underlying Material is shown engaged in or as the subject of substantially new and different events than those depicted in the existing Motion Picture.

*Simulcasting* means making available a digital Motion Picture Copy on the Internet solely on a Website operated by telecaster duly authorized to exploit Free TV Rights in the embodied Motion Picture for access without charge simultaneously with a Free TV Authorized Telecast of the Motion Picture Copy.

*Simultaneous Retransmission* means the simultaneous, unaltered and unabridged retransmission by an operator other than the Authorized Telecaster of a Motion Picture by cable, microwave, satellite or telephone system for reception by the public of an initial transmission.

*Single Use* means authorizing accessing, streaming or downloading, as applicable, of a Motion Picture Copy that is made available on the Internet or a ClosedNet by a user who is required to pay a separate fee for each single act of accessing, streaming or downloading the Motion Picture Copy in whole or in part.

*Stream (stream)* means to make available a Motion Picture Copy on the Internet or a ClosedNet in a manner that allows continuous viewing of the Motion Picture Copy in substantially linear form on a Computer or Mobile Device simultaneously with the transmission of such Motion Picture Copy over the Internet or Closed Network but which does not allow making another digital copy except for a transient period of time necessary to facilitate such viewing. *Stream* includes *streaming*.

*Subscription Use* means authorizing accessing, streaming or downloading, as applicable, of a Motion Picture Copy that is made available on a Website on the Internet or a Closed Network by a user who is required to pay a set fee for a specified period to access, stream or download, as applicable, the embodied Motion Picture along with other Motion Pictures available in the same manner on the same Website or Closed Network.

CONFIDENTIAL                                                                          TC-SETTLMT-0001601

Contract No:_____

*Subtitled* means a Version of the Picture in which a translation of the original dialogue appears on the bottom of the screen.

*Telecast (telecast)* means the communication to the public of a Motion Picture Copy by means of Hertzian waves, wire, cable casting, wireless diffusion, radio waves or satellite in a manner that allows the Motion Picture Copy to be viewed on a television, but without use of an Internet Protocol.

*Telecast* (*telecast*) means *broadcast*.

*Telecaster (telecaster)* means *broadcaster*.

*Transmit (transmit* or *transmission)* means to make available a Motion Picture Copy utilizing Internet Protocol by wire or wireless means.

*Underlying Material* means the literary and other material from which a Motion Picture is derived or on which it is based, including all versions of the screenplay, all notes, memos, direction, comments, ideas, stage business and other material incorporated in any version of the Motion Picture, and, to the extent necessary rights and licenses have been duly obtained, all existing novels, stories, plays, songs, events, characters, ideas, or other works from which any version of the Motion Picture is derived or on which it is based.

*Version* means an adaptation of a Motion Picture that is not accomplished by merely mechanical reproduction or use of minimal originality but instead uses original artistic or intellectual expression to create a new Work in its own right which contains materials or expressions of authorship not found in the original Motion Picture.

*Video Compact Disc* means a type of compressed analog VideoDisc designed to be used solely on a special purpose electronic device that is solely dedicated for private viewing of a Motion Picture on the screen of a television in a substantially linear manner.

*VideoCassette* means a VHS or Beta cassette or comparable analog magnetic storage   device designed to be used with a reproduction apparatus that causes a Motion Picture to be visible on a television screen for private viewing in a substantially linear manner. A VideoCassette does not include any type of VideoDisc or Compact Disc or DVD.

*VideoDisc* means a laser or capacitance disc or comparable analog optical or mechanical storage device designed to be used with a reproduction apparatus that causes a Motion Picture to be visible on a television screen for private viewing in a substantially linear manner. A VideoDisc does not include any type of Compact Disc or DVD.

*Videogram* means any type of VideoCassette or Disc, but only to the extent use of the specific type of electronic storage device is authorized in the Agreement by the Parties.

*Video-On-Demand* (*VOD*) means the same as *Demand View or View-On-Demand* and is a type of PayPerView Right.

*Website* means a set of interconnected data resources at an addressable location on the Internet or a Closed Network which is accessible by other users or Authorized Subscribers of the applicable network.

*Wireless* means exploitation of a digital Motion Picture Copy by making it available on a Closed Network for over-the-air transmission to a Mobile Device which allows access to a Motion Picture Copy.

*Wireless Right* is a type of *ClosedNet Right*.

*Wireless system* means a closed system of integrated telecommunications facilities that allow system Subscribers to access an over-the-air digital signal embodying a Motion Picture Copy on a Computer including a Mobile Device.

Contract No:_____ ___

*Work* means an original expression of authorship in the literary, scientific or artistic domain, whatever may be the mode or form of its expression.

CONFIDENTIAL

TC-SETTLMT-0001603

# ASSIGNMENT

This assignment agreement ("Assignment") between ALEBRIJE ENTERTAINMENT, LLC located at 1421 SW 107 Ave. #261 Miami, FL 33174 ("Assignor") and ONE KEY ENTERTAINMENT, LLC located at 5600 Wilshire Blvd. #358 Los Angeles, CA 90036 ("Assignee') is dated effective as of June 09, 2017.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, in perpetuity in and to that certain motion picture, currently entitled BROOKLYN GUNS (the "Picture") based on the original screenplay entitled "Brooklyn Guns" written by Jon Carlo.

1.  Assignor hereby represents and warrants:

    1.1.    That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.

    1.2.    That, as of the effective date hereof, Assignor has the right to enter into this Assignment.

    1.3.    That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, granted, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.

2.  Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.

3.  Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.

4.  Assignor hereby waives the benefit of any provisions of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to assignee or to obtain any other form of equitable relief, specific to performance or otherwise, any right to which Assignor expressly waives.

5.  This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.

6.  This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Agreement cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE 09TH DAY OF JUNE 2017.

ALEBRIJE ENTERTAINMENT, LLC

By: _____

Its: _____

ONE KEY ENTERTAINMENT, LLC

By: _____

Its: _____

CONFIDENTIAL

# ASSIGNMENT

This assignment agreement ("Assignment") between ONE KEY ENTERTAINMENT, LLC located at 5600 Wilshire Blvd. #358 Los Angeles, CA 90036 ("Assignor") and IINMM CAPITAL, LLC located at 5550 Wilshire Blvd. #523 Los Angeles, CA 90036 ("Assignee') is dated effective as of June 09, 2017.

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby irrevocably and unconditionally sell, grant, convey and assign unto Assignee all of Assignor's rights, title and interest of every kind and nature, throughout the universe, in perpetuity in and to that certain motion picture, currently entitled BROOKLYN GUNS (the "Picture") based on the original screenplay entitled "Brooklyn Guns" written by Jon Carlo.

1.   Assignor hereby represents and warrants:

    1.1.   That Assignor is the sole and exclusive owner of the rights and privileges granted or to be granted to Assignee hereunder.

    1.2.   That, as of the effective date hereof, Assignor has the right to enter into this Assignment.

    1.3.   That, as of the effective date hereof, no part of the rights herein conveyed has in any way been encumbered, conveyed, granted, assigned, transferred or otherwise disposed of and all such rights are therefore free and clear of any and all liens, claims, charges or encumbrances whatsoever in favor of any party whatsoever.

2.   Assignor shall indemnify Assignee, its successors, assigns, licensees and officers, and hold them harmless from and against any and all claims, liability, losses, damages, costs, expenses (including but not limited to attorney's fees) arising out of any breach by Assignor of any warranty made by Assignor hereunder.

3.   Assignee hereby assumes and agrees to be bound by all future obligations of Assignor which accrue after the date hereof.

4.   Assignor hereby waives the benefit of any provisions of law known as "droit morale" or any similar law in any country of the world and agrees not to institute or permit any action or lawsuit on the ground that the Picture in any way constitutes an infringement of any "droit morale" and Assignor agrees that Assignor shall not, under any circumstances (including without limitation, the circumstances of a breach by Assignee) be entitled to enjoin the exhibition or other exploitation of the Picture, to terminate or rescind any rights granted to assignee or to obtain any other form of equitable relief, specific to performance or otherwise, any right to which Assignor expressly waives.

5.   This Assignment, and the rights granted hereunder, may not be assigned by Assignor to any person, firm or corporation. Assignee may assign this Assignment and the rights and services granted herein, together with the results and proceeds thereof, and the representations and warranties contained herein, to any person or entity.

6.   This Assignment shall be construed in accordance with the laws of the state of California and shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, licensees and assigns. This Agreement cannot be amended or modified except in a writing signed by all parties hereto.

IN WITNESS WHEREOF, THE PARTIES HERETO HAVE EXECUTED AND DELIVERED THIS ASSIGNMENT AS OF THE 09TH DAY OF JUNE 2017.

ONE KEY ENTERTAINMENT, LLC

By:
Its:

IINMM CAPITAL, LLC

By:
Its:

CONFIDENTIAL