# EXHIBIT L

# JJMT CAPITAL

**Investment Opportunity Overview**

# CONFIDENTIALITY AND DISCLAIMERS

JJMT Capital has deemed all of the information to be presented and all information contained in these materials as strictly confidential and proprietary and to contain legally protectable trade secrets. The information is not generally known to the public.  By receiving these materials, recipients are agreeing to maintain all information contained in this presentation strictly confidential and to not to disclose the information to anyone, except within recipient's organization and to agents and advisors bound by duties of confidentiality or as otherwise required by law. The information presented and contained herein may not be reproduced or redistributed.

The information presented and contained herein contains certain statements that are "forward looking statements" and projections. Those statements may include, among others, discussions of the fund's business strategy and JJMT Capital's expectations concerning investment results, future operations, profitability, and liquidity and capital resources. The forward looking statements and projections investment performance are necessarily based on certain assumptions and are intended to illustrate hypothetical results under those assumptions (not all of which are specified herein).  These assumptions may include general assumptions relating to economic and market conditions. They also include assumptions based on good faith assessments by JJMT Capital managers.

Although JJMT Capital believes that the expectations reflected in the forward looking statements and projections are reasonable under the circumstances at the time they were prepared, it can give no assurance that such expectations will prove to be accurate.  These projections and other estimates may change without notice including for audit adjustments or other factors not known at time estimates are prepared.  All phases of the operation of the JJMT Capital are subject to a number of uncertainties, risks and other influences, many of which are outside the control of the fund and any one of which, or a combination of which, could materially affect whether the forward looking statements and projections ultimately prove to be accurate. Actual results will likely differ from projected results, and such differences may be material. Important factors that could cause actual results to differ from projected expectations include, but are not limited to, prolonged downturns in general economic conditions and securities markets, regulatory changes in industries in which the fund's partners operate, shortage of available debt or other capital to finance the growth of various essential partners. JJMT Capital undertakes no duty or obligation to update the forward looking statements and projections, whether as a result of new information, future events or otherwise.

Recipients of this information should not view the past or projected performance of JJMT Capital as indicative of future results, and there is a possibility of loss in connection with an investment in the JJMT Capital funds.  All performance returns as indicated in this presentation are net of all management fees, carry and other fund expenses (unless indicated as gross of fees, in which case net returns are also presented with gross returns).  References to benchmarking indices with respect to performance in this presentation are for comparison purposes only.  The total return of the S&P 500 Index, a commonly used benchmark for the U.S. equity markets, is an unmanaged, capitalization-weighted index reflecting the performance of 500 widely-held U.S. equity stocks chosen based on industry representation, liquidity and stability.  Financial indicators and benchmarks are unmanaged, do not reflect any management fees, are for illustration purposes only, and have limitations when used for such purposes because they may have volatility, credit, or other material characteristics that are different from the JJMT Capital funds.

# JJMT CAPITAL OVERVIEW

› JJMT Capital is a Delaware-based LLC focused on providing capital to our partner, 1inMM Productions, for the purposes of financing the acquisition of film distribution rights

› 1inMM Productions is a film distribution company based in Los Angeles that engages in financing, production, and distribution of films throughout Latin America, Australia, and New Zealand

› The company was founded in early 2013 by Zach Horwitz and his partners Julio Hallivis, Gustavo Montaudon, and Javier Salgado with significant committed capital from Howard Schultz (Starbucks Chairman and CEO)

› In its current geographies, 1inMM is a top three distribution company

› Within its distribution business segment, 1inMM Productions' business model consists of purchasing the film distribution rights from Producers and selling those rights to Platforms including HBO, SONY, Netflix, Showtime, basic cable, etc.

› 1inMM's revenue model consists of earning a royalty on the revenue stream of every film it "flips" to Platforms

› For every film 1inMM distributes, it earns royalties for 15 years

› In addition to Howard Schultz, JJMT Capital is one of the sources of capital for 1inMM – thereby providing 1inMM the financial flexibility to purchase film rights from Producers

# ILLUSTRATIVE TRANSACTION OVERVIEW



# TRANSACTIONS COMPLETED TO DATE

› Our first transaction was completed in Q1 2014, with the majority of efforts occurring over the last 9 months

› 15 acquisitions have been financed to date

› Depending on available deal flow provided by 1inMM, JJMT intends to finance the acquisition of 10-15 more films through the end of 2015

| Film | Transaction Date | Customer | Purchase Price |
|------|-----------------|----------|----------------|
| Film | 3/27/2014 | Sony Pictures | $37,000 |
| Film | 10/6/2014 | Sony Pictures | $297,000 |
| Film | 11/17/2014 | Sony Pictures | $32,500 |
| Film | 12/26/2014 | HBO Studios | $36,000 |
| Film | 1/15/2015 | HBO Studios | $81,100 |
| Film | 2/12/2015 | HBO Studios | $265,000 |
| Film | 2/17/2015 | HBO Studios | $263,500 |
| Film | 3/10/2015 | HBO Studios | $38,250 |
| Film | 3/30/2015 | HBO Studios | $225,500 |
| Film | 4/6/2015 | HBO Studios | $325,250 |
| Film | 6/10/2015 | HBO Studios | $265,000 |
| Film | 6/20/2015 | HBO Studios | $253,500 |
| Film | 8/3/2015 | HBO Studios | $235,750 |
| Film | 8/3/2015 | HBO Studios | $170,500 |
| Film | 8/10/2015 | HBO Studios | $416,000 |

Total Capital Deployed          $2,941,850

The source of this capital comes from the founding partners of JJMT and select outside investors

CONFIDENTIAL INFORMATION

5

# TRANSACTIONS COMPLETED TO DATE CONT'D…












Not pictured: Wild for the Night, Bronco Belle, Stolen Dreams, Deseo

# HISTORIC AND FUTURE ANTICIPATED DEAL FLOW

› 1inMM's historical and projected deal flow is shown below.  Important to note that 1inMM has never experienced a "hung" transaction (i.e., HBO/SONY/Netflix have always successfully transacted on their acquisitions)

  › **2013**: 22 films (Netflix)

  › **2014**: 49 films (22 Netflix / 15 SONY / 12 HBO)

  › **2015**: 71 films (32 Netflix / 15 SONY / 24 HBO)

  › **2016**: between 110-130 films

| Month | Major Festival |
|---|---|
| January | Sundance |
| February | Berlin |
| March | South by Southwest (SXSW) |
| April | Hong Kong |
| May | Cannes |
| June | Indie & LA |
| July | Small Festivals |
| August | Telluride |
| September | Toronto & Venice |
| October | Small Festivals |
| November | American Film Market |
| December | Small Festivals |



Anticipated Deal Flow by Month

# ILLUSTRATIVE INVESTMENT INTO JJMT CAPITAL

› Investments into JJMT are structured as loans (promissory notes) and generally short term in nature (3 or 6 months)

› At the end of the investment period, investors will have their capital (plus interest) returned and will then have the opportunity to re-invest in future deals if they so choose

› JJMT anticipates participating in 20-30 films in throughout the course of any calendar year, and so will have ample opportunity to deploy committed capital

| 6 Month Investment | |
|---|---|
| **Investor** | John Doe |
| **Investment amount $** | $100,000 |
| **Assumed Annualized Rate (% APR)** | *35.0%* |
| **Investment date** | *1/1/2015* |
| **Distribution date** | *7/1/2015* |
| **Hold Period (years)** | 0.5 |
| | |
| **Payouts** | |
| $ return | $17,500.0 |
| Implied % IRR | *38.4%* |

| 3 Month Investment | |
|---|---|
| **Investor** | John Doe |
| **Investment amount $** | $100,000 |
| **Assumed Annualized Rate (% APR)** | *35.0%* |
| **Investment date** | *1/1/2015* |
| **Distribution date** | *4/1/2015* |
| **Hold Period (years)** | 0.25 |
| | |
| **Payouts** | |
| $ return | $8,750.0 |
| Implied % IRR | *40.5%* |

# CURRENT JJMT INVESTOR RETURNS

| Number | Investor | Total Investment | Total Interest | Hold Period | % APR |
|---|---|---|---|---|---|
| 1 | Investor | $274,250 | $45,880 | 6 months | 33.5% |
| 2 | Investor | $95,000 | $15,000 | 6 months | 31.6% |
| 3 | Investor | $90,000 | $15,750 | 6 months | 35.0% |
| 4 | Investor | $85,000 | $14,875 | 6 months | 35.0% |
| 5 | Investor | $75,000 | $11,250 | 6 months | 30.0% |
| 6 | Investor | $65,000 | $11,375 | 6 months | 35.0% |
| 7 | Investor | $51,000 | $8,925 | 6 months | 35.0% |
| 8 | Investor | $50,000 | $10,000 | 6 months | 40.0% |
| 9 | Investor | $50,000 | $7,875 | 6 months | 31.5% |
| 10 | Investor | $50,000 | $8,750 | 6 months | 35.0% |
| 11 | Investor | $45,000 | $7,875 | 6 months | 35.0% |
| 12 | Investor | $40,000 | $6,000 | 6 months | 30.0% |
| 13 | Investor | $40,000 | $7,000 | 6 months | 35.0% |
| 14 | Investor | $35,000 | $6,125 | 6 months | 35.0% |
| 15 | Investor | $35,000 | $6,125 | 6 months | 35.0% |
| 16 | Investor | $30,000 | $5,250 | 6 months | 35.0% |
| 17 | Investor | $25,000 | $4,375 | 6 months | 35.0% |
| 18 | Investor | $25,000 | $4,375 | 6 months | 35.0% |
| 19 | Investor | $25,000 | $3,750 | 6 months | 30.0% |
| 20 | Investor | $25,000 | $3,750 | 6 months | 30.0% |
| 21 | Investor | $25,000 | $3,750 | 6 months | 30.0% |
| 22 | Investor | $25,000 | $3,750 | 6 months | 30.0% |
| 23 | Investor | $25,000 | $3,750 | 6 months | 30.0% |
| 24 | Investor | $25,000 | $3,750 | 6 months | 30.0% |
| 25 | Investor | $25,000 | $4,375 | 6 months | 35.0% |
| 26 | Investor | $25,000 | $4,375 | 6 months | 35.0% |
| 27 | Investor | $25,000 | $4,375 | 6 months | 35.0% |
| 28 | Investor | $25,000 | $4,375 | 6 months | 35.0% |
| 29 | Investor | $25,000 | $4,375 | 6 months | 35.0% |
| 30 | Investor | $25,000 | $4,375 | 6 months | 35.0% |
| 31 | Investor | $25,000 | $4,375 | 6 months | 35.0% |
| 32 | Investor | $20,000 | $3,500 | 6 months | 35.0% |
| | **Total** | **$1,505,250** | **$253,430** | **6 months** | **33.7%** |

## Overview of Results

› JJMT has deployed ~$1.5mm of outside capital across a variety of films since April 2015

› Average investment period for any single deal has been approximately 6 months

› Average %APR across all investments has been ~34%

# INVESTMENT OPPORTUNITY

› JJMT continues to raise and deploy capital in order to meet the needs of our growing partner, 1inMM Productions

› As previously indicated, any investment into JJMT Capital will be structured as a standard loan agreement with a targeted return of 30-40% APR

› Each loan agreement will be a separate and unique investment in which capital will be called shortly before the funding date of each film (generally 5-10 business days)

**For further information please reach out to any of our Managing Partners:**

**Jacob Wunderlin**
Managing Partner
jwunderlin@jjmtcap.com

**Joe deAlteris**
Managing Partner
jdealteris@jjmtcap.com

**Matthew Schweinzger**
Managing Partner
mschweinzger@jjmtcap.com

**Tyler Crookston**
Managing Partner
tcrookston@jjmtcap.com

# EXHIBIT M

# SAC MOVIE FUND ONE LLC

## CONFIDENTIAL INFORMATION STATEMENT

### March 10, 2017

This Confidential Information Statement (the "**Information Statement**") has been prepared in connection with an offering (the "**Offering**") by SAC Movie Fund One LLC, a California limited liability company (the "**Company**") of 3,000,000 Class A Preferred Units (the "**Preferred Units**"), at a purchase price of $1.00 per Preferred Unit.  The offering price of the Preferred Units has been arbitrarily determined and bears no relationship to the assets or book value of the Company.  The Offering will be made directly by the Company through its Manager, who will not separately be compensated for such selling efforts in compliance with federal and state securities laws.

———————————

**See "Risk Factors" beginning on page 4 of this Memorandum for a discussion of certain factors that should be considered by prospective investors.**

———————————

The Offering is scheduled to terminate at 5:00 p.m., Pacific time, on April 30, 2017, *provided, however*, that we reserve the right to extend the terms of the Offering up to one hundred eighty (180) days without notice to the subscribers (the "**Termination Date**").  We also reserve the right increase the number of Preferred Units to be sold in this Offering.  The first closing shall be held in the discretion of the Company within five business days of the date the Company has received one or more subscriptions for at least 1,000,000 Preferred Units generating gross financing proceeds to the Company of at least $1,000,000 (the "**Minimum Condition**").  The first closing will occur with respect to the actual number of Preferred Units sold as of that closing date, which number will be determined in the Company's sole discretion, as long as the Minimum Condition is met.  The Offering will continue with respect to any unsold Preferred Units, and closings may be held from time to time with respect to additional Preferred Units sold until the Termination Date.

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE SECURITIES LAWS PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND RULE 506 OF REGULATION D PROMULGATED THEREUNDER. ACCORDINGLY, THE PREFERRED UNITS WILL ONLY BE OFFERED OR SOLD TO "ACCREDITED INVESTORS" AS DEFINED IN RULE 501(A) OF REGULATION D UNDER THE SECURITIES ACT.

THE INFORMATION CONTAINED IN THIS INFORMATION STATEMENT IS PROVIDED SOLELY FOR THE PERSONS RECEIVING IT AND IS NOT AUTHORIZED FOR REPRODUCTION OR DISTRIBUTION TO OTHERS.  THE DELIVERY OF THIS INFORMATION STATEMENT AT ANY TIME DOES NOT IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE OF ISSUE. THIS INFORMATION STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY OF THESE SECURITIES IN ANY STATE TO ANY PERSON TO WHOM IT IS UNLAWFUL TO SOLICIT IN SUCH STATE.

THERE IS NO PRIVATE MARKET FOR THESE SECURITIES.  THESE SECURITIES SHOULD BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, AN EXEMPTION THEREFROM, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

Nanya 00080

## SUMMARY

*This summary highlights selected information from this Information Statement and may not contain all of the information that is important to investors.  Investors should read this entire Information Statement carefully, including the section entitled "Risk Factors," before making an investment in the Membership Units.*

*In this Information Statement, the terms "the Company," "we," "us," and "our" refer to SAC Movie Fund One LLC a California limited liability company, and, unless the context otherwise requires, "Membership Units" refers to the units representing Membership Interests of the Company and may be either Class A Preferred Units or Class B Profits Units.*

**The Company:**

The Company is a California limited liability company. The Company was formed in 2017 for the purpose of acquiring the foreign television distribution rights of motion pictures with the intention of licensing such rights to third-party media companies such as HBO and Netflix. The Company has entered into a Participation Agreement with 1INMM Capital, LLC, a California limited liability company ("**1INMM**") for acquisition of foreign television distribution rights of motion pictures. A copy of the Participation Agreement is attached to this Memo as Exhibit B.   A more detailed description of the Company's business model is set forth below under the Company Summary.

**The Offering:**

*Class A Preferred Units:*

*Security:*  Class A Preferred Units of SAC Movie Fund One LLC.

*Manager:*  The Company's sole manager is SAC Advisory Group, LLC (the "Manager"), the principals of which are Jeff Spiegel and Ryan Spiegel.

*Operating Expenses:*  The Company will reimburse the Manager for all operating costs and expenses of the Company, including accounting, tax preparation and legal expenses related to review the distribution agreements related to the acquisition of foreign television distribution rights of motion pictures.

*Capitalization*: 50% of the Company's Membership Units will be sold to investors and the Manager under this Offering in the form of Class A Preferred Units.  The remaining 50% of the Company's Membership Units represented by Class B Profits Units will be held by the Manager and shall represent the Manager's profits interest in the Company.

*Preferred Cumulative Annual Return:*  The Class A Preferred Unit investors will be entitled to a preferred cumulative annual return equal to 10% of their Capital Contributions.  After the Class A investors have received their 10% preferred cumulative annual return, the Class B Profits Units held by the Manager shall receive a return equal to the Class A Preferred Units, after which time all remaining profits  will be allocated  in accordance with all Members' Units Percentage Interests.

*Subscription Terms:*

We are offering the Preferred Units at a price of $1.00 per Preferred Unit.   The stated minimum subscription of an investor is 50,000 Preferred Units ($50,000).  However we may, in our discretion, accept smaller subscriptions.   The Offering has a Minimum Condition of $1,000,000.  Once we have accepted one or more subscriptions for a minimum of $1,000,000 in aggregate, we may conduct a closing. Thereafter we may continue to accept subscriptions at our discretion.

*Use  of Proceeds:*

The purpose of the Company is to finance, through participation, the acquisition of movie licensing rights for foreign distribution to third-party media companies.

1

| | |
|---|---|
| *Offering Period:* | The Offering period will expire on the earlier to occur of: (i) the sale of 3,000,000 Preferred Units or (ii) April 30, 2017, unless extended by the Company, in its discretion, up to the Termination Date. If less than 1,000,000 Preferred Units have been sold by the Termination Date so that the Minimum Condition has not been met, the Company will return all amounts received from Investors and terminate the Offering. |
| *Units Outstanding:* | The Manager currently holds 3,000,000 Class B Profits Units as of the date of this Information Statement, which represents all outstanding Membership Units prior to this Offering. |
| *Investor Suitability:* | The Offering will only be made to persons who meet certain suitability standards described herein, including the requirement that they be "accredited investors" within the meaning of Rule 501(a) of Regulation D. |
| *Restrictions on Resale:* | None of the Preferred Units will be registered under the Securities Act. The rights and preferences of the Preferred Units shall be governed by the Company's operating agreement (the "**Operating Agreement**") which contains language restricting the distribution, resale, transfer, pledge, hypothecation or other disposition of the Preferred Units unless and until the Preferred Units are registered under the Securities Act or an opinion of counsel reasonably satisfactory to the Company is received that registration is not required under the Securities Act. |
| *Subscription Documents*: | The purchase and sale of the Preferred Units will be made pursuant to the Subscription Agreement attached to this Information Statement. |
| *Operating Agreement:* | Purchasers of the Preferred Units will become members in the Company, which is a limited liability company or LLC. LLCs are governed by an Operating Agreement. Purchasers of the Preferred Units will be required to sign and become a party to the Operating Agreement as a condition to the purchase of the Units. Pursuant to the Subscription Agreement for the Preferred Units, subscribers will grant to the Manager of the Company a power of attorney authorizing the Manager to sign the Operating Agreement, making the subscribers party thereto. |
| *Risk Factors:* | The Preferred Units are speculative and involve a high degree of risk. Prospective investors should carefully review and consider the factors set forth under "Risk Factors," as well as all other information contained in this Information Statement and exhibits hereto. |
| *Expenses:* | All prospective purchasers of the Preferred Units will be responsible for their own costs, fees and expenses, including the costs, fees and expenses of their legal counsel and other advisors. |
| *Finder's Fee:* | Upon closing the Offering, the Manager at its own expense will pay a finder's fee of 0.5% to any person that introduces the Company to an investor who executes a Subscription Agreement. |

The Company will make available to any offeree, its attorney, accountant, tax advisor, or offeree representative any other information deemed necessary and appropriate by the offeree, to the extent such information is available to the Company or may be obtained by the Company without unreasonable cost or effort.

THE EXECUTION OF A SUBSCRIPTION AGREEMENT AND PURCHASE OF PREFERRED UNITS SHALL BE DEEMED AN ADMISSION FOR ALL PURPOSES THAT THE SUBSCRIBER HAS BEEN FURNISHED ALL INFORMATION IT DEEMS MATERIAL PRIOR TO MAKING ITS DECISION TO INVEST.

Nanya 00082

## THE COMPANY SUMMARY

**Overview**

How It Works (Step by Step):

1. The Company and 1INMM have executed a Participation Agreement that provides the terms under which the Company will fund the purchase of certain distribution rights on behalf of 1INMM. The Manager will hand pick movie deals brought to the Company by 1INMM. 1INMM will bring the Manager a signed non-binding letter of intent (the "**LOI**") from the licensor (companies such as HBO, Netflix, Sony, or Universal) and offer sheet to foreign sales agent ("**FSA**"), who represent the sales of movie licensing rights, in order for the Manager to view the proposed deal. In essence, 1INMM buys the licensing rights from the FSA and sells the Latin American distribution rights to the licensor, who has already agreed to purchase such distribution rights at a higher price (the "**Participation Fee**"). The Company will provide the funds to 1INMM as a "Participation Advance" for this purchase. In general, the difference between the Participation Advance and the Participation Fee represents a 25-35% yield on these types of agreements.

2. When the Manager agrees to fund a participation with 1INMM, the following takes place:
   a. The Company executes a participation agreement and schedule for the funding and repayment with 1INMM.
   b. The Company then wires the Participation Advance directly to the FSA for the purchase of distribution rights to the movie.
   c. Once licensing rights are owned by 1INMM, they will complete an assignment agreement, which transfers the licensing rights to the Company until payment of Participation Fee. Upon the Company's receipt of the Participation Fee, the assignment agreement will be terminated and the distribution rights will revert back to 1INMM.
   d. Payment of the Participation Fee depends on the particular licensor. Most relicensing agreements will be with HBO which generally pays the participation fee 6 months of signing an LOI. Netflix generally closes a deal within 1 year and Sony closes its deals within 3 months. The Manager will choose participations that maximize returns for the Company.
   e. In certain instances, a licensor may decide not to close a movie purchase even after signing an LOI, in which case 1INMM will shop the movie to another licensor. In this case, the Participation Agreement provides that 1INMM has 10 days after the movie is rejected by a licensor to execute a new participation with a new licensor. For example, if HBO rejects a movie, 1INMM will shop the movie to Netflix. If 1INMM is unable to negotiate a new movie participation that is acceptable to the Manager, 1INMM is obligated and will refund the Participation Advance to the Company.

3. Once 1INMM acquires the licensing rights from the FSA then the following takes place:
   a. A formal contract is then signed with licensor for purchase of the relicensing rights as originally agreed upon in LOI.
   b. Movie is sent to dubbing house to complete all the specs required by licensor.
   c. Movie is delivered to licensor.

4. Based on the due date of the participation schedule with 1INMM, the Participation Fee will be paid. This will be coming directly from the licensor to IINMM who will then deposit into the Company's account. Profits will then be allocated and distributed for that movie participation to the Company's members in accordance with the terms of the Company's operating agreement.

Nanya 00083

Frequently Asked Questions

**How much can I invest?  What is the minimum?**
$50,000 per unique investor is the minimum investment, which may be adjusted in the sole discretion of the Manager.  There is no set ceiling on the amount of investment from each investor and shall be at the discretion of the Manager.

**Who manages the Company?**
The Manager of the Company is SAC Advisory Group, LLC, a California limited liability company.  The Manager is operated by Jeffrey Spiegel and Ryan Spiegel.

**Does the Manager have any skin in the game?**
Yes.  The Manager will invest $200,000 into the Company that will go towards the 3,000,000 Preferred Class A Units up for purchase.

**Can members sell or transfer their units?**
The Preferred Class A Units are restricted as to sale and transfer.  Any transfer or sale of an investor's Preferred Class A Units is subject to the Manager's sole discretion.

**How does the Manager get paid?**
The Manager will receive the a 10% return after the Preferred return to the Class A Units.  All additional profits will be spilt 50/50 between Class A Units and the Manager Class B Units.

**Are Preferred Units liquid at any time? Can I redeem them whenever I want?**
No.  Subject to the provisions of the Company's Operating Agreement, any time after one year from the date of a Member's investment, a Member may request a return of all or a portion of such Member's capital contribution.  The Company will use reasonable commercial efforts to return the requested capital within six months of the Member's request.  However, the return of capital will be subject to the Company's available cash and the term of the Participation Agreements.

**How often are distributions made?**
When a participation fee is received by the Company, profits will be allocated and distributed to members ,subject to the Manager's discretion.

**Can I reinvest my distributions or interest?**
No.  Initially, the Company will be distributing profits and only retaining the capital investment for reinvestment into additional participation agreements. The Manager reserves the right to allow reinvestment upon amending the operating agreement.

**What is the priority of cash flow? Who gets paid in what order?**
On the closing of each movie deal, the original capital will be returned to the Company for reinvestment.  The profits will be distributed as follows.
- The Class A Unit investors will first receive an annual cumulative preferred return of 10%
- After the preferred return distribution to the investors, the Manager Class B Profit Units will receive a return of 10%
- All remaining profits will be split 50/50 between Class A Preferred Unit Members and the Class B Profit Units of the Manger based on Membership Units.

**What is the term of the Company?**
The term of the Company is ten years.  At the end of the ten years, the initial investment capital will be returned to the members and the Company will be dissolved.  The Manager has the authority to dissolve the Company before the ten years at their discretion.

**When will the Company start making investments?**
The Company shall begin entering participation agreements upon the receipt of $1,000,000 of investment capital.  The relative size of the participation agreements may be smaller initially depending on the amount of capital available in the Company.

4

## RISK FACTORS

**THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF FINANCIAL RISK AND SHOULD BE CONSIDERED ONLY BY THOSE PERSONS WHO ARE ABLE TO AFFORD A LOSS OF THEIR ENTIRE INVESTMENT.   PROSPECTIVE INVESTORS CONTEMPLATING THE PURCHASE OF UNITS SHOULD CONSIDER THE FOLLOWING SPECIFIC RISK FACTORS IN ADDITION TO THOSE DISCUSSED GENERALLY ELSEWHERE IN THIS MEMORANDUM.**

**Risks Relating to Television Industry**

*Changes in the foreign market of television viewers and the associated supply of motion pictures may result in decreases in the licensee fees paid for foreign distribution rights that may have a corresponding material adverse effect on business.*

Changes in pricing, demand or supply of foreign television distribution rights affect our target customers' demand for our motion pictures.

**Risks Relating to our Business**

*Complete Reliance on One Source of Motion Pictures*

The Company's sole source of motion pictures from which to generate revenue is 1INMM.  The Company and 1INMM have entered into a Participation Agreement under which 1INMM may ask the Company to fund the acquisition of certain motion pictures.  However, 1INMM has no exclusive obligation to use the Company for acquiring foreign distribution rights.  In fact, 1INMM may terminate the Participation Agreement at any time for any reason.   The Company does not control the pipeline for securing motion pictures for licensing to target customers.  In fact, the Company has no expertise in securing motion pictures for licensing given that each motion picture must be dubbed in the foreign language and all the titles and credits must be redone for each movie.  1INMM has this expertise.  Hence, if 1INMM terminates its relationship with the Company, the Company will no longer generate any revenue.

*Use of Offering Proceeds; Allocation of Risk to the Investors*

Substantially all of the Offering proceeds are required for the acquisition of foreign distribution rights of American motion pictures.  As a result, the investors will bear all of the financial risk if we do not successfully acquire distribution rights that will generate license fees in excess of our acquisition costs.  This risk could result in a total loss of the investment.

**Risks Relating to this Offering**

*Newly Formed Company; Limited Information*

The Company has been newly formed for the purpose of securing foreign distribution rights from 1INMM.  The Company has no operating history and has no revenue.  We have yet to sign any contracts for the purchase of any foreign distribution rights.  There is no guarantee that 1INMM will continue to support the Company.

*The Company's business, financial condition, and results of operations could be subject to significant fluctuation, and the Company may not be able to adjust its operations to effectively address changes it does not anticipate.*

The Company cannot reliably predict future sales, pricing, and profitability.  Changes in competitive, market and economic conditions may require the Company to adjust its operations, and it may not be able to make those adjustments or to make them quickly enough to adapt to changing conditions.

Factors that may negatively affect sales and operating results include:

- access to motion pictures for the acquisition of foreign distribution rights;

- global or regional economic downturns that might negatively impact on the license fees paid by third-party media companies for the purchase of television foreign distribution rights;

5

Nanya 00085

- lack of demand for, or market acceptance of, the Company's products and services;

- adverse changes in industries on which the Company is dependent, such as movie, streaming and television industries; or

- changes in the volume or timing of the production of motion pictures.

*The Company is dependent upon the services of key personnel.*

The Company's success depends, to a significant extent, upon the continued service of SAC Advisory Group, LLC as its Manager, and the services of Jeff Spiegel and Ryan Spiegel. The Company has no officers or employees.

*Control by Manager*

The Manager of the Company is SAC Advisory Group, LLC. Under the terms of the Company's Operating Agreement, the Manager can be removed for any reason with the vote or written consent of all Members. The Manager is a member of the Company and currently holds 3,000,000 Class B Profits Units. Following consummation of the maximum Offering, the new Members will be issued 3,000,000 Preferred Units. Given the voting provisions established under the Company's Operating Agreement, SAC Advisory Group, LLC cannot be removed as the Manager without the consent of SAC Advisory Group, LLC.

## USE OF PROCEEDS

We expect to utilize the proceeds of the Offering primarily to finance, through participation, the acquisition of movie licensing rights for foreign distribution to third-party media companies.

## MANAGEMENT AND ADVISORS

The names and certain biographical information regarding our executive officers, board members, and key advisors are set forth below.

### *Jeff Spiegel*

Jeff Spiegel is Co-Founder and Partner of SAC Advisory Group, LLC. He has had a distinguished career as a Certified Public Account and established his own firm in 1990. Jeff's experience covers a full range of tax, accounting, audit, and business consulting services. Throughout his career, Jeff has specialized in providing services for individuals and small businesses in a wide variety of industries including financial services, real estate, investment partnerships, professional service firms and e-commerce. His specialty is working on private equity funds. He holds a Bachelor of Science from the University of Arizona.

Jeff has over 30 years business experience and in great health.

### *Ryan Spiegel*

Ryan Spiegel is Co-Founder and Managing Partner of SAC Advisory Group, LLC. He has a diverse business and entrepreneurial background. From working in the NBA, to opening a business abroad, to managing a financial advising and investment business, to becoming an author, Ryan is a true entrepreneur. He holds a Bachelor of Science in Business from University of Oregon.

He has known Craig Cole, Co-Founder of 1INMM, for over 10 years and has built a working relationship with his company. With an opportunity to make a strong investment, he jumped on the opportunity to start SAC Movie Fund One, LLC and provide investors a very sizeable ROI.

Ryan is 30 years old and in excellent health.

Nanya 00086

_1inMM Capital, LLC_

1INMM is a California limited liability company that was formed in September, 2013.  Company was founded and is managed by Zachary Horwitz and Craig Cole. They are a foreign distributor of movie rights focusing on the Latin America territory.

**TERMS OF THE OFFERING**

**The Offering**

The Company is offering up to 3,000,0000 Preferred Units.  The purchase price for each share is $1.00.  The first closing shall be held in the discretion of the Company within five business days of the date the Company has received one or more subscriptions for at least 1,000,000 Preferred Units.  The first closing will occur with respect to the actual number of Preferred Units sold as of that closing date, which number will be determined in the Company's sole discretion, as long as the Minimum Condition is met.  The Offering will continue with respect to any Preferred Units, and closings may be held from time to time with respect to additional Preferred Units sold until the Termination Date.

The stated minimum subscription for an investor is for 50,000 Preferred Units ($50,000).  However, the Company reserves the right to accept purchases for more or less than 50,000 Preferred Units, and in any increments, in its discretion.

Those persons desiring to invest in the Preferred Units will become parties to a Subscription Agreement and certain related agreements, including the Company's Operating Agreement.  Purchasers of Preferred Units will become members in the Company, which is a limited liability company or LLC.  Pursuant to the Subscription Agreement for the Preferred Units, subscribers will grant to the Manager of the Company a power of attorney authorizing such persons to so sign the Operating Agreement, making the subscribers party thereto.

The Offering will be made pursuant to exemptions from registration provided by Section 4(2) of the Act and Rule 506 of Regulation D promulgated of the Securities Act.  Preferred Units will be offered for sale only to accredited investors who satisfy the requirements set forth in this Information Statement under "Investor Qualifications."  The Company reserves the right to approve or disapprove each investor and accept or reject any subscriptions in whole or in part, at its sole discretion.

**Payment of Subscriptions**

You must pay the purchase price for the Preferred Units you are subscribing to in full upon subscription.

**Acceptance of Subscriptions**

The execution of the Subscription Agreement by a subscriber constitutes a binding offer to buy Preferred Units in the Company and an agreement to hold the offer open until the agreed subscription is accepted or rejected by us.  Moreover, we have the unrestricted right to reject tendered subscriptions for any reason.  If the Preferred Units available for sale are oversubscribed, we will sell them to investors as we determine in our sole discretion, provided that such investors satisfy the applicable investor suitability standards.

**INVESTOR QUALIFICATIONS**

**General**

Investment in the Preferred Units involves significant risks and is suitable only for persons of adequate financial means who have no need for liquidity with respect to their investment and who can bear the economic risk of a complete loss of their investment.  This Offering is made in reliance on exemptions from the registration requirements of the Securities Act and applicable state and foreign securities laws and regulations.

The suitability standards discussed below represent minimum suitability standards for prospective investors.  The satisfaction of such standards by a prospective investor does not necessarily mean that the Membership Units are a suitable investment for such prospective investor.  Prospective investors are encouraged to consult their personal financial advisors to determine whether an investment in the Membership Units is appropriate.  The Company may reject subscriptions, in whole or in part, in its sole discretion.

7

**Suitability Requirements**

Each investor must represent in writing that it qualifies as an "accredited investor" as such term is defined in Rule 501(a) of Regulation D under the Securities Act, and must demonstrate the basis for such qualification. To be an accredited investor, an investor must fall within any of the following categories at the time of the sale of any Units to that investor:

A natural person with an individual Net Worth, or joint Net Worth with a spouse, in excess of $1,000,000 (excluding the value of your primary residence).

A natural person (i) who has had an individual income in excess of $200,000 in each of the past two years or a joint income with a spouse in excess of $300,000 in those two years and (ii) who reasonably expects to reach the same income level in the current year.

A corporation, partnership, tax exempt organization (under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended) or Massachusetts or similar business trust (i) not formed for the specific purpose of acquiring the securities to be offered in the Transaction and (ii) having total assets in excess of $5,000,000.

An employee benefit plan (within the meaning of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA")) (i) whose investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company or registered investment advisor, (ii) having total assets in excess of $5,000,000, or (iii) if a self directed plan, whose investment decisions are made solely by persons that are accredited investors.

A trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Units, where the purchase is directed by a "sophisticated person" as defined in Regulation 506(b)(2)(ii)

As used above, the term "net worth" means the excess of total assets over total liabilities. In computing net worth, any positive net equity in the principal residence of the investor is ignored as an asset, while any negative net equity is included as a liability.

In order to meet the conditions for exemption from the registration requirements under the securities laws of certain jurisdictions, investors who are residents of such jurisdictions may be required to meet additional suitability requirements.

## SUBSCRIPTION PROCEDURE

Each prospective investor of Preferred Units has been provided with a subscription package along with this Memorandum. In order to subscribe for Membership Units, an investor must deliver the following to: SAC Movie Fund One, LLC.

One fully completed and signed copy of:

1.  Subscription Agreement; and

2.  Either:

    a.  A check payable to the order of SAC Movie Fund One, LLC in the full amount of the purchase price of the Preferred Units subscribed for; or

    b.  A wire transfer in accordance with wire instructions provided by the Company, in the full amount of the purchase price of the Preferred Units subscribed for.

On delivery of the above documents and required payment, as indicated above, each investor will become bound by the terms of the Subscription Agreement and, if accepted, the Company's Operating Agreement, and will not be able to revoke its subscription. We will furnish to each investor whose subscription is accepted by the Company (1) a copy of a fully executed Subscription Agreement, and (2) a conformed copy of the Company's Operating Agreement.

Nanya 00088

# EXHIBIT N

# FORTUNE FILM FUND TWO LLC

## CONFIDENTIAL INFORMATION STATEMENT

### December 7, 2017

This Confidential Information Statement (the "**Information Statement**") has been prepared in connection with an offering (the "**Offering**") by Fortune Film Fund Two LLC, a California limited liability company (the "**Company**") of up to 10,000,000 Class A Preferred Units (the "**Preferred Units**"), at a purchase price of $1.00 per Preferred Unit. The offering price of the Preferred Units has been arbitrarily determined and bears no relationship to the assets or book value of the Company. The Offering will be made directly by the Company through its Manager, who will not separately be compensated for such selling efforts in compliance with federal and state securities laws.

———————————————

**See "Risk Factors" beginning on page 4 of this Memorandum for a discussion of certain factors that should be considered by prospective investors.**

———————————————

The Manager reserve the right to extend the terms of the Offering for as long as investors express an interest in purchasing Preferred Units. The Manager also reserves the right increase the number of Preferred Units to be sold in this Offering. The first closing shall be held in the discretion of the Company within five business days of the date the Company has received one or more subscriptions for at least 1,000,000 Preferred Units generating gross financing proceeds to the Company of at least $1,000,000 (the "**Minimum Condition**"). The first closing will occur with respect to the actual number of Preferred Units sold as of that closing date, which number will be determined in the Company's sole discretion, as long as the Minimum Condition is met. The Offering will continue with respect to any unsold Preferred Units, and closings may be held from time to time with respect to additional Preferred Units sold.

THE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") OR ANY STATE SECURITIES LAWS PURSUANT TO THE EXEMPTION FROM REGISTRATION PROVIDED BY SECTION 4(2) OF THE SECURITIES ACT AND RULE 506(c) OF REGULATION D PROMULGATED THEREUNDER. ACCORDINGLY, THE PREFERRED UNITS WILL ONLY BE OFFERED OR SOLD TO "ACCREDITED INVESTORS" AS DEFINED IN RULE 501(A) OF REGULATION D UNDER THE SECURITIES ACT.

THE INFORMATION CONTAINED IN THIS INFORMATION STATEMENT IS PROVIDED SOLELY FOR THE PERSONS RECEIVING IT AND IS NOT AUTHORIZED FOR REPRODUCTION OR DISTRIBUTION TO OTHERS. THE DELIVERY OF THIS INFORMATION STATEMENT AT ANY TIME DOES NOT IMPLY THAT THE INFORMATION HEREIN IS CORRECT AS OF ANY TIME SUBSEQUENT TO ITS DATE OF ISSUE. THIS INFORMATION STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY OF THESE SECURITIES IN ANY STATE TO ANY PERSON TO WHOM IT IS UNLAWFUL TO SOLICIT IN SUCH STATE.

THERE IS NO PRIVATE MARKET FOR THESE SECURITIES. THESE SECURITIES SHOULD BE ACQUIRED FOR INVESTMENT PURPOSES ONLY AND MAY NOT BE SOLD OR TRANSFERRED EXCEPT AS PERMITTED UNDER THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO AN EFFECTIVE REGISTRATION OF SUCH SECURITIES UNDER SUCH LAWS, AN EXEMPTION THEREFROM, OR AN OPINION OF COUNSEL ACCEPTABLE TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED.

# SUMMARY

*This summary highlights selected information from this Information Statement and may not contain all of the information that is important to investors. Investors should read this entire Information Statement carefully, including the section entitled "Risk Factors," before making an investment in the Membership Units.*

*In this Information Statement, the terms "the Company," "we," "us," and "our" refer to Fortune Film Fund Two LLC, a California limited liability company, and, unless the context otherwise requires, "Membership Units" refers to the units representing Membership Interests of the Company and may be either Class A Preferred Units or Class B Profits Units.*

**The Company:**       The Company is a California limited liability company. The Company was formed in 2017 for the purpose to finance, through participation, the acquisition of movie licensing rights for foreign distribution to third-party media companies such as HBO and Netflix. The Company has entered into a Participation Agreement with 1INMM Capital, LLC, a California limited liability company ("**1INMM**") to finance the acquisition of foreign television distribution rights of motion pictures. A copy of the Participation Agreement is attached to this Memo as Exhibit B. A more detailed description of the Company's business model is set forth below under the Company Summary.

**The Offering:**

*Class A Preferred Units:*       *Security*: Class A Preferred Units of Fortune Film Fund Two LLC.

*Manager*: The Company's sole manager is SAC Advisory Group, LLC (the "Manager"), the principals of which are Jeff Spiegel and Ryan Spiegel.

*Operating Expenses:* The Company will reimburse the Manager for all operating costs and expenses of the Company, including accounting, tax preparation and legal expenses related to reviewing the distribution agreements related to the acquisition of foreign television distribution rights of motion pictures.

*Capitalization*: 50% of the Company's Membership Units will be sold to investors under this Offering in the form of Class A Preferred Units. The remaining 50% of the Company's Membership Units represented by Class B Profits Units will be held by the Manager and shall represent the Manager's profits interest in the Company.

*Preferred Cumulative Annual Return:* The investors will be entitled to a preferred cumulative annual return equal to 10% of their Capital Contributions. After the investors have received their preferred cumulative annual return, the Manager shall receive a profit share equal to the investors' preferred return, after which time all profits will be split equally between the holders of Class A Preferred Units and the holder of Class B Profits Units.

*Subscription Terms:*       We are offering the Preferred Units at a price of $1.00 per Preferred Unit. The stated minimum subscription of an investor is 50,000 Preferred Units ($50,000). The Offering has a Minimum Condition of $1,000,000. Once we have accepted one or more subscriptions for a minimum of $1,000,000 in aggregate, we may conduct a closing. Thereafter we may continue to accept subscriptions at our discretion.

*Use of Proceeds:*       The purpose of the Company is to finance, through participation, the acquisition of movie licensing rights for foreign distribution to third-party media companies.

1

| | |
|---|---|
| *Offering Period:* | The Offering period will expire on the earlier to occur of: (i) the sale of 10,000,000 Preferred Units or (ii) upon the decision by the Manager to stop selling Preferred Units.  If the Manager is unable to sell at least 1,000,000 Preferred Units, the Manager will terminate the Offering  and the Company will return all amounts received from Investors. |
| *Units Outstanding:* | The Manager currently holds 10,000,000 Class B Profits Units as of the date of this Information Statement, which represents all outstanding Membership Units prior to this Offering.  Such Class B Profits Units may be adjusted to equal the actual number of Class A Preferred Units sold to investors. |
| *Investor Suitability:* | The Offering will only be made to persons who meet certain suitability standards described herein, including the requirement that they be "accredited investors" within the meaning of Rule 501(a) of Regulation D. |
| *Restrictions on Resale:* | None of the Preferred Units will be registered under the Securities Act. The rights and preferences of the Preferred Units shall be governed by the Company's operating agreement (the "**Operating Agreement**") which contains language restricting the distribution, resale, transfer, pledge, hypothecation or other disposition of the Preferred Units unless and until the Preferred Units are registered under the Securities Act or an opinion of counsel reasonably satisfactory to the Company is received that registration is not required under the Securities Act. |
| *Subscription Documents*: | The purchase and sale of the Preferred Units will be made pursuant to the Subscription Agreement attached to this Confidential Information Statement. |
| *Operating Agreement:* | Purchasers of the Preferred Units will become members in the Company, which is a limited liability company or LLC.  LLCs are governed by an Operating Agreement.  Purchasers of the Preferred Units will be required to sign and become a party to the Operating Agreement as a condition to the purchase of the Preferred Units.  Pursuant to the Subscription Agreement for the Preferred Units, subscribers will grant to the Manager of the Company a power of attorney authorizing the Manager to so sign the Operating Agreement, making the subscribers party thereto. |
| *Risk Factors:* | The Preferred Units are speculative and involve a high degree of risk. Prospective investors should carefully review and consider the factors set forth under "Risk Factors," as well as all other information contained in this Information Statement and exhibits hereto. |
| *Expenses:* | All prospective purchasers of the Preferred Units will be responsible for their own costs, fees and expenses, including the costs, fees and expenses of their legal counsel and other advisors. |

**THE EXECUTION OF A SUBSCRIPTION AGREEMENT AND PURCHASE OF PREFERRED UNITS SHALL BE DEEMED AN ADMISSION FOR ALL PURPOSES THAT THE SUBSCRIBER HAS BEEN FURNISHED ALL INFORMATION IT DEEMS MATERIAL PRIOR TO MAKING ITS DECISION TO INVEST.**

## THE COMPANY SUMMARY

**Overview**

How It Works (Step by Step):

1. The Company and 1INMM have executed a Participation Agreement that provides the terms under which the Company will fund the purchase of certain distribution rights on behalf of 1INMM. The Manager will hand pick movie deals brought to the Company by 1INMM.  1INMM will bring the Manager a signed non-binding letter of intent (the "**LOI**") from the licensor (companies such as HBO, Netflix, Sony, or Universal) and offer sheet to foreign sales agent ("**FSA**"), who represent the sales of movie licensing rights, in order for the Manager to view the proposed deal.  In essence, 1INMM buys the licensing rights from the FSA and sells the Latin American distribution rights to the licensor, who has already agreed to purchase such distribution rights at a higher price (the "**Participation Fee**").  The Company will provide the funds to 1INMM as a "Participation Advance" for this purchase.  In general, the difference between the Participation Advance and the Participation Fee represents a 25-35% yield on these types of agreements.

2. When the Manager agrees to fund a participation with 1INMM, the following takes place:
   a. The Company executes a participation agreement and schedule for the funding and repayment with 1INMM.
   b. The Company then wires the Participation Advance amount to a joint account in 1INMM's name, where the Manager is a co-signatory on the account that allows the Manager to control when money leaves this account.
   c. Upon our approval, movies are then wired to the FSA to purchase the distribution rights to the movie.
   d. Once licensing rights are owned by 1INMM, they will complete an assignment agreement, which transfers the licensing rights to the Company until payment of Participation Fee.  Upon the Company's receipt of the Participation Fee, the assignment agreement will be terminated and the distribution rights will revert back to 1INMM.
   e. Payment of the Participation Fee depends on the particular licensor.  Most relicensing agreements will be with HBO which generally pays the participation fee 6 months of signing an LOI.  Netflix generally closes a deal within 1 year and Sony closes its deals within 3 months.  The Manager will choose participations that maximize returns for the Company.
   f. In certain instances, a licensor may decide not to close a movie purchase even after signing an LOI, in which case 1INMM will shop the movie to another licensor.  In this case, the Participation Agreement provides that 1INMM has 10 days after the movie is rejected by a licensor to execute a new participation with a new licensor.  For example, if HBO rejects a movie, 1INMM will shop the movie to Netflix.  If 1INMM is unable to negotiate a new movie participation that is acceptable to the Manager, 1INMM is obligated and will refund the Participation Advance to the Company.

3. Once 1INMM acquires the licensing rights from the FSA then the following takes place:
   a. A formal contract is then signed with licensor for purchase of the relicensing rights as originally agreed upon in LOI.
   b. Movie is sent to dubbing house to complete all the specs required by licensor.
   c. Movie is delivered to licensor.

4. Based on the due date of the participation schedule with 1INMM, the Participation Fee will be paid. This will be coming directly from the licensor to 1INMM who will then deposit into the Company's account.  Profits will then be allocated and distributed for that movie participation to the Company's members in accordance with the terms of the Company's operating agreement.

Frequently Asked Questions

**How much can I invest?  What is the minimum?**
$50,000 per unique investor is the minimum investment, which may be adjusted in the sole discretion of the Manager. There is no set ceiling on the amount of investment from each investor and shall be at the discretion of the Manager.

**Who manages the Company?**
The Manager of the Company is SAC Advisory Group, LLC, a California limited liability company.  The Manager is operated by Jeffrey Spiegel and Ryan Spiegel.

**Does the Manager have any skin in the game?**
Yes.  The Manager will invest $200,000 into the Company that will go towards the 10,000,000 Preferred Class A Units up for purchase.

**Can members sell or transfer their units?**
The Preferred Class A Units are restricted as to sale and transfer.  Any transfer or sale of an investor's Preferred Class A Units is subject to the Manager's sole discretion.

**How does the Manager get paid?**
The Manager will receive a 10% return after the Preferred return to the Class A Units.  All additional profits will be spilt 50/50 between Class A Units and the Manager Class B Units.  There is no management fee.

**Are Preferred Units liquid at any time? Can I redeem them whenever I want?**
No.  Subject to the provisions of the Company's Operating Agreement, any time after one year from the date of a Member's investment, a Member may request a return of all or a portion of such Member's capital contribution.  The Company will use reasonable commercial efforts to return the requested capital within six months of the Member's request.  However, the return of capital will be subject to the Company's available cash and the term of the Participation Agreements.

**How often are distributions made?**
When a participation fee is received by the Company, profits will be allocated and distributed to members, distributions subject to the Manager's discretion.

**Can I reinvest my distributions or interest?**
Yes. Any Member may elect on an annual basis to reinvest either 100% or 50% of such Member's allocable share of Participation Profits that would otherwise be distributed to such Member under this Agreement.  Such election shall be made on an annual basis on or before June 30 of each year, and such election shall remain in effect for the entire year beginning on July 1 and ending on June 30.

**What is the priority of cash flow? Who gets paid in what order?**
On the closing of each participation agreement, the original capital will be returned to the Company for reinvestment.  The profits will be distributed as follows.

- The Class A Unit investors will first receive an annual cumulative preferred return of 10%
- After the preferred return distribution to the investors, the Manager Class B Profit Units will receive a return equal to the Class A preferred return.
- All remaining profits will be split 50/50 between Class A Preferred Unit Members and the Class B Profit Units of the Manger based on Membership Units.

**What is the term of the Company?**
The term of the Company is ten years.  At the end of the ten years, the initial investment capital will be returned to the members and the Company will be dissolved.  The Manager has the authority to dissolve the Company before the ten years at their discretion.

**When will the Company start making investments?**
The Company shall begin entering participation agreements upon the receipt of $1,000,000 of investment capital.  The relative size of the participation agreements may be smaller initially depending on the amount of capital available in the Company.

**RISK FACTORS**

**THE SECURITIES OFFERED HEREBY ARE SPECULATIVE AND INVOLVE A HIGH DEGREE OF FINANCIAL RISK AND SHOULD BE CONSIDERED ONLY BY THOSE PERSONS WHO ARE ABLE TO AFFORD A LOSS OF THEIR ENTIRE INVESTMENT.  PROSPECTIVE INVESTORS CONTEMPLATING THE PURCHASE OF UNITS SHOULD CONSIDER THE FOLLOWING SPECIFIC RISK FACTORS IN ADDITION TO THOSE DISCUSSED GENERALLY ELSEWHERE IN THIS MEMORANDUM.**

**Risks Relating to Television Industry**

*Changes in the foreign market of television viewers and the associated supply of motion pictures may result in decreases in the licensee fees paid for foreign distribution rights that may have a corresponding material adverse effect on business.*

Changes in pricing, demand or supply of foreign television distribution rights affect 1INMM target customers' demand for rights to motion pictures.

**Risks Relating to our Business**

*Complete Reliance on One Source of Motion Pictures*

The Company's sole of source of participations in motion pictures from which to generate revenue is 1INMM. The Company and 1INMM have entered into a Participation Agreement under which 1INMM may ask the Company to fund the acquisition of certain motion pictures.  However, 1INMM has no exclusive obligation to use the Company for acquiring foreign distribution rights.  In fact, 1INMM may terminate the Participation Agreement at any time for any reason.  The Company does not control the pipeline for securing motion pictures for licensing to target customers. In fact, the Company has no expertise in securing motion pictures for licensing given that each motion picture must be dubbed in the foreign language and all the titles and credits must be redone for each movie.  1INMM has this expertise.  Hence, if 1INMM terminates it relationship with the Company, the Company will no longer generate any revenue.

*Use of Offering Proceeds; Allocation of Risk to the Investors*

Substantially all of the Offering proceeds are required to finance, through participation, the acquisition of movie licensing rights for foreign distribution to third-party media companies..  As a result, the investors will bear all of the financial risk if we do not successfully acquire distribution rights that will generate license fees in excess of our acquisition costs.  This risk could result in a total loss of the investment.

**Risks Relating to this Offering**

*Newly Formed Company; Limited Information*

The Company has been newly formed for the purpose of financing, through participation, the acquisition of movie licensing rights for foreign distribution to third-party media companies from 1INMM.  The Company has no operating history and has no revenue.  We have yet to sign any contracts for the financing of any foreign distribution rights. There is no guarantee that 1INMM will continue to support the Company.

*The Company's business, financial condition, and results of operations could be subject to significant fluctuation, and the Company may not be able to adjust its operations to effectively address changes it does not anticipate.*

The Company cannot reliably predict future sales, pricing, and profitability.  Changes in competitive, market and economic conditions may require the Company to adjust its operations, and it may not be able to make those adjustments or to make them quickly enough to adapt to changing conditions.

Factors that may negatively affect sales and operating results include:

- access to motion pictures for the acquisition of foreign distribution rights;

- global or regional economic downturns that might negatively impact on the license fees paid by third-party media companies for the purchase of television foreign distribution rights;

- lack of demand for, or market acceptance of, the Company's products and services;

- adverse changes in industries on which the Company is dependent, such as movie, streaming and television industries; or

- changes in the volume or timing of the production of motion pictures.

*The Company is dependent upon the services of key personnel.*

The Company's success depends, to a significant extent, upon the continued service of SAC Advisory Group, LLC as its Manager, and the services of Jeffrey Spiegel and Ryan Spiegel. The Company has no officers or employees.

*Control by Manager*

The Manager of the Company is SAC Advisory Group, LLC. Under the terms of the Company's Operating Agreement, the Manager can be removed for any reason with the vote or written consent of all Members. The Manager is a member of the Company and currently holds 10,000,000 Class B Profits Units. Following consummation of the maximum Offering, the new Members will be issued 10,000,000 Preferred Units. Given the voting provisions established under the Company's Operating Agreement, SAC Advisory Group, LLC cannot be removed as the Manager without the consent of SAC Advisory Group, LLC.

## USE OF PROCEEDS

We expect to utilize the proceeds of the Offering primarily to finance, through participation, the acquisition of movie licensing rights for foreign distribution to third-party media companies.

## MANAGEMENT AND ADVISORS

The names and certain biographical information regarding our executive officers, board members, and key advisors are set forth below.

### *Jeffrey Spiegel*

Jeffrey Spiegel is Co-Founder and Partner of SAC Advisory Group, LLC. Jeffrey is also the owner of Spiegel Accountancy Corp. He has had a distinguished career as a Certified Public Account and established his own firm in 1990. Jeff's experience covers a full range of tax, accounting, audit, and business consulting services. Throughout his career, Jeff has specialized in providing services for individuals and small businesses in a wide variety of industries including financial services, real estate, investment partnerships, professional service firms and e-commerce. His specialty is working on private equity funds. He holds a Bachelor of Science from the University of Arizona.

Jeff has over 30 years business experience and in great health.

*Ryan Spiegel*

Ryan Spiegel is Co-Founder and Managing Partner of SAC Advisory Group, LLC.  He has a diverse business and entrepreneurial background.  From working in the NBA, to opening a business abroad, to managing a financial advising and investment business, to becoming an author, to managing SAC Movie Fund One, LLC, Ryan is a true entrepreneur. He holds a Bachelor of Science in Business from University of Oregon.

Ryan has known Craig Cole, Co-Founder of 1INMM, for over 10 years and has built a working relationship with his company.  With strong returns in SAC Movie Fund One, LLC, Ryan jumped at the opportunity to launch a second fund.

Ryan is 31 years old and in excellent health.

*1inMM Capital, LLC*

1INMM is a California limited liability company that was formed in September, 2013.  Company was founded and is managed by Zachary Horwitz and Craig Cole. They are a foreign distributor of movie rights focusing on the Latin America territory.

## TERMS OF THE OFFERING

**The Offering**

The Company is offering up to 10,000,0000 Preferred Units.  The purchase price for each share is $1.00.  The first closing shall be held in the discretion of the Company within five business days of the date the Company has received one or more subscriptions for at least 1,000,000 Preferred Units.  The first closing will occur with respect to the actual number of Preferred Units sold as of that closing date, which number will be determined in the Company's sole discretion, as long as the Minimum Condition is met.  The Offering will continue with respect to any Preferred Units, and closings may be held from time to time with respect to additional Preferred Units sold.

The stated minimum subscription for an investor is for 50,000 Preferred Units ($50,000).

Those persons desiring to invest in the Preferred Units will become parties to a Subscription Agreement and certain related agreements, including the Company's Operating Agreement.  Purchasers of Preferred Units will become members in the Company, which is a limited liability company or LLC.  Pursuant to the Subscription Agreement for the Preferred Units, subscribers will grant to the Manager of the Company a power of attorney authorizing such persons to so sign the Operating Agreement, making the subscribers party thereto.

The Offering will be made pursuant to exemptions from registration provided by Section 4(2) of the Act and Rule 506 of Regulation D promulgated of the Securities Act.  Preferred Units will be offered for sale only to accredited investors who satisfy the requirements set forth in this Confidential Information Statement under "Investor Qualifications."  The Company reserves the right to approve or disapprove each investor and accept or reject any subscriptions in whole or in part, at its sole discretion.

**Payment of Subscriptions**

You must pay the purchase price for the Preferred Units you are subscribing to in full upon subscription.

**Acceptance of Subscriptions**

The execution of the Subscription Agreement by a subscriber constitutes a binding offer to buy Preferred Units in the Company and an agreement to hold the offer open until the agreed subscription is accepted or rejected by us.  Moreover, we have the unrestricted right to reject tendered subscriptions for any reason.  If the Preferred Units available for sale are oversubscribed, we will sell them to investors as we determine in our sole discretion, provided that such investors satisfy the applicable investor suitability standards.

## INVESTOR QUALIFICATIONS

**General**

Investment in the Preferred Units involves significant risks and is suitable only for persons of adequate financial means who have no need for liquidity with respect to their investment and who can bear the economic risk of a complete loss of their investment.  This Offering is made in reliance on exemptions from the registration requirements of the Securities Act and applicable state and foreign securities laws and regulations.

The suitability standards discussed below represent minimum suitability standards for prospective investors.  The satisfaction of such standards by a prospective investor does not necessarily mean that the Membership Units are a suitable investment for such prospective investor.  Prospective investors are encouraged to consult their personal financial advisors to determine whether an investment in the Membership Units is appropriate.  The Company may reject subscriptions, in whole or in part, in its sole discretion.

**Suitability Requirements**

Each investor must represent in writing that he or she qualifies as an "accredited investor" as such term is defined in Rule 501(a) of Regulation D under the Securities Act, and must demonstrate the basis for such qualification.  To be an accredited investor, an investor must fall within any of the following categories at the time of the sale of any Units to that investor:

A natural person with an individual Net Worth, or joint Net Worth with a spouse, in excess of $1,000,000 (excluding the value of your primary residence).

A natural person (i) who has had an individual income in excess of $200,000 in each of the past two years or a joint income with a spouse in excess of $300,000 in those two years and (ii) who reasonably expects to reach the same income level in the current year.

A corporation, partnership, tax exempt organization (under Section 501(c)(3) of the Internal Revenue Code of 1986, as amended) or Massachusetts or similar business trust (i) not formed for the specific purpose of acquiring the securities to be offered in the Transaction and (ii) having total assets in excess of $5,000,000.

An employee benefit plan (within the meaning of Title I of the Employee Retirement Income Security Act of 1974 ("ERISA")) (i) whose investment decision is made by a plan fiduciary, as defined in Section 3(21) of ERISA, which is either a bank, savings and loan association, insurance company or registered investment advisor, (ii) having total assets in excess of $5,000,000, or (iii) if a self directed plan, whose investment decisions are made solely by persons that are accredited investors.

A trust with total assets in excess of $5,000,000, not formed for the specific purpose of acquiring the Units, where the purchase is directed by a "sophisticated person" as defined in Regulation 506(b)(2)(ii)

As used above, the term "net worth" means the excess of total assets over total liabilities.  In computing net worth, any positive net equity in the principal residence of the investor is ignored as an asset, while any negative net equity is included as a liability.

In order to meet the conditions for exemption from the registration requirements under the securities laws of certain jurisdictions, investors who are residents of such jurisdictions may be required to meet additional suitability requirements.

## SUBSCRIPTION PROCEDURE

Each prospective investor of Preferred Units has been provided with a subscription package along with this Memorandum. In order to subscribe for Membership Units, an investor must deliver the following to:  Fortune Film Fund Two LLC.

One fully completed and signed copy of:

1.      Subscription Agreement;

2.      Accredited Investor Representation Letter; and

3.      Either:

      a.   A check payable to the order of Fortune Film Fund Two LLC in the full amount of the purchase price of the Preferred Units subscribed for; or

      b.   A wire transfer in accordance with wire instructions provided by the Company, in the full amount of the purchase price of the Preferred Units subscribed for.

On delivery of the above documents and required payment, as indicated above, each investor will become bound by the terms of the Subscription Agreement and, if accepted, the Company's Operating Agreement, and will not be able to revoke its subscription. We will furnish to each investor whose subscription is accepted by the Company (1) a copy of a fully executed Subscription Agreement, and (2) a conformed copy of the Company's Operating Agreement.

# EXHIBIT O

**Secretary of State**
**Statement of Information**
(Limited Liability Company)

**LLC-12**

19-C19737

# FILED

In the office of the Secretary of State
of the State of California

JUN 06, 2019

**IMPORTANT** — Read instructions before completing this form.

**Filing Fee – $20.00**

**Copy Fees** – First page $1.00; each attachment page $0.50;
Certification Fee - $5.00 plus copy fees

**This Space For Office Use Only**

**1. Limited Liability Company Name** (Enter the exact name of the LLC. If you registered in California using an alternate name, see instructions.)

FATHOM FEATURES LLC

| 2. 12-Digit Secretary of State File Number | 3. State, Foreign Country or Place of Organization (only if formed outside of California) |
|---|---|
| 201900910090 | CALIFORNIA |

**4. Business Addresses**

| | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| a. Street Address of Principal Office - Do not list a P.O. Box<br>212 MARINE STREET APT. 309 | SANTA MONICA | CA | 90405 |
| b. Mailing Address of LLC, if different than item 4a<br>212 MARINE STREET APT. 309 | SANTA MONICA | CA | 90405 |
| c. Street Address of California Office, if Item 4a is not in California - Do not list a P.O. Box<br>212 MARINE STREET APT. 309 | SANTA MONICA | CA | 90405 |

**5. Manager(s) or Member(s)**

If no **managers** have been appointed or elected, provide the name and address of each **member**. At least one name **and** address must be listed. If the manager/member is an individual, complete Items 5a and 5c (leave Item 5b blank). If the manager/member is an entity, complete Items 5b and 5c (leave Item 5a blank). Note: The LLC cannot serve as its own manager or member. If the LLC has additional managers/members, enter the name(s) and addresses on Form LLC-12A (see instructions).

| a. First Name, if an individual - Do not complete Item 5b | Middle Name | Last Name | Suffix |
|---|---|---|---|
| CRAIG | | COLE | |

b. Entity Name - Do not complete Item 5a

| c. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 212 MARINE STREET APT. 309 | SANTA MONICA | CA | 90405 |

**6. Service of Process** (Must provide either Individual OR Corporation.)

**INDIVIDUAL** – Complete Items 6a and 6b only. Must include agent's full name and California street address.

| a. California Agent's First Name (if agent is not a corporation) | Middle Name | Last Name | Suffix |
|---|---|---|---|
| SCOTT | | STREITFELD | |

| b. Street Address (if agent is not a corporation) - Do not enter a P.O. Box | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 23300 VENTURA BLVD STE 200 | WOODLAND HILLS | CA | 91364 |

**CORPORATION** – Complete Item 6c only. Only include the name of the registered agent Corporation.

c. California Registered Corporate Agent's Name (if agent is a corporation) – Do not complete Item 6a or 6b

**7. Type of Business**

a. Describe the type of business or services of the Limited Liability Company

ENTERTAINMENT

**8. Chief Executive Officer, if elected or appointed**

| a. First Name | Middle Name | Last Name | Suffix |
|---|---|---|---|
| CRAIG | | COLE | |

| b. Address | City (no abbreviations) | State | Zip Code |
|---|---|---|---|
| 212 MARINE STREET APT. 309 | SANTA MONICA | CA | 90405 |

**9. The Information contained herein, including any attachments, is true and correct.**

| 06/06/2019 | SCOTT STREITFELD | | SCOTT STREITFELD, CPA, A PROFESSIONAL | |
|---|---|---|---|---|
| Date | Type or Print Name of Person Completing the Form | | Title | Signature |

**Return Address (Optional)** (For communication from the Secretary of State related to this document, or if purchasing a copy of the filed document enter the name of a person or company and the mailing address. This information will become public when filed. SEE INSTRUCTIONS BEFORE COMPLETING.)

Name:

Company:

Address:

City/State/Zip: