# EXHIBIT 1

1    LOFTUS & EISENBERG, LTD.
    ALEXANDER N. LOFTUS, ESQ.
2    (*admitted pro hac vice*)
    ROSS M. GOOD, ESQ.
3    (*admitted pro hac vice*)
4    161 N. Clark, Suite 1600
    Chicago, Illinois 60601
5    T: (312) 772-5396
    alex@loftusandeisenberg.com
6    ross@loftusandeisenberg.com
7
    ARON LAW FIRM
8    WILLIAM ARON, ESQ. (#234408)
    15 W Carrillo St, Suite 217
9    Santa Barbara, CA 93101
    T: (805) 618-1768
10    bill@aronlawfirm.com
11    *Attorneys for Plaintiffs*

12

13    **UNITED STATES DISTRICT COURT—NORTHERN DISTRICT OF CALIFORNIA**
                     **SAN FRANCISCO DIVISION**
14

| | |
|---|---|
| ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, <br><br>           Plaintiffs, <br><br>       v. <br><br> SPIEGEL ACCOUNTANCY CORP., JEFFREY SPIEGEL, RYAN SPIEGEL, and SAC ADVISORY GROUP, LLC <br><br>          Defendants. | Case No.: 23-CV-00287 <br><br> **SECOND AMENDED COMPLAINT FOR:** <br><br> 1. **Violation of § 10(b)(5) of the Securities Act of 1934** <br> 2. **Violation of § 12(a)(2) of the Securities Act of 1933** <br> 3. **Violation of § 15 of the Securities Act of 1933** <br> 4. **Declaratory Judgment Pursuant to § 29(b)** <br> 5. **Violation of California Corporations Code § 25401** <br> 6. **Negligent Misrepresentation** <br> 7. **Accounting Malpractice** <br> 8. **Unjust Enrichment** <br><br> **DEMAND FOR JURY TRIAL** |

15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SECOND AMENDED COMPLAINT**

Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., and PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC (collectively "Plaintiffs"), by and through their undersigned attorneys, complains against Defendants, Spiegel Accountancy Corp., SAC Advisory Group, LLC, Jeffery Spiegel, and Ryan Spiegel. Plaintiffs allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) Documents filed in *SEC v. Zachary Horwitz and 1inMM Capital* Central District California 2:21-CV-02927; (b) Documents obtained in discovery in related matters pending against alleged aiders and abettors of 1inMM; (c) Documents obtained from other investors in SAC Advisory Group and Plaintiffs; (d) Deposition testimony of Ryan Spiegel and Jeffrey Spiegel, (e) Documents produced by SAC Advisory Group; (e) Documents and sales materials produced to the public at large when SAC Advisory Group was selling investment; and (f) Review of other publicly available information concerning Defendants.

## I. INTRODUCTION

1.      SAC Advisory Group ("SAC") was the second largest aggregator for a Los Angeles Ponzi Schemer, Zachary Horwitz ("Horwitz") and his 1inMM Capital, LLC ("1inMM") venture. SAC's only owners or employees are Jeffrey Spiegel ("Jeff") and Ryan Spiegel ("Ryan") (collectively "The Spiegels"). The six Plaintiffs collectively invested over $17,000,000 in SAC based on The Spiegels' representations.

2.      Horwitz's scheme was absurd, and it wouldn't have been funded but for sophisticated aggregators such as Defendants parroting his lies, cloaking the scheme in their own credibility as financial professionals.

3.      The manner Horwitz allegedly generated revenue for 1inMM included, but was not limited to, the following: (i) receiving a percentage of the gross receipts that HBO generated from exploiting film rights; (ii) retaining a portion of the profit margin from Netflix-specific transactions;



1  (iii) following the repayment of notes used to finance the acquisition of content rights and the

2  expiration of initial 3-year sublicensing period with platforms such as HBO and Netflix, Horwitz

3  would retain rights to the same content for an additional period of years, thereby enabling Horwitz

4  to continue licensing the content to other parties for Horwitz's sole financial benefit.

5      4.    Any of these supposed revenue streams could have easily been confirmed by a call

6  or email to HBO or Netflix but that was never done.

7      5.    In reality, Horwitz had no relationship with either HBO or Netflix and never licensed

8  any movie rights to either company and as a result he was sentenced to decades in Federal Prison

9  and ordered to repay over $200,000,000.

10      6.    When rounding up investment for 1inMM, Defendants owed well defined duties as

11  highly compensated professionals to investigate the investment before offering it. Instead,

12  Defendants operated with deliberate recklessness in an extreme departure from the standards of

13  ordinary care and never sought any third-party confirmation of Horwitz's stories and

14  misrepresented or concealed many of the facts they did know.

15  **II.    PARTIES**

16      7.    Plaintiff, ELLUSIONIST CASH BALANCE PLAN AND TRUST ("Ellusionist"),

17  is a Trust whose Trustee is a citizen of California and domiciled in California. The individual with

18  authority to invest for Ellusionist is Brad Christianson ("Brad").

19      8.    Plaintiff, UYEN HUHYN ("Uyen" or "Cindy"), is an individual and a citizen of

20  California and domiciled in California.

21      9.    Plaintiff, SOUTHWEST INVESTMENTS FUNDS, LLC ("Southwest Investment

22  Funds"), is a Nevada limited liability company whose only member is a citizen of California and

23  domiciled in California. Kambiz "Jim" Zomorrodi is a managing member of Southwest Investment

24  funds.

25      10.    Plaintiff, AVR GROUP, LLC ("AVR Group"), is a Nevada limited liability

26  company whose only member is a citizen of California and domiciled in California. Joseph

27  McNulty ("Joe") is a managing member of AVR Group.

28

Federal Securities Fraud and Accounting Malpractice Complaint

11.  Plaintiff, TRIDENT ASSET MANAGEMENT, INC. ("Trident Asset Management"), is a California Corporation with its principal place of business in California. Joseph McNulty ("Joe") is the only officer of Trident asset management.

12.  Plaintiff, PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC ("Phoenix Affordable Housing Authority"), is an Arizona limited liability company whose only member is a citizen of California and domiciled in California. Kambiz "Jim" Zomorrodi ("Jim") is a managing member of Phoenix Affordable Housing. Jim was in Arizona at times relevant to this complaint and maintains an Arizona driver's license.

13.  Defendant, JEFFREY SPEIGEL, is an individual and citizen of California and domiciled in California.

14.  Defendant, RYAN SPEIGEL, is an individual and citizen of California and domiciled in California.

15.  Defendant, SAC ADVISORY GROUP, LLC, is a California limited liability company whose primary place of business is 2300 Contra Costa Blvd, Suite 425, Pleasant Hill, California.

16.  Defendant, SPIEGEL ACCOUNTANCY CORP., is a California Corporation whose primary place of business is 2300 Contra Costa Blvd, Suite 425, Pleasant Hill, California. At all relevant times, Jeff was acting as an agent or apparent agent of Spiegel Accountancy Corp.

## III.  JURISDICTION AND VENUE

17.  The Court has subject matter jurisdiction pursuant to 15 U.S.C. § 78a, 28 U.S.C. § 1331, and 28 U.S.C. § 1367(a).

18.  Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2) because all defendants are residents in the State of California and a substantial part of the events or omissions giving rise to Plaintiff Investors' claims occurred in this District.

## IV.  FACTS COMMON TO ALL COUNTS

### A.  Horwitz's Ponzi Scheme

19.  Horwitz, a Los Angeles based actor and Indiana University alum, and his company 1inMM conducted a Ponzi scheme raising over $690 million from investors through aggregators



including SAC and its funds using fabricated agreements and fake emails with prominent third-party companies with whom Horwitz had no actual business relationship.

20. Horwitz told Defendants that the purpose of the 1inMM offering was to finance 1inMM's acquisition and licensing of distribution rights in specific movies, primarily from Latin America, to major media companies, mostly Netflix or Home Box Office ("HBO").

21. The Promissory Notes issued by 1inMM to the Defendants had maturities ranging from three months to twenty-four months, with the vast majority of those notes coming due in either six months or twelve months. Each note provided for a specific amount to be paid at maturity, which typically equated to a profit of between 35 and 45 percent over the life of the note.

22. Horwitz told Defendants that he and 1inMM would profit from these transactions by selling the movie rights to HBO or Netflix at a profit in excess of the profits paid to investors, and that Horwitz and 1inMM would retain this excess.

23. Horwitz told Defendants he had experience acquiring and licensing distribution rights in movies to HBO and Netflix. Horwitz sold himself as bringing "a wealth of knowledge, reputation, and experience[.]"

24. In reality, 1inMM and Horwitz had no distribution relationship with either HBO or Netflix and never licensed any movie rights to either company.

25. Horwitz obtained funds from SAC and other aggregators acting as placement agents via promissory notes which were issued to the aggregators. The aggregators utilized all sorts of investment vehicles to gather funds to pay for Horwitz's promissory notes.

26. Horwitz relied on Defendants to function as his brokers, investment bankers, or underwriters to raise funds based on their reputation as trustworthy financial professionals.

27. The aggregators were gatekeepers for Horwitz and parroted his lies from their position as trustworthy professionals.

28. Horwitz's scheme was carefully orchestrated to put layers of confidence between him and the end investor. Investors gave their money to Defendants who were well a respected audit accountant and his son. Individual investors were never allowed direct access to Horwitz.

When the payments stopped, Horwitz added a layer of sophisticated attorneys to help add more confidence to each communication and create more apparent distance between Defendants and Horwitz.

29. The confidence man thus borrowed the investor's existing confidence in Defendants, confidence in financial professionals, and confidence in attorneys to keep his scheme running with a total of $1.2 Billion passing through 1inMM accounts.

30. Horwitz told Defendants he had experience and relationships in the media content distribution industry, that he and 1inMM had existing business relationships with HBO and Netflix, and that he could use his experience and connections to acquire and sell distribution rights in movies to Netflix and HBO for a profit.

31. Horwitz promised to use the proceeds from each promissory note placed with investors to purchase the rights to a specific movie, to license those rights to either HBO or Netflix, and to use the profits to repay the note.

32. The manner Horwitz claimed 1inMM supposedly generated revenue for itself included, but was not limited to, the following: (i) receiving a percentage of the gross receipts that HBO generated from exploiting film rights; (ii) retaining a portion of the profit margin from Netflix-specific transactions; (iii) following the repayment of notes used to finance the acquisition of content rights and the expiration of initial 3-year sublicensing period with platforms such as HBO and Netflix, 1inMM would retain rights to the same content for an additional period of years, thereby enabling 1inMM to continue licensing the content to other parties for 1inMM's sole financial benefit.

33. Any of these supposed revenue streams could have been confirmed by reputable third parties directly but never were.

34. Horwitz justified the relatively short maturities for the notes by representing that the standard payment timeline – and thus the time needed to repay investors on the notes – was twelve months for Netflix and six months for HBO.

---

Federal Securities Fraud and Accounting Malpractice Complaint

35.     Horwitz and 1inMM did not have business relationships with Netflix or HBO and did not sign distribution agreements with Netflix or HBO. 1inMM did not acquire the movie rights funded by the Promissory Notes and did not sell those rights to Netflix or HBO.

36.     These falsehoods could have easily been confirmed prior to any investment by Plaintiffs with a phone call to Netflix or HBO but that call was not made until long after the scheme imploded and Jeff and Ryan reaped millions in profits from Horwitz's scheme.

37.     Horwitz used money "invested" in his "company" to pay earlier investors and for lavish personal spending, including, but not limited to, extravagant trips to Las Vegas, flights on chartered jets, payments for high-end automobiles, a subscription service for luxury watches, and the purchase of a multi-million-dollar home.

38.     In late 2019, Horwitz and 1inMM stopped making payments to investors for the outstanding promissory notes.

39.     Horwitz provided Defendants false explanations for why he had stopped making payments.

40.     Horwitz initially blamed HBO and Netflix for failing to make promised payments to 1inMM.

41.     Horwitz told Defendants that while he had intended to sue HBO for non-payment, that he was instead able to obtain an alleged consolidated distribution agreement, pursuant to which HBO would immediately pay its past due payments to 1inMM.

42.     Throughout 2020, Horwitz passed along lies to Defendants that they in turn used to pacify their investors and keep the fraud going to delay the inevitable reckoning.

**B.  Defendants' Offering**

43.     Horwitz raised money with five principal aggregators who acted as placement agents or underwriters selling securities for investment in 1inMM most of whom raised funds from friends, family, and other downstream investors for the purpose of investing in promissory notes used to fund individual projects offered by 1inMM (hereinafter "1inMM Offering").

44.     The many aggregators competed for Horwitz's favor. The large Chicago aggregator generally received the first access to Horwitz's "deals" and SAC was careful not to offend Horwitz,

Federal Securities Fraud and Accounting Malpractice Complaint

1    ask to many questions, or let their investors communicate with him, out of fear SAC's potential

2    deals would go to other aggregators.

3        45.    In or about March of 2017, Defendants began soliciting investment with SAC.

4        46.    Defendants solicited $75,132,950 in investment via sales of three forms of

5    investment in the 1inMM Offering of which $29,733,025 remains owed to investors.

6        47.    Ryan is the managing member of SAC.

7        48.    Jeff and Ryan each own half of SAC.

8
9        49.    Ryan and Jeff are both employees of Spiegel Accountancy Corp. and relied on its

10   office infrastructure for all of SAC's activities as detailed herein.

11       50.    The investments with each Plaintiff were structured as "Profit Sharing Agreements"

12   whereby SAC provided 1inMM with the funds necessary to pay the purported Acquisition Fee (the

13   "SAC Advance") in exchange for a participation interest in the funds received by 1inMM in

14   relicensing a portion of the Distribution Rights to a third-party media company. Plaintiffs each

15   agreed to fund the "SAC Advance." When 1inMM made the return payment, the Plaintiff received

16   16% interest. (Profit Sharing Agreements attached hereto as Exhibit "A" and incorporated herein).

17       51.    Plaintiffs invested money with SAC, in the common enterprise of funding movie

18   rights acquisition, the investors fortunes for the investment were interwoven with SAC's, and the

19   success or failure of the investment was wholly controlled by 1inMM and SAC.

20       52.    1inMM paid fictitious interest on promissory notes issued to SAC of between 30%

21   and 40% throughout the scheme.

22       53.    In or about March 2017, Ryan communicated the attached 1inMM Capital overview

23   to Brad, Joe, and Cindy that repeated Horwitz's key misrepresentations. (Attached hereto as Exhibit

24   "B").

25       54.    In or about March 2017, Ryan communicated an Investor Information Statement to

26   Brad, Joe, and Cindy detailing SAC's investment in 1inMM.

27       55.    On August 10, 2018, Ryan communicated an offer for Brad to invest via a Profit

28   Sharing Agreement instead of via a fund. Ryan stated in an email: "Would you be interested in

---

Federal Securities Fraud and Accounting Malpractice Complaint

funding your own film outside of the fund? Typically, they range from $650-750k. I could probably get you a film in September or October. You would get 17% return on your capital and you would receive the capital and earnings back in 6 months from the fund date. Let me know if you are interested in something like that. ... hey have to fill all the fund orders first and then can supply anything extra to me for individual investors. I would purchase the film through my management company and we would have a profit sharing agreement between us that I have used with other individual investors."

56.     On May 25, 2018, Ryan and Jeff communicated an offer in person to Jim and Joe to invest in the same thing as Fortune Film Fund One but this time via a Profit Sharing Agreement.

57.     SAC did not invest money via the Profit Sharing Agreements but earned a significant profit on each investment that paid before the Ponzi Scheme collapsed.

**C. Defendants' Public Sales Pitch to Dozens of Investors**

58.     Defendants sold investment in 1inMM in various forms to anyone with sufficient assets to participate.

59.     Defendants engaged at least one salesman with experience selling insurance and unregistered investments and paid him a finder's fee of 5% of the amount invested in consideration of each investor he successfully solicited on Defendants' behalf.

60.     Defendants had no prior relationship with the investors solicited by salesmen including recent immigrants and elderly individuals.

61.     Ryan and Jeff presented to large groups of potential investors at a conference in Oregon.

62.     On or about April 5, 2017, Ryan presented the investment opportunity to individuals at the Mile Marker Club Symposium in Oregon.

63.     Defendants had no prior relationship with the investors solicited at conferences.

64.     Ryan attended conventions where his father would solicit accounting business to wealthy individuals and present information on SAC for the purpose of recruiting new investors.

65.    On March 27, 2017, Ryan created and narrated a video[1] that was shared at least one convention publicly and shared with other investors including Plaintiffs in this action that contained the following representations depicted in the screen shots below:



---

[1] The video is available at: https://grabify.link/XNHEY5

Federal Securities Fraud and Accounting Malpractice Complaint





66.     Ryan closed Defendants' video presentation broadcast to investors with the statement, "We expect similar returns in our fund so pretty exciting stuff!" There was no cautionary language on the video.

67.     Over 100 individuals from all walks of life and experience invested in Defendants' various offerings of investment in 1inMM thanks to Defendants' aggressive public sales efforts.

**D.  Defendants' Misrepresentations to Investors**

68.     The Spiegels made the following representations to Plaintiffs:

a.      In or about April 2017, Ryan on behalf of SAC distributed the video referenced in paragraph 65 via a Google Drive link to Joe, Cindy, and Brad, and Joe shared the video with Jim.

b.      SAC, via an email send by Ryan, communicated the following to all Plaintiffs in the Profit Sharing Agreement itself:

i.      "WHEREAS [1inMM Capital, LLC,] is in the business of acquiring and licensing film distribution rights to third-party media companies for exclusive distribution in Latin American and African countries (the "Distribution Rights");

ii.     "WHEREAS in connection with acquiring the Distribution Rights to a particular movie (the "Licensed Movie"), Distributor must pay a one-time non-refundable license fee (the "Acquisition Fee") to the holder of the movie's worldwide distribution rights which is generally the producer of the movie;"

Federal Securities Fraud and Accounting Malpractice Complaint

10

iii. "WHEREAS in order to assist the [1inMM Capital, LLC,] in acquiring the Distribution Rights, SAC provides the Distributor with the funds necessary to pay the Acquisition Fee (the "SAC Advance") in exchange for a participation interest in the funds received by Distributor in relicensing a portion of the Distribution Rights to a third-party media company ("Media Company")."

c. On or about In or about March 2017, SAC communicated the following to Cindy, Joe, and Brad via email:

i. "1inMM Acquires the Latin American distribution rights for all windows of distribution; "

ii. "1inMM's acquisitions are all under $750,000.00. Films over $750,000.00 are bought by 1inMM Productions;"

iii. "1inMM licenses all films to either HBO/Netflix or SONY in Latin America;"

iv. "1inMM headed up by Zach Horwitz and Craig Cole"

d. In or about March 2017, Ryan, on behalf of SAC, communicated the following to Cindy, Joe, and Brad via email:

i. SAC will hand pick movie deals brought to the SAC by 1inMM. "1INMM will bring SAC signed non-binding letter of intent (the "**LOI**") from the licensor (companies such as HBO, Netflix, Sony, or Universal) and offer sheet to foreign sales agent ("**FSA**"), who represent the sales of movie licensing rights," in order for SAC view the proposed deal.

ii. "In essence, 1INMM buys the licensing rights from the FSA and sells the Latin American distribution rights to the licensor, who has already agreed to purchase such distribution rights at a higher price(the "**Participation Fee**")."

iii. "In certain instances, a licensor may decide not to close a movie purchase even after signing an LOI, in which case 1INMM will shop the movie to another licensor. In this case, the Participation Agreement provides that 1INMM has 10

days after the movie is rejected by a licensor to execute a new participation with a new licensor."

    iv.   If 1inMM is unable to negotiate a new movie participation that is acceptable to the SAC 1INMM is obligated and will refund the Participation Advance to SAC.

    v.   Based on the due date of the participation schedule with 1inMM, the Participation Fee will be paid. This will be coming directly from the licensor to 1inMM who will then deposit into the Company's joint account with 1inMM. As co-signatory on the joint account, the Manager will then wire the money to the Company's bank account to close that movie participation. Profits will then be allocated and distributed for that movie participation to the Company's members in accordance with the terms of the Company's operating agreement.

e.    In or about March 2017, Ryan, on behalf of SAC, communicated the following to Cindy, Joe, and Brad via email about Craig Cole:

    i.   Ryan has known "Craig Cole, Co-Founder of 1INMM, for over 10 years and has built a working relationship with his company."

    ii.   "1INMM is a California limited liability company that was formed in September, 2013. Company was founded and is managed by Zachary Horwitz and Craig Cole. They are a foreign distributor of movie rights focusing on the Latin America territory. "

f.    Jeff and Ryan communicated by phone to Plaintiffs at the time of their investment commitment that they did their own due diligence on Horwitz's representations;

    i.   Brad and Cindy talked to Jeff by phone in May 2018, Jeff told Brad during this phone call that he and his son had done much due diligence, had contracts from HBO, signed by officials at HBO, and had verified those individuals worked at HBO.

---

Federal Securities Fraud and Accounting Malpractice Complaint 

12

      ii.    Brad and Cindy talked to Ryan by phone in May 2018 and Ryan explained that SAC was able to obtain such a "sweet deal" because Ryan went to college with Craig Cole, a co-founder of 1inMM.

      iii.    On or about May 25, 2018, Joe and Jim met with Jeff and Ryan together at Spiegel Accountancy's office. During that meeting Jeff and Ryan said they went to Los Angeles and personally reviewed 1inMM's financial records and said the operation was legitimate.

   g.    In April 2018 Ryan told Cindy by phone that the investment was zero risk of loss and that the only risk was time.

   h.    Jeff and Ryan verbally communicated to Plaintiffs at the time of their investment commitment that they engaged professionals to do due diligence on Horwitz's representations;

      i.    Jeff and Ryan communicated this in person to Jim and Joe on May 25, 2018.

      ii.    Ryan reiterated this by phone to Joe in June 2018.

      iii.    Ryan told Cindy about the professional due diligence by phone in May 2018

   i.    Jeff, Ryan, and SAC told investors at conferences and symposiums and Plaintiffs by phone and email that 1inMM had a letter of intent to sell each movie with a distributor before the movie rights were purchased;

      i.    Jeff and Ryan communicated this in person on or about May 25, 2018  to Jim and Joe.

      ii.    Ryan communicated this by phone to Joe in April 2018.

      iii.    Ryan communicated this fact via email to Cindy, Brad, and Joe in March 2017.

      iv.    In April 2018 Jeff told Brad by phone that 1inMM had been operating for quite a while as a subsidiary of a bigger operation that owned them.  1inMM was the branch-off to go after these smaller movies in 600K range (smaller cost).  1inMM had connections in South America and around the world and would be acquiring the movies and selling the Netflix, HBO, Hulu and Sony.

---

j. Jeff and Ryan concealed from investors that they never had direct communication with HBO, Netflix, Horwitz's Bank, or Horwitz's accountant to confirm anything Horwitz told them;

k. Jeff and Ryan concealed from investors that 1inMM did not have an accountant and was never audited;

l. Jeff, Ryan, and SAC told investors at conferences and symposiums and Plaintiffs by phone and email that they were co-signors on Horwitz's bank account and signed off on each payment to foreign sales agents that 1inMM bought the movie rights from;

      i. Ryan communicated to Brad via email on or about March 15, 2017 that SAC was a co-signor on 1inMM's accounts holding Brad's investment.

      ii. Ryan communicated this by phone to Jim and Joe in April 2018.

m. After 1inMM defaulted on its promissory notes Ryan and Jeff told Plaintiffs by phone and email that they were "victims" of Horwitz and lost money;

n. Ryan told investors via email their "investment was safe" even after payments stopped coming and it was clear 1inMM did not actually have contracts with HBO;

o. Jeff, Ryan, and SAC concealed from investors that Horwitz's attorney disavowed all statements made on behalf of Horwitz when he withdrew;

p. On or about February 18, 2021, Ryan told all Plaintiffs via email HBO had a plan to pay 1inMM;

q. On or about March 15, 2021, Ryan told all Plaintiffs via email Warner Media intended to pay 1inMM in March 2021; and

r. On or about April 7, 2021, Ryan told all Plaintiffs via email that Jeff and Ryan were "shocked" by Horwitz's arrest.

69. All of the aforementioned representations in paragraph 68 will hereinafter be referred to as the "Representations."

---

Federal Securities Fraud and Accounting Malpractice Complaint

14

70.     The Representations were either false and known to be false, or were recklessly made with gross negligence and lack of the appropriate due diligence under the standards of care governing Defendants in the conduct of their profession.

71.     The true facts then known to the Defendants corresponding point by point to the Representations include the following:

a.     1inMM never received a money from Netflix or HBO, there were no loans, the whole scheme was imagined by Horwitz;

b.     Defendants never contacted, HBO, Netflix, Sony, City National Bank, never investigated whether there were any internal controls in place at 1inMM, never talked to any third parties in the movie funding business who had experienced dealing with Horwitz, never evaluated Horwitz's personal finances or credit rating, never confirmed what if any assets 1inMM had, never checked to see if 1inMM had an UCC filings for its purported interest in films, never reviewed any financial statements or tax returns created by a third party for 1inMM or Horwitz, and limited their due diligence to asking Horwitz and Cole questions and reviewing documents provided by Horwitz and Cole;

c.     SAC engaged an attorney named Brian Fraser ("Fraser") to draft documents and review contracts between SAC and 1inMM. Defendants do not know whether Fraser communicated with any third parties or sought any records from any third parties. They do not know what if any due diligence Fraser did on their behalf other than reviewing the documents provided by Horwitz and ordering a background check. They do not know what if anything they paid Fraser for this service;

d.     Horwitz never engaged with any movie platforms and never had a letter of intent with any platforms to purchase any movies. In the extensive investigation of Horwitz's activities, no "letters of intent" have been uncovered, not even any forged copies;

e.     1inMM never received payments from HBO. This is clear in their bank records and would be clear in their tax returns if reviewed by Defendants. If Defendants actually had access to banking information as co-signors on Horwitz's account, as they told investors, then this is a completely fraudulent representation as the transfers would have been made from the

Federal Securities Fraud and Accounting Malpractice Complaint

15

account they had access to. Most absurd, the contracts Horwitz gave Defendants were with "**HBO Holdings, Inc**." (emphasis added). Defendants did not know what if any relationship "HBO Holdings, Inc." had with the streaming platform HBO and did not bother to confirm that HBO Holdings, Inc. was even an existing corporation. There was no HBO Holdings, Inc. incorporated anywhere in 2017 or 2018. This is readily apparent with a Google Search of "HBO Holdings, Inc" which leads to the Edgar Archive of all of Time Warner's Subsidiaries which does not include "HBO Holdings, Inc." Further, the California Secretary of State website that shows there is no company registered to do business in California called "HBO Holdings, Inc" despite numerous other HBO entities;

f.      On or about November 18, 2019, Ryan was told by one of the female investors that "HBO Holdings, Inc." did not exist. Defendants never took any independent steps to confirm that "HBO Holdings, Inc." did not exist.

g.      1inMM was only in the business of taking money from investors and paying it out to other investors. There was never a legitimate business. This fact could have easily been uncovered before any investment was made or the falsity was actually known by Defendants when the representation was made;

h.      Cole had no ownership interest or employment with 1inMM. This was confirmed in the background checks ordered by Attorney Fraser in 2017;

i.      Despite telling investors they were co-signors on 1inMM's bank account, Defendants never communicated directly with 1inMM's bank, City National Bank, they never accessed the accounts they were supposedly co-signors on, and never received statements from City National Bank. The whole extent of the due diligence is what Horwitz and Cole told them. Had investors known that, they never would have invested;

j.      Defendants never inquired if 1inMM had an accountant or bookkeeper;

k.      None of 1inMM's bank accounts at City National Bank indicated that Jeff, Ryan, or SAC were cosigners. Jeff and Ryan may have completed a form to become co-signors, but it was never processed by the bank, and neither Jeff, Ryan, nor SAC ever had any access to 1inMM's accounts as they falsely told investors;

Federal Securities Fraud and Accounting Malpractice Complaint

16

l. Jeff, Ryan, and SAC are "net winners" in the Ponzi Scheme. Jeff and Ryan are the only owners of SAC which earned a profit in excess of $4,000,000 at the expense of dozens of investors;

m. Ryan still told investors their money was safe even after 1inMM defaulted on its obligations and remarkably was not being paid by ANY of the three platforms, and all for different purported reasons. This lie was told with the intent of keeping the fraud under wraps and delaying the consequences of facilitating a Ponzi Scheme;

n. On February 17, 2021, 1inMM's attorney, who had been passing along many of the misrepresentations to Ryan and Jeff, explicitly disavowed any statements he had made on behalf of Horwitz and 1inMM. This noisy withdrawal and disavowal was a significant red flag that Ryan concealed from investors;

o. On approximately February 21, 2021, days after the withdrawal and disavowal, Ryan told investors that Horwitz had a new deal with HBO for repayment and money was coming. Ryan had reason to know this was obviously false considering 1inMM's large law firm had just disavowed the same statement; and

p. On or about March 15, 2021, Ryan told investors a lie about a purported deal between Warner Media and 1inMM. At this point the SEC was engaged in its investigation of Horwitz. Two weeks prior, another aggregator presented evidence of the fraud to the SEC and had notified its hundreds of investors of the fraud. On March 31, 2021, the SEC prepared a filing including records provided by SAC.

72. There was no reasonable basis in fact or otherwise for the representations made with respect to the suitability of any investment in 1inMM in that a reasonable investigation would have disclosed it was a complete fraud.

73. Rather than relying on any substantive investigation of their own, Defendants relied on the fact that 1inMM kept paying as sufficient evidence that the obvious Ponzi Scheme was legitimate.

74.     Had Defendants been truthful, then Defendants would have advised the Plaintiffs that Defendants did not subjectively believe, nor hold a due-diligence based professional opinion that the investment in 1inMM was suitable for anyone.

75.     Defendants undertook no due diligence sufficient to comply with the governing standards of care for their profession with respect to each and every other Representation they made relating to the 1inMM Offering as alleged herein.

76.     Each of the Plaintiff Investors justifiably trusted and relied upon the above-alleged Representations in making the decision to invest in the 1inMM Offering and not take action against Horwitz or report him to law enforcement sooner.

77.     Plaintiffs relied on Defendants to investigate the investment they were offering, confirm facts presented in the offering materials, and not conceal facts unflattering to the 1inMM Offering, because Defendants held themselves out as financial professionals operating within a well-regarded audit accounting firm, and warned Plaintiffs that if they contacted Horwitz or HBO they would not be able to continue investing and arranged for the evidence supporting Horwitz's lies be shared only as "attorney's eyes only".

**E.  1inMM DEFAULTS**

78.     As with every Ponzi Scheme, the well eventually dried up and payments stopped coming in late 2019. Everyone who had direct contact with Horwitz saw this coming. Big banks had already refused to do business with the scheme by this time.  Defendants never cared so long as the money was coming. In December 2019, the coverup shifted into high gear.

79.     Shortly after the payments stopped, Horwitz engaged two sophisticated law firms to add a layer of credibility to 1inMM's communications and Defendants, in turn, engaged well regarded counsel to help lull investors who were owed money.

80.     On January 22, 2020, Ryan advised Plaintiffs that the fund was not able to take on new investment purportedly because "Our partners ended up securing another funding source, so we are going to continue with what we currently have for the time being". The reality was that fresh money stopped coming in so there was nothing to pay out.

---

Federal Securities Fraud and Accounting Malpractice Complaint



81.     On January 31, 2020, Ryan advised Plaintiffs that there would be some changes in the fund based on Horwitz's imagined deal with HBO:

> Participation Amendments- You may or may not know that TimeWarner (who owned HBO) was recently acquired by AT&T, so there has been some changes in the process between our distribution partner and HBO. These changes are now taking place and we are amending our agreements with our distribution partner to cater to these process changes. HBO has expanded their diligence period on the front end of the purchase cycle, meaning that there is anywhere from 1-3 weeks of diligence before the LOI is inked and the 6 month process starts for the minimum guarantee payment (where we are liquidated from the deal). In addition, there is a 1-2 week processing time from when the minimum guarantee is due to our distribution partner and they actually receive the funds.
> As a result of these processing changes, we are amending our agreement with our distribution partner [1inMM]. The new agreement will be a maturity date of 7.5 months and a yield of 26%, which is amended from the original agreement of a maturity date of 6 months and a yield of 22%. The effective yield is very similar to our original agreement. While our new maturity date is slated to be at 7.5 months, there is the possibility that we are paid before that on some films, which would only increase the effective yield. We still expect for investor returns to be over 20% and on par with the returns from 2019.

82.     On April 17, 2020, Ryan and Jeff advised Plaintiffs that 1inMM had defaulted on its loans and advised investors "With this news, we have decided to wind down the equity fund as participations are paid over the coming months. We will return capital and earnings to investors as the participations in our portfolio are paid off." Despite it appearing to be a sufficiently dire situation to warrant shutting down the fund, Ryan and Jeff promised "We want to reassure you again, that although we are having some delays, **we know that no funds have been lost**. We expect that we will be receiving all of the funds due and will be returning your capital and earnings." (Emphasis added). This statement was false. Ryan had no reason to believe that payment was coming and that nothing was lost.

83.     By the fall of 2020, Ryan and Jeff engaged counsel to assist them in spreading Horwitz's falsehoods and providing another layer of credibility to the absurd story told to lull Plaintiffs.

84.     On October 4, 2020, Ryan emailed an investor, "We will be getting clarity on payments and documentation this week from 1inMM. Our lawyer is in direct contact with their legal counsel, who also confirmed the execution of the agreement."

85.     On October 15, 2020, Ryan directly asked Horwitz for a letter from his lawyer to use to placate his investors.

86.     Despite using letters from counsel engaging with Horwitz's counsel to lull investors, Ryan and Zach continued to communicate directly and ask their attorneys to memorialize their direct communications to share with investors.

87.     Rather than just telling investors that he was speaking directly to Horwitz, Ryan concocted a letter from a reputable attorney to make the absurdity seem more plausible to Plaintiffs.

88.     On November 4, 2020, SAC's counsel, a well-regarded litigator and acquaintance of Jeff's, sent a letter to Plaintiffs at Defendants direction that provided in pertinent part:

> As you know, 1inMM Capital (our distribution partner) and HBO (the licensor of our films), have been in negotiations over the past many months to restructure their agreement. That amended agreement was finally executed on October 13, 2020. I was provided a severely redacted copy of this agreement in order to verify that it had been signed and what the terms were regarding the catch up payment owed on film investments. I received the redacted version on October 20, 2020. **While the agreement is highly confidential, I am able to tell you that I was able to verify its execution and was further able to verify the terms of payment of past due amounts to 1inMM**. SAC has also been in communication with 1inMM Capital regarding how 1inMM will satisfy its obligations to SAC and its entities. The following information has been provided:
> • 1inMM has confirmed that it agrees with the total amount due and owing as asserted by SAC and its entities.
> • 1inMM has agreed to notify SAC of payments made by HBO over the coming months. What I can tell you is that the redacted agreement provides that **HBO will be making full payment by the end of the year, unless it exercises options to extend, which would require making substantial interim payments**.
> • 1inMM has committed that it will make pro rata or proportionate payments to SAC for its share of the total advances. These payments will be made within 14 days of 1inMM receiving any payment from HBO.
> • 1inMM has told SAC that March 1, 2021 is the latest date by which full payment will be made.
> • SAC will remit payments to its investors in a timely manner as soon as received from 1inMM. These payments will be remitted on a first in first out basis based on the original maturity date of each film.

(Emphasis added).

---

Federal Securities Fraud and Accounting Malpractice Complaint



89.     On December 15, 2020 Ryan communicated via email to Plaintiffs that money was coming and "The CAM account is now over $100M as of last Friday and we were able to verify this account statement.  When the funds are released to 1inMM we will be notified.  1inMM was under the impression that the first $20M would have already been remitted to them, but it has not yet been released from the CAM account." Ryan had not verified anything was another lie to lull investors.

90.     On February 28, 2021, investors in JJMT Capital, LLC., who also invested funds in 1inMM, were advised that 1inMM was a fraud after JJMT's new counsel at King & Spalding discovered 1inMM was a Ponzi Scheme **after just one day of investigating.** (Emphasis added).

91.     On March 15, 2021, while the fraud was obvious to hundreds of other investors, Ryan continued to pass along lies to his investors stating: "We wanted to provide a quick update as to where everything currently stands. After discussions with their investment groups, 1inMM has agreed to accept the payment proposal from Warner Media and were told they will be receiving the agreement this week. Once all the details are finalized and the agreement is executed we will be sharing all the information with investors. **We are optimistic that this will get finalized and payments will be remitted.**" (Emphasis added).

92.     On April 5, 2021, the Securities and Exchange Commission filed a securities fraud Complaint against Horwitz detailing the obvious fraud including information received from Defendants submitted over a week earlier.

93.     Two days later, on April 7, 2021, Ryan communicated to investors "we received some shocking and disheartening news yesterday regarding 1inMM Capital" that the SEC initiated action against 1inMM.

94.     This was not shocking to Ryan at all because he had supplied documents to the SEC the prior month in support of its investigation, and it was readily apparent that Horwitz was running a Ponzi Scheme.

95.     Plaintiffs justifiably relied on Defendants' representations about the suitability of investment in 1inMM because the SAC principals were accounting professionals and represented they had a personal relationship with Cole, a 1inMM co-founder.

Federal Securities Fraud and Accounting Malpractice Complaint

**F. Defendants' Duties to Plaintiffs**

96.    SAC's role as an aggregator for the Ponzi Scheme is analogous to an underwriter or placement agent for a legitimate investment. Defendants were the gatekeepers who vetted the investment and sold it with their Representations. Ryan and Jeff earned a large cut of the profits in consideration of their due diligence and lending their credibility to the bogus investment.

97.    While SAC was not actually a professional placement agent, underwriter, or broker/dealer, SAC pretended to be and assumed the duties.

98.    A placement agent, or at least a party acting in that role such as SAC, is required to perform reasonable due diligence on an investment such as this prior to offering it for sale to its customers pursuant to FINRA Rule 2111.05(a), FINRA Regulatory Notice 10-22, NASD Notice to Members 03-71, and NASD Notice to Members 05-26, 17 C.F.R. § 240.15l-1(b)(1).

99.    FINRA requires that a broker-dealer, as SAC was paid millions to play the part of, must, at a minimum, conduct a reasonable investigation concerning:

    a.    the issuer and its management;

    b.    the business prospects of the issuer;

    c.    the assets held by or to be acquired by the issuer;

    d.    the claims being made; and

    e.    the intended use of proceeds of the offering.

100.    Defendants had a duty to conduct a reasonable investigation in connection with each offering, notwithstanding that a subsequent offering may be for the same issuer, prior to making the Representations.

101.    FINRA has also provided detailed guidance on how anyone offering a 1inMM investment or that was acting with the 1inMM Offering may ensure an adequate investigation has taken place into the issuer and its management, the issuer's business prospects, and the issuer's assets.

102.    As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1inMM and its history by Defendants would have included:

---

a.     Examining historical financial statements of 1inMM, with particular focus, if available, on financial statements that have been audited by an independent certified public accountant and auditor letters to management;

b.     Looking for any trends indicated by 1inMM's financial statements;

c.     Contacting customers and suppliers regarding their dealings with 1inMM;

d.     Reviewing 1inMM's contracts, leases, and financing arrangements;

e.     Inquiring about 1inMM's past securities offerings and the degree of their success; and

f.     Inquiring about the length of time that 1inMM had been in business and whether the focus of its business was expected to change.

103.     This was not done here. The full extent of the investigation was reliance on information supplied by the Ponzi Schemer. There was zero independent investigation done by Defendants in an extreme departure from the standards of ordinary care, and which presented a danger of misleading buyers with false statements that were either known to the Defendants to be false or were so obviously false that Defendants must have been aware of the falsity.

104.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1inMM's business prospects by SAC should include:

a.     Inquiring about the viability and value of any movies funded by 1inMM;

b.     Inquiring about the industry in which 1inMM operates, and the competitive position of 1inMM; and

c.     Requesting any business plan, business model or other description of the business intentions of 1inMM and its management and their expectations for the business, and analyzing management's assumptions upon which any business forecast is based. A broker/dealer should test models with information from representative assets to validate projected returns, break-even points, and similar information provided to investors.

105.     As set forth in FINRA Regulatory Notice 10-22 and securities industry standards, a reasonable investigation of 1inMM's assets and facilities should include:



a.   Carefully examining any reports by third-party experts that may raise red flags;

b.   Obtaining an expert opinion from auditors and financial experts and others as necessary to form a basis for determining the suitability of the investment prior to recommending the security to investors;

c.   Inquiring about previous or potential regulatory or disciplinary problems of the issuer;

d.   Obtaining a credit check of 1inMM;

e.    Making reasonable inquiries concerning the issuer's management. SAC should have inquired about such issues as the expertise of management for the issuer's business and the extent to which management has changed or is expected to change;

f.   Inquiring about the forms and amount of management compensation, who determines the compensation and the extent to which the forms of compensation could present serious conflicts of interest. A party acting as a broker-dealer might make similar inquiries concerning the qualifications and integrity of any board of directors or similar body of the issue; and

g.   Inquiring about the length of time that the issuer has been in business and whether the focus of its business is expected to change.

106.   FINRA Rule 2111 is the basic rule for assessing the suitability of an investment before selling it to the public. Reasonable-basis suitability requires that the person making millions selling investment: (1) perform reasonable diligence to understand the potential risks and rewards associated with a recommended security or strategy and (2) determine whether the recommendation is suitable for at least some investors based on that understanding. A broker-dealer can violate reasonable-basis suitability under either prong of the test.

107.   Defendants could not rely blindly upon 1inMM for information concerning a company, nor may it rely on the information provided by the issuer in lieu of conducting its own reasonable investigation.

108.   While broker-dealers or placement agents – like SAC was playing the part of – are not expected to have the same knowledge as an issuer or its management, firms are required to

Federal Securities Fraud and Accounting Malpractice Complaint

exercise a high degree of care in investigating and independently verifying an issuer's representations and claims. The fact that a broker-dealer's customers may be sophisticated and knowledgeable does not obviate this duty to investigate.

109.    Of course, under these circumstances, Defendants were in a position to know more about 1inMM, understand its business, its finances, and its outlook better than just a mere broker-dealer since it was acting as its placement agent or investment banker raising capital exclusively for 1inMM.

110.    In the course of a reasonable investigation, a broker-dealer, such as the Defendants were acting, must note any information that it encounters that could be considered a "red flag" that would alert a prudent person to conduct further inquiry. A broker-dealer's reasonable investigation responsibilities obligate it to follow up on any red flags that it encounters during its inquiry as well as to investigate any substantial adverse information about the issuer. When presented with red flags, the broker-dealer must do more than "blindly rely" upon representations by the issuer's management or the disclosure in an offering document.

111.    Jeff is a Certified Public Accountant with Spiegel Accountancy Corp., and Plaintiffs relied on his financial expertise with Spiegel Accountancy Corp.[2] when deciding to invest with SAC.

112.    Jeff's customers relied on him based on their existing professional relationship.

113.    Jeff, in turn, relied on the existing professional relationship and his knowledge of their finances to exploit them for investment in SAC.

114.    The American Institute of Certified Public Accountants' ("AICPA") Code of Professional Conduct Section 1.000.020 addresses how CPAs such as Jeff should respond to certain ethical conflicts.

115.    The AICPA Code of Professional Conduct Section 1.400.001 "Acts Discreditable" provides: "A member shall not commit an act discreditable to the profession."

---

[2] All Plaintiffs with exception of UYEN were presently customers of Spiegel Accountancy Corp. or had previously engaged Jeff to perform professional accounting services.



116. Section 0.300.060 of the Code provides:

> Due care principle. A member should observe the profession's technical and ethical standards, strive continually to improve competence and the quality of services, and discharge professional responsibility to the best of the member's ability. ... **Due care requires a member to discharge professional responsibilities with competence and diligence**. It imposes the obligation to perform professional services to the best of a member's ability, with concern for the best interest of those for whom the services are performed, and **consistent with the profession's responsibility to the public**. ... **Each member is responsible for assessing his or her own competence of evaluating whether education, experience, and judgment are adequate for the responsibility to be assumed**...**Members should be diligent in discharging responsibilities to clients, employers, <u>and the public.</u>**

117. The International Ethics Standards Board for Accountants ("IESBA") Code of Ethics for Professional Accountants is another standard that defines the duties owed by Jeff.

118. Section 100.1 provides:

> **A distinguishing mark of the accountancy profession is its acceptance of the responsibility to act in the public interest**. Therefore, a professional accountant's responsibility is not exclusively to satisfy the needs of an individual client or employer. In acting in the public interest, a professional accountant shall observe and comply with this Code.

119. Section 110 of the Code provides:

> A professional accountant shall not **knowingly be associated with** reports, returns, **communications** or other information where the professional accountant believes that the information: (a) Contains a materially false or misleading statement; (b) Contains statements or information furnished recklessly; or (c) Omits or obscures information required to be included where such omission or obscurity would be misleading.

120. When a professional accountant becomes aware that the accountant has been associated with such information, the accountant shall take steps to be disassociated from that information.

121. Jeff did nothing when he learned of the obvious malpresentations Ryan was making after 1inMM's default or 1inMM's own counsel disavowing the statements. Spiegel Accountancy Corp. did not take any action to eliminate its association with the fraudulent conduct alleged herein.

---

Federal Securities Fraud and Accounting Malpractice Complaint



122.   Jeff violated his most basic duties as an accountant who specializes in audits of investment funds by failing to at all investigate this absurd investment.

123.   Jeff violated Cal. Code Regs. tit. 16, § 57 which provides: "A licensee shall not concurrently engage in the practice of public accountancy and in any other business or occupation which impairs the licensee's independence, objectivity, or creates a conflict of interest in rendering professional services" by wearing multiple hats of fund manager, accountant, account for investors, and accountant for the funds.

124.   Jeff could not objectively provide advice to his Spiegel Accountancy Corp customers when he was making millions off the investment he was selling them into. The conflict of interest is glaring and was ignored by Spiegel Accountancy Corp.

125.   As described herein, unfortunately for the Plaintiffs, SAC failed to conduct proper due diligence, which was an extreme departure from the standards of ordinary care.

**G. Plaintiffs' Investment with SAC in the 1inMM Offering**

126.   Plaintiff, UYEN, first invested in SAC on or about September 2019 and entered her final investment agreement (investment agreements collectively referred to as "Securities Contracts") on or about January 2020 and paid $359,450 to participate in profit sharing agreements.

127.   Ellusionist, first invested in SAC on or about September 2019 and entered its final investment agreement on or about January 2020 and paid $1,701,500 to participate in profit sharing agreements.

128.   Ellusionist was a longtime customer of Spiegel Accountancy Corp. and was solicited for investment in SAC at Spiegel Accountancy Corp.'s office.

129.   Plaintiff, Southwest Investment Funds, first invested in SAC on or about June 2019 and entered its final investment agreement on or about January 2020 and paid $10,001,650 to participate in profit sharing agreements.

130.   Plaintiff, AVR Group, first invested in SAC on or about June 2019 and entered its final investment agreement on or about January 2020 and paid $2,359,515 to participate in profit sharing agreements.

---

Federal Securities Fraud and Accounting Malpractice Complaint



131.    Plaintiff, Trident Asset Management, first invested in SAC on or about June 2019 and entered its final investment agreement on or about January 2020 and paid $663,125 to participate in profit sharing agreements.

132.    Plaintiff, Phoenix Affordable Housing Authority, first invested in SAC on or about June 2019 and entered its final investment agreement on or about January 2020 and paid $2,227,950 to participate in profit sharing agreements.

133.    The principal of Southwest Investment Funds, AVR Group, Trident Asset Management, and Phoenix Affordable Housing Authority was a customer of Spiegel Accountancy Corp. and was solicited by Jeff at Spiegel Accountancy Corp.'s office.

**F.    Class Action Tolling**

134.    Plaintiffs were all members of a proposed class and delayed filing this action until class certification Motions were denied in *Carter v. Spiegel et al.* 21-CV-03990 and a subsequent AAA Proceeding *Nanya v. Spiegel et al.* 01-22-0002-9473.

135.    Plaintiffs' individual claims were tolled until the motion for class certification was denied.

**V. CLAIMS**

**FIRST CAUSE OF ACTION**
**Violation of Section 10(b) of Securities Exchange Act of 1934 and Rule 10b-5**
**[Against all Defendants]**

136.    Plaintiffs, restate and reallege paragraphs 1 through 135 as though fully set forth herein as paragraph 136.

137.    Plaintiffs' interests in the 1inMM Offering memorialized in "Profit Sharing Agreements" constitute securities within the meaning of the Securities Exchange Act of 1933 and related common law. Even if these securities were exempt from registration requirements, the antifraud and civil liability provisions of Rule 10b-5 still apply.

138.    The conduct of Defendants violates SEC Rule l0b-5 (promulgated under the Securities Exchange Act of 1934).

---

Federal Securities Fraud and Accounting Malpractice Complaint

139.   Defendants individually and in concert used directly and indirectly the means and instrumentalities of interstate commerce, the mails and/or interstate wires in connection with their scheme to defraud and manipulate as set forth above.

140.   Defendants were deliberately reckless in that their conduct represented an extreme departure from the standards of ordinary care. There was a significant danger of misleading Plaintiffs that was both known to Defendants and so obvious that Defendants must have been aware of it.

141.   Defendants each employed devices, schemes, and artifices to defraud, made untrue statements of material fact, and omitted material facts necessary to make their statements not misleading, and engaged in acts, practices and a course of business that operated as a fraud and deceit upon the Plaintiffs.

142.   Defendants affirmatively created an impression of a state of affairs that differed materially from reality. The Spiegels and SAC and each of them created this false impression to Plaintiffs in the Representations. Plaintiffs were led to believe that their investment with SAC was based on competent due diligence completed by financial professionals confirming that streaming services such as HBO and Netflix had business relationships with 1inMM. None of this was true.

143.   The Spiegels and SAC were each a primary participant in the wrongful and illegal conduct.

144.   The Spiegels and SAC acted with intent to deceive, manipulate and defraud the Plaintiffs. The Spiegels and SAC acted with actual knowledge, or at a minimum severe recklessness, that the omissions and statements referenced herein were false and misleading, and that the failure to disclose material facts and make accurate representations as to their actual and intended plans and trading induced Plaintiff to do business with SAC and participate in its funding of 1inMM.

145.   Jeff Spiegel and Ryan Spiegel are also persons in control of Defendant SAC under Section 20(a) of the Securities and Exchange Act. Each own a 50% interest in SAC. Further, each was well aware of and participated intimately in the misrepresentations and wrongful omissions made to Plaintiffs, and each has participated in and ratified the fraudulent conduct alleged herein.

146.   At the time of the misrepresentations and omissions alleged herein, Plaintiffs believed all statements and assurances made by Defendants were true and was unaware of any of

1   the omitted facts, such as the fact that 1inMM did not have an agreement with HBO as alleged

2   herein. Had Plaintiffs known the true facts, Plaintiffs would never have invested with Defendant

3   SAC.

4       147.   As a direct and proximate result of the wrongful conduct of The Spiegels and SAC,

5   Plaintiffs suffered damages and are consequently entitled to all relief available under the Securities

6   Exchange Act, including compensatory damages against each of the Defendants Jeffrey Spiegel,

7   Ryan Spiegel, and SAC jointly and severally, for all damages suffered as a result of the Defendants'

8   wrongdoing in an amount to be proven at trial, with interest thereon; the costs and expenses of this

9   action; and other relief which the Court may find just, appropriate or legally warranted.

10      WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST,

11  UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT

12  ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC,

13  respectfully requests that the Court enter judgment against Defendants, JEFFREY SPIEGEL, RYAN

14  SPIEGEL, and SAC ADVISORY GROUP, LLC,  award  compensatory  damages in an amount in

15  excess of $10,000,000 and punitive damages in excess of $20,000,000, and grant any and all further

16  relief that the Court deems to be necessary or appropriate under the circumstances.

17                    **SECOND CLAIM FOR RELIEF**
                **Violation of Section 12(a)(2) of the Securities Act of 1933**
18                          **[Against SAC]**

19      148.   Plaintiffs, restate and reallege paragraphs 1 through 135 as though fully set forth

20  herein as paragraph 148.

21      149.   For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation

22  that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is

23  based solely on claims of strict liability and/or negligence under the Securities Act.

24      150.   SAC was a seller, offeror, and/or solicitor of sale of the Profit Sharing Agreements

25  to facilitate investment in the 1inMM Offering under Section 12(a)(2) of the Securities Act and

26  pertinent common law.

27

28

---

Federal Securities Fraud and Accounting Malpractice Complaint              

30

151.     SAC offered, sold and/or solicited a security, namely the 1inMM Offering via Profit Sharing Agreements by and through untrue and/or misleading statements of material fact that Defendants exercise of reasonable care should have known were false.

152.     SAC solicited Plaintiffs in person at Spiegel Accountancy Corp.'s office, over the telephone, through the mail, and through email.

153.     SAC actively solicited the sale of the Defendants' Profit Sharing Agreements to serve Defendants' own financial interests.

154.     SAC solicited investment in 1inMM of over $70,000,000 from over 100 investors including at conferences, via salesmen, and via video presentations.

155.     Neither Plaintiffs nor SAC had access to the type of information normally provided in prospectus of a SEC registration statement such as Form S-1.

156.     At the time of investment in the Profit Sharing Agreements, Plaintiffs did not know that the representations made to them by SAC were untrue and did not know the above described omitted material facts, were not disclosed.

157.     Plaintiffs did not know, or in the exercise of due diligence could not have known of the untruths and omissions made by SAC.

WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendant SAC ADVISORY GROUP, LLC, award compensatory damages in an amount in excess of $10,000,000, and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

Federal Securities Fraud and Accounting Malpractice Complaint

### THIRD CLAIM FOR RELIEF
### Violation of Section 15 of the Securities Act of 1933
### [Against Spiegel Accountancy Corp., Jeff, and Ryan]

158.    Plaintiffs restate and reallege paragraphs 1 through 135 as though fully set forth herein as paragraph 158.

159.    For purposes of this Count, Plaintiffs expressly exclude and disclaim any allegation that could be construed as alleging fraud or intentional or reckless misconduct, as this Count is based solely on claims of strict liability and/or negligence under the Securities Act.

160.    Defendants, Jeff, Ryan, and Spiegel Accountancy Corp. were sellers, offerors, and/or solicitors of sale of the Defendants' Profit Sharing Agreement under Section 12(a)(2) of the Securities Act and pertinent common law.

161.    Jeff, Ryan, and Spiegel Accountancy Corp. had control over SAC.

162.    Spiegel Accountancy Corp. paid Ryan a salary and provided all of SAC's infrastructure including but not limited to office space, software, hardware, phone services, email accounts. Spiegel Accountancy Corp. allowed its customers to be solicited at the firm's office during the provision of accounting services.

163.    The Spiegels and SAC solicited Plaintiffs in person at Spiegel Accountancy Corp., over the telephone, through the mail and through email.

164.    Defendants actively solicited the 1inMM Offering and Profit Sharing Agreements to serve Defendants' own financial interests.

165.    At the time of investment in the Profit Sharing Agreements, Plaintiffs did not know that the representations made to them by Defendants were untrue, and did not know the above described omitted material facts, were not disclosed.

166.    Plaintiffs did not know, or in the exercise of due diligence could not have known of the untruths and omissions made by The Spiegels who warned Plaintiffs not to contact Horwitz or HBO directly.

WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT

---



ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, SPIEGEL ACCOUNTANCY CORP., JEFFREY SPIEGEL, and RYAN SPIEGEL, award compensatory damages in an amount in excess of $10,000,000, and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

**FOURTH CLAIM FOR RELIEF**
**Declaration that Profit Sharing Agreements are Void**
**[Against all Defendants]**

167.    Plaintiffs restate and reallege paragraphs 1 through 135 as though fully set forth herein as paragraph 167.

168.    Section 29(a) of the Securities Exchange Act provides that "any condition, stipulation, or provision binding any person to waive compliance with any provision of this chapter or of any rule or regulation thereunder, or of any rule of a self-regulatory organization, shall be void." 15 U.S.C. § 78cc(a).

169.    Section 29(b) of the Act voids the rights of the violator when the conduct of the violator contravenes the Act.

170.    The Profit Sharing Agreement impermissibly seeks to waive compliance with the antifraud and civil liability provisions of the Securities Exchange Acts of 1933 and 1934 including but not limited to the following provisions:

   a.    "Investor irrevocably waives any and all claims against SAC in the event Investor receives less than the Preferred Return or realizes a complete loss of the Investment Amount in connection with the payment of the Investment Amount hereunder"
   b.    "He or she acknowledges that in connection with paying the Investment Amount no oral or written representations have been made by SAC, its manager or any officer, employee, agent other than representations made in this Agreement"

171.    Blanket releases of liability that accompany the purchase and sale of securities are invalid.

172.    Section 29(a) forecloses anticipatory waivers of compliance with duties imposed by Rule 10b-5, including non-reliance clauses, because if a party commits itself never to claim that it relied on representations of the other party to its contract, it purports anticipatorily to waive a future claim based on fraudulent misrepresentations of that party.

Federal Securities Fraud and Accounting Malpractice Complaint

33

173.    Plaintiffs have a private right of action for rescission of the Profit Sharing Agreements in this case under Section 29(b) of the Act. *See Mills v. Electric Auto- Lite Co.*, 396 U.S. 375 (1970).

174.    As a result of the facts described in the foregoing paragraphs, an actual controversy of sufficient immediacy exists between the Parties as to whether, pursuant to Section 29(b), the violative agreement or performance by Defendants of the same renders the agreements void.

175.    Section 29(b) of the Act is clear, its statutory language voids the transaction as to Plaintiffs and any security is void, improper, and unlawful.

176.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, Plaintiffs, requests the Court declare: (i) pursuant to Section 29(b) of the Act, the Securities Contracts are void and/or rescinded.

WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, requests the Court enter an Order in Plaintiffs' favor against Defendants Declaring that the Profit Sharing Agreements are void and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

### FIFTH CLAIM FOR RELIEF
**Violation of California Corporations Code Section 25401 -
Untrue Statements or Omissions in Connection with Sale of Security
[Against SAC, Jeff, and Ryan]**

177.    Plaintiffs restate and reallege paragraphs 1 through 135 as though fully set forth herein as paragraph 177.

178.    California Corporations Code Section 25401 provides as follows:

"It is unlawful for any person to offer to sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."

---

Federal Securities Fraud and Accounting Malpractice Complaint

34

179.    By its terms, Corporations Code Section 25401 does not require any fraudulent misrepresentation or an intent to deceive, rather simply the making of untrue statements of material fact or the non-disclosure of a material fact.

180.    As more fully set forth herein, plaintiffs are informed and believe and based thereon allege that the above-described representations, promises, assurances, expressions of opinion and non-disclosures of material fact by Defendants were made negligently, recklessly and carelessly.

181.    California Corporations Code Section 25501 is the remedial statute for Code Section 25401, and reads as follows:

> Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells security to him, who may sue either for rescission or damages.

182.    Jeff and Ryan are jointly and severally liable pursuant to California Corporations Code Section 25504 which provides in pertinent part:

> Every person who directly or indirectly controls a person liable under Section 25501 or 25503, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker–dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.

183.    Defendants offered to sell Plaintiffs securities, consisting of Profit Sharing Agreements, to Plaintiffs within the State of California, by means of both oral and written communications by The Spiegels to Plaintiffs, and said offer included untrue statements concerning the true value of the units being offered, and numerous statements lulling Plaintiffs to allow the fraud to continue, whereas the true facts were that 1inMM was a pure Ponzi Scheme with no actual value.

184.    The Spiegels made untrue and misleading statements of material facts and also omitted material facts in offering and selling the 1inMM Offering to Plaintiffs.

---

Federal Securities Fraud and Accounting Malpractice Complaint



185.    The Spiegels should reasonably have known these statements were untrue and misleading at the time they made them, and that Plaintiffs were in complete reliance upon their claimed superior and exc1usive knowledge, information and expertise, and that the facts stated and omitted were material to Plaintiffs' decision to participate in the 1inMM Offering.

186.    As a result of Defendants' Representations and non-disclosures, Plaintiffs participated in the 1inMM Offering and caused investment funds to be transferred to funds operated by Defendants to purchase the subject securities.

187.    For all the reasons set forth above, the Plaintiffs lost the value of their investment and hereby seek recovery of the full amount of their monetary detriment, damage, and loss in the sum in excess of $10,000,000 or in an amount or amounts to be established according to proof at time of trial.

WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, JEFFREY SPIEGEL, RYAN SPIEGEL, and SAC ADVISORY GROUP, LLC, award compensatory damages in an amount in excess of $10,000,000, and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

### SIXTH CLAIM FOR RELIEF
**Negligent Misrepresentation**
**[Against all Defendants]**

188.    Plaintiffs restate and reallege paragraphs 1 through 135 as though fully set forth herein as paragraph 188.

189.    To establish the applicable standard of care under the circumstances, the Court may examine professional standards of conduct in the industry. In this case, the applicable standards of conduct for Defendants include the rules promulgated by FINRA (which each broker offering

1   securities such as the 1inMM notes should be a member of, the California Rules of Professional

2   Conduct, the AICPA, and California Board of Accountancy Regulations.

3          190.    At all times relevant, Jeff was acting as an actual and apparent agent of Spiegel

4   Accountancy Corp.

5          191.    Those who undertake any work or calling for which a special skill is required, such

6   as a broker-dealer, have a duty not only to exercise reasonable care in what they do, but also to

7   possess a standard minimum of special knowledge and ability.

8          192.    Defendants owed Plaintiffs a duty to act as a reasonably prudent professional would

9   do under the same or similar circumstances. The duties set forth herein arise from the regulations,

10  customs and usage of the brokerage trade, including rules promulgated by FINRA. These duties

11  and obligations flow to Plaintiffs as a result of the relationship between Defendants and Plaintiffs.

12         193.    Spiegel Accountancy Corp. owed Plaintiffs a duty to act as a reasonably prudent

13  professional would do under the same or similar circumstances. These duties and obligations flow

14  to Plaintiffs because of the direct representations made to Plaintiffs at Spiegel Accountancy Corp.'s

15  office, via its email, and by its President.

16         194.    Ellusionist engaged Spiegel Accountancy Corp. for tax preparation, audit, and

17  business consulting for nearly twenty years prior to the investment.

18         195.    The members of Southwest Investment Funds, AVR Group, Trident Asset

19  Management and Phoenix Affordable Housing had previously engaged Spiegel Accountancy Corp.

20  for audit services and relied on that prior relationship when deciding to invest.

21         196.    Spiegel Accountancy Corp. handled SAC's tax preparation since its inception.

22         197.    As set forth above, Defendants breached their legal duty to provide accurate

23  information to Plaintiffs as prospective purchasers of investments in SAC funds by omitting

24  material facts, and such material facts were necessary to make the statements made, in light of the

25  circumstances under which they were made, not misleading.

26         198.    By reason of the aforesaid, Defendants are guilty of negligent misrepresentation and

27  omission in connection with the offer and sale of investments in 1inMM Offerings.

28

---

Federal Securities Fraud and Accounting Malpractice Complaint

199.   At all times relevant to this action, Defendants had knowledge of, or reasonable grounds to believe the existence of facts by reason of which their liability under this Count is alleged to exist, and with this knowledge, Defendants made material omissions of fact with respect to the offer and sale of securities.

200.   As described above, Defendants negligently breached their duties to Plaintiffs.

201.   Had a reasonably person under the same or similar circumstances conducted adequate due diligence on 1inMM to understand the risks and rewards of the 1inMM Offerings, it would have concluded that the risks in investing in 1inMM far outweighed any potential reward, and it would not have approved of the 1inMM Offerings for sale to any of its clients.

202.   By approving the sale of the 1inMM Offerings to its clients, notwithstanding the numerous red flags identified herein, Defendants demonstrated that they failed to understand the risks and rewards of the 1inMM offerings, or consciously ignored the risks presented by these red flags in order to ensure Defendants maximized their fees and commissions instead.

203.   Defendants knew or should have known that Plaintiffs would place their trust and confidence in Defendants that it had a reasonable basis to conclude that 1inMM was suitable for at least some investors, and that it had conducted adequate due diligence to understand the risks and rewards of the 1inMM offering.

204.   Defendants knew or should have known that it was reasonably foreseeable that Plaintiffs would act in reliance on Defendants' approval to sell the 1inMM Offerings.

205.   But for Defendants' approval to sell the 1inMM Offerings, Plaintiffs would not have even been presented the opportunity to participate in the 1inMM Offerings.

206.   As a direct and proximate result of Defendants' negligence, Defendants are liable to Plaintiffs for all of the investment losses that they suffered in the 1inMM Offerings.

WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, SPIEGEL ACCOUNTANCY CORP., JEFFREY SPIEGEL, RYAN SPIEGEL, and SAC ADVISORY

GROUP, LLC, award compensatory damages in an amount in excess of $6,000,000, and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

### SEVENTH CLAIM FOR RELIEF
**Accounting Malpractice**
**[Against Spiegel Accountancy Corp. and Jeffrey Spiegel]**

207.    Plaintiffs (excluding UYEN) restate and reallege paragraphs 1 through 135 as though fully set forth herein as paragraph 207.

208.    At all times relevant hereto, Jeff was acting as an agent or apparent agent of Spiegel Accountancy Corp.

209.    At all relevant times, Plaintiffs (excluding UYEN) were customers of Spiegel Accountancy Corp.

210.    Spiegel Accountancy Corp. performed numerous services on behalf of Plaintiffs including but not limited to preparing their tax returns and keeping their books and records.

211.    Jeff sold Plaintiffs on the 1inMM investments when meeting to discuss the tax services provided by Spiegel Accountancy Corp. at its office.

212.    Jeff used his knowledge of Plaintiffs' financial situations and the long trusting relationship after years of providing accounting services to sell Plaintiffs into a Ponzi Scheme.

213.    Jeff and Spiegel Accountancy Corp. owed Plaintiffs a duty of reasonable care at all times relevant hereto.

214.    The California Board of Accountancy established regulations prohibiting conflicts of interests which provide:

(a)    Incompatible Occupations/Conflict of Interest. A licensee shall not concurrently engage in the practice of public accountancy and in any other business or occupation which impairs the licensee's independence, objectivity, or creates a conflict of interest in rendering professional services.
(b)    Licensees engaged in the practice of public accountancy shall comply with all applicable professional standards, including but not limited to generally accepted accounting principles and generally accepted auditing standards.

---

215. The AICPA Code of Professional Conduct Section 1.400.001 "Acts Discreditable" provides: "A member shall not commit an act discreditable to the profession."

216. Section 0.300.060 of the Code provides:

Due care principle. A member should observe the profession's technical and ethical standards, strive continually to improve competence and the quality of services, and discharge professional responsibility to the best of the member's ability. ... Due care requires a member to discharge professional responsibilities with competence and diligence. It imposes the obligation to perform professional services to the best of a member's ability, with concern for the best interest of those for whom the services are performed, and consistent with the profession's responsibility to the public. ... Each member is responsible for assessing his or her own competence of evaluating whether education, experience, and judgment are adequate for the responsibility to be assumed...Members should be diligent in discharging responsibilities to clients, employers, and the public.

217. The International Ethics Standards Board for Accountants ("IESBA") Code of Ethics for Professional Accountants is another standard that defines the duties owed by Jeff.

218. Section 100.1 provides:

A distinguishing mark of the accountancy profession is its acceptance of the responsibility to act in the public interest. Therefore, a professional accountant's responsibility is not exclusively to satisfy the needs of an individual client or employer. In acting in the public interest, a professional accountant shall observe and comply with this Code.

219. Section 110 of the Code provides:

A professional accountant shall not knowingly be associated with reports, returns, communications or other information where the professional accountant believes that the information: (a) Contains a materially false or misleading statement; (b) Contains statements or information furnished recklessly; or (c) Omits or obscures information required to be included where such omission or obscurity would be misleading.

220. When a professional accountant becomes aware that the accountant has been associated with such information, the accountant shall take steps to be disassociated from that information.

221. Spiegel Accountancy Corp. and Jeff violated the controlling standards set forth herein and capitalized on a conflict of interest, woefully failed to discover the fraud despite the countless red flags and, once the fraud became obvious, they failed to act in the public interest.

---

222. Jeff violated controlling regulations while concurrently selling his customers investment in a Ponzi scheme for his own personal gain while also providing them with tax services.

223. But for the negligent acts and breaches of the standard of care, SAC Advisory Group and Jeff would not have parroted Horwitz's lies, would have uncovered the fraud, and would have saved Plaintiffs millions of dollars.

WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, SPIEGEL ACCOUNTANCY CORP. and JEFFREY SPIEGEL; award compensatory damages in an amount in excess of $6,000,000 and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

## EIGHTH CLAIM FOR RELIEF
### Unjust Enrichment
### [Against all Defendants]

224. Plaintiffs restate and reallege paragraphs 1 through 135 as though fully set forth herein as paragraph 224.

225. Ryan, Jeff, and SAC received and retained a benefit from Plaintiffs and inequity has resulted.

226. Ryan, Jeff, and SAC benefitted from negligently misrepresenting the nature and value of the Plaintiffs' investment and Horwitz's gross fraud.

227. Ryan, Jeff, and SAC directly benefitted by earning over $5,000,000 as a result of Horwitz's admitted criminal conduct.

228. Plaintiffs conferred a benefit on Defendants by paying excessive interest on fraudulent investments.

229. It is inequitable for Defendants to retain these benefits.

230. Plaintiffs were not aware of the true facts about the investment, and did not benefit from Defendants' conduct.

---

Federal Securities Fraud and Accounting Malpractice Complaint

231. Defendants knowingly accepted the benefits of their unjust conduct and refused to return the benefit when the fraud was admitted.

232. As a result of Defendants' conduct, the amount of his unjust enrichment should be disgorged in an amount according to proof.

WHEREFORE, Plaintiffs, ELLUSIONIST CASH BALANCE PLAN AND TRUST, UYEN HUHYN, SOUTHWEST INVESTMENTS FUNDS, LLC, AVR GROUP, LLC, TRIDENT ASSET MANAGEMENT, INC., PHOENIX AFFORDABLE HOUSING AUTHORITY, LLC, respectfully requests that the Court enter judgment against Defendants, SAC ADVISORY GROUP, LLC, JEFFREY SPIEGEL, and RYAN SPIEGEL award compensatory damages in an amount in excess of $4,000,000, and grant any and all further relief that the Court deems to be necessary or appropriate under the circumstances.

Dated: August 30, 2023

Respectfully submitted,

**LOFTUS & EISENBERG, LTD.**

By: ___/s/*Alexander N. Loftus*___
      Alexander N. Loftus
      Attorneys for Plaintiffs

Alexander Loftus, Esq.
Ross M. Good, Esq.
LOFTUS & EISENBERG, LTD.
161 N. Clark, Suite 1600
Chicago, Illinois 60601
T: (312) 889-6625
alex@loftusandeisenberg.com
ross@loftusandeisenberg.com
*Pro Hac Vice*

William Aron, Esq.
ARON LAW FIRM
15 W Carrillo St, Suite 217
Santa Barbara, CA 93101
T: (805) 618-1768
bill@aronlawfirm.com

# EXHIBIT A

# PROFIT SHARING AGREEMENT

THIS AGREEMENT is made and entered into as of March 25, 2019 (the "**Effective Date**") by and between SAC ADVISORY GROUP, LLC, a California limited liability company ("SAC"), and the undersigned investor ("**Investor**").

## WITNESSETH

WHEREAS Distributor (defined below) is in the business of acquiring and licensing film distribution rights to third-party media companies for exclusive distribution in Latin American and African countries (the "**Distribution Rights**");

WHEREAS in connection with acquiring the Distribution Rights to a particular movie (the "**Licensed Movie**"), Distributor must pay a one-time non-refundable license fee (the "**Acquisition Fee**") to the holder of the movie's worldwide distribution rights which is generally the producer of the movie;

WHEREAS in order to assist the Distributor in acquiring the Distribution Rights, SAC provides the Distributor with the funds necessary to pay the Acquisition Fee (the "**SAC Advance**") in exchange for a participation interest in the funds received by Distributor in relicensing a portion of the Distribution Rights to a third-party media company ("**Media Company**").

WHEREAS Investor has agreed to provide SAC with the funds necessary to fund the SAC Advance in exchange for a profits interest in the Participation Fee (defined below) received by SAC in connection with the distributor licensing the Licensed Movie to a Media Company.

NOW THEREFORE, in consideration good and valuable consideration, the receipt of which is hereby mutually acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.**    **Definitions.**

    **1.1**    "**Distributor**" means 1INMM Capital, LLC, a California limited liability company

    **1.2**    "**Participation Fee**" means the fees paid by the distributor to SAC in connection with licensing the Licensed Movie to a Media Company.

**Section 2.**    **Investor Payment of Investment Amount.**

    Subject to the terms and conditions of this Agreement, Investor agrees to pay SAC the amount of $99,450 ("**Investment Amount**") in order to fund the SAC Advance for the purchase of the Distribution Rights of a Licensed Movie (The Corrupted).

**Section 3.**    **Payment of License Fee.**

    **3.1**    Upon the receipt of the Participation Fee received by SAC from the distributor, SAC shall immediately pay Investor an amount equal to a 16% return on the Investment Amount (the "**Preferred Return**"). After the payment of the Preferred Return to Investor, SAC shall be entitled to retain the remaining amount of the Participation Fee. In the event that the amount of the Participation Fee is less than the amount necessary to provide Investor with the Preferred Return, Investor shall be paid the entire Participation Fee. Investor acknowledges that SAC has not guaranteed that Investor will actually receive the Preferred Return and Investor irrevocably waives any and all claims against SAC in the event Investor

receives less than the Preferred Return or realizes a complete loss of the Investment Amount in connection with the payment of the Investment Amount hereunder.

     **3.2**     As collateral security for the payment of each participation fee with respect a particular Licensed Movie, Distributor has granted SAC a lien and continuing security interest in the Distribution Rights with respect to such Licensed Movie and proceeds of the foregoing and all general intangibles and contract rights related thereto, including without limitation, all revenues, License Fees, distributions, contract rights and other rights and interests that Distributor is, or may hereafter become, entitled to receive on account of such Licensed Movie (the "**Security Interest**"). SAC hereby agrees that Investor is entitled to the protections provided by the Security Interest and, therefore, SAC hereby assigns Investor an undivided interest in the Security Interest. For avoidance of doubt, Investor's undivided interest in the Security Interest means that both SAC and Investor are joint holders of the Security Interest with identical rights and preferences with respect to any Licensed Movie subject to the Security Interest.

**Section 4.**     **Representations and Warranties.**  Investor makes the following representations and warranties in connection with executing this Agreement.

     4.1     <u>Preexisting Relationship or Experience</u>. He or she has a preexisting personal or business relationship with SAC, its manager, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by SAC or any affiliate or selling agent of SAC, he or she is capable of evaluating the risks and merits of paying the Investment Amount and of protecting his or her own interests in connection with such investment.

     4.2     <u>Accredited Investor; Economic Risk</u>. He or she represents that he or she is an Accredited Investor (as defined in Rule 501(a) of Regulation D of the Securities Act of 1933) and/or is financially able to bear the economic risk of paying the Investment Amount, including the total loss thereof.

     4.3     <u>Investment Risk</u>. He or she acknowledges that the payment of the Investment Amount is a speculative investment that involves a substantial degree of risk of loss by him or her of his or her entire investment, and that he or she understands and take full cognizance of the risk factors related to the investment made hereunder and that SAC may never receive any Participation Fee in attempting to sell the Distributions Rights to the Licensed Movie.

     4.4     <u>No Other Warranties</u>. He or she acknowledges that in connection with paying the Investment Amount no oral or written representations have been made by SAC, its manager or any officer, employee, agent other than representations made in this Agreement.

     4.5     <u>Inquiry Opportunity</u>. He or she has been given the opportunity to ask questions of, and receive answers from, SAC concerning the terms and conditions of the Investment Amount in order to evaluate the merits and risks entering into this Agreement.

**Section 5.**     **Miscellaneous.**

     5**.1**     This Agreement shall terminate upon the payment of all amounts due Investor hereunder.

     5**.2**     All previous agreements and arrangements made by the parties and relating to the subject matter hereof are hereby superseded and this Agreement, there being no promises, terms, conditions or obligations, oral or written, express or implied, other than those contained herein. This Agreement may only be amended by a written document signed by all parties.

5.3     This Agreement has been delivered in the State of California and shall be construed and interpreted in accordance with the laws thereof.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  If any legal action is necessary or brought in any court or arbitration proceeding, to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary expenses, in addition to any other relief to which such party may be entitled.

5.4     No waiver of any term or condition of this Agreement shall be valid or binding on a party unless the same has been mutually assented to in writing by both parties.  The failure of a party to enforce at any time any of the provisions of this Agreement, or the failure to require at any time performance by the other party of any of the provisions of this Agreement, shall in no way be construed to be a present or future waiver of such provisions, nor in any way affect the ability of a party to enforce each and every such provision thereafter.

IN WITNESS WHEREOF, the parties hereto have executed this Profit Sharing Agreement as of the day and year first above written.


SAC ADVISORY GROUP, LLC                INVESTOR:
a California limited liability company         C421


_____              _____
Ryan Spiegel, Manager                          Cindy Huynh

3

DocuSign Envelope ID: 9CA579F0-E3A3-4B57-8058-37FD43657481

## PROFIT SHARING AGREEMENT

THIS AGREEMENT is made and entered into as of March 25, 2019 (the "**Effective Date**") by and between SAC ADVISORY GROUP, LLC, a California limited liability company ("SAC"), and the undersigned investor ("**Investor**").

### WITNESSETH

WHEREAS Distributor (defined below) is in the business of acquiring and licensing film distribution rights to third-party media companies for exclusive distribution in Latin American and African countries (the "**Distribution Rights**");

WHEREAS in connection with acquiring the Distribution Rights to a particular movie (the "**Licensed Movie**"), Distributor must pay a one-time non-refundable license fee (the "**Acquisition Fee**") to the holder of the movie's worldwide distribution rights which is generally the producer of the movie;

WHEREAS in order to assist the Distributor in acquiring the Distribution Rights, SAC provides the Distributor with the funds necessary to pay the Acquisition Fee (the "**SAC Advance**") in exchange for a participation interest in the funds received by Distributor in relicensing a portion of the Distribution Rights to a third-party media company ("**Media Company**").

WHEREAS Investor has agreed to provide SAC with the funds necessary to fund the SAC Advance in exchange for a profits interest in the Participation Fee (defined below) received by SAC in connection with the distributor licensing the Licensed Movie to a Media Company.

NOW THEREFORE, in consideration good and valuable consideration, the receipt of which is hereby mutually acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.**     **Definitions.**

    **1.1**     "**Distributor**" means 1INMM Capital, LLC, a California limited liability company

    **1.2**     "**Participation Fee**" means the fees paid by the distributor to SAC in connection with licensing the Licensed Movie to a Media Company.

**Section 2.**     **Investor Payment of Investment Amount.**

Subject to the terms and conditions of this Agreement, Investor agrees to pay SAC the amount of $526,500 ("**Investment Amount**") in order to fund the SAC Advance for the purchase of the Distribution Rights of a Licensed Movie (The Corrupted).

**Section 3.**     **Payment of License Fee.**

    **3.1**     Upon the receipt of the Participation Fee received by SAC from the distributor, SAC shall immediately pay Investor an amount equal to a 16% return on the Investment Amount (the "**Preferred Return**"). After the payment of the Preferred Return to Investor, SAC shall be entitled to retain the remaining amount of the Participation Fee. In the event that the amount of the Participation Fee is less than the amount necessary to provide Investor with the Preferred Return, Investor shall be paid the entire Participation Fee. Investor acknowledges that SAC has not guaranteed that Investor will actually receive the Preferred Return and Investor irrevocably waives any and all claims against SAC in the event Investor

receives less than the Preferred Return or realizes a complete loss of the Investment Amount in connection with the payment of the Investment Amount hereunder.

      **3.2**    As collateral security for the payment of each participation fee with respect a particular Licensed Movie, Distributor has granted SAC a lien and continuing security interest in the Distribution Rights with respect to such Licensed Movie and proceeds of the foregoing and all general intangibles and contract rights related thereto, including without limitation, all revenues, License Fees, distributions, contract rights and other rights and interests that Distributor is, or may hereafter become, entitled to receive on account of such Licensed Movie (the "**Security Interest**").  SAC hereby agrees that Investor is entitled to the protections provided by the Security Interest and, therefore, SAC hereby assigns Investor an undivided interest in the Security Interest.  For avoidance of doubt, Investor's undivided interest in the Security Interest means that both SAC and Investor are joint holders of the Security Interest with identical rights and preferences with respect to any Licensed Movie subject to the Security Interest.

**Section 4.**    **Representations and Warranties.**  Investor makes the following representations and warranties in connection with executing this Agreement.

      **4.1**    <u>Preexisting Relationship or Experience</u>.  He or she has a preexisting personal or business relationship with SAC, its manager, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by SAC or any affiliate or selling agent of SAC, he or she is capable of evaluating the risks and merits of paying the Investment Amount and of protecting his or her own interests in connection with such investment.

      **4.2**    <u>Accredited Investor; Economic Risk</u>.  He or she represents that he or she is an Accredited Investor (as defined in Rule 501(a) of Regulation D of the Securities Act of 1933) and/or is financially able to bear the economic risk of paying the Investment Amount, including the total loss thereof.

      **4.3**    <u>Investment Risk</u>.  He or she acknowledges that the payment of the Investment Amount is a speculative investment that involves a substantial degree of risk of loss by him or her of his or her entire investment, and that he or she understands and take full cognizance of the risk factors related to the investment made hereunder and that SAC may never receive any Participation Fee in attempting to sell the Distributions Rights to the Licensed Movie.

      **4.4**    <u>No Other Warranties</u>.  He or she acknowledges that in connection with paying the Investment Amount no oral or written representations have been made by SAC, its manager or any officer, employee, agent other than representations made in this Agreement.

      **4.5**    <u>Inquiry Opportunity</u>. He or she has been given the opportunity to ask questions of, and receive answers from, SAC concerning the terms and conditions of the Investment Amount in order to evaluate the merits and risks entering into this Agreement.

**Section 5.**    **Miscellaneous.**

      **5.1**    This Agreement shall terminate upon the payment of all amounts due Investor hereunder.

      **5.2**    All previous agreements and arrangements made by the parties and relating to the subject matter hereof are hereby superseded and this Agreement, there being no promises, terms, conditions or obligations, oral or written, express or implied, other than those contained herein.  This Agreement may only be amended by a written document signed by all parties.

5.3     This Agreement has been delivered in the State of California and shall be construed and interpreted in accordance with the laws thereof.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  If any legal action is necessary or brought in any court or arbitration proceeding, to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary expenses, in addition to any other relief to which such party may be entitled.

5.4     No waiver of any term or condition of this Agreement shall be valid or binding on a party unless the same has been mutually assented to in writing by both parties.  The failure of a party to enforce at any time any of the provisions of this Agreement, or the failure to require at any time performance by the other party of any of the provisions of this Agreement, shall in no way be construed to be a present or future waiver of such provisions, nor in any way affect the ability of a party to enforce each and every such provision thereafter.

IN WITNESS WHEREOF, the parties hereto have executed this Profit Sharing Agreement as of the day and year first above written.


SAC ADVISORY GROUP, LLC                    INVESTOR:
a California limited liability company            Ellusionist.com Cash Balance Plan & TST UA
                                                                    Jan 01, 2013


_____            _____
Ryan Spiegel, Manager                              Brad Christian, Managing Member

3

## PROFIT SHARING AGREEMENT AMENDMENT

This agreement is to amend section 3.1 of the profit sharing agreement that was dated October 28, 2019 by and between SAC ADVISORY GROUP, LLC, a California limited liability company ("SAC"), and the undersigned investor ("Investor") for the licensed movie, The Burnt Orange Heresy, for the amount of $744,250.

The below amendment to section 3.1 is agreed upon by both parties as of January 17, 2020.

**3.1** Upon the receipt of the Participation Fee received by SAC from the distributor, SAC shall immediately pay Investor an amount equal to a 21% return on the Investment Amount (the "Preferred Return"). After the payment of the Preferred Return to Investor, SAC shall be entitled to retain the remaining amount of the Participation Fee. In the event that the amount of the Participation Fee is less than the amount necessary to provide Investor with the Preferred Return, Investor shall be paid the entire Participation Fee. Investor acknowledges that SAC has not guaranteed that Investor will actually receive the Preferred Return and Investor irrevocably waives any and all claims against SAC in the event Investor receives less than the Preferred Return or realizes a complete loss of the Investment Amount in connection with the payment of the Investment Amount hereunder.

SAC ADVISORY GROUP, LLC

a California limited liability company

Ryan Spiegel, Manager

INVESTOR:

AVR Group, LLC

Joe McNulty

Print Name

E73E3C014A78473...

Signature

Trident Asset Management Inc.

Joe McNulty

Print Name

E73E3C014A78473...

Signature

# PROFIT SHARING AGREEMENT

THIS AGREEMENT is made and entered into as of October 28, 2019 (the "**Effective Date**") by and between SAC ADVISORY GROUP, LLC, a California limited liability company ("**SAC**"), and the undersigned investor ("**Investor**").

## WITNESSETH

WHEREAS Distributor (defined below) is in the business of acquiring and licensing film distribution rights to third-party media companies for exclusive distribution in Latin American and African countries (the "**Distribution Rights**");

WHEREAS in connection with acquiring the Distribution Rights to a particular movie (the "**Licensed Movie**"), Distributor must pay a one-time non-refundable license fee (the "**Acquisition Fee**") to the holder of the movie's worldwide distribution rights which is generally the producer of the movie;

WHEREAS in order to assist the Distributor in acquiring the Distribution Rights, SAC provides the Distributor with the funds necessary to pay the Acquisition Fee (the "**SAC Advance**") in exchange for a participation interest in the funds received by Distributor in relicensing a portion of the Distribution Rights to a third-party media company ("**Media Company**").

WHEREAS Investor has agreed to provide SAC with the funds necessary to fund the SAC Advance in exchange for a profits interest in the Participation Fee (defined below) received by SAC in connection with the distributor licensing the Licensed Movie to a Media Company.

NOW THEREFORE, in consideration good and valuable consideration, the receipt of which is hereby mutually acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.**     **Definitions.**

**1.1**     "**Distributor**" means 1INMM Capital, LLC, a California limited liability company

**1.2**     "**Participation Fee**" means the fees paid by the distributor to SAC in connection with licensing the Licensed Movie to a Media Company.

**Section 2.**     **Investor Payment of Investment Amount.**

Subject to the terms and conditions of this Agreement, Investor agrees to pay SAC the amount of $744,250 ("**Investment Amount**") in order to fund the SAC Advance for the purchase of the Distribution Rights of a Licensed Movie (The Burnt Orange Heresy).

**Section 3.**     **Payment of License Fee.**

**3.1**     Upon the receipt of the Participation Fee received by SAC from the distributor, SAC shall immediately pay Investor an amount equal to a 17% return on the Investment Amount (the "**Preferred Return**"). After the payment of the Preferred Return to Investor, SAC shall be entitled to retain the remaining amount of the Participation Fee. In the event that the amount of the Participation Fee is less than the amount necessary to provide Investor with the Preferred Return, Investor shall be paid the entire Participation Fee. Investor acknowledges that SAC has not guaranteed that Investor will actually receive the Preferred Return and Investor irrevocably waives any and all claims against SAC in the event Investor

receives less than the Preferred Return or realizes a complete loss of the Investment Amount in connection with the payment of the Investment Amount hereunder.

      **3.2**     As collateral security for the payment of each participation fee with respect a particular Licensed Movie, Distributor has granted SAC a lien and continuing security interest in the Distribution Rights with respect to such Licensed Movie and proceeds of the foregoing and all general intangibles and contract rights related thereto, including without limitation, all revenues, License Fees, distributions, contract rights and other rights and interests that Distributor is, or may hereafter become, entitled to receive on account of such Licensed Movie (the "**Security Interest**"). SAC hereby agrees that Investor is entitled to the protections provided by the Security Interest and, therefore, SAC hereby assigns Investor an undivided interest in the Security Interest. For avoidance of doubt, Investor's undivided interest in the Security Interest means that both SAC and Investor are joint holders of the Security Interest with identical rights and preferences with respect to any Licensed Movie subject to the Security Interest.

**Section 4.**     **Representations and Warranties.** Investor makes the following representations and warranties in connection with executing this Agreement.

      4.1     <u>Preexisting Relationship or Experience</u>. He or she has a preexisting personal or business relationship with SAC, its manager, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by SAC or any affiliate or selling agent of SAC, he or she is capable of evaluating the risks and merits of paying the Investment Amount and of protecting his or her own interests in connection with such investment.

      4.2     <u>Accredited Investor; Economic Risk</u>. He or she represents that he or she is an Accredited Investor (as defined in Rule 501(a) of Regulation D of the Securities Act of 1933) and/or is financially able to bear the economic risk of paying the Investment Amount, including the total loss thereof.

      4.3     <u>Investment Risk</u>. He or she acknowledges that the payment of the Investment Amount is a speculative investment that involves a substantial degree of risk of loss by him or her of his or her entire investment, and that he or she understands and take full cognizance of the risk factors related to the investment made hereunder and that SAC may never receive any Participation Fee in attempting to sell the Distributions Rights to the Licensed Movie.

      4.4     <u>No Other Warranties</u>. He or she acknowledges that in connection with paying the Investment Amount no oral or written representations have been made by SAC, its manager or any officer, employee, agent other than representations made in this Agreement.

      4.5     <u>Inquiry Opportunity</u>. He or she has been given the opportunity to ask questions of, and receive answers from, SAC concerning the terms and conditions of the Investment Amount in order to evaluate the merits and risks entering into this Agreement.

**Section 5.**     **Miscellaneous.**

      5**.1**     This Agreement shall terminate upon the payment of all amounts due Investor hereunder.

      5**.2**     All previous agreements and arrangements made by the parties and relating to the subject matter hereof are hereby superseded and this Agreement, there being no promises, terms, conditions or obligations, oral or written, express or implied, other than those contained herein. This Agreement may only be amended by a written document signed by all parties.

5.**3**    This Agreement has been delivered in the State of California and shall be construed and interpreted in accordance with the laws thereof.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  If any legal action is necessary or brought in any court or arbitration proceeding, to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary expenses, in addition to any other relief to which such party may be entitled.

5.**4**    No waiver of any term or condition of this Agreement shall be valid or binding on a party unless the same has been mutually assented to in writing by both parties.  The failure of a party to enforce at any time any of the provisions of this Agreement, or the failure to require at any time performance by the other party of any of the provisions of this Agreement, shall in no way be construed to be a present or future waiver of such provisions, nor in any way affect the ability of a party to enforce each and every such provision thereafter.

    IN WITNESS WHEREOF, the parties hereto have executed this Profit Sharing Agreement as of the day and year first above written.


SAC ADVISORY GROUP, LLC                      INVESTOR:
a California limited liability company             AVR Group, LLC

                                                          Joe McNulty
_____                  _____
Ryan Spiegel, Manager                           Print Name

                                                          
                                                          _____
                                                          Signature


                                                          Trident Asset Management Inc.
                                                          Joe McNulty
                                                          _____
                                                          Print Name

                                                          
                                                          _____
                                                          Signature

3

DocuSign Envelope ID: ...

# PROFIT SHARING AGREEMENT

THIS AGREEMENT is made and entered into as of June 25, 2018 (the "**Effective Date**") by and between SAC ADVISORY GROUP, LLC, a California limited liability company ("**SAC**"), and the undersigned investor ("**Investor**").

## WITNESSETH

WHEREAS Distributor (defined below) is in the business of acquiring and licensing film distribution rights to third-party media companies for exclusive distribution in Latin American and African countries (the "**Distribution Rights**");

WHEREAS in connection with acquiring the Distribution Rights to a particular movie (the "**Licensed Movie**"), Distributor must pay a one-time non-refundable license fee (the "**Acquisition Fee**") to the holder of the movie's worldwide distribution rights which is generally the producer of the movie;

WHEREAS in order to assist the Distributor in acquiring the Distribution Rights, SAC provides the Distributor with the funds necessary to pay the Acquisition Fee (the "**SAC Advance**") in exchange for a participation interest in the funds received by Distributor in relicensing a portion of the Distribution Rights to a third-party media company ("**Media Company**").

WHEREAS Investor has agreed to provide SAC with the funds necessary to fund the SAC Advance in exchange for a profits interest in the Participation Fee (defined below) received by SAC in connection with the distributor licensing the Licensed Movie to a Media Company.

NOW THEREFORE, in consideration good and valuable consideration, the receipt of which is hereby mutually acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.**    **Definitions.**

    **1.1**    "**Distributor**" means 1INMM Capital, LLC, a California limited liability company

    **1.2**    "**Participation Fee**" means the fees paid by the distributor to SAC in connection with licensing the Licensed Movie to a Media Company.

**Section 2.**    **Investor Payment of Investment Amount.**

    Subject to the terms and conditions of this Agreement, Investor agrees to pay SAC the amount of $675,950 ("**Investment Amount**") in order to fund the SAC Advance for the purchase of the Distribution Rights of a Licensed Movie (WER).

**Section 3.**    **Payment of License Fee.**

    **3.1**    Upon the receipt of the Participation Fee received by SAC from the distributor, SAC shall immediately pay Investor an amount equal to an 18% return on the Investment Amount (the "**Preferred Return**"). The 18% preferred return will be paid as follows: First, 15% will be paid to Southwest Investment Funds, LLC and second, 3% paid to Trident Asset Management Inc. After the payment of the Preferred Return to Investor, SAC shall be entitled to retain the remaining amount of the Participation Fee. In the event that the amount of the Participation Fee is less than the amount necessary to provide Investor with the Preferred Return, Investor shall be paid the entire Participation Fee. Investor acknowledges that SAC has not guaranteed that Investor will actually receive the Preferred Return and Investor irrevocably

waives any and all claims against SAC in the event Investor receives less than the Preferred Return or realizes a complete loss of the Investment Amount in connection with the payment of the Investment Amount hereunder.

        **3.2**      As collateral security for the payment of each participation fee with respect a particular Licensed Movie, Distributor has granted SAC a lien and continuing security interest in the Distribution Rights with respect to such Licensed Movie and proceeds of the foregoing and all general intangibles and contract rights related thereto, including without limitation, all revenues, License Fees, distributions, contract rights and other rights and interests that Distributor is, or may hereafter become, entitled to receive on account of such Licensed Movie (the "**Security Interest**").  SAC hereby agrees that Investor is entitled to the protections provided by the Security Interest and, therefore, SAC hereby assigns Investor an undivided interest in the Security Interest.  For avoidance of doubt, Investor's undivided interest in the Security Interest means that both SAC and Investor are joint holders of the Security Interest with identical rights and preferences with respect to any Licensed Movie subject to the Security Interest.

**Section 4.**      **Representations and Warranties.**  Investor makes the following representations and warranties in connection with executing this Agreement.

        4.1      <u>Preexisting Relationship or Experience</u>.  He or she has a preexisting personal or business relationship with SAC, its manager, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by SAC or any affiliate or selling agent of SAC, he or she is capable of evaluating the risks and merits of paying the Investment Amount and of protecting his or her own interests in connection with such investment.

        4.2      <u>Accredited Investor; Economic Risk</u>.  He or she represents that he or she is an Accredited Investor (as defined in Rule 501(a) of Regulation D of the Securities Act of 1933) and/or is financially able to bear the economic risk of paying the Investment Amount, including the total loss thereof.

        4.3      <u>Investment Risk</u>.  He or she acknowledges that the payment of the Investment Amount is a speculative investment that involves a substantial degree of risk of loss by him or her of his or her entire investment, and that he or she understands and take full cognizance of the risk factors related to the investment made hereunder and that SAC may never receive any Participation Fee in attempting to sell the Distributions Rights to the Licensed Movie.

        4.4      <u>No Other Warranties</u>.  He or she acknowledges that in connection with paying the Investment Amount no oral or written representations have been made by SAC, its manager or any officer, employee, agent other than representations made in this Agreement.

        4.5      <u>Inquiry Opportunity</u>. He or she has been given the opportunity to ask questions of, and receive answers from, SAC concerning the terms and conditions of the Investment Amount in order to evaluate the merits and risks entering into this Agreement.

**Section 5.**      **Miscellaneous.**

        5**.1**      This Agreement shall terminate upon the payment of all amounts due Investor hereunder.

        5**.2**      All previous agreements and arrangements made by the parties and relating to the subject matter hereof are hereby superseded and this Agreement, there being no promises, terms, conditions or obligations, oral or written, express or implied, other than those contained herein.  This Agreement may only be amended by a written document signed by all parties.

5.3     This Agreement has been delivered in the State of California and shall be construed and interpreted in accordance with the laws thereof. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. If any legal action is necessary or brought in any court or arbitration proceeding, to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary expenses, in addition to any other relief to which such party may be entitled.

5.4     No waiver of any term or condition of this Agreement shall be valid or binding on a party unless the same has been mutually assented to in writing by both parties. The failure of a party to enforce at any time any of the provisions of this Agreement, or the failure to require at any time performance by the other party of any of the provisions of this Agreement, shall in no way be construed to be a present or future waiver of such provisions, nor in any way affect the ability of a party to enforce each and every such provision thereafter.

        IN WITNESS WHEREOF, the parties hereto have executed this Profit Sharing Agreement as of the day and year first above written.

SAC ADVISORY GROUP, LLC                     INVESTOR:
a California limited liability company       SOUTHWEST INVESTMENT FUNDS, LLC

_Ryan Spiegel_                              KAMBIZ ZOMORRODI
_____                 _____
Ryan Spiegel, Manager                       Print Name

                                            _____
                                            Signature


                                            TRIDENT ASSET MANAGEMENT INC.

                                            Joe McNulty, President
                                            _____
                                            Print Name

                                            _joemcnulty_
                                            _____
                                            Signature
                                                        6/26/2018 8:17:59 PM PDT

DocuSign Envelope ID: E43B5287129EE-47E9-97EE-5E9275EB6619

# PROFIT SHARING AGREEMENT

THIS AGREEMENT is made and entered into as of June 25, 2018 (the "**Effective Date**") by and between SAC ADVISORY GROUP, LLC, a California limited liability company ("SAC"), and the undersigned investor ("**Investor**").

## WITNESSETH

WHEREAS Distributor (defined below) is in the business of acquiring and licensing film distribution rights to third-party media companies for exclusive distribution in Latin American and African countries (the "**Distribution Rights**");

WHEREAS in connection with acquiring the Distribution Rights to a particular movie (the "**Licensed Movie**"), Distributor must pay a one-time non-refundable license fee (the "**Acquisition Fee**") to the holder of the movie's worldwide distribution rights which is generally the producer of the movie;

WHEREAS in order to assist the Distributor in acquiring the Distribution Rights, SAC provides the Distributor with the funds necessary to pay the Acquisition Fee (the "**SAC Advance**") in exchange for a participation interest in the funds received by Distributor in relicensing a portion of the Distribution Rights to a third-party media company ("**Media Company**").

WHEREAS Investor has agreed to provide SAC with the funds necessary to fund the SAC Advance in exchange for a profits interest in the Participation Fee (defined below) received by SAC in connection with the distributor licensing the Licensed Movie to a Media Company.

NOW THEREFORE, in consideration good and valuable consideration, the receipt of which is hereby mutually acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.**      **Definitions.**

   **1.1**      "**Distributor**" means 1INMM Capital, LLC, a California limited liability company

   **1.2**      "**Participation Fee**" means the fees paid by the distributor to SAC in connection with licensing the Licensed Movie to a Media Company.

**Section 2.**      **Investor Payment of Investment Amount.**

   Subject to the terms and conditions of this Agreement, Investor agrees to pay SAC the amount of $680,550 ("**Investment Amount**") in order to fund the SAC Advance for the purchase of the Distribution Rights of a Licensed Movie (Red Snake).

**Section 3.**      **Payment of License Fee.**

   **3.1**      Upon the receipt of the Participation Fee received by SAC from the distributor, SAC shall immediately pay Investor an amount equal to an 18% return on the Investment Amount (the "**Preferred Return**"). The 18% preferred return will be paid as follows: First, 15% will be paid to Southwest Investment Funds, LLC and second, 3% paid to Trident Asset Management Inc. After the payment of the Preferred Return to Investor, SAC shall be entitled to retain the remaining amount of the Participation Fee. In the event that the amount of the Participation Fee is less than the amount necessary to provide Investor with the Preferred Return, Investor shall be paid the entire Participation Fee. Investor acknowledges that SAC has not guaranteed that Investor will actually receive the Preferred Return and Investor irrevocably

waives any and all claims against SAC in the event Investor receives less than the Preferred Return or realizes a complete loss of the Investment Amount in connection with the payment of the Investment Amount hereunder.

**3.2**    As collateral security for the payment of each participation fee with respect a particular Licensed Movie, Distributor has granted SAC a lien and continuing security interest in the Distribution Rights with respect to such Licensed Movie and proceeds of the foregoing and all general intangibles and contract rights related thereto, including without limitation, all revenues, License Fees, distributions, contract rights and other rights and interests that Distributor is, or may hereafter become, entitled to receive on account of such Licensed Movie (the "**Security Interest**").  SAC hereby agrees that Investor is entitled to the protections provided by the Security Interest and, therefore, SAC hereby assigns Investor an undivided interest in the Security Interest.  For avoidance of doubt, Investor's undivided interest in the Security Interest means that both SAC and Investor are joint holders of the Security Interest with identical rights and preferences with respect to any Licensed Movie subject to the Security Interest.

**Section 4.**    **Representations and Warranties.**  Investor makes the following representations and warranties in connection with executing this Agreement.

4.1    <u>Preexisting Relationship or Experience</u>.  He or she has a preexisting personal or business relationship with SAC, its manager, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by SAC or any affiliate or selling agent of SAC, he or she is capable of evaluating the risks and merits of paying the Investment Amount and of protecting his or her own interests in connection with such investment.

4.2    <u>Accredited Investor; Economic Risk</u>.  He or she represents that he or she is an Accredited Investor (as defined in Rule 501(a) of Regulation D of the Securities Act of 1933) and/or is financially able to bear the economic risk of paying the Investment Amount, including the total loss thereof.

4.3    <u>Investment Risk</u>.  He or she acknowledges that the payment of the Investment Amount is a speculative investment that involves a substantial degree of risk of loss by him or her of his or her entire investment, and that he or she understands and take full cognizance of the risk factors related to the investment made hereunder and that SAC may never receive any Participation Fee in attempting to sell the Distributions Rights to the Licensed Movie.

4.4    <u>No Other Warranties</u>.  He or she acknowledges that in connection with paying the Investment Amount no oral or written representations have been made by SAC, its manager or any officer, employee, agent other than representations made in this Agreement.

4.5    <u>Inquiry Opportunity</u>. He or she has been given the opportunity to ask questions of, and receive answers from, SAC concerning the terms and conditions of the Investment Amount in order to evaluate the merits and risks entering into this Agreement.

**Section 5.**    **Miscellaneous.**

5**.1**    This Agreement shall terminate upon the payment of all amounts due Investor hereunder.

5**.2**    All previous agreements and arrangements made by the parties and relating to the subject matter hereof are hereby superseded and this Agreement, there being no promises, terms, conditions or obligations, oral or written, express or implied, other than those contained herein.  This Agreement may only be amended by a written document signed by all parties.

5.**3**    This Agreement has been delivered in the State of California and shall be construed and interpreted in accordance with the laws thereof.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  If any legal action is necessary or brought in any court or arbitration proceeding, to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary expenses, in addition to any other relief to which such party may be entitled.

5.**4**    No waiver of any term or condition of this Agreement shall be valid or binding on a party unless the same has been mutually assented to in writing by both parties.  The failure of a party to enforce at any time any of the provisions of this Agreement, or the failure to require at any time performance by the other party of any of the provisions of this Agreement, shall in no way be construed to be a present or future waiver of such provisions, nor in any way affect the ability of a party to enforce each and every such provision thereafter.

    IN WITNESS WHEREOF, the parties hereto have executed this Profit Sharing Agreement as of the day and year first above written.

SAC ADVISORY GROUP, LLC
a California limited liability company

INVESTOR:
SOUTHWEST INVESTMENT FUNDS, LLC

_Ryan Spiegel_
_____
Ryan Spiegel, Manager

KAMBIZ ZOMORRODI
_____
Print Name

_____
Signature

TRIDENT ASSET MANAGEMENT INC.

Joe McNulty, President
_____
Print Name

_joemcnulty_
_____
Signature

6/26/2018 8:17:59 PM PDT

3

DocuSign Envelope ID: F4985237129FF-47F0-97EF-FE027EF86640

# PROFIT SHARING AGREEMENT

THIS AGREEMENT is made and entered into as of June 25, 2018 (the "**Effective Date**") by and between SAC ADVISORY GROUP, LLC, a California limited liability company ("**SAC**"), and the undersigned investor ("**Investor**").

## WITNESSETH

WHEREAS Distributor (defined below) is in the business of acquiring and licensing film distribution rights to third-party media companies for exclusive distribution in Latin American and African countries (the "**Distribution Rights**");

WHEREAS in connection with acquiring the Distribution Rights to a particular movie (the "**Licensed Movie**"), Distributor must pay a one-time non-refundable license fee (the "**Acquisition Fee**") to the holder of the movie's worldwide distribution rights which is generally the producer of the movie;

WHEREAS in order to assist the Distributor in acquiring the Distribution Rights, SAC provides the Distributor with the funds necessary to pay the Acquisition Fee (the "**SAC Advance**") in exchange for a participation interest in the funds received by Distributor in relicensing a portion of the Distribution Rights to a third-party media company ("**Media Company**").

WHEREAS Investor has agreed to provide SAC with the funds necessary to fund the SAC Advance in exchange for a profits interest in the Participation Fee (defined below) received by SAC in connection with the distributor licensing the Licensed Movie to a Media Company.

NOW THEREFORE, in consideration good and valuable consideration, the receipt of which is hereby mutually acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.**      **Definitions.**

    **1.1**      "**Distributor**" means 1INMM Capital, LLC, a California limited liability company

    **1.2**      "**Participation Fee**" means the fees paid by the distributor to SAC in connection with licensing the Licensed Movie to a Media Company.

**Section 2.**      **Investor Payment of Investment Amount.**

Subject to the terms and conditions of this Agreement, Investor agrees to pay SAC the amount of $695,200 ("**Investment Amount**") in order to fund the SAC Advance for the purchase of the Distribution Rights of a Licensed Movie (Brick Mansions).

**Section 3.**      **Payment of License Fee.**

    **3.1**      Upon the receipt of the Participation Fee received by SAC from the distributor, SAC shall immediately pay Investor an amount equal to an 18% return on the Investment Amount (the "**Preferred Return**"). The 18% preferred return will be paid as follows: First, 15% will be paid to Southwest Investment Funds, LLC and second, 3% paid to Trident Asset Management Inc. After the payment of the Preferred Return to Investor, SAC shall be entitled to retain the remaining amount of the Participation Fee. In the event that the amount of the Participation Fee is less than the amount necessary to provide Investor with the Preferred Return, Investor shall be paid the entire Participation Fee. Investor acknowledges that SAC has not guaranteed that Investor will actually receive the Preferred Return and Investor irrevocably

DocuSign Envelope ID: E4985E8742DEE-47E9-87EF-EE027EF86649

waives any and all claims against SAC in the event Investor receives less than the Preferred Return or realizes a complete loss of the Investment Amount in connection with the payment of the Investment Amount hereunder.

**3.2** As collateral security for the payment of each participation fee with respect a particular Licensed Movie, Distributor has granted SAC a lien and continuing security interest in the Distribution Rights with respect to such Licensed Movie and proceeds of the foregoing and all general intangibles and contract rights related thereto, including without limitation, all revenues, License Fees, distributions, contract rights and other rights and interests that Distributor is, or may hereafter become, entitled to receive on account of such Licensed Movie (the "**Security Interest**"). SAC hereby agrees that Investor is entitled to the protections provided by the Security Interest and, therefore, SAC hereby assigns Investor an undivided interest in the Security Interest. For avoidance of doubt, Investor's undivided interest in the Security Interest means that both SAC and Investor are joint holders of the Security Interest with identical rights and preferences with respect to any Licensed Movie subject to the Security Interest.

**Section 4.**    **Representations and Warranties.**   Investor makes the following representations and warranties in connection with executing this Agreement.

**4.1**    Preexisting Relationship or Experience.   He or she has a preexisting personal or business relationship with SAC, its manager, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by SAC or any affiliate or selling agent of SAC, he or she is capable of evaluating the risks and merits of paying the Investment Amount and of protecting his or her own interests in connection with such investment.

**4.2**    Accredited Investor; Economic Risk.   He or she represents that he or she is an Accredited Investor (as defined in Rule 501(a) of Regulation D of the Securities Act of 1933) and/or is financially able to bear the economic risk of paying the Investment Amount, including the total loss thereof.

**4.3**    Investment Risk.   He or she acknowledges that the payment of the Investment Amount is a speculative investment that involves a substantial degree of risk of loss by him or her of his or her entire investment, and that he or she understands and take full cognizance of the risk factors related to the investment made hereunder and that SAC may never receive any Participation Fee in attempting to sell the Distributions Rights to the Licensed Movie.

**4.4**    No Other Warranties.   He or she acknowledges that in connection with paying the Investment Amount no oral or written representations have been made by SAC, its manager or any officer, employee, agent other than representations made in this Agreement.

**4.5**    Inquiry Opportunity.   He or she has been given the opportunity to ask questions of, and receive answers from, SAC concerning the terms and conditions of the Investment Amount in order to evaluate the merits and risks entering into this Agreement.

**Section 5.**    **Miscellaneous.**

5**.1**    This Agreement shall terminate upon the payment of all amounts due Investor hereunder.

5**.2**    All previous agreements and arrangements made by the parties and relating to the subject matter hereof are hereby superseded and this Agreement, there being no promises, terms, conditions or

2

obligations, oral or written, express or implied, other than those contained herein. This Agreement may only be amended by a written document signed by all parties.

**5.3** This Agreement has been delivered in the State of California and shall be construed and interpreted in accordance with the laws thereof. Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement. If any legal action is necessary or brought in any court or arbitration proceeding, to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary expenses, in addition to any other relief to which such party may be entitled.

**5.4** No waiver of any term or condition of this Agreement shall be valid or binding on a party unless the same has been mutually assented to in writing by both parties. The failure of a party to enforce at any time any of the provisions of this Agreement, or the failure to require at any time performance by the other party of any of the provisions of this Agreement, shall in no way be construed to be a present or future waiver of such provisions, nor in any way affect the ability of a party to enforce each and every such provision thereafter.

IN WITNESS WHEREOF, the parties hereto have executed this Profit Sharing Agreement as of the day and year first above written.

SAC ADVISORY GROUP, LLC
a California limited liability company

DocuSigned by:
*Ryan Spiegel*
1B173702EC924C7...
_____
Ryan Spiegel, Manager

INVESTOR:
SOUTHWEST INVESTMENT FUNDS, LLC

KAMBIZ ZOMORRODI
_____
Print Name

DocuSigned by:
1C29E5B57E9642B...
_____
Signature

TRIDENT ASSET MANAGEMENT INC.

Joe McNulty, President
_____
Print Name

DocuSigned by:
*joemcnulty*
672E3C014A78473...
_____
Signature

6/26/2018 8:17:59 PM PDT

3

DocuSign Envelope ID: E19B527420EE-47E9-87EE-5E827EFB6649

## PROFIT SHARING AGREEMENT

THIS AGREEMENT is made and entered into as of June 25, 2018 (the "**Effective Date**") by and between SAC ADVISORY GROUP, LLC, a California limited liability company ("SAC"), and the undersigned investor ("**Investor**").

## WITNESSETH

WHEREAS Distributor (defined below) is in the business of acquiring and licensing film distribution rights to third-party media companies for exclusive distribution in Latin American and African countries (the "**Distribution Rights**");

WHEREAS in connection with acquiring the Distribution Rights to a particular movie (the "**Licensed Movie**"), Distributor must pay a one-time non-refundable license fee (the "**Acquisition Fee**") to the holder of the movie's worldwide distribution rights which is generally the producer of the movie;

WHEREAS in order to assist the Distributor in acquiring the Distribution Rights, SAC provides the Distributor with the funds necessary to pay the Acquisition Fee (the "**SAC Advance**") in exchange for a participation interest in the funds received by Distributor in relicensing a portion of the Distribution Rights to a third-party media company ("**Media Company**").

WHEREAS Investor has agreed to provide SAC with the funds necessary to fund the SAC Advance in exchange for a profits interest in the Participation Fee (defined below) received by SAC in connection with the distributor licensing the Licensed Movie to a Media Company.

NOW THEREFORE, in consideration good and valuable consideration, the receipt of which is hereby mutually acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

**Section 1.**    **Definitions.**

    **1.1**    "**Distributor**" means 1INMM Capital, LLC, a California limited liability company

    **1.2**    "**Participation Fee**" means the fees paid by the distributor to SAC in connection with licensing the Licensed Movie to a Media Company.

**Section 2.**    **Investor Payment of Investment Amount.**

    Subject to the terms and conditions of this Agreement, Investor agrees to pay SAC the amount of $640,000 ("**Investment Amount**") in order to fund the SAC Advance for the purchase of the Distribution Rights of a Licensed Movie (Everly).

**Section 3.**    **Payment of License Fee.**

    **3.1**    Upon the receipt of the Participation Fee received by SAC from the distributor, SAC shall immediately pay Investor an amount equal to an 18% return on the Investment Amount (the "**Preferred Return**"). The 18% preferred return will be paid as follows: First, 15% will be paid to Southwest Investment Funds, LLC and second, 3% paid to Trident Asset Management Inc. After the payment of the Preferred Return to Investor, SAC shall be entitled to retain the remaining amount of the Participation Fee. In the event that the amount of the Participation Fee is less than the amount necessary to provide Investor with the Preferred Return, Investor shall be paid the entire Participation Fee. Investor acknowledges that SAC has not guaranteed that Investor will actually receive the Preferred Return and Investor irrevocably

waives any and all claims against SAC in the event Investor receives less than the Preferred Return or realizes a complete loss of the Investment Amount in connection with the payment of the Investment Amount hereunder.

**3.2** As collateral security for the payment of each participation fee with respect a particular Licensed Movie, Distributor has granted SAC a lien and continuing security interest in the Distribution Rights with respect to such Licensed Movie and proceeds of the foregoing and all general intangibles and contract rights related thereto, including without limitation, all revenues, License Fees, distributions, contract rights and other rights and interests that Distributor is, or may hereafter become, entitled to receive on account of such Licensed Movie (the "**Security Interest**"). SAC hereby agrees that Investor is entitled to the protections provided by the Security Interest and, therefore, SAC hereby assigns Investor an undivided interest in the Security Interest. For avoidance of doubt, Investor's undivided interest in the Security Interest means that both SAC and Investor are joint holders of the Security Interest with identical rights and preferences with respect to any Licensed Movie subject to the Security Interest.

**Section 4.** **Representations and Warranties.** Investor makes the following representations and warranties in connection with executing this Agreement.

4.1 <u>Preexisting Relationship or Experience</u>. He or she has a preexisting personal or business relationship with SAC, its manager, or by reason of his or her business or financial experience, or by reason of the business or financial experience of his or her financial advisor who is unaffiliated with and who is not compensated, directly or indirectly, by SAC or any affiliate or selling agent of SAC, he or she is capable of evaluating the risks and merits of paying the Investment Amount and of protecting his or her own interests in connection with such investment.

4.2 <u>Accredited Investor; Economic Risk</u>. He or she represents that he or she is an Accredited Investor (as defined in Rule 501(a) of Regulation D of the Securities Act of 1933) and/or is financially able to bear the economic risk of paying the Investment Amount, including the total loss thereof.

4.3 <u>Investment Risk</u>. He or she acknowledges that the payment of the Investment Amount is a speculative investment that involves a substantial degree of risk of loss by him or her of his or her entire investment, and that he or she understands and take full cognizance of the risk factors related to the investment made hereunder and that SAC may never receive any Participation Fee in attempting to sell the Distributions Rights to the Licensed Movie.

4.4 <u>No Other Warranties</u>. He or she acknowledges that in connection with paying the Investment Amount no oral or written representations have been made by SAC, its manager or any officer, employee, agent other than representations made in this Agreement.

4.5 <u>Inquiry Opportunity</u>. He or she has been given the opportunity to ask questions of, and receive answers from, SAC concerning the terms and conditions of the Investment Amount in order to evaluate the merits and risks entering into this Agreement.

**Section 5.** **Miscellaneous.**

5**.1** This Agreement shall terminate upon the payment of all amounts due Investor hereunder.

5**.2** All previous agreements and arrangements made by the parties and relating to the subject matter hereof are hereby superseded and this Agreement, there being no promises, terms, conditions or obligations, oral or written, express or implied, other than those contained herein. This Agreement may only be amended by a written document signed by all parties.

5.**3**    This Agreement has been delivered in the State of California and shall be construed and interpreted in accordance with the laws thereof.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.  If any legal action is necessary or brought in any court or arbitration proceeding, to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary expenses, in addition to any other relief to which such party may be entitled.

5.**4**    No waiver of any term or condition of this Agreement shall be valid or binding on a party unless the same has been mutually assented to in writing by both parties.  The failure of a party to enforce at any time any of the provisions of this Agreement, or the failure to require at any time performance by the other party of any of the provisions of this Agreement, shall in no way be construed to be a present or future waiver of such provisions, nor in any way affect the ability of a party to enforce each and every such provision thereafter.

        IN WITNESS WHEREOF, the parties hereto have executed this Profit Sharing Agreement as of the day and year first above written.

SAC ADVISORY GROUP, LLC
a California limited liability company

_Ryan Spiegel_
1B173702EC924C7...
_____
Ryan Spiegel, Manager

INVESTOR:
SOUTHWEST INVESTMENT FUNDS, LLC

    KAMBIZ ZOMORRODI
_____
Print Name

1C29E5B57E9642B...
_____
Signature

TRIDENT ASSET MANAGEMENT INC.

    Joe McNulty, President
_____
Print Name

joemcnulty
E73E3C014A78473...
_____
Signature
        6/26/2018 8:17:59 PM PDT

3

# EXHIBIT B



1inMM Capital, LLC Overview

Here is a snapshot overview of 1inMM Capital to date:

- Founded in 2014
- Sister company to 1inMM Productions
- Acquires the Latin American distribution rights for all windows of distribution
- All acquisitions are under $750,000.00. Films over $750,000.00 are bought by 1inMM Productions.
- Licenses all films to either HBO/Netflix or SONY in Latin America.
- Acquired and successfully licensed 11 films in 2014 / 38 in 2015 / 92 in 2016*
- Zero defaults on outstanding participation agreements
- $50+MM of deployed capital in fiscal 2016
- Company headed up by Zach Horwitz and Craig Cole

*(27 Netflix / 50 HBO / 15 SONY) - 2016

Examples:

Deal with SAC Advisory Group, LLC (6 month turnaround with HBO)

| Maturity | Participation Advance | Participation Fee | Profit | Return (%) |
|---|---|---|---|---|
| 2/22/2017 | $ 342,600 | $ 450,350 | $ 107,750 | 31.45% |

5 additional participation agreements done with 1inMM Capital at the end of 2016 with other investors (All 6 month turnarounds with HBO).

| Maturity | Participation Advance | Participation Fee | Profit | Return (%) |
|---|---|---|---|---|
| 10/1/2016 | $ 725,500 | $ 943,000 | $ 217,500 | 29.98% |
| 10/19/2016 | $ 680,750 | $ 881,571 | $ 200,821 | 29.50% |
| 10/27/2016 | $ 210,000 | $ 271,740 | $ 61,740 | 29.40% |
| 11/11/2016 | $ 615,000 | $ 793,350 | $ 178,350 | 29.00% |
| 11/11/2016 | $ 635,000 | $ 822,325 | $ 187,325 | 29.50% |
| **Total** | **$ 2,866,250** | **$ 3,711,986** | **$ 845,736** | **29.48%** |

**Annualized average return of 58.96%**