**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:24-cv-20755-DSL**

AVR GROUP, LLC, TRIDENT ASSET
MANAGEMENT, INC., and MICHAEL
DZIURGOT, individually and as the
representatives of a class of similarly-
situated persons,

      Plaintiffs,

v.

ALEBRIJE ENTERTAINMENT LLC,
CRAIG COLE, MATTHEW COLE,
GUSTAVO MONTAUDON, and John Does
1-10,

 Defendants.

_____/

**<u>PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTIONS TO
DISMISS CLASS ACTION COMPLAINT</u>**

Plaintiffs, AVR Group, LLC, Trident Asset Management, Inc., and Michael Dziurgot ("Plaintiffs"), submit this Response in Opposition to the Motions to Dismiss the Class Action Complaint (ECF No. 16, 43, 45) ("Motions to Dismiss") filed by Alebrije Entertainment, LLC ("Alebrije"), Craig Cole ("Craig"), Matthew Cole ("Matthew"), and Gustavo Montaudon ("Montaudon") (together, "Defendants").

## **INTRODUCTION**

This action is premised on a massive billion-dollar fraud built on the promise of movie deals with HBO Latin America in Miami. The principal of the Ponzi Scheme, Zachary Horwitz ("Horwitz"), is in prison and a Receiver has been appointed for him, 1inMM and the other various entities he controlled. As noted in the responses, this is one of many such actions across the country litigated to pursue the various aiders and salesmen for the fraud.

South Florida was locus of operations for the movie deals and studio relied on by 1inMM investors. Defendants assisted in creating and spreading the lies about huge deals executed with HBO Latin America in Miami. But for the tortious conduct in this District there would be no fraud and no unjust enrichment. The gravamen of this action is that Defendants each profited from the fraud and are net winners in the scheme. The members of the proposed class are net losers in the amount of $61,000,000 some of those losses are now in Defendants pockets and must be returned. Sufficient facts are alleged to recovery the profits and punish and deter the aiding and abetting of Horwitz's fraud.

The crux of Defendants' Motions to Dismiss is that they did not commit the acts and omissions alleged and if they did it is someone else's fault in another state. These arguments are wholly without merit because they require the Court to completely ignore the highly detailed allegations of Plaintiffs' Class Action Complaint (ECF. No. 1) ("Cmplt.") in violation of the

motion to dismiss standard. The unrebutted allegations are more than sufficient to state claims against Defendants and to establish this Court's jurisdiction. This Court should decline Defendants' invitation to disregard the federal pleading standard and deny the Motions to Dismiss in their entirety.

**ARGUMENT**

## I.      LEGAL STANDARD

In analyzing a complaint subject to a motion to dismiss, courts must accept the factual allegations as true, construing them in the light most favorable to the plaintiff. *Pielage v. McConnel*, 516 F.3d 1282, 1284 (11th Cir. 2008); *Hill v. White*, 321 F.3d 1334, 1335 (11th Cir. 2003); *see also Southern-Owners Insurance Co. v. Wall 2 Walls Construction, LLC,* 2012 U.S. Dist. LEXIS 171119, at *5 (M.D. Fla. Dec. 3, 2012) (the "Court accepts as true all allegations in the complaint and construes them in the light most favorable to the plaintiff … [and] favors the plaintiff with all reasonable inferences from the complaint"). A plaintiff is generally not required to allege all the details upon which he bases his claim. See Fed. R. Civ. P. 8(a)(2). Instead, Rule 8(a)(2) only requires a short and plain statement that fairly notifies the defendant of the claim and the supporting grounds. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). The claims must be plausible on their face, meaning that a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## II.      PLAINTIFFS STATE CLAIMS FOR AIDING AND ABETTING FRAUD.

Tort claims based on a theory of aiding and abetting have three elements: (1) the existence of an underlying violation; (2) knowledge of the violation by the alleged aider and abettor; and (3) the rendering of substantial assistance in committing the violation by the alleged aider and

abettor. *Lawrence v. Bank of Am., N.A.*, 455 F. App'x 904, 906 (11th Cir. 2012); *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1097-98 (11th Cir. 2017) (citing *ZP No. 54 Ltd. P'ship v. Fid. & Deposit Co.*, 917 So. 2d 368, 372 (Fla. Dist. Ct. App. 2005)).

"While the element of actual knowledge may be alleged generally, the plaintiff still must accompany that general allegation with allegations of specific facts that give rise to a strong inference of actual knowledge regarding the underlying fraud." *Todd Benjamin International, Ltd. v. Grant Thornton International, Ltd.*, 682 F. Supp. 3d 1112, 1136-37 (S.D. Fla. 2023) (*quoting Lamm v. State St. Bank & Tr. Co.*, 889 F. Supp. 2d 1321, 1332 (S.D. Fla. 2012)). "Conclusory statements that a defendant 'actually knew' [are] insufficient to support an aiding and abetting claim where the facts in the complaint only suggest that the defendant 'should have known that something was amiss.'" *Rusty115 Corp. v. Bank of America, N.A.*, 2023 U.S. Dist. LEXIS 165584, at *15 (S.D. Fla. Sep. 18, 2023) (quoting *Platinum Estates, Inc. v. TD Bank*, N.A., 2012 U.S. Dist. LEXIS 30684, at *9 (S.D. Fla. Mar. 8, 2012)).

Aiding and abetting can be shown through circumstantial evidence. The degree of knowledge that can be inferred "depend[s] on how ordinary the assisting activity is in the business involved." *Perlman v. Bank of Am., N.A.*, 2011 U.S. Dist. LEXIS 161084, 2011 U.S. Dist. LEXIS 161084, at *18 (S.D. Fla. Dec. 21, 2011). "[S]tronger evidence of complicity" is required "for the alleged aider and abettor who conducts what appears to be a transaction in the ordinary course of his business," whereas conduct that is atypical or lacks business justification may allow for an inference of knowledge. *Id.* (quoting *Woods v. Barnett Bank of Fort Lauderdale*, 765 F.2d 1004, 1009-10 (11th Cir. 1985)). In this case, Craig was the salesman, holding himself out as a 1inMM co-founder (Cmplt. ¶ 92), directly engaging with investors and telling the lies to perpetuate the

fraud while Montaudon and Alebrije were the meat of the operation generating some facts upon which to base the scheme.

"Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Chang*, 845 F.3d at 1098 (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006)). The failure to stop the theft of such trust funds can constitute substantial assistance." *Id.: Groom v. Bank of Am.*, 2012 U.S. Dist. LEXIS 2374, at *14 (M.D. Fla. Jan. 9, 2012) ("[F]ailure to act, absent a duty to act, is not substantial assistance.") (citation omitted). "[T]o establish that a bank substantially assisted a fraudulent scheme to steal trust funds, knowledge of the underlying fraud 'is the crucial element.'" *Chang*, 845 F.3d at 1098 (quoting *In re First Alliance Mortg. Co.*, 471 F.3d 977, 995 (9th Cir. 2006)). *Rusty 115 Corp. v. Bank of Am., N.A.,* 2024 U.S. Dist. LEXIS 67953, *22-23. In this case, Defendants were the face of the fraud machine operated by Horwitz.  Plaintiffs' Complaint details how Defendants were repeatedly held out as the legitimate face of the operation that was used to induce investors to contribute to the wild scheme. Investors were provided template Distribution Agreements which originally came from Defendants Alebrije and Montaudon. (Cmplt. ¶ 183, Ex. I). These Distribution Agreements concealed from investors the reality that they were not in fact investing in anything of value but disclosed Alebrije's involvement. (Cmplt. ¶ 184). Also, "[p]rospective investors of 1inMM were told that Montaudon's Alebrije and Horwitz's 1inMM co-founded an entity called ONE KEY ENTERTAINMENT" that was doing deals with HBO in Miami. (Cmplt. ¶ 112).

## III.   PLAINTIFFS STATE CLAIMS FOR UNJUST ENRICHMENT.

The Complaint alleges that all Defendants profited from the scheme. They may cry poor now but the bank records prove otherwise. There is no just reason that anyone should retain profits

on this massive crime emanating from South Florida. To state a claim for unjust enrichments plaintiffs must show that "(1) [it] has conferred a benefit on the defendant, (2) the defendant voluntarily accepted and retained that benefit, and (3) the circumstances are such that it would be inequitable for the defendants to retain it without paying the value thereof." *Omnipol, A.S. v. Multinational Def. Servs., LLC*, 32 F.4th 1298, 1308 (11th Cir. 2022) (citing *Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1337 (11th Cir. 2012)). Applying these elements in the context of a Ponzi scheme such as this, courts have found that a "[P]onzi scheme operator removes assets from the receivership entities for an unauthorized purpose, and thus, injures the entities." *Wiand v. EFG Bank*, 2012 U.S. Dist. LEXIS 30323, at *25 (M.D. Fla. Feb. 8, 2012) (citation omitted), *report and recommendation adopted*, 2012 U.S. Dist. LEXIS 30245 (M.D. Fla. Mar. 7, 2012)).

In this case, Plaintiffs allege that the Defendants conferred a benefit in the form of false profits on the defaulted Plaintiffs and the Class, that these Defendants voluntarily accepted and retained the benefit (i.e., false profits), and that it is inequitable for the Defendants to retain the false profits at the expense of the Plaintiffs and the Class. In light of these averments every element of the unjust enrichment claims are supported. *See Wiand v. Adamek*, 2024 U.S. Dist. LEXIS 10060, *19-20.

The various defunct zombie entities the class members' money moved through are irrelevant for the purposes of evaluating a claim for unjust enrichment. A Ponzi scheme is insolvent from its inception, and becomes increasingly insolvent as the scheme progresses. *See Cunningham v. Brown*, 265 U.S. 1, 8 (1924) (stating that due to the nature of his scheme, Charles Ponzi "was always insolvent, and became daily more so, the more his business succeeded"); *In re Financial Fed. Title & Trust, Inc.*, 309 F.3d 1325, 1332 (11th Cir. 2002) (noting that by definition a Ponzi scheme is driven further into insolvency with each transaction); *Warfield v. Byron*, 436

F.3d 551, 558 (5th Cir. 2006) ("a Ponzi scheme ... is, as a matter of law, insolvent from its inception."); *In re ATM Financial Services, LLC),* 2011 Bankr. LEXIS 2394, at *19 (Bankr. M.D. Fla. June 24, 2011) ("there is little debate that a company run as a Ponzi scheme is insolvent as a matter of law"). *Wiand v. EFG Bank*, 2012 U.S. Dist. LEXIS 30323, *27. Plaintiffs' and the proposed class put money into the scheme and Defendants profited off of it. There is no question of fact that Defendants profited, and Plaintiffs and the Class lost. It is unjust for Defendants to retain any benefits from their business dealings with Horwitz and this action should not be dismissed.

Contrary to Defendants' assertions, "the mere fact that there has been no direct contact between a defendant and the plaintiff does not preclude a finding that the defendant received a direct benefit from that plaintiff." *Williams v. Wells Fargo Bank, N.A*., 2011 U.S. Dist. LEXIS 105513, at *26 (S.D. Fla. Sep. 19, 2011). Matthew cites *CFLB Partnership, LLC v. Diamond Blue International, Inc*., 352 So. 3d 357 (Dist. Ct. App. 2022) without distinguishing the underlying difference between a legitimate business and a Ponzi scheme. (ECF. No. 40 at 11-12). While it is true that investors in both cases invested money in exchange for promissory notes, the similarities end there as the defendants in the cases cited were operating legitimately and the Court made a factual finding that no direct benefit was conferred stating "[h]ere, no such direct benefit was conferred." *CFLB Partnership, LLC.* at 359. That court went on to say that "we recognize our decision in this matter may not be in accord with certain federal district court orders relied upon by [p]laintiffs and the trial court." *Id.* at 360 (citing *Weinberg v. Advanced Data Processing, Inc*., 147 F. Supp. 3d 1359, 1368 (S.D. Fla. 2015) ("the 'direct benefit' element of an unjust enrichment claim may be satisfied where a benefit is conferred through an intermediary. In other words, a direct benefit can derive from a transaction with no direct contact.")). Plaintiffs' Complaint

specifically alleges a benefit conferred to Defendant Matthew $997,401 through 1inMM acting as intermediary. (Cmplt. ¶ 136). Matthew says he "invested in 1inMM…That is it" (ECF. No. 40 at 9) while neglecting to acknowledge that his son, co-Defendant Craig held himself out as the co-founder of 1inMM and Matthew was the first significant investor of 1inMM, was paid handsomely for his investment in this Ponzi Scheme, and that Matthew avoided the losses suffered by other investors whose sons were not in the inner circle of the criminal enterprise. (Cmplt. ¶¶ 32, 37, 136). Matthew cannot be allowed to profit from his son's crimes.

## IV.    PLAINTIFFS' CLAIMS ARE TIMELY

The claims were filed within three years of when the claim accrued. This action arises from a criminal fraud. The elements of the crime include the fraudulent concealment of the fraud for years. The fraud was not disclosed until Horwitz was indicted in April 2021. *See* (Cmplt. ¶ 8).

Fla. Stat. § 95.031 (2)(a) is controlling here and provides:

(a) An action founded upon fraud under s. 95.11(3), including constructive fraud, must be begun within the period prescribed in this chapter, **with the period running from the time the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence**, instead of running from any date prescribed elsewhere in s. 95.11(3), but in any event an action for fraud under s. 95.11(3) must be begun within 12 years after the date of the commission of the alleged fraud, regardless of the date the fraud was or should have been discovered.

Under Florida law, Plaintiffs claims for aiding and abetting fraud and unjust enrichment had to be brought within four years of the accrual of the claim. *See* Fla. Stat. § 95.11(3)(a), (j), (l), (p) (establishing a four-year time limit for filing actions "founded on negligence," actions "founded on fraud," actions "to rescind a contract," and all actions "not specifically provided for in these statutes"). The statute of limitations begins running "from the time the cause of action accrues." Fla. Stat. § 95.031. Generally speaking, "[a] cause of action accrues when the last element constituting the cause of action occurs." *Id*. § 95.031(1).

Under Florida's "delayed discovery rule," however, the running of the statute of limitations for certain claims -- including fraud-based claims -- may be postponed until "the facts giving rise to the cause of action were discovered or should have been discovered with the exercise of due diligence." Fla. Stat. § 95.031(2)(a); *see also Davis v. Monahan*, 832 So. 2d 708, 709-10 (Fla. 2002) (Florida's delayed discovery doctrine applies only to claims of fraud, products liability, professional and medical malpractice, and intentional torts based on abuse). Florida law makes clear, however, that "[i]n the civil context, a party who relies on a misrepresentation must show that it exercised some diligence in investigating the misrepresentation, unless it is shown that the fraudulent party had exclusive or superior knowledge, or prevented further investigation." *Adams v. Prestressed Sys. Indus.*, 625 So. 2d 895, 897 (Fla. Dist. Ct. App. 1993). This is the case here. There is no reasonable dispute of the fraudulent concealment as proven in the Horwitz criminal prosecution. (Cmplt. at ¶ 194).

The fraudulent concealment is further illustrated in the Complaint, for example, on December 12, 2019, Craig misled SAC Advisory ("SAC") investors by providing fraudulent banking information and explicitly stating "See attached bank statement of incoming wires from HBO." (Cmplt. Ex. A). At the time Craig sent the fraudulent bank statements, Craig knew or had reason to know that his statements were not true. Days after lying to SAC investors, on or about December 27, 2019, Matthew was directly paid $997,401.00 via wire transfer from 1inMM; on December 31, 2019, Craig was paid $100,000 via wire transfer with a memo on the wire transfer saying "BACKEND -SAC-DEPOSIT -FILMS". Even after repayments to investors ceased, Craig continued to conceal the truth from investors:

7/14/20, 6:48 PM

> Long form is being reviewed by another attorney at our firm as our main guy is in the hospital on "paternity leave" this week. Smh hence the MIA. I am sure as soon as baby and mom are healthy - he will reach out and hop back in. - No red flag that we know of from a deal point perspective.... language changes, clauses that we don't want in there etc but nothing unexpected as of yet. Great so far.
>
> Heard from HBO and they are having "COVID related issues" as it pertains to getting approval from everyone they need to have eyes on this - so still dealing with that but been approved by many.
>
> According to Gustavo - it's an absolute shitshow in Miami so I'm sure people are sick etc.
>
> But, train is moving

(Cmplt. ¶ 48).

## V.   PLAINTIFFS PLED FACTS TO ESTABLISH THIS COURT HAS PERSONAL JURISIDICTION OVER MATTHEW AND CRAIG.

Motions to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure are governed by a two-part analysis. In specific jurisdiction cases, the Court must examine "(1) whether the plaintiff's claims 'arise out of or relate to' at least one of the defendant's contacts with the forum; (2) whether the nonresident defendant 'purposefully availed' himself of the privilege of conducting activities within the forum state, thus invoking the benefit of the forum state's laws; and (3) whether the exercise of personal jurisdiction comports with 'traditional notions of fair play and substantial justice." *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1355 (11th Cir. 2013) (citation omitted). The plaintiff bears the burden of establishing the first two requirements. *See id.* If it carries that burden, Matthew and Craig must then make a "compelling case that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice." *Id.* (quoting *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1267 (11th Cir. 2010)).

9

Matthew and Craig do not meet this high standard where both profited from a South Florida scheme premised on the promise of movie deals done with HBO in this District and relying on a handful of actual deals done here. This is the locus of the fraud.

## A. FLORIDA'S LONG-ARM STATUTE

Florida Statute Section 48.193(1)(a) states "a person, whether or not a citizen or resident of this state . . . submits himself . . . to the jurisdiction of the courts of [Florida] for any cause of action arising from any of the following acts: . . . [c]ommitting a tortious act within this state." *3lions Publ'g, Inc. v. Interactive Media Corp.*, 389 F.Supp. 3d 1031, 1037 (M.D. Fla. 2019). Although Section 48.193(1)(a)(2) creates personal jurisdiction for a non-resident's "tortious act within Florida" physical presence "within Florida" is unnecessary. *Volt, LLC v. Volt Lightening Grp., LLC*, 369 F.Supp. 3d 1241, 1245 (M.D. Fla. 2019). "A non-resident can submit to Florida's jurisdiction by transmitting "into Florida" an electronic communication that results in a tort. *Id.* (*citing Wendt v. Horowitz*, 822 So.2d 1252, 1262 (Fla. 2002)). A plaintiff satisfies its initial pleading requirements by tracking the language of the long-arm statute without pleading supporting facts or by alleging specific facts that demonstrate that the defendant's actions fit within one or more subsections of the statute. *3lions Publ'g*, at 1037 (*citing Wash. Capital Corp. v. Milandco, Ltd., Inc.*, 695 So. 2d 838, 841 (Fla. 4th DCA 1997)).

The case before the Court solely concerns an assertion of specific personal jurisdiction under Florida Statute Section 48.193(1)(a)2. Section 48.193(1)(a)2 provides that "[a] person, whether or not a citizen or resident of this state," is subject to personal jurisdiction "for any cause of action arising from . . . [c]ommitting a tortious act within [Florida]." Fla. Stat. § 48.193(1)(a)2. Thus, a plaintiff must have alleged that its unjust enrichment claims "ar[ose] from . . . [c]ommitting a tortious

act within this state." *See* § 48.193(1)(a)2. In this case the core misrepresentations were in Florida. Florida is the heart of the fraudulent scheme upon which the billion-dollar Ponzi turned.

The Florida Supreme Court has clarified that physical presence is not required to "commit a tortious act" within Florida. *See Wendt v. Horowitz*, 822 So. 2d 1252, 1260 (Fla. 2002). "The critical factor in deciding whether a tort committed out of state may subject the tortfeasor to personal jurisdiction in Florida is whether the cause of action arose from the act in question." *Wiggins v. Tigrent, Inc.*, 147 So. 3d 76, 87 (Fla. 2d DCA 2014). As it relates to the "arising from" language referenced both within section 48.193(1)(a) and *Wendt*, such language "necessarily focuses analysis not on where a plaintiff ultimately felt damages, but where a defendant's tortious conduct occurred." *Metnick & Levy, P.A. v. Seuling*, 123 So. 3d 639, 645 (Fla. 4th DCA 2013). In this regard, "mere injury in Florida resulting from a tort committed elsewhere is insufficient to support personal jurisdiction over a nonresident defendant." *Kaminsky v. Hecht*, 272 So. 3d 786, 788 (Fla. 4th DCA 2019) (quoting *Consol. Energy Inc. v. Strumor*, 920 So. 2d 829, 832 (Fla. 4th DCA 2006)). However, a nonresident defendant may nonetheless commit a tortious act in Florida by way of communications directed into Florida for the purpose of fraud, slander, or some other intentional tort. *See Robinson Helicopter Co., Inc. v. Gangapersaud*, 346 So. 3d 134, 140 (Fla. 2d DCA 2022). In this case the communications went into and out of Florida in order to perpetuate the fraud. It doesn't matter if Matthew and Craig came here when they claims are based on them profiting from the tortious acts that occurred here.

**B. CONSTITUTIONAL DUE PROCESS**

Assuming the requirements of Florida's long-arm statute are satisfied, "[t]he Constitution prohibits the exercise of personal jurisdiction over a nonresident defendant unless his contact with the state is such that he has 'fair warning' that he may be subject to suit there." *Licciardello v.*

*Lovelady*, 544 F.3d 1280, 1284, (11th Cir. 2008) (citing *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977). "The Eleventh Circuit has held that intentional torts are acts that create a 'substantial connection' with the forum state such that the acts may support the exercise of personal jurisdiction over a nonresident defendant who otherwise has no other contacts with the forum." *3lions Publ'g*, at 1039 (*See also Licciardello* at 1280; *Calder v. Jones*, 465 U.S. 783, 790 (1984)).

### C. THE MOTIONS LACK NECESSARY FACTUAL SUPPORT TO SUSTAIN A MOTION BASED ON LACK OF JURISDICTION

In *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502–03 (Fla. 1989), the Florida Supreme Court outlined the basic procedure for long-arm jurisdiction cases. The court held that a plaintiff must first allege a jurisdictional basis in his pleading. Then, if the defendant wishes to contest these allegations, he must file an affidavit specifically addressing the allegations. Once a defendant submits an appropriate affidavit, the plaintiff must support his allegations with an affidavit of his own. If no disputed factual issues appear on the face of the opposing affidavits, the trial court can decide the long-arm issue without holding an evidentiary hearing. However, if the opposing affidavits conflict with one another, the trial court must "hold a limited evidentiary hearing in order to determine the jurisdiction issue." *Venetian Salami Co.* at *503*; *see also Clover Systems v. Almagran, S.A.,* 2007 U.S. Dist. LEXIS 41416, at *8 (S.D. Fla. June 7, 2007) ("To successfully challenge personal jurisdiction, [Defendants] cannot rely on conclusory statements but rather must provide specific factual declarations relevant to the court's jurisdictional analysis.") (citing *Meier v. Sun Int'l Hotels, Ltd*., 288 F.3d 1264, 1269 (11th Cir. 2002)).  Where, as here, Defendants submits affidavits to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction unless those affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction. *See Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1215 (11th Cir. 1999). Where the plaintiff's complaint and supporting evidence conflict with the defendant's

affidavits, the court must construe all reasonable inferences in favor of the plaintiff. *See Madara*, 916 F.2d at 1514. *Meier v. Sun Int'l Hotels, Ltd*., 288 F.3d 1264, 1269. In this case, Matthew doesn't bother to submit and affidavit and Craig's doesn't actually refute any of the facts alleged. This is insufficient to challenge jurisdiction and their Motions to Dismiss based on Lack of Jurisdiction must be denied.

Craig submits a declaration that sets up a series of strawmen to knock down but doesn't actually contradict the factual allegations. (ECF No. 43-1, "Craig Decl."). For example, Plaintiffs allege "Craig disseminated forged banking records for 1inMM, the company which he held himself out as a founder, to induce investments." (Cmplt. ¶ 42). In response, Craig doesn't deny this and instead states he was "never a signatory on 1inMM's bank accounts, and to [the best of Craig Cole's] knowledge, never had access to any of its bank accounts." (Craig Decl. ¶ 17).

Further, Plaintiffs allege that Craig was paid "a percentage of any investments he brought" in and "dove into the 1inMM venture headfirst and earned commissions by securing investments for 1inMM." (Cmplt. ¶¶ 37-38). Plaintiffs' Complaint further alleges that "Between April 4, 2018 and February 2, 2019, Craig was paid $606,000 in commissions for luring SAC [Advisory] clients to invest with 1inMM." (Complaint at ¶ 132). Instead of denying these factual allegations, Craig Cole states "I never received commissions **from** SAC Advisory or [JJMT] for investments that they raised from third-party investors for the 1inMM opportunity." (Craig Decl. ¶ 16) (emphasis added). Because Craig Cole was paid by 1inMM and neither SAC Advisory nor JJMT, his statement is true while it is also true he made an exceptional profit off the Ponzi scheme.

Plaintiffs' Complaint specifically alleges that "Between February 12, 2019 and December 31, 2019, proceeds owed to Craig were paid to an entity he set up in California called FATHOM FEATURES LLC." (Cmplt. ¶ 133). Rather than respond to this factual allegation that Craig was

paid commissions for investments he brought to 1inMM, his declaration states "I am the sole member of Fathom Features LLC [], a California corporation. Fathom Features has never solicited or conducted business in Florida, and has no offices, members, managers, employes, or bank accounts in Florida." (Craig Decl. ¶ 12). Again, Craig does not deny Plaintiffs' Complaints' factual allegations regarding how the Ponzi scheme paid him or that the Ponzi scheme operated in Florida.

Craig's Declaration similarly misrepresents the factual allegations made about his communications with Defendant Gustavo Montaudon. Plaintiffs specifically allege that Craig Cole described Defendant Gustavo Montaudon to investors as "the OG LatAm connect" on February 27, 2020. (Cmplt. ¶ 61). Plaintiffs further allege that Craig Cole forwarded emails to investors regarding Defendant Gustavo Montaudon's role in getting everyone's investments paid back on March 9, 2020. (Cmplt. ¶ 62). Rather than responding to these specific allegations, Craig states he has "never met Gustavo Montaudon and have never had a direct conversation with him nor any representative of Alebrije."  (Craig Decl. ¶ 10).

Plaintiffs' Complaint alleges that Craig knew 1inMM "had no direct relationship with either HBO or Netflix regarding any of the promissory notes and nonetheless held himself out as the **co-founder** of 1inMM's marvelous money-making machine." (Cmplt. ¶ 92). Rather than respond to the factual allegation that he held himself out as a co-founder of 1inMM, Craig's Declaration states he has "never been a member, manager, or employee of 1inMM Capital." (Craig Decl. ¶ 4). Unsurprisingly, despite no factual allegation in Plaintiffs' Complaint, Craig asserts that he has "never been a member, manager or employee of" SAC Advisory, JJMT, One Key Entertainment, LLC, or Defendant Alebrije Entertainment LLC. (Craig Decl. ¶¶ 5-7, 9). Craig avoids responding to the factual allegations contained in Plaintiffs' Complaint because they are true.

ONE KEY ENTERTAINMENT was incorporated in the state of Florida. (Cmplt. Ex. D).

Victims of 1inMM were falsely told the following about ONE KEY ENTERTAINMENT:

> a. "Co-Founded by 1inMM Productions and Alebrije Entertainment in order to capitalize and fulfill the current output deal that Alebrije Entertainment has in place with Netflix, Sony and HBO. "
> b. "One Key Entertainment is the legal entity in which 1inMM Capital will be funding the acquisition and distribution of feature length motion pictures through Netflix, Sony and HBO."
> c. "One Key Entertainment coassigns the rights of each film purchased from 1inMM Capital, proceeds to 1inMM Capital, for the length of the licensing period (10-15 years)."

(Cmplt. ¶ 113).

Defendants Montaudon and Alebrije attempt to distinguish 1inMM Productions from 1inMM Capital (ECF. 45 at 2), however, Defendants fail to acknowledge that investors were told that 1inMM Capital was in strategic partnerships with 1inMM Productions, Defendant Alebrije and ONE KEY ENTERTAINMENT. (Cmplt. Ex. D, Page 4-7).  Again, the Florida entity and its operations were the key to the sales pitch to investors.

"Craig knew Horwitz had no direct relationship with either HBO or Netflix regarding any of the promissory notes and nonetheless held himself out as the co-founder of 1inMM's marvelous money-making machine." (Cmplt. ¶ 91).  The entire "marvelous money-making machine" was premised on acquiring licensing rights through Defendant Montaudon and his company, Defendant Alebrije, in the Southern District of Florida. Specifically, "Craig described Gustavo Montaudon as 'the OG LatAm connect' to investors." (Cmplt. ¶ 61). Craig provided lists of active deals in the Southern District of Florida that were being worked through with the assistance of Defendants Alebrije and Montaudon. (Cmplt. ¶ 44, Exhibit F).

Defendant Alebrije is incorporated in Florida. (Cmplt. ¶ 12). Defendant Montaudon has been domiciled in Florida at all relevant times. (Cmplt. ¶ 13). Simply put, investors were all told

15

by Defendants that money invested was being put to use in Florida with the assistance of Defendants Montaudon and Alebrije through the joint venture of ONE KEY ENTERTAINMENT.

On March 9, 2020, after repayments to investors had stopped, Craig forwarded the following email to investors:

-------- Original Message --------
Subject: HBOLA Update
From: <lvacanti@hbo.com> <lvacanti@hbo.com>
Date: Mon, March 09, 2020 3:40 pm
To: "Zach Horwitz" <zach@1inmm.com>
Cc: "gustavom@alebrije.tv <gustavom@alebrije.tv>,
<lperaza@hbo.com> <lperaza@hbo.com>,
<cristina.marquez@hbo.com> <cristina.marquez@hbo.com>,
<rhernandez@hbo.com> <rhernandez@hbo.com>,
<rrios@hbo.com> <rrios@hbo.com>,
"vanessa.cruz@hbo.com" <vanessa.cruz@hbo.com>

Good Afternoon -

Hope this email finds you well. As promised, please find the initial outline of proposed terms for all past, current and future licensed content. As we continue to assimilate the next chapter of our enterprise, it is essential that our processes fall in line across the board. We understand that some of these modifications to our previous relationship may require discussion and we will do our best to work side by side until both parties feel comfortable and confident moving forward.

Please review the below modifications and we will be following up with a condensed (content specific) proposal for films/shows/etc that have been licensed in CY 2019 and currently in the market. This proposal will outline advance payments, profit participation payments and profit participation accounting statements for 2020/2021.

We look forward to our future.

Respectfully,

HBO Latin America

(Cmplt. ¶ 62). This email purportedly identifies (1) Defendant Montaudon's email account at Defendant Alebrije, (2) Horwitz, (3) Robert Rios and (4) Luis Vacanti. *Id.* Craig told investors that Luis Vacanti was a Miami-based HBO Executive and was involved in getting repayment to investors. (Cmplt. ¶ 65). Craig told investors that Robert Rios was employed with HBO in Miami and was also "extremely involved in our deal." (Cmplt. ¶¶ 66-67). Very simply the fraudsters cannot sell investors on a South Florida business then avoid jurisdiction by recanting their story without any evidence or affidavits to support it.

16

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants'

Motion to Dismiss the Class Action Complaint in its entirety.[1]

Dated: June 14, 2024                     Respectfully submitted,

                                         **LOFTUS & EISENBERG, LTD.**


                              By:    /s/ *Ross M. Good*
                                      Ross M. Good – FL Bar No.: 116405

                                     Alexander N. Loftus, Esq.
                                     Ross Good, Esq.
                                     LOFTUS & EISENBERG, LTD.
                                     161 N. Clark, Suite 1600
                                     Chicago, Illinois 60601
                                     Telephone:  (312) 899-6625
                                     alex@loftusandeisenberg.com
                                     ross@loftusandeisenberg.com

---

[1] If the Court is inclined to grant any part of Defendants' motion to dismiss, Plaintiffs respectfully request that they be granted leave to file a second amended complaint. *See Canon Latin America, Inc. v. Lantech (C.R.), S.A.,* 2009 U.S. Dist. LEXIS 139568, at *16 (S.D. Fla. Apr. 28, 2009) (denying in part defendants' motion to dismiss and granting plaintiff leave to file a second amended complaint after reasoning that "there is a conceivable factual basis on which [plaintiff's] claims would survive").

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on June 14, 2024, the foregoing document was filed with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record registered to receive electronic Notices of Electronic Filing generated by CM/ECF.

/s/ *Ross M. Good*
 Ross M. Good – FL Bar No.: 116405